Dax D. Anderson (USB 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com

*Attorney for Defendants, JRM Nutrasciences, LLC,
Muscle Sports Products, LLC and Jason Mancuso*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual;<br><br>Defendants. | Case No.: 2:20-CV-0000581-DBB-JCB<br><br>Judge: David Barlow<br><br>Magistrate Judge Jared C. Bennett<br><br>**DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID FRANKLYN**<br><br>*ORAL ARGUMENT REQUESTED |

Pursuant to Federal Rule of Civil Procedure 7(b), DUCivR[1] 7-1, and Federal Rules of Evidence[2] 104(a), 403, and 702, Defendants JRM Nutrasciences, LLC ("JRM") Muscle Sports Products, LLC ("Muscle") and Jason Mancuso ("Mancuso") (collectively, "JRM Parties"), hereby respectfully move the court to exclude the testimony and report (hereinafter "Report"[3]) of David Franklyn ("Franklyn").  Pursuant to Local Rule 7-1(a)(1), JRM Parties also provide herein a memorandum in support of the instant motion to exclude (the "Motion").

## PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS THEREFOR

JRM Parties respectfully ask the court to exclude Franklyn's proposed testimony, as well as any use of his Report.  Such relief is authorized pursuant to Federal Rules of Evidence 104, 403 and 702, as well as Daubert and its progeny.[4]  Specifically, as Kodiak Cakes, LLC's ("Kodiak Cakes") proposed expert witness, Kodiak Cakes bears the burden to prove that Franklyn's Report and testimony are admissible.  However, Franklyn's opinions are based almost entirely upon speculation, which will not assist the jury at trial. Franklyn's methodology is flawed because he ignores significant data, sources of information and misinterprets the data without any acceptable methodological explanation or support. In addition, Franklyn fails to use reliable principles and methods, and further fails to apply such methods to the facts and data in the case.  Franklyn even lacks sufficient qualifications for the opinions he offers.  Franklyn's opinions not only fail the requirements of Rule 702, but also will cause unfair prejudice when presented with a cloak of an "expert" label.  For all of the reasons set forth below, Franklyn's testimony and Report should be excluded.

---

[1] The Rules of Practice for the United States District Court for the District of Utah are hereinafter referred to as the "Local Rule" or "Local Rules."  This motion and the memorandum in support is formatted and organized in accordance with the amended Local Rules effective as of December 1, 2021.

[2] The Federal Rules of Evidence are hereinafter referred to as the "Rule" or "Rules."

[3] See Expert Witness Report of David Franklyn, Dated November 1, 2021, attached as **Exhibit "1"**.

[4] See FED. R. EVID. 104(a), 403, 702; see also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

4872-8003-3832.v1
4872-8003-3832.v1

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7-1(g), if the court does not grant this Motion based on the briefs, JRM Parties hereby respectfully request oral argument on the Motion.  Good cause exists for oral argument because permitting a person to provide testimony as an "expert" witness when he would do more harm than good and has failed to meet the requirements of an expert would severely and unfairly prejudice the defendants in this case.

4872-8003-3832.v1
4872-8003-3832.v1

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE

### INTRODUCTION

Kodiak Cakes is in the business of making and selling health-focused, protein enhanced, food products, including pancakes, muffins, granola bars, and other foods.  Kodiak  Cakes asserts that since at least November 27, 1995, it has used the word mark "Kodiak" ("Kodiak Word Mark") and the depiction of a roaring bear with a tilted head enclosed by a circle ("Kodiak Bear Mark") in connection with the marketing, promotion, and sale of its products.  Kodiak Cakes owns the following trademark registrations related to the word "Kodiak":  US Reg. No. 1992074; US Reg. No. 2052194; U.S. Reg. No. 4509684; US Reg. No. 5471173; US Reg. No. 5471172; US Reg. No. 5458224 (collectively the "Kodiak Marks").

The JRM Parties are engaged in the licensing, marketing, distribution and/or sale of protein supplement products to fitness and body building consumers under the names "Kodiak Sports Nutrition" and "Kodiak Supplements" among others. JRM owns the mark Kodiak Sports Nutrition, US Serial No. 86/911,351.  JRM has authorized Muscle to sell products under this mark.  Mancuso is the owner and sole member of both JRM and Muscle.

Muscle licenses and/or uses the Kodiak Sports Nutrition and Kodiak Supplements marks in connection with a visual mark that consists of a roaring bear. Muscle's licensing and or use of the Kodiak Sports Nutrition and Kodiak Supplements names and related visual marks began on or after February 16, 2016, which post-dates Kodiak Cakes' use of the Kodiak Word Mark and the Kodiak Bear Mark.

Kodiak Cakes filed the above-captioned suit against the JRM Parties in the United States District Court for the District of Utah, on August 12, 2020 (the "Lawsuit").  In the Lawsuit, Kodiak Cakes alleged that the JRM Parties engaged in the unauthorized and unlawful use in

4872-8003-3832.v1
4872-8003-3832.v1

commerce of Kodiak Sports Nutrition and Kodiak Supplements marks, which Kodiak Cakes alleges are confusingly similar to its own senior marks.  Accordingly, Kodiak Cakes has asserted claims against the JRM Parties, including Trademark Infringement in violation of 15 U.S.C. § 1114; False Designation of Origin under 15 U.S.C. § 1125(a); Unfair Competition/Trademark Infringement in violation of Utah common law; Unfair Methods of Trade in violation of Utah Code Ann. § 13-5-1 *et seq.* and Unfair Competition in violation of Utah Code Ann. § 13-5(a)-1 *et seq.*

Franklyn's Report claims to divine the key issues in this case surrounding whether the marks are confusingly similar. Not surprisingly, after being paid more for his report[5] than the JRM Defendants have made in most years of their use of their marks, Franklyn concludes that "the combination of JRM Nutrasciences, LLC's use of the single-word KODIAK mark and bear logo on its KODIAK SPORT NUTRITION protein product has created a significant level of consumer confusion within the interested universe."[6]  Interestingly, Franklyn admits that he is "largely self-taught" in the world of creating and taking surveys[7], didn't rely on any independent third parties to assist him in establishing the interested universe of consumers[8] or the similar products with which he would compare to the competing parties' products[9] and didn't rely on any representations from the JRM Parties as to who their consumers targeted.[10]  As set forth below, Mr. Franklyn lacks the requisite qualifications or expertise to be an expert under the Rules of Evidence, improperly bases his opinions on rank speculation, and improperly surveys a range of consumers too broad for the dispute before this court.  Franklyn's Report and testimony are inadmissible.

Initially, Franklyn has no formal training.    Moreover, in addition to no formal training, he doesn't possess any certifications, degrees, or real-world experience taking surveys other than

---

[5] Franklyn was paid $120,000 for the creation of his report by Kodiak Cakes.  See Deposition of David Franklyn attached hereto as Exhibit 2, p. 67, line 24.
[6] Exhibit 1, p. 108.
[7] See Statement of Fact ¶ 12.
[8] See Statement of Facts ¶¶ 25-27
[9] See Statement of Fact ¶ 4
[10] See Statement of Facts ¶ ¶ 31-34

4872-8003-3832.v1
4872-8003-3832.v1

his own self-taught procedures and methodologies based on his review of the works of others. Franklyn proudly wears his lack of specialized training in this field as a badge of honor when asserting that he is "self-taught," but that does not give him any specialized knowledge or training with which to assist this court on the issues at hand. In addition to lacking any training, Franklyn takes broad subjective discretion when establishing what he calls the "relevant consumer universe" in this case.  When asked to explain how the "relevant consumer universe" was determined in this case, Mr. Franklyn stated:  "here you have a plaintiff that makes a product that in terms of its composition, i.e., protein added, overlaps with the market for the types of people who buy the defendant's types of products."  When asked how he determined that the markets "overlapped" his subjective and unproven methodology is exposed:  "**I** determined that the brands overlapped based on **conversations** with counsel, **conversations** with my college-aged children and their friends, based on **general market research that I did on the Internet** to determine that there is plausibly a group of people who buy pancake mixes and the like with extra protein for a variety of health and body building related reasons, and that they overlap with people who would also buy nutritional supplements that have added protein for similar reasons . . . **It seemed to me** . . ."[11]

Franklyn is merely an attorney, with experience as legal counsel in peripherally related trademark cases for a few short years as an associate, with the majority of his career being a non-practicing attorney teaching at various law schools.  Teaching trademark, patent or even marketing classes, does not make an individual an expert in survey taking.   Franklyn's Report and testimony survives on speculation, personal assumption unsupported by any industry standards.  These and other legal concerns more specifically addressed below render Franklyn's Report and testimony unreliable, and therefore inadmissible.  Accordingly, Franklyn's Report and testimony should be excluded.

---

[11] See Exhibit 2 pages 86:13-87:18

4872-8003-3832.v1
4872-8003-3832.v1

## <u>STATEMENT OF RELEVANT FACTS</u>

1.      Franklyn was engaged by Kodiak Cakes to opine on the following issues:

> I have been retained to assess, using standard and generally accepted statistical and consumer market survey methods, the level of confusion, if any, stemming from the usage of the KODIAK mark by JRM NutraSciences and/or its licensees including Muscle Sports Products, LLC.
>       Furthermore, I have been retained to assess, using standard and generally accepted statistical and consumer market survey methods, the level of association that an interested universe of consumers have between the term "Kodiak" and products commonly sold under the Kodiak Cakes, LLC's KODIAK and KODIAK CAKES brands.[12]

2.      While Mr. Franklyn's C.V. is full of experience teaching and writing articles, only two of his publication/research entries relate to surveys and only one of those has been published.  (1. "*Trademark Survey: An undulating Path* and 2) "*Trademark Surveys and Icebergs – It's What's Under the Water* (forthcoming).  As to the section on presentations, again only one of the presentations specifically addresses surveys (*The Use of Surveys in trademark Litigation*).  None of the entries show any formal training to create and take consumer surveys.[13]

3.      Franklyn was paid $120,000 in exchange for conducting his surveys and submitting his expert report.[14]

4.      Franklyn independently established what he determined as the "relevant universe" of consumers in this case by first selecting random products containing added protein based off a google internet search. Then, in order to be considered part of the "relevant universe" of consumers the survey takers "had to select that they had either purchased [p]rotein powder

---

[12] See Expert Report attached hereto as Exhibit 1, pages 5-6.
[13] See Curriculum Vitae of Mr. Franklyn attached hereto as Exhibit 3 and incorporated herein by reference.
[14] Exhibit 2 p. 67:1-4.

4872-8003-3832.v1
4872-8003-3832.v1

and/or intended to purchase protein powder or [f]oods with added protein in the next 12 months."[15]

5.      Franklyn did not conduct or receive any marketing reports or data to verify whether individuals purchasing Kodiak Cakes ever also purchased products from the JRM Parties.[16]

6.      When determining what channels of distribution were used by the parties to this lawsuit, Franklyn did not receive or review any independent market research or analysis establishing the distribution channels, instead Franklyn 1) reviewed specific responses to interrogatory requests  from the defendant, without receiving or reviewing the entire discovery responses, 2) discussed potential distribution channels with counsel for the plaintiff, and 3) visited websites of both the plaintiff and the defendant and studies them.  Franklyn didn't talk to any of the Defendants nor did he seem to be aware of the facts set forth in paragraph 31-34 herein.

> Q.    (BY MR. SINK)   Did you do any research to come to an understanding as to whether the products from these litigating parties are ever sold in the same stores?
> A.    I did.
>
> Q.     And what was that research?
>
> A.     A few things.   I conducted Internet searches of a variety of terms, including the -- that included the word "Kodiak" on Google to see if in typing in a variety of terms I ever got Internet search proximity results for the two companies.   I did.
> In addition to that, I spoke with counsel about the channels of distribution of both parties' products on the Internet and in physical stores in the United States.
> Q.     Did you review any surveys or reports -- when you talk about channels of distribution that you discussed with counsel, I do not want to know what you discussed with counsel, but I do want to know if your reviewed any physical reports that gave any data as to the channels of distribution of these two respective products and parties.

---

[15] Exhibit 1 p. 26.  See also Exhibit 2 page 102:13-18 (stating "I and my assistant under my supervision conducted a number of Google Internet searches using search term phrases as queries such as 'foods with added protein.' We came up with a batch of search results and then sifted through them and picked images.").
[16] See Generally Exhibit 2.

4872-8003-3832.v1
4872-8003-3832.v1

A.  I did.

Q.  And what did you review?

A.  Amongst other things, I reviewed responses to your clients or perhaps your - - penned by you, responses to interrogatory requests that had been prompted upon you by the plaintiff in this case and specifically with regard to the types of stores online and offline that your client's products are sold at or out of.

In addition, I also looked at or discussed with counsel answers to deposition questions that were posed by I believe Chad - - what's his last name, Chad's last name? Dunham? Derum? By counsel in this case as to your client's answers about where its products are sold and how they're sold in the United States.

In addition to that I visited the websites of the - - of both the plaintiff and the defendant and studied them.

Q.  I'm showing you what's marked as Exhibit Number 4.  This was what you indicated that were the materials that you considered.  I don't see any list on that exhibit of these deposition transcripts or responses to interrogatories.  But you're saying that you did actually physically handle and review responses to interrogatories and deposition transcripts?

A. No.  Counsel brought them up on a shared screen in much the same nature that you're doing here now.

Q.  So did you have a chance to review those entire documents or just what was shared with you?

A.  Just what was shared with me, I believe. I'd have to double-check.[17]

7.  When asked whether the parties to this lawsuit sold their products in the same

physical stores Franklyn testified  that he wasn't asked to do that:

Q:  And what was that research that you did to determine whether or not these products were sold in the same stores?

MR. HARMOND:  Asked and answered.   That question was given a very thorough response previously.

Q.  (BY MR. SINK)  Go ahead, Mr. Franklyn.

A.  Yes.  I mentioned previously that I conducted a number of Internet searches using a number of Internet search queries to determine whether the products of the plaintiff and the products of the defendant would come up close to each other or in the terms of trademark law proximate to each other in the search results on Google.   And I found substantial evidence that they would.   And in that sense there is Internet sales search proximity.

And then if one just clicks on one of those two sites for those products that they're -- that bring one to the company at issue, one would find that while

---

[17] Exhibit 2 pgs. 198:8 – 200:13

4872-8003-3832.v1
4872-8003-3832.v1

they're not sold in the exact same online stores, they're sold online in the marketplace where confusion based on search results is particularly risky.

The second piece of research or type of research I did was in this case -- in this regard was to ask counsel for the defendant specific questions about how each of these companies marketed and sold their products, the Kodiak Cakes versus the Kodiak supplements, et cetera. And I learned various pieces of information based on that.

I also asked questions of counsel about whether there was any evidence of record -- in the record that I could rely on as to what percentage of sales by either the plaintiff and/or the defendant were made through online purchases versus physical store purchases.  And I got some answers in that regard or at least some information in that regard.

And that would be the best summary I could give you as to what I did to conduct research as to whether the products at issue in this case, the products between the plaintiff and the defendant were sold in similar stores.

Q.    You were not asked to determine whether these parties to this lawsuit sold their products in the same physical locations, were you?

A.    No, I was not.[18]

8.    When addressing his qualifications Mr. Franklyn admits that he has zero work experience in marketing

Q.   Do you have any marketing experience in - - other than what you've discussed in academia, before you got into academia in approximately 1996, did you have any work experience in marketing?

A.  I did not.[19]

9.    When addressing his qualification Mr. Franklyn admits that he has zero work experience in advertising.

Q.  Did you have any work experience in advertising?

A.  No.[20]

10.    Mr. Franklyn entered academia in 1996, prior to joining academia Mr. Franklyn had zero experience conducting or being involved in survey work of any kind.

Q. Did you have any work experience in conducting or being involved in survey work of any kind?

---

[18] Exhibit 2 pages 203:16-205:11
[19] Exhibit 2 page 19:9-13
[20] See Exhibit 2 page 19:14-16

x

A. No.[21]

11.     Prior to 2002, six years after starting his teaching career, Mr. Franklyn had never

designed or created a survey.

> Q. And at that point in time you'd never conducted a survey before?
> A. I had advised clients on surveys.  I had talked to clients in y consulting
> practices, sir, but I had myself had never designed a survey prior to
> 2002.[22]

> Q.  In 2002 Mr. Franklyn designed his first survey, without every taking
>
> any classes or receiving any training on how to design and conduct a
>
> survey.  Okay.  So in 2002, how did you know how to design a survey?
>
> A.  Well, I worked with - - I had been consulting.  I had been involved in
> trademark litigation.  I had seen a number of surveys and survey formats.
> And in trademark law there are a number of accepted methodologies, or
> reasonably accepted methodologies, some had modification.   And I
> studied it and I consulted with others.
> Q.  Did you ever take any classes on how to create a survey?
> A.  I took no formal classes, I studied a lot.
> Q.  I'm sorry, I didn't understand that, and I'm imagining the reporter
> didn't as well.  You took what kind of classes?
> A.  I took no formal classes.  I'm largely self taught, especially in the
> beginning years.[23]

12.     Mr. Franklyn admits that there is no certification or license to conduct surveys.

> Q. To your knowledge, is there any type of license that you can receive to
> be a certified survey designer?

> A. Not to my knowledge.[24]

13.     When asked "if there's no license and no licensing board, who determines what a

common or accepted methodology is for these surveys?" Mr. Franklin states:  "Judges over the

course of the last 20, 30 years, as reviewing different types of surveys that have been presented

---

[21] See Exhibit 2 page 19:17-19
[22] See Exhibit 2 page 20:6-11
[23] See Exhibit 2 pages 20:12 – 21:3
[24] See Exhibit 2 page 21:12-15

4872-8003-3832.v1
4872-8003-3832.v1

and either found methodologically sound and, you know, adequate or note found to be sound and adequate.  But through a trial and error process, by the common law process."[25]

14.     Mr. Franklyn's report does not give any opinion on damages.  Instead he focuses on potential confusion and the strength of the Kodiak Cakes brand.[26]

15.     When asked whether survey evidence is evidence of "actual confusion" in the marketplace Mr. Franklyn testified:  "It is simulated actual confusion.  So I don't call it actual confusion.  I think of it as evidence of likelihood of confusion."[27]

16.     When asked whether "evidence of actual confusion is a weighty factor in determining the existence of confusion between trademarks?"  Mr. Franklyn testified that "It can be. . . it is widely thought of as being an important type of evidence in these types of cases."[28]

17.     Mr. Franklyn testified that in this case he reviewed no evidence of actual confusion.

> Q. Is it safe for me to understand that based on what you have represented here in Exhibit Number 4, that you did not review any evidence of actual confusion?
> A. Correct.[29]

18.     As to the reliability of his surveys and therefore this expert report, Mr. Franklyn could not identify any industry standards to verify a survey stating that the reliability standard "isn't set in stone."

> Q.     (BY MR. SINK)  Can the results of a Squirt or a Modified Lineup survey be tested?
> MR. HARMOND:  Objection, vague.
> THE WITNESS:  I don't know what you mean.
> Q.     (BY MR. SINK)  Are they -- is there a reliable rate of error?
> MR. HARMOND:  Same objection.

---

[25] See Exhibit 2 pages 21:21 – 22:4
[26] See Exhibit 2 pages 22:18-23:13
[27] See Exhibit 2 pages 30:25 – 31:2
[28] See Exhibit 2 page 31:7-18.
[29] See Exhibit 2 page 32:18-22

4872-8003-3832.v1
4872-8003-3832.v1

THE WITNESS:  I don't know what you mean  by "reliable rate of error."

Q.   (BY MR. SINK)  You have absolutely no idea what I mean by a rate of error when it comes to survey results?  Did I understand your question
correctly or your answer correctly?

A.   No.  I didn't mean to imply that to you. I think the exact wording of your question was a little bit vague to me.

Q.   Well, let me reask it.  You understand what a rate of error is related to survey taking; is that correct?

A.   Yes.  I think what you're referring to is a margin of error.

Q.   Okay.  I'll use margin of error.  So does the Squirt or Modified Lineup survey have a margin of error, an established margin of error?

A.   Do you mean as a general proposition?

Q.   Yes.

A.   There's guidance on this.  There's no such thing as a -- in my understanding as an established margin of error that you cannot reach, or if you do, you no longer have a reliable survey.  You have a goal for what you would like to get generally as a margin of error in order to have maximum statistical reliability.  But it isn't set in stone.  And even margins of error that are higher or lower can be interpreted in context and still provide useful data as to the question examined.

Q.   Is there an established margin of error for the Eveready survey?

A.   Same answer.[30]

19.     After admitting that there is no set reliability test, Mr. Franklyn then set forth a

more subjective "rule of thumb" he called "a "95 percent confidence" subjectively determined by

the survey taker.

Q.   If I understand your answer, there is no established or you're unaware of any established margin of error for the Eveready survey; is that correct?

A.   To my knowledge, when you use the word "established," that's where I'm getting hung up with.  The rule of thumb is that to the extent possible, margins of error in surveys, not just Eveready and nonspecific to Eveready or Squirt is a 95 percent confidence involved with them, and approximately a 5 percent margin of error, one direction or another.  And these metrics are taken from social science marketing research generally and they're not unique or specific to a Squirt or an Eveready.

Q.   Can you explain that to me, a 95 percent confidence?  Did I hear that correctly, you said a 95 percent confidence?

A.   Yes.  Interval.

---

[30] See Exhibit 2 pages 40:8 – 41:21

4872-8003-3832.v1
4872-8003-3832.v1

> Q.   And what does that mean, a 95 percent confidence that who has?  Who establishes this 95 percent confidence?
> A.   I do.  As the survey expert I take a look at the data and at the size of the group that took the survey.  I look at the answers to the questions and the range of answers.  And there's a formula that I can use and do use to calculate a margin of error for any given survey that I administer.[31]

20.   When asked to tie his "95 percent confidence" test to the margin of error of these surveys, Mr. Franklyn could not recall the formula to calculate the margin of error, could not point to anything in his report setting forth the margin of error for each of the surveys conducted in this case and could not even recall or find the exact margins of error for these four surveys.  In the end, he estimated that the margin of error was around 6% based on his memory and nothing else.

> Q.   Did you calculate a margin of error for any of the surveys done in this case?
> A.   I did.
> Q.   Where is the formula for that?  I didn't ever see a formula. What's the formula to calculate a rate of error on a Squirt/Modified Lineup survey?
> A.   The formula is actually pretty complicated, and I don't have it in front of me.  But I calculated it and had it double-checked by my assistant.  And I believe we put a sentence or two -- we put information into the report about the margins of error attending these surveys.  It's a mathematical formula with mathematical terms, and then you do the inputs and you do the math.
> MR. SINK:  If it's okay with you, Dr. Franklyn -- or I don't know if you're a doctor -- sure, you got a JD, Dr. Franklyn.  Are you okay if we take a break right now?  And I want you to go ahead and look at your expert report and please point out to me where you're referencing a margin of error in your report because I don't see it.  And if I've missed it, then I just want you to have a chance to go back and say, hey, Jeremy, this is where it's at.  And so when you talk about margin of error, here's where I address it in my report.  I don't mean to give you a homework assignment, but that's probably a better use of our break than me sitting here on the record waiting for you to do that.  Is that okay if we do that, Counsel and Mr. Franklyn?

---

[31] See Exhibit 2 pages 41:22 – 42:23

4872-8003-3832.v1
4872-8003-3832.v1

MR. HARMOND:  Sure.  The only thing I would ask, Jeremy, is can you put us in a breakout room?

MR. SINK:  You know, let me see if I can do that.

(Break taken from 11:11 to 11:26 a.m.)

Q.   (BY MR. SINK)  Okay.  Mr. Franklyn, prior to going on break, I asked you if you could find in your expert report, which we have marked as Exhibit 2 in this deposition, where I could find any language related to the rate of error related to your opinions.  Did you find anything in that report that you can point me to?

A.   I have not.

Q.   I want to go back to an answer that you gave earlier.  I asked you related to this 95 percent confidence level whose confidence that was or what it was based on, and I believe that you indicated that that was your confidence level in the survey.  Is that correct?

A.   Well, in this particular instance it is. But, I mean, it's not subjective as to me.  It is -- the idea is that if the -- I'm the survey taker, I'm the survey designer, I'm the person who is accepting responsibility for this survey.  So in that sense it has to do with my confidence in the results that I garnered.

But the idea is that how confident could a person be in looking at this data and concluding that it is representative of the results one would get more or less if it was rerun multiple times.

Q.   What are the objective -- you used the word "subjective" to highlight that it's not just your opinion, if I understood that correctly.  And so what are the objective factors that you rely on to have a 95 percent confidence level?

A.   The factors have to do largely with how big the sample size is. If you only talk to, let's say, ten people in a survey and you got 50 percent confusion, how confident could a survey taker be that if she enlarged that sample size to 20 or 30 or 40 or 50, that that same level of confusion would carry forward and across a larger sample size.

And the idea is that the larger the sample size, the more reliable the bottom line conclusions are.  Because after you get to a certain point in enlarging your sample size, generally speaking we do not see significant variations in survey taker answers and results after a certain number.  And so to that end we try to make sure that our test cells and our control cells have enough people in them such that we can rely on their aggregate findings that is being indicative of what would happen if we surveyed a much larger group of people.

Q.   Other than the sample size of the survey takers or the number of people that you have on the survey, are there any other objective factors?

A.   Yes.  After you give the survey, administer the survey and you look at the data, I should -- a survey expert should evaluate the degree of answers and the range of difference in answers among survey takers to see if the answers vary wildly.  And again, it could be the answers to like

which types of questions.  And the more variance there is, it can also mean the -- it can play into the calculation of the margin of error.

Q.    What's the numerical number of variants that is acceptable in your surveys when you conduct a Squirt or a Modified Lineup survey?

A.    There is no such accepted numerical number regarding variants. It isn't used that way as an end-of-the-road, be-all metric.  It is something that's evaluated in the context of looking at the overall margin of error analysis.

Q.    And again, when you're talking about an overall margin of error, you're not talking about an actual number, or are you?

A.    Yes.  Yes, you are.  So for example, in –

Q.    Well, I don't want an example.  I want -- I want what we're talking about, the Squirt or the Modified Lineup survey that you did in this case. I've asked you to point me to the rate of error that you have in the survey that you've done here, and you haven't given me one.  And so I'm really trying to understand when you say:  I used a formula or I used a range or I used statistical analysis, what – I don't know where to look at in your report to understand what you're saying.

A.    Well, that, sir, is because I didn't put a section in my report laying out the manner in which I calculated the margin of error for any of these surveys.

Q.    Okay.

A.    And that way -- but that doesn't mean I didn't do that work.

Q.    Well, you didn't provide it to me.

A.    I don't have to provide it to you, which I do this all the time and most of the cases that I do, and including in my expert reports, I don't provide it as part of the expert report.  But I do the work. And it is incumbent upon the opposing party, here you, to either do it yourself or consult with an expert if you want to double-check my work or question what representations I make to you about what my work is.

Q.    Well, what I want to know is what formula you used to determine the rate of error in this case. Because I think that's what we're talking about.  I'm not trying to put words in your mouth.  I'm trying to understand the formula you used.  So what is the formula that you used to determine your rate of error?

A.    The mathematical formula is actually a little complicated, and I would have to check back into my -- I mean, I don't have it off the top of my head is the answer to you.  It has a variety of variables that gets put into it.  I'd have to go back and look at what that formula is.  But that formula is not an invention of David Franklyn, nor is it varied by me.  It is Biblical.  Everybody who does one of these follows this formula.

Q.    Do you do the math yourself?

A.    Sometimes I do it myself.  Sometimes I have my assistant, Mike Ally [phonetic], do it.  Sometimes we double-check each other's work.  It just depends.

4872-8003-3832.v1
4872-8003-3832.v1

Q.    Do you have somewhere in your notes where you have the calculations that you conducted in this case pursuant to this formula that you have referenced?

A.    Not that I've been able to find, which I went looking for in response to your discovery requests.

Q.    So how do we know that you used the formula in this case?

A.    I can give you the numbers that I came up with for margin of error and represent to you that I used this standard formula.  And then if you are so inclined, you could take a look at the data and either yourself or through a litigation consulting person rerun all of the data using the generally accepted formula.  It's not that hard.

Q.    But you can't recall it as you sit here today as far as this formula is concerned?

A.    I'm trying to get it off the top of my brain.  I just don't want to make a mistake as to the exact placement of the variables that go into the mathematical equation.

Q.    Do you recall some of the variables that do go into the mathematical equation?

A.    Yeah, one of them is the length of time -- or the number of people who were in each cell on the survey.  And in some instances -- in some instances of the calculation of math -- margin of error another variable is the number of people in the United States who could be considered part of the general population that would be users or buyers or potential buyers of the type of products at issue.  Sometimes that data is available, sometimes it's not. Sometimes it's included in the calculations, sometimes it's not.

Q.    Is that a variable that you looked up in this case?

A.    I don't --

Q.    You froze there or glitched.  Can you answer that question again.  Is that a variable you used in this case?

A.    I don't think so.

Q.    So you did not use the variable of the number of people who could be considered to be part of the general population who would be quote unquote consumers in this realm; is that correct?

A.    I don't recall.  I want to double-check with my assistant Mike on that one and refresh my recollection as to exactly how we calculated it here.

Q.    So you indicated earlier that as you sit here right now, are you telling me that you know a rate of error for the results that you did for Survey 1?

A.    Yes.

Q.    And where are you getting that number from?

A.    Memory.

Q.    Just from your memory?

A.    Yes.

4872-8003-3832.v1
4872-8003-3832.v1

Q.    And how do you know that that memory -- what are you relying on to use that memory for this survey and Survey Number 1 of the four surveys that you did in this case versus the many hundreds of other surveys that you've done over your years of work?

A.    I'm not sure I follow that question, Counselor.

Q.    What's the foundation for you knowing that this number is the number that relates to this Survey Number 1?

A.    Well, we found similar margins of error for all of the surveys because we used similar sizes of cells.

Q.    So the rate of error, if I understand you correctly, was not the same for the four surveys because you used the word "similar"?

A.    It was highly similar.

Q.    But -- so was it the same or was it not?

A.    Well, it might have been the same for some and slightly different from others.

Q.    Okay.  So as you sit here right now, what were the rates of errors for Surveys 1, 2, 3 and 4?

MR. HARMOND:  Objection, compound question.

Q.    (BY MR. SINK)  You can break it into four, Mr. Franklyn. Survey Number 1, what was the rate of error?

A.    For all four it was approximately --

Q.    That's not my question.  My question is for Survey Number 1, what was the rate of error?

A.    I'd have to go back and look exactly what it broke down for Survey 1.  What I recall off the top of my head is generally the average, and that they were very close to each other, the numbers.  And I memorized or tried to memorize what the average was for the rate of error for the whole package in case you asked me about it.

Q.    So as you sit here right now, do you recall the rate of error for Survey Number 1?

A.    I believe it was 6 percent.

Q.    It was exactly 6 percent, it wasn't 6.035297341?

A.    I believe it was approximately 6 percent.

Q.    As you sit here right now, what was the rate of error for Survey Number 2?

A.    I believe it was approximately 6 percent.

Q.    And for Number 3?

A.    The same.

Q.    And for Number 4?

A.    The same.[32]

---

[32] See Exhibit 2 pages 42:24-53:13

4872-8003-3832.v1
4872-8003-3832.v1

21.     When addressing the actual formula used to calculate his rate of error, Mr.

Franklyn couldn't recall what the variables stood for.

Q.     Where can I go and look to get the formula to determine the rate
of error for those three types of consumer surveys?
A.     Well, there's a lot of places you could go and look.  One -- I
don't know, do you have a survey expert in this case?
Q.     The question is for you.  Where can I go and get that formula?
A.     Please go and talk to your own consulting survey expert in this
case if you have one to give you the best rendition of the formula and to
apply it, the math that you -- of the data that I've given you, that would be
one.  If you don't want to do it that way or that's not convenient for you for
whatever reason, you can also go and look online about how to calculate
margin of error.  And you will find pretty good agreement about how to
do that with a pretty set forth mathematical -- you know, it's kind of like E
equals MC squared.  But it's actually Z times A over the square root of N.
And they break down what each of those inputs is and how to do the
math.  And they usually in many of these websites if you put in the inputs,
they will actually calculate it for you and double-check it for you.
Q.     So in that formula you just gave me, which is Z times A over the
square root of N, what does the Z stand for?
A.     That is actually the score that you're going to get.
Q.     So that's your answer?
A.     Yes.
Q.     And you're multiplying your answer -- you're taking your answer
-- because maybe I didn't write down the formula correctly.  I thought that
what you told me is that the margin of error equals Z times A over the
square foot of N.  And if I go online, that is the formula, margin of error
equals Z times A over the square root of N.  So using that, you've used
that formula before?
A.     Yes.
Q.     And that's the formula, did I state it correctly?
A.     Yes.
Q.     In that formula, what does the Z stand for?
A.     Give me a second.  I'm thinking.  Because I don't want to
misstate that.  The -- I want to give that a little thought as to how I applied
it here.  If we can go back to that maybe a little bit later in the deposition.
Q.     Sure.

. . . . .

. . . . .

 p. 208

4872-8003-3832.v1
4872-8003-3832.v1

Q.    Okay.  Earlier today we talked about this formula, this rate of
error formula?

A.    Yes.

Q.    Do you have any further or different recollection as to what the
three variables stand for?

A.    I mean -- you mean what they are or what they stand for?

Q.    What they stand for.  I think earlier I asked you what the Z, the
A and the N were, and you said you wanted to get back to it later.  And so
I'm getting back to it later.

A.    Well, it's not enough later.  I don't have --

Q.    No?

A.    I don't have a better answer for you at the moment.  I usually
plug it into a program or have one of my assistants do it, and it's just
escaping me off the top of my head what the numerical stands for
in its abbreviated form.

Q.    Well, I think one of the things that you identified as a potential
variable was the number of people in the cell or the number of people in a
survey.  Would that be one of the variables?

A.    It absolutely is.

Q.    Okay.  So other than that, do you know  what the other two -- I
guess we're only down to two variables.

A.    Yes, one of the variables is the degree of divergence in answers
between respondents and any given question.

Q.    That doesn't sound like something that can be mathematically
determined.  How do you determine a degree of divergence in written
answers?

A.    Well, it doesn't necessarily have to be a written answer.  It could
be a multiple choice answer, right?  So if you were to ask people -- show
them an image and show it to 30 people and say, "How many of you see
the color red in this image?"  And you gave that question to a group of 30
people and four people said I see red.  And you also asked them how
many people see blue, and 13 people said they see blue.  And
concomitantly 26 people said they don't see red, only four people said they
see red.  Then the degree of difference between the people who said
red and the people who said they didn't see red is pretty high.  And the
reliability goes down, and -- in terms of the specific results.  The need for
a larger sample arises to see if this divergence will continue as you expand
the size of the survey import.

        By contrast if 14 percent of the people in the survey, say, out of
let's say 30, 14 people say they see red and 16 people say they don't see
red, then the lack of divergence between the two sets makes the findings
more reliable, at least as to that fact.[33]

---

[33] See Exhibit 2 pages. 54:3 – 56:3  and 208:22-211:2

4872-8003-3832.v1
4872-8003-3832.v1

22.     Although protein supplements and foods with protein added was the subject of his surveys, Franklyn did no analysis as to the types of proteins used in the products which were the subject of his survey, in no way considers himself an expert in that field and agreed that the type of protein in the products surveyed wasn't a factor in setting up the surveys.

Q.    Okay.  Did you do any analysis as to what types of proteins were used in the products that you used in your survey?
A.    No.
Q.    You're not a chemist, correct?
A.    Correct.
Q.    You didn't do any analyzation of any of the proteins in any of the products?
A.    That's correct.
Q.    And you're not here to render an opinion as to protein quality?
A.    That is correct.
Q.    Did the type of protein used have any impact on how you developed your surveys?
A.    Not that I recall.  Can you tell me by way of reference what page you're on here?
Q.    Four.
A.    I'm just going to take a look at my hard copy if you'll bear with me for a moment.  Yeah, same answers.  Off the top of my head, I don't remember that there was any special numerical component to the use of the word "high" in this context.
Q.    Okay.  So the use of the word "high" doesn't have any significant meaning and you didn't do any re -- is that correct?
        MR. HARMOND:  Objection, mischaracterizes testimony.
        THE WITNESS:  What did you say about significant research or something?
Q.    (BY MR. SINK)  Well, I asked you first of all what you meant by the term "high protein."  And your answer, I thought you heard that what you meant was added protein or any protein that was in the product.  Did I hear that correctly?
        MR. HARMOND:  Objection, mischaracterizes testimony.
        THE WITNESS:  I said is protein added to what would have normally occurred in a product of this type.
Q.    (BY MR. SINK)  Okay.  And so -- but you didn't review any -- as far as the type of protein or the quality of protein, that wasn't a factor in setting up your survey?
        MR. HARMOND:  Mischaracterizes testimony, asked and answered.
        THE WITNESS:  Not that I recall.[34]

---

[34] See Exhibit 2 pages 69:22 – 71:17

4872-8003-3832.v1
4872-8003-3832.v1

23.     When determining the likely consumers for Kodiak Cakes, Mr. Franklyn

received that information through discussions with counsel for Kodiak Cakes.  Mr. Franklyn

didn't list any documents reviewed on this subject and didn't list any such documents in his

disclosures.

Q. So I'll reask the question.  As far as Kodiak Cakes is concerned, did
you do any research to see what age group typically eats Kodiak Cakes
pancakes?
A.    Yes.
Q.    And what research was that?
A.    I spoke with counsel about that and asked what evidence of the
record they had regarding that.
Q.    And did you review any documentation?
A.    That, I don't recall.
Q.    If you would have reviewed any documents, you would have put
it on the list of documents that you reviewed in this case, but there is no
other document listed, right?
A.    Correct.
Q.    So am I correct in assuming that you didn't review any other documents?

A.    Or I forgot about them and don't have a recollection of them.
But I -- I have a recollection of talking to Mr. Harmond and Mr. Hummel
about this set of questions.
Q.    Okay.  And what is your understanding as
to the age group that typically eats Kodiak Cakes pancakes?
A.    It's younger males, adult males, perhaps between the ages of 18
and 35.  Although I can't remember exactly if that was like the upper end.
But there are also people who are non-male and over 35 who buy and eat
Kodiak Cakes pancakes.
Q.    And the source of this was the people that are paying you for this
litigation; is that correct?
MR. HARMOND:  Objection, asked and
answered.
THE WITNESS:  What do you mean?  That seems like --
Q.    (BY MR. SINK)  The source of this information that it's 18- to
35-year-olds, skewing male, would be Kodiak Cakes?
A.    I believe so.  I believe that counsel for Kodiak Cakes acquired
knowledge about the likely demographics for purchasers of Kodiak Cakes
through their client.[35]

---

[35] See Exhibit 2 pages 74:24 - 76:15;  see also list of documents reviewed by Mr. Franklyn attached to the Expert
Report as appendix E and attached hereto as Exhibit 4 and incorporated herein by reference

4872-8003-3832.v1
4872-8003-3832.v1

24.     Franklyn's determination of the "interested universe of consumers" is based on

Franklyn's own subjective determinations, not any marketing or consumer data.

> Q.     What do you mean by "the interested universe of
> consumers"?
>    A.     The interested universe of consumers in this case for the three
> confusion surveys is predominately, although not exclusively,
> predominately people who have bought in the past or who are likely to
> buy in the future the type of products sold by the defendant.  I said
> predominantly but not exclusively because whereas here you have a
> plaintiff that makes a product that in terms of its composition, i.e., protein
> added, overlaps with the market for the types of people who buy the
> defendant's types of products, then it can be prudent to include in the
> interested universe a certain subset of survey takers who are also
> participants in the plaintiff's market, meaning that they have bought
> or are likely to buy in the future the foods with protein added.
>          And so in this survey I think we see some evidence of different
> types of people in the relevant survey taking universe.
>    Q.     And so how did you determine that the brands overlapped
> between the plaintiff and the defendant in this case?
>    A.     I determined that the brands overlapped based on conversations
> with counsel, conversations with my college-aged children and their
> friends, **based on general market research that I did on the Internet** to
> determine that there is plausibly a group of people who buy pancake mixes
> and the like with extra protein for a variety of **health and body building**
> related reasons, **and that they overlap with people who would also buy
> nutritional supplements that have added protein for similar reasons**.
>    Q.     Why were you looking -- you used the term "**for health and
> body building purposes.**"  Why were those types of consumers important
> to you?
>    A.     It seemed to me that a person who would buy your client's
> product here, for example, the 1Whey product with the added protein for a
> variety of reasons, one of which is to just simply have more protein in her
> diet if she feels that her normal eating patterns don't yield a lot of protein.
>          But in addition to that, to have people in that survey who take this
> sort of buy and ingest this type of product, not primarily to -- I suppose
> what it would say -- add protein to an otherwise protein deficient diet, but
> **to add enough protein so that it would support their exercise regimens
> in building muscle and health**.
>    Q.     So when you determined the interested universe of consumers,
> you are the one who determined what that interested universe of
> consumers was or is for the defendant's products?

4872-8003-3832.v1
4872-8003-3832.v1

A.   Yes and no.  The case law and trademark law teaches us pretty clearly that when one is doing a likelihood of infusion [sic] survey, in particular, it wouldn't necessarily be the same interested universe when one is doing a brand recognition survey that's trying to evaluate the strength of the plaintiff's brand, for example, which is a type of survey that I did here.

But that the case law and literature teaches that when one is doing a forward confusion survey as opposed to a reverse confusion survey, the typical target interested universe is people who have bought or are likely to buy the type of product that the defendant sells.

And so I needed to collect information based on Internet research, based on conversations with counsel, and what other -- and ideally based on document productions that had been requested, to my knowledge not satisfactorily provided by your client or answered by your client, to determine to the best extent practicable under the circumstances the demographics on the types of people who buy your client's products.

And so I used what I got in the case, and I used what I could find on my own to the best of my ability approximate that market.[36]

26.   Although Mr. Franklyn stated that "health and body building" and foods that "would support [the consumers] exercise regimens in building muscle and health" were factors in determining the "interested universe of consumers" no such vetting questions about health or , building muscle were included in the vetting questions.  The vetting questions to establish the relevant universe for each survey are found on pages 22-26 of the Expert Report.[37] The vetting question are identical for all four surveys as set forth below:

Q.   (BY MR. SINK)  That is almost my question other than your inclusion of the word "relevant."  My question was:  Is that all of the questions that were asked them, not just the relevant questions, but all of the questions for them to be considered part of the relevant universe?
A.   These are all the questions they were asked.
Q.   And were those questions the same for all four surveys?
A.   I don't recall.  Let me look at Survey 4.
Q.   I'll give you the -- the page for that is 79 for Survey 4.
A.   Okay.
MR. HARMOND:  Is that the only page, 79? It looks like there might be more.
MR. SINK:  I apologize, I gave the last page in that.  I believe relevant universe for four is 75 through 79.

[36] See Exhibit 2 pages 86:5-89.9 (emphasis added)
[37] See Exhibit 1 page 22.

4872-8003-3832.v1
4872-8003-3832.v1

Q.   (BY MR. SINK)  And they appear to be the same questions.  I'll represent to you that as I reviewed this, that my belief was that the questions asked in all four groups were identical as far as defining the relevant universe is concerned.  And you can look at those on pages 26, 45, 65, and 75.

And so I'll just renew my question.  My question was whether your relevant universe of interest questions were the same for all four of your survey groups?

A.   I believe so.  Yes, I believe so.[38]

27.     The vetting questions do not limit the participants to a certain age group but instead allow survey takers to participate if they are over the age of 18, live in the United States, don't have a family member in advertising or marketing, and if they plan to purchase one of the seven products listed on the survey in the next 12 months, only one of which belongs to the plaintiff (foods with added protein) and one of which belongs to the defendants (protein pownder).  Nowhere in the vetting questions are consumers asked why they would be purchasing one of the seven products.[39]

28.     Franklyn's survey uses undefined terms making the survey responses confusing and unreliable.  In his conclusion section on page 108 of his report Franklyn states as follows: "Based on the extensive research I described in this report, it is clear the combination of JRM Nutrasciences, LLC's use of the single-word Kodiak mark and the bear logo on its Kodiak Sport Nutrition protein product has created a significant level of consumer confusion within the interested universe."  See Report p. 108. In this conclusion Franklyn refers to the word "Kodiak" as a "mark" and the picture of the bear as a "logo."   Later he uses the term "brand."  See Report p. 98, 103, 104, 106, 109 and 110. Apparently using powers of discernment, and without defining the terms for the survey takers, Mr. Franklyn is able to "tell by the answer" what a survey participant means when using terms of art "mark", "logo" and "trademark" and "brand",

---

[38] See Exhibit 2 pages 172:22 – 174:1
[39] See Exhibit 1 pages 22-26

4872-8003-3832.v1
4872-8003-3832.v1

because in his own words, "I think people based on my prior work in this for 20 years have a pretty good sense of what a logo is."

> THE WITNESS:  What do you mean by logo here in your question?
>
> Q.    (BY MR. SINK)  Well, you're the one who said you relied on their response here as to logo, okay, in pages 95 through 96.  And so my question, if you could answer it, is:  Did you ask any of your survey participants if they had a knowledge as to what the word "logo" meant?
>
> A.    Sure.
>
> Q.    Where did you ask that question?
>
> A.    I can tell by the answer, at least one person who said logo including the bear that he knows what the logo is.
>
> Q.    So you tell by their answers.  Did you specifically ask them any questions as to whether they knew what the word "logo" meant?
>
> A.    I did not ask them in this survey what the word "logo" meant.
>
> Q.    Did you ask them in Survey Number 1 what the word "logo" meant?
>
> A.    Nope.
>
> Q.    Did you ask them in Survey Number 3?
>
> A.    I couldn't have in this sense --
>
> Q.    So that's a no?
>
> MR. HARMOND:  Let him answer the question, please.  You're the one who is asking -- if you don't like the answer, you still have to let him answer.
>
> Q.    (BY MR. SINK)  Go ahead, Mr. Franklyn, if you want to add something.
>
> A.    Because you're being unethical and rude and interrupting me and telling me that something is a no when it's not a no.  And I know enough from teaching civil procedure that you should be sanctioned for that.
>
> Q.    I'm sure your counsel on the other side will take care of that.  But back to my question, Mr. Franklyn, so is there anywhere in Survey Number 3, where you asked individuals about their meaning of the word "logo"?
>
> A.    Individuals were free to explain in the open ended what either -- expressly or by implication what they would mean by the word "logo" when they make reference thereto.  And I think people based on my prior work in this for 20 years have a pretty good sense of what a logo is.  Do you disagree?  Do you think they don't understand what a logo is?[40]

---

[40] See Exhibit 2 pages 169:17 - 171:12

4872-8003-3832.v1
4872-8003-3832.v1

29. However, Mr. Franklyn then contradicts himself and shows that the consumer truly doesn't really know the difference between these terms, calling into question his 20 years of experience and having "a pretty good sense" of what people know and don't know when using these terms:

> Q.   If you could turn to page 103 of your report, this is some of your conclusions related to Survey Number 3.  And I'd like -- if you could help me out here to understand.  There's some differences here that I need to understand.
>
> At the top of page 103, it says "Across the cells, there is a similar level of awareness for the **brand** Kodiak Cakes.  Specifically within the test cell, there were 95 respondents aware of the Kodiak Cakes brand.  Of the aforementioned, 38 respondents who identified products made by Kodiak Cakes, LLC, all of them had prior awareness of the Kodiak Cakes **brand**."
>
> This is the first time that we've come across the word "**brand**."  Could you help explain to me what you are referring to in this conclusion where you use the word "Kodiak Cakes brand" or the phrase "Kodiak Cakes brand"?
>
> A.   I mean largely the same thing as I would have said if I would have written Kodiak Cakes trademark.
>
> Q.   Was that trademark singular or trademark plural?
>
> A.   Well, the Kodiak Cakes brand includes all of the trademarks that the company has -- the phrase "Kodiak Cakes brand" includes all of the Kodiak trademarks that that company has, period.  So therefore, in this context the word "brand" refers to more than one related trademark.
>
> Q.   Is there anywhere at the U.S. PTO where you can register a brand?
>
> A.   Sure, you can register all of the trademarks that belong to a family of brands.
>
> Q.   So you can register trademarks.  Do they have anything that's called -- where you can actually get a brand number?
>
> A.   No.
>
> Q.   And I don't want to be surprised at trial. So you're referring to the trademarks that you referred to at the beginning of this, which I believe you indicated were the Kodiak, single word – I should go back and use your words and not mine.  But the Kodiak mark, the Kodiak Cakes mark and the bear logo.
>
> Is there anything other than those three that would be inclusive of what you're referring to here as the Kodiak Cakes brand?
>
> A.   Yes.
>
> MR. HARMOND:  Objection to that question as mischaracterizing testimony.

4872-8003-3832.v1
4872-8003-3832.v1

THE WITNESS:  **A brand is a funny word and it** is -- as I mentioned earlier I have taught both business school courses on brands and marketing courses, and I've taught law classes on brands.  In the law school classes we tend to use the nomenclature trademark.  In business school they tend to use the nomenclature brand.  And in many, if not most instances, they are overlapping terms used by different sets of professionals; one legal professionals, the other marketing professionals.

And I have actually been asked this question a few times in testimony in a court of law.  In fact, once by a judge about whether there's any difference between a trademark and a brand.  Without sounding too -- or wanting to get into too much on this or sounding too academic, I would just say that a brand is more than a trademark in the sense that -- in the sense that according to marketing people it can include everything there is that a consumer could associate visually and audibly, emotionally with a particular company and its brand or brands.

And so, for example, if you go to In-N-Out Burger and all the workers are dressed in white clothing with little hats on that I think they have red stripes on them, that might not be part of the protectable trade-dress and trademarks of In-N-Out.

But very few people in the marketing industry would say, well, it isn't part of their brand.  It is part of the brand.  And so I think brand is broader than trademark.

In some instances for some companies it simply doesn't matter.  Everything they considered part of the brand is also something they've registered as a trademark.  Sometimes there are parts of their brand that they consider or could consider and register full parts of their trade dress, but they're never actually registered as part of their trade dress.  That is the overall look and feel of the product, packaging or the like, but they could apply common law rights and sue thereof.

So, you know, a brand could include both registered trademarks and unregistered verbal trademarks and unregistered trade-dress could include color, packaging, could include things like the bear image standing alone or in combination with colors and designs and so on and so forth.

So that's a rather longish answer to your question.  Bringing it back down to this specific context in which you articulated the question, I believe it was on page 103, where I think I said here or I did say "Of the aforementioned 38 respondents who identified products made by Kodiak Cakes, LLC, all of them had prior awareness of the Kodiak Cakes brand."

**I think I use the word "brand" there, if I recall correctly, Mr. Sink, because I included the word "brand" in the questions I asked near the end of each survey about whether they had prior awareness of any of these brands.  And in that context I felt it was more appropriate and kind of user friendly to the survey taker to ask the question using the word "brand" instead of using the word "trademark" in case the survey taker might think, geez, was I aware of it as a trademark?  Do I know what that means?  Do I know if it's**

xxviii

**registered or not?  I didn't want to get into any follow-up stuff like that, and just say, yeah, I've heard of the Kodiak brand.  So that's where that's coming from**.[41]

30.    One of the keys in designing his surveys is randomizing the presentation of the data.  However, neither Mr. Franklyn nor his staff take any notes or provide any test results to confirm that the survey is in fact random – we just have to take his word for it and trust that he has adequately trained his staff on the same.

> Q:  . . And are you -- are you noting whether the images are randomized?
> A.    Yes.  Randomization is something we pay careful attention to. And I also have my staff pay careful attention to it to ensure that if we instructed it to be randomized, that they don't all see it the same way I saw it.
> Q.    Do you recall whether you checked the survey in this particular case to see whether images were randomized?
> A.    We did.
> Q.    And do you have any notes, anything that would support your statement that the images were in fact randomized?
> A.    I didn't take notes on that, nor do I recall my staff taking notes on that.
> Q.    And that's not part of your standard operating procedure to keep a file on that to be able to say, hey, on such and such a date we went in, we confirmed that the images were randomized?  You don't do that type of thing when you do these reports?
> A.    Not usually because we've never had a problem with the platform provider following our programming instructions.
> Q.    But you don't have any documentation to verify that, just what your recollection is?
> A.    It's not just my recollection, it's the recollection of myself and my staff.  I was told, and I personally saw that they were randomized.
> Q.    Which staff members told you that the images were randomized?
> A.    I don't recall exactly.  But it was at least -- it would have normally been Mike Ally, my senior assistant, and could have also been my junior assistant, Ed Porch [phonetic].  It could have been
>
> .
> .

---

[41] See Exhibit 2 pages 185:9 - 190:1 (emphasis added)

4872-8003-3832.v1
4872-8003-3832.v1

.
p. 155:

The other type of instructions you're talking about I take it meaning do I give verbal or written -- I'd say written instructions to my staff as to how to handle things like pretesting a survey to make sure that it renders intelligibly and that it follows the written programmer instructions. **The answer to the second question is no. It is not in my typical custom and practice to provide those types of instructions to my staff because it's pretty simple and they know what we're doing and why we're doing it.**
.
.
.
p. 158.

A.    And what I'm referring to in terms of quality checking is we would have had that in front of us at the time we took the survey to make sure that the programmer had programmed it correctly.
Q.    **But no form in your office as to check this was done, this was done, this was done. You're just saying someone reviewed it and it met all the criteria?**
**A.    Yes.**[42]

31.    Jason Mancuso is the Chief Executive Officer of Muscle Sports Products, LLC.[43]

32.    MSP is the party licensed to use the Kodiak Sports Nutrition mark from JRM NutraSciences.[44]

33.    MSP's "target demographic market is 18-35 year-old males and females located anywhere on the third rock from the Sun."[45]

34.    More specifically Jason Mancuso identified the target demographic as follows:

Q.    Are you aware of what kind of following   Kodiak Cakes has within the fitness community?
A.    I'm not.

---

[42] See Exhibit 2 pages 150:10-151:19 and 155:11-21 and 158:10-18 (emphasis added)
[43] See Defendant Muscle Sports Products, LLC'S Responses to Plaintiff's First Set of Discovery Requests attached hereto as Exhibit 5, Response to Request for Admission 8.
[44] See Exhibit 5, Response to Request for Admission 7
[45] See Exhibit 5, Response to Interrogatory No. 8.

4872-8003-3832.v1
4872-8003-3832.v1

Q.     Or the demographics and activity levels of people that Kodiak
Cakes targets for its product, do you have any knowledge or information
about that?

A.     They just appear to go after more of like the wholesome family to
get a little extra protein into their diet, **but they don't appear to go after
the fitness or body builders like we do.**

       **Our products are high protein.   Their products are just added
protein.  It is, honestly, two different products**.  If their product was in
our

industry, it would be considered a weight gainer because it's double the
carbs to the protein where like our 1Whey is high protein and maybe one
or two carbs.  It's two different things.[46]

---

[46] See Deposition Transcript of Jason Mancuso attached hereto as Exhibit 6 and incorporated herein by reference,
pages 153:21 – 154:13.

xxxi

**ARGUMENT**

I. **KODIAK CAKES BEARS THE BURDEN TO PROVE THAT FRANKLYN'S TESTIMONY AND REPORT ARE ADMISSIBLE**

This case is premised on a federal question.[47]  Thus, as with procedural questions, which are governed by the federal law of this court,[48] "[t]he admissibility of evidence . . .is generally governed by federal law."[49]

As a threshold matter, Kodiak Cakes engaged Franklyn to offer opinions in this case.[50] Rule 104 requires this court to "decide any preliminary question about whether a witness is qualified … or evidence is admissible."[51]  As Kodiak Cakes's witness, Kodiak Cakes bears the burden to establish that Franklyn's Report and testimony are admissible by a preponderance of proof.[52]

II. **FRANKLYN'S TESTIMONY AND REPORT SHOULD BE EXCLUDED**

A. **Legal Standards:  Rules 403 and 702 and Daubert**

As a general matter of evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice…, misleading the jury…, wasting time, or needlessly presenting cumulative evidence."[53]

Beyond the court's general discretion under Rule 403, Rule 702 requires this court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but

---

[47] See Docket Entry #2 (Complaint) at ¶ 4; see also Amended Complaint, Docket Entry #28 at ¶ 6.

[48] E.g., Hanna v. Plumber, 380 U.S. 460, 465 (1965).

[49] Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 880 (10th Cir. 2006) (quoting Macsenti v. Becker, 237 F.3d 1223, 1241 (10th Cir. 2001) (internal quotation mark omitted)).

[50] See Statement of Relevant Facts ("Facts"), supra, at ¶ 1.

[51] FED. R. EVID. 104(a).

[52] See Bourjaily v. United States, 483 U.S. 171, 175 (1987) (The inquiry "is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied" by a preponderance of proof); see also FED. R. EVID. 702 advisory committee's note (2000) (expert testimony admissibility is governed by Rule 104(a); "the proponent has the burden" to prove admissibility "by a preponderance of the evidence.").

[53] FED. R. EVID. 403.

1

reliable."[54]  Simply put, pursuant to Rule 702, the court functions as a "gatekeeper" in making decisions whether to admit or exclude expert testimony.[55]  This is a matter left to the sound discretion of district courts.[56]  To this end, Rule 702 states that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[57]

In practice, Rule 702 requires a two-part inquiry:  first, the court must "determine if the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline[,]" i.e., "whether the reasoning or methodology underlying the testimony is scientifically valid[;]" and, second, the court must determine whether the proposed testimony is "sufficiently relevant to the task at hand."[58]  Moreover, while neither definitive nor exhaustive, the following factors inform the first inquiry:

> (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques [or standards controlling the technique's operation], and (4) whether the theory or approach has general acceptance.[59]

Importantly, to be admissible, expert testimony must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[60]  This,

---

[54] Daubert, 509 U.S. at 589; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (applying Daubert's general holding to all expert testimony).

[55] E.g., Norris v. Baxter Healthcare Corp., 397 F.3d 878, 883 (10th Cir. 2005); Goebel v. Denver & Rio Grande W. R. Co., 346 F.3d 987, 991 (10th Cir. 2003).

[56] E.g., Kumho Tire, 526 U.S. at 141-42; Norris, 397 F.3d at 883.

[57] FED. R. EVID. 702.

[58] Norris, 397 F.3d at 883-884 (citing and quoting Daubert, 509 U.S. at 592-93 and 597 (internal quotation marks and alterations in original omitted)).

[59] Id. at 884 (quoting Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120-21 (10th Cir. 2004) (citations and internal quotation marks omitted)); see Kumho Tire, 526 U.S. at 150-51.

[60] Kumho Tire, 526 U.S. at 152.

2

in turn, requires meeting "exacting standards of reliability"[61]—"a grounding in the methods and procedures of science based on actual knowledge, not mere subjective belief or unsupported speculation."[62]  Indeed, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[63]  Put differently, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[64]  "It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."[65]  Simply put, "it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."[66]

### B.    Franklyn's Testimony and Report Should be Excluded Where Franklyn is Unqualified and His Opinions are Nearly Pure Speculation

#### 1.    Franklyn's Experience as a Lawyer and Law School Professor and Self Taught Survey Experience Does Not Sufficiently Qualify Him

As a threshold matter, Rule 702 allows expert testimony *only* where the witness "is qualified as an expert by knowledge, skill, experience, training, or education" pertinent to the opinions at issue.[67]  An individual's credentials, regardless of how impressive, are merely a starting point.  For example, in Ralston v. Smith & Nephew Richards, Inc.,[68] the plaintiff's expert, a board-certified orthopedic surgeon and associate professor of medicine, was properly excluded where she did not possess the requisite qualifications to testify on the relevant issue.[69]  Similarly, in

---

[61] Weisgram v. Marley Co., 528 U.S. 440, 455 (2000).
[62] Goebel, 346 F.3d at 991 (quoting Daubert, 509 U.S. at 590 (internal quotation marks omitted)); Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir. 2003) (same).
[63] Goebel, 346 F.3d at 992 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) internal quotation marks omitted)); see also Norris, 397 F.3d at 886 (same).
[64] Id. (internal quotation marks and alterations omitted).
[65] Id. (internal quotation marks omitted).
[66] Christian v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) (internal quotation marks omitted) (statements re: what might have happened are pure speculation); see also FED. R. EVID. 702 advisory committee's note (2000) (expert testimony must be objective, not conclusory).
[67] FED. R. EVID. 702; see also Norris, 397 F.3d at 883-884.
[68] 275 F.3d 965 (10th Cir. 2001).
[69] Id. at 967, 969-70 (although well-credentialed, expert excluded where she had not done research or published in the area for which she was offering opinions).

3

<u>Broadcort Capital Corp. v. Summar Medical Corp.</u>,[70] the Tenth Circuit affirmed the exclusion of an attorney-expert that, while having "some education and training in the field," including "experience that any attorney would receive representing clients in the area of securities law," his "general experience and education did not qualify [him] as an expert…."[71]

In this case, there is no dispute that Franklyn is a well-educated, former practicing attorney, with a wealth of experience teaching trademark law and even some experience teaching business marketing and survey classes.[72]  Nevertheless, Franklyn lacks the requisite "knowledge, skill, experience, training, or education"[73] necessary to qualify him as an expert in designing and conducting trademark surveys.  First and foremost, Mr. Franklyn has no formal training in designing and conducting trademark surveys.  Mr. Franklyn does not hide this fact instead wearing almost as a badge of honor the fact that he is "largely self-taught."[74] Mr. Franklyn's lack of training evidence the problem all court's face when presented with trademark "survey" experts.  As Franklyn himself admits, there is no license or training required in his field.[75] When asked "if there's no license and no licensing board, who determines what a common or accepted methodology is for these surveys?" Mr. Franklin states:

> Judges over the course of the last 20, 30 years, as reviewing different types of surveys that have been presented and either found methodologically sound and, you know, adequate or not found to be sound and adequate.  But through a trial and error process, by the common law process."[76]

Rule 702 does not contemplate being qualified as an expert by the "court" through a "trial and error" process.   Instead, Rule 702 requires qualification based on knowledge, skill, experience, training or education." While there is no doubt that Mr. Franklyn possesses legal knowledge, there is nothing in his C.V. or testimony to support that he possesses technical skill, experience or

---

[70] 972 F.2d 1183 (10th Cir. 1992).
[71] <u>Id.</u> at 1194-95.
[72] See Exhibit 3.
[73] FED. R. EVID. 702; <u>see also</u> <u>Norris</u>, 397 F.3d at 883-884.
[74] See Statement of Fact 12.
[75] See Statement of Fact ¶ 13.
[76] See Statement of Fact  ¶ 14.

4872-8003-3832.v1
4872-8003-3832.v1

training to conduct marketing surveys about consumers.  Franklyn's teaching experience and trial and error survey experience do not anoint him with the technical skill, training, scientific knowledge or other specialized knowledge to render his opinions in this case.  Simply deciding to become a survey taker and studying really hard, doesn't make one an expert.  This is especially true where the self-anointed expert has no formal training, no marketing experience, no advertising experience, no survey design experience, no survey taking experience and no licensing or other technical board certification to validate his self-proclaimed label.[77]  Nevertheless, Franklyn was engaged—and repeatedly opines—that the consumers in the entire United States of America are "confused as to source, sponsorship, or affiliation" between the two companies to this lawsuit.  In short, while Franklyn is potentially an expert in something, he lacks the requisite qualifications to help the fact finder understand the alleged "evidence" about which he is expressing opinions.

2. <u>Franklyn's Opinions Amount to Little More than Rank Speculation that Do Not Assist the Finder of Fact</u>

Worst of all, Franklyn's primary "expert" method is speculation.  As set forth above, "it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."[78]  In this case, Franklyn's opinions lack the "intellectual rigor that characterizes the practice of an expert in the relevant field"[79] inasmuch as his opinions comprise little more than "mere subjective belief [and] unsupported speculation" rather than being grounded in "the methods and procedures of science based on actual knowledge."[80]  First, the heart of Franklyn's opinions is that, there is confusion in the "interested universe."  Problematically for Mr. Franklyn, in addition to lacking the formal training and skill necessary to design and conduct surveys, his opinions cannot be and have not been (1) "tested," (2) subjected "to peer review or publication," (3) "general[ly] accepted," or (4) the subject of known rates of error or standards for controlling the same.[81]  In

[77] See Statements of Fact ¶¶ 8, 9 10 and 11.
[78] <u>Christian</u>, 332 F.3d at 1283 (internal quotation marks omitted).
[79] <u>Kumho Tire</u>, 526 U.S. at 152.
[80] <u>Goebel</u>, 346 F.3d at 992.
[81] <u>See</u>, <u>e.g.</u>, <u>Norris</u>, 397 F.3d at 884.

5

short, Franklyn's testimony is, in effect, immune to objective challenge; it comprises "a subjective, conclusory approach that cannot reasonably be assessed for reliability."[82]

Franklyn's subjective methodology begins with his definition of the "interested universe." His own testimony shows that this is not based on any scientific or specialized knowledge, and definitely isn't tested, subject to peer review or generally accepted. He states:

> Q.    What do you mean by "the interested universe of consumers"?
> A.    The interested universe of consumers in this case for the three confusion surveys is predominately, although not exclusively, predominately people who have bought in the past or who are likely to buy in the future the type of products sold by the defendant.  I said predominantly but not exclusively because whereas here you have a plaintiff that makes a product that in terms of its composition, i.e., protein added, overlaps with the market for the types of people who buy the defendant's types of products, then it can be prudent to include in the interested universe a certain subset of survey takers who are also participants in the plaintiff's market, meaning that they have bought or are likely to buy in the future the foods with protein added.
>        And so in this survey I think we see some evidence of different types of people in the relevant survey taking universe.
> Q.    And so how did you determine that the brands overlapped between the plaintiff and the defendant in this case?
> A.    I determined that the brands overlapped based on conversations with counsel, conversations with my college-aged children and their friends, based on general market research that I did on the Internet to determine that there is plausibly a group of people who buy pancake mixes and the like with extra protein for a variety of health and body building related reasons, and that they overlap with people who would also buy nutritional supplements that have added protein for similar reasons.
> Q.    Why were you looking -- you used the term "for health and body building purposes."  Why were those types of consumers important to you?
> A.    It seemed to me that a person who would buy your client's product here, for example, the 1Whey product with the added protein for a variety of reasons, one of which is to just simply have more protein in her diet if she feels that her normal eating patterns don't yield a lot of protein.
>        But in addition to that, to have people in that survey who take this sort of buy and ingest this type of product, not primarily to -- I suppose what it would say -- add protein to an otherwise protein deficient diet, but

---

[82] See FED. R. EVID. 702 advisory committee's note (2000).

4872-8003-3832.v1
4872-8003-3832.v1

to add enough protein so that it would support their exercise regimens in building muscle and health.

Q.   So when you determined the interested universe of consumers, you are the one who determined what that interested universe of consumers was or is for the defendant's products?

A.   Yes and no.  The case law and trademark law teaches us pretty clearly that when one is doing a likelihood of infusion survey, in particular, it wouldn't necessarily be the same interested universe when one is doing a brand recognition survey that's trying to evaluate the strength of the plaintiff's brand, for example, which is a type of survey that I did here.

But that the case law and literature teaches that when one is doing a forward confusion survey as opposed to a reverse confusion survey, the typical target interested universe is people who have bought or are likely to buy the type of product that the defendant sells.

And so I needed to collect information based on Internet research, based on conversations with counsel, and what other -- and ideally based on document productions that had been requested, to my knowledge not satisfactorily provided by your client or answered by your client, to determine to the best extent practicable under the circumstances the demographics on the types of people who buy your client's products.

And so I used what I got in the case, and I used what I could find on my own to the best of my ability approximate that market.[83]

The final sentence in this explanation sums up the subjective nature of these opinions:  Mr Franklyn "used what [he] got in the case, and [he] used what [he] could find on [his]own to the best of [his] ability to approximate that market."  His sources include, counsel from attorneys for the plaintiffs, his college aged children, his children's friends, caselaw, and some document production in this case (although he later admits that no documents were physically presented to him -just highlights presented by attorneys for the defendants)[84]  Using those sources, how could this court ever be led astray? Unfortunately for Franklyn, these are not the sources that characterize "the methods and procedures of science."

When the subject of verifying the accuracy of his surveys is addressed, Franklyn's answers again show the subjective and non-scientific basis of his opinions.  Mr. Franklyn's own words say it best:

---

[83] See Statement of Facts para. 25.
[84] See Statement of Fact para. 6.

4872-8003-3832.v1
4872-8003-3832.v1

Q.    If I understand your answer, there is no established or you're unaware of any established margin of error for the Eveready survey; is that correct?

A.    To my knowledge, when you use the word "established," that's where I'm getting hung up with.  The rule of thumb is that to the extent possible, margins of error in surveys, not just Eveready and nonspecific to Eveready or Squirt is a 95 percent confidence involved with them, and approximately a 5 percent margin of error, one direction or another.

And these metrics are taken from social science marketing research generally and they're not unique or specific to a Squirt or an Eveready.

Q.    Can you explain that to me, a 95 percent confidence?  Did I hear that correctly, you said a 95 percent confidence?

A.    Yes.  Interval.

Q.    And what does that mean, a 95 percent confidence that who has?  Who establishes this 95 percent confidence?

A.    I do.  As the survey expert I take a look at the data and at the size of the group that took the survey.  I look at the answers to the questions and the range of answers.  And there's a formula that I can use and do use to calculate a margin of error for any given survey that I administer.[85]

Who determines that the survey falls within the 95 percent level of confidence?  Mr. Franklyn.  Based on what?  An acceptable rate of error?  But, Mr. Franklyn has no idea how to calculate the rate of error, didn't provide the calculations in his report and when pressed on the subject couldn't even identify what the variables in the rate of error formula stood for.[86]

Mr. Franklyn's subjective biases shine through when interpreting the responses from his survey takers.  While Mr. Franklyn is very well-educated and could likely lead an interesting and informative discussion on trademark law to legal students, he assumes that the survey takers have knowledge which he cannot verify nor test.  Mr. Franklyn did not define terms like marks, trademarks, logos or brands for his survey takers which resulted in assuming the meaning for various responses, including conflating the meanings of "logo", "brand" and "mark."[87]  This leads to his conclusions being his subjective interpretation of the responses instead of any reliable scientifically backed results.[88]

---

[85] See Statement of Fact paragraph 20.
[86] See Statements of Fact paragraphs 19, 20, 21 and 22.
[87] See Statements of Fact paragraph 28 and 29.
[88] See Statement of Fact paragraph 28 stating: Q: But back to my question, Mr. Franklyn, so is there anywhere in Survey Number 3, where you asked individuals about their meaning of the word "logo"?

4872-8003-3832.v1
4872-8003-3832.v1

In sum, the court is presented with Mr. Franklyn's subjective materials masquerading as reliable and objective social science marketing surveys evidence, for which Mr. Franklyn has no experience, no understanding of how to calculate its rate of error and no peers or peer review test to submit his results, to verify accuracy. In sum, these are Mr. Franklyn's subjective methods and opinions and no one else's. Indeed, it is mere advocacy.

At bottom, Franklyn's testimony and Report are inadmissible because (1) they are either not based on sufficient facts or they ignore obvious countervailing facts, (2) they are not the product of reliable principles and methods, and (3) Franklyn has not reliably applied the principles and methods to the facts in this case.[89] Put differently, "there is simply too great an analytical gap between the data and the opinion proffered."[90] Accordingly, Franklyn's Report and testimony should be excluded.

### C. Franklyn's Report and Testimony are unreliable as he did not survey the correct universe of consumers.

"To demonstrate trademark infringement, plaintiff must prove "that it ha[d] a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers."[91] Of key importance is whether "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question."[92]

The primary goal of a survey is to reliably get inside the minds of the relevant consuming public to assess whether confusion is likely. "'The first step in designing a survey' to gauge . . . confusion 'is to determine the 'universe to be studied,' that is, the segment of the population whose

---

A.   Individuals were free to explain in the open ended what either -- expressly or by implication what they would mean by the word "logo" when they make reference thereto. And I think people based on my prior work in this for 20 years have a pretty good sense of what a logo is.

[89] E.g., Norris, 397 F.3d at 884.

[90] See Goebel, 346 F.3d at 992.

[91] Valador, Inc. v. HTC Corporation, 242 F. Supp. 3d 448, 453 (E.D. Va. 2917) (citing Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 171 (4th Cir. 2006) (quotation marks omitted))

[92] Id. (citing George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009) (quoting CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006)).

4872-8003-3832.v1
4872-8003-3832.v1

perceptions and state of mind are relevant in this case." [93] "Courts have recognized two forms of confusion in trademark infringement cases: 'forward confusion' and 'reverse confusion.' The traditional pattern of forward confusion occurs 'when customers mistakenly think that the junior user's goods or services are from the same source as or connected with the senior user's goods or services.'"[94] "By contrast, in a reverse confusion case, the junior user overwhelms the market such that 'customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user.'"[95] Mr. Franklyn appears to be applying a forward confusion test where defendants are trading on the goodwill and reputation of Kodiak Cakes. When applying a forward confusion methodology the "proper universe to survey is the potential buyers of the junior user's good or services."[96]

In the immediate case Franklyn never properly identified the defendants' users. Instead, Franklyn admittedly bastardized his surveys by replacing "potential buyers" with his own category of users which he described as consumers consuming protein added foods for "health and body building" purposes.   Franklyn's describes this universe as follows:

> Q.     What do you mean by "the interested universe of consumers"?
>    A.    The interested universe of consumers in this case for the three confusion surveys is predominately, although not exclusively, predominately people who have bought in the past or who are likely to buy in the future the type of products sold by the defendant.  I said predominantly but not exclusively because whereas here you have a plaintiff that makes a product that in terms of its composition, i.e., protein added, overlaps with the market for the types of people who buy the defendant's types of products, then it can be prudent to include in the interested universe a certain subset of survey takers who are also participants in the plaintiff's market, meaning that they have bought or are likely to buy in the future the foods with protein added.
>         And so in this survey I think we see some evidence of different types of people in the relevant survey taking universe.

---

[93] Valador, Inc. at 459 (citing 6 McCarthy on Trademarks, § 32:159).
[94] Valador, Inc. at 453 (citing 4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed. 2017)).
[95] Id. (citation omitted).
[96] 6 McCarthy on Trademarks § 32: 159.

Q.    And so how did you determine that the brands overlapped between the plaintiff and the defendant in this case?

A.    I determined that the brands overlapped based on conversations with counsel, conversations with my college-aged children and their friends, **based on general market research that I did on the Internet** to determine that there is plausibly a group of people who buy pancake mixes and the like with extra protein for a variety of **health and body building** related reasons, **and that they overlap with people who would also buy nutritional supplements that have added protein for similar reasons**.

Q.    Why were you looking -- you used the term "**for health and body building purposes.**"  Why were those types of consumers important to you?

A.    It seemed to me that a person who would buy your client's product here, for example, the 1Whey product with the added protein for a variety of reasons, one of which is to just simply have more protein in her diet if she feels that her normal eating patterns don't yield a lot of protein.

But in addition to that, to have people in that survey who take this sort of buy and ingest this type of product, not primarily to -- I suppose what it would say -- add protein to an otherwise protein deficient diet, but **to add enough protein so that it would support their exercise regimens in building muscle and health**.

Q.    So when you determined the interested universe of consumers, you are the one who determined what that interested universe of consumers was or is for the defendant's products?

A.    Yes and no.  The case law and trademark law teaches us pretty clearly that when one is doing a likelihood of infusion survey, in particular, it wouldn't necessarily be the same interested universe when one is doing a brand recognition survey that's trying to evaluate the strength of the plaintiff's brand, for example, which is a type of survey that I did here.

But that the case law and literature teaches that when one is doing a forward confusion survey as opposed to a reverse confusion survey, the typical target interested universe is people who have bought or are likely to buy the type of product that the defendant sells.

And so I needed to collect information based on Internet research, based on conversations with counsel, and what other -- and ideally based on document productions that had been requested, to my knowledge not satisfactorily provided by your client or answered by your client, to determine to the best extent practicable under the circumstances the demographics on the types of people who buy your client's products.

And so I used what I got in the case, and I used what I could find on my own to the best of my ability approximate that market.[97]

---

[97] Statement of Facts ¶ 25 (emphasis added).

11

But, even assuming that this untested and unreliable "health and body building" consumer is the correct consumer for defendants' products, Franklyn's survey in no way limited the survey takers to that sub group.  Franklyn asked the following gatekeeping questions to every survey taker: 1. Their age; 2. Their gender; 3.  Their state of residence in the United States;  4. An industry sensitive question about marketing and/or advertising employees in the household; 5.   Whether they purchased certain "nutritional" products; 6.  Where they purchased those "nutritional" products; 7.  The likelihood of purchasing the "nutritional" products in the next 12 months; and 8. Where they would purchase those products in the next 12 months.[98]  "In order to qualify for the survey, consumers had indicate they were over 18 years of age, lived in the United States and select that they had either purchased one of the seven identified products and/or intended to purchase one of those products in the next 12 months."[99]  Nowhere in the gatekeeping questions did Mr. Franklyn ask any questions related to the alleged "health and body building" aspect of this class of consumers.  Mr. Franklyn's survey and report is too broad and should be excluded.

Over inclusive surveys are rejected by courts because they fail to identify relevant consumers and thus produce unreliable evidence.  A survey is too broad if it does not sufficiently limit its results to the relevant consumers "in the market" for a product like defendant's protein powder.  Franklyn's survey "resembles the survey rejected in Weight Watchers, a trademark infringement suit over unauthorized use of plaintiff's 'Lean Cuisine' mark.  Notably, the district court in Weight Watchers held that a survey was unreliable and over-inclusive where the survey universe comprised women between the ages of 18 and 55 who (1) had purchased frozen food entrees in the past six months and (2) had tried to lose weight through diet or exercise in the past year. The court concluded that because 'some of the respondents may not have been in the market for diet food of any kind ... the study universe therefore was too broad.'"[100]  That same logic

---

[98] See Statement of Facts ¶ 27 (setting forth in detail each of the gatekeeping questions).
[99] See Expert report. P. 26.
[100] Valador, Inc. v. HTC Corp., 242 F. Supp. 3d at 461 (citing Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990)(emphasis added)).

4872-8003-3832.v1
4872-8003-3832.v1

renders Mr. Franklyn's report unreliable: the survey participants were not required to be protein powder consumers, but only needed to intend to consume food with added protein or protein powder.[101]   Mr. Franklyn's use of the exclusive "or" allowed his results to include irrelevant consumers.  Franklyn's conclusions are therefore too unreliable to pass muster under Rule 702 and the principles of <u>Daubert</u>.

Moreover, Franklyn appears to ignore the discovery responses from the Defendants wherein the Defendants specifically identify their target consumer base as 18-35 year-olds.[102] Additionally, Franklyn does not address the fitness and body building focus identified by Jason Mancuso in his deposition.[103] These narrowing factors were clearly identified by the defendants in this case, yet inexplicably ignored by Mr. Franklyn when conducting his surveys.  Similar to expert in <u>Weight Watchers</u>, Mr. Franklyn's report should be excluded and he should not be qualified as an expert under Rule 702.

Additionally, even if Mr. Franklyn was employing a "reverse confusion" survey, focusing on the consumers likely to purchase Kodiak Cakes' products instead of defendants' products, his surveys participants are still too broad.  When identifying the universe of consumers in this case Franklyn said the following about users of Kodiak Cakes:

> Q. So I'll reask the question.  As far as Kodiak Cakes is concerned, did you do any research to see what age group typically eats Kodiak Cakes pancakes?
> A.   Yes.
> Q.   And what research was that?
> A.   I spoke with counsel about that and asked what evidence of the record they had regarding that.
> Q.   And did you review any documentation?
> A.   That, I don't recall.
> Q.   If you would have reviewed any documents, you would have put it on the list of documents that you reviewed in this case, but there is no other document listed, right?
> A.   Correct.

---

[101] See Exhibit 1 p. 26.
[102] See Statement of Fact ¶ 33
[103] See Statement of Fact ¶ 34

4872-8003-3832.v1
4872-8003-3832.v1

Q.    So am I correct in assuming that you didn't review any other documents?

A.    Or I forgot about them and don't have a recollection of them.
But I -- I have a recollection of talking to Mr. Harmond and Mr. Hummel
about this set of questions.
Q.    Okay.   And what is your understanding as
to the age group that typically eats Kodiak Cakes pancakes?
A.    It's younger males, adult males, perhaps between the ages of 18
and 35.   Although I can't remember exactly if that was like the upper end.
But there are also people who are non-male and over 35 who buy and eat
Kodiak Cakes pancakes.
Q.    And the source of this was the people that are paying you for this
litigation; is that correct?
      MR. HARMOND:   Objection, asked and
answered.
      THE WITNESS:   What do you mean?   That seems like --
Q.    (BY MR. SINK)   The source of this information that it's 18- to
35-year-olds, skewing male, would be Kodiak Cakes?
A.    I believe so.   I believe that counsel for Kodiak Cakes acquired
knowledge about the likely demographics for purchasers of Kodiak Cakes
through their client.[104]

The consumers identified by Franklyn as consuming Kodiak Cakes' products are male 18-35.

First, as set forth in the gatekeeping questions outlined above, Mr. Franklyn did not limit the survey

to 18-35 year old males.   His survey was taken based on the purchase of foods, being over 18 years

of age and had nothing to do with gender.[105]   Moreover, even if Mr. Franklyn had limited the

surveys to males aged 18-35, under the principles set forth in the Weight Watcher's case his survey

gatekeeping question still did not sufficiently narrow the survey field to "individuals in the market"

for Kodiak Cakes' products as the list of products queuing the survey participants included

vitamins and other "nutritional" products which Kodiak Cakes does not produce.   Under both the

forward and reverse confusion tests Mr. Franklyn's employed gatekeeping questions did not

sufficiently identify and limit the proper field of survey participants and therefore is too broad.

**D.   Franklyn's Report and Testimony are either Irrelevant to the Task at Hand or
Will Not be Helpful to the Fact Finder**

---

[104] See Statements of Facts ¶ 24
[105] See Statement Facts ¶ 27 and expert report pages 22-26.

14

Owing to Franklyn's failure to properly identify and limit the proper universe, Franklyn's Report and testimony are irrelevant to the task as hand, i.e., providing meaningful opinions as to whether there is a likelihood of confusion in the marketplace.[106]  At a minimum, the surveys' systemic errors undermine Franklyn's ability to help the jury get inside the mind of the relevant consumes and understand the evidence or determine facts in issue.  Moreover, Franklyn's Report essentially offers nothing more than a recitation of cherry-picked facts and or made-up facts, i.e., that Kodiak Cakes' primary consumers are 18-35 year old males, followed by Franklyn's personal advocacy as to confusion in the marketplace[107] without properly identifying and limiting the proper survey takers. Such testimony is inadmissible as it addresses "lay matters which the trier of fact is capable of understanding and deciding without [Franklyn's] help."[108]  Accordingly, Franklyn's Report and testimony should be excluded as both irrelevant and unhelpful to the jury.

    1.    <u>Assuming Franklyn Scrapes by Rule 702, the Marginal Probative Value of His Report and Testimony are Outweighed by Unfair Prejudice</u>

Given the limited probative value of Franklyn's Report and testimony (discussed, <u>infra</u>), the Report and testimony should be excluded, if for no other reason, because its marginal value will be grossly outweighed by the danger of unfair prejudice.  Merely identifying Franklyn as an expert will elevate his testimony in the minds of the jury above other fact witnesses despite his testimony being less reliable.[109]  Moreover, as Franklyn's Report merely provides advocacy and biased opinions which the jury will need to determine on its own, Franklyn's Report and testimony

---

[106] <u>E.g.</u>, <u>Norris</u>, 397 F.3d at 883-84.

[107] <u>See</u> Ex. 1 (Franklyn Report), <u>passim</u>.

[108] <u>See</u> <u>Liberty Media Corp. LMC v. Vivendi Universal, S.A.</u>, 874 F.Supp.2d 169, 172 (S.D.N.Y. 2012) (quoting <u>Andrews v. Metro N. Commuter R.R. Co.</u>, 882 F.2d 705, 708 (2d Cir. 1989) (internal quotation marks omitted)); <u>see also</u> <u>id.</u> at 178 (excluding expert testimony regarding open closing conditions for raising "a pure question of fact" which the jury can determine on its own based on the evidence of record); <u>IFreedom Direct Corp. v. First Tennessee Bank Nat'l Ass'n</u>, Civ. No. 2:09-cv-205-DN, 2012 WL 3067598, at *3 (D. Utah July 27, 2012) (unpublished) (precluding expert from merely summarizing the facts or depositions of others as this is the "fact-finder's function" and would implicate a "needless presentation of cumulative evidence and a waste of time …[;] a party may not elevate and advocate the value of individual evidence by having it recounted by an expert." (citations and internal quotation marks omitted)).

[109] <u>See</u> FED. R. EVID. 403.

should be excluded where it will needlessly present cumulative evidence and otherwise simply waste time.[110]

<b><u>CONCLUSION</u></b>

For all of the foregoing reasons, Franklyn's testimony and Report should be excluded.

DATED this 8th day of July, 2022.

Respectfully submitted,

**KIRTON│McCONKIE**

By: */s/Jeremy C. Sink*
    Jeremy C. Sink
    Dax Anderson

*Attorneys for Defendants*

---

[110] See IFreedom, Civ. No. 2:09-cv-205-DN, 2012 WL 3067598, at *3.

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she caused a copy of the foregoing to be served on

the following via CM/ECF and email.


MANNING CURTIS BRADSHAW &
BEDNAR PLLC
Alan C. Bradshaw, #4801 Chad R.
Derum, #9452 Michael E. Harmond,
#17230
136 East South Temple, Suite 1300 Salt Lake
City, Utah 84111 Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com cderum@mc2b.com
mharmond@mc2b.com

Stephen H. Bean
Nicholas Wells
Legends Law Group, PLLC 330 N
Main
Kaysville, UT 84037
steve@legendslaw.com
nwells@legendslaw.com


 Dated: July 8, 2022                    */Margaret Carlson*

4872-8003-3832.v1
4872-8003-3832.v1