MANNING CURTIS BRADSHAW
& BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
Michael E. Harmond, #17230
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com
cderum@mc2b.com
mharmond@mc2b.com

LEGENDS LAW GROUP, PLLC
Stephen H. Bean #9240
Nicholas Wells #10150
330 N Main
Kaysville, UT  84037
steve@legendslaw.com
nwells@legendslaw.com

*Attorneys for Plaintiff Kodiak Cakes, LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah limited liability corporation,<br><br>Plaintiff,<br><br>v.<br><br>JRM NUTRASCIENCES, LLC, a New York limited liability corporation, MUSCLE SPORTS PRODUCTS, LLC, a New York limited liability corporation, and JASON MANCUSO, an individual;<br><br>Defendant. | **APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ITS ESTABLISHMENT OF COMMON LAW RIGHTS TO THE KODIAK MARKS**<br><br>Civil No. 2:20-cv-00581-DBB-JCB<br><br>District Judge David Barlow<br>Magistrate Judge Jared C. Bennett<br><br><br>*<u>Redacted Version</u>* |

Pursuant to DUCivR 56-1(e), Plaintiff Kodiak Cakes, LLC ("Kodiak") submits this

Appendix of Evidence, which includes all evidence relied upon in Plaintiff's contemporaneously

filed Motion for Summary Judgment on Its Establishment of Common Law Rights to the Kodiak

Marks.  The evidence set forth below includes several of Kodiak's trademark registrations.  *See*

Exs. A, B, C, & S.  It also includes a declaration of Kodiak's CEO, Joel Clark.  *See* Exhibit D.

Attached to Clark's declaration are 9 exhibits that the declaration describes and authenticates.

Also included are the report and curriculum vitae of Kodiak's expert, Professor David Franklyn.

*See* Exhibits F & G.  Exhibit E is the Safeway grocery chain's 2004 annual report.  Exhibits H,

K, L, N, Q, and R are responses to interrogatories and requests for admission by Defendants

JRM Nutrasciences, LLC, Muscle Sports Products, LLC, and Jason Mancuso.  Exhibits I and O

are excerpts from the 30(b)(6) deposition of Muscle Sports Products, LLC and the deposition of

Jason Mancuso, respectively.  Exhibits J, M, and P and exhibits to Muscle Sports Products,

LLC's and Jason Mancuso's depositions.

## INDEX OF EXHIBITS

Ex. A       TSDR Printout of U.S. Trademark Reg. No. 1992074

Ex. B       TSDR Printout of U.S. Trademark Reg. No. 5471172

Ex. C       TSDR Printout of U.S. Trademark Reg. No. 6441657

Ex. D       Declaration of Joel Clark  [***Confidential Document***]

Ex. E       Safeway 2004 Annual Report

Ex. F       Expert Report of David Franklyn

Ex. G       Curriculum Vitae of David Franklyn (Appendix A to Expert Report)

Ex. H       Muscle Sports Products LLC's Responses to Plaintiff's First Set of
            Discovery Requests

Ex. I       Excerpts of 30(b)(6) Deposition of Muscle Sports Products, LLC

Ex. J       Product List for Muscle Sports Products, LLC [***Confidential Document***]

Ex. K       JRM Nutrasciences, LLC's Responses to Plaintiff's First Set of
            Interrogatories

Ex. L          Jason Mancuso's Responses to Plaintiff's First Set of Discovery Requests

Ex. M         Kodiak Sports Nutrition Master Logo

Ex. N          JRM Nutrasciences, LLC's Responses to Plaintiff's Second Set of Interrogatories

Ex. O          Excerpts of Deposition of Jason Mancuso

Ex. P          Mancuso Instagram Post

Ex. Q         JRM Nutrasciences, LLC's Responses to Defendant's Second Set of Requests for Admissions

Ex. R         Muscle Sports Products, LLC's Responses to Defendant's Second Set of Discovery Requests

Ex. S         TSDR Printout of U.S. Trademark Reg. No. 2052194

## **CERTIFICATE OF SERVICE**

I hereby certify that on Friday, July 29, 2022, I filed the *Redacted Version* of the foregoing **APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ITS ESTABLISHMENT OF COMMON LAW RIGHTS TO THE KODIAK MARKS** with the Clerk of Court using the Electronic Court Filing System, which will send a notice of the electronic filing to:

Dax Anderson, Esq.
danderson@kmclaw.com
Kirton McConkie
36 S. State Street, Suite 1900
Salt Lake City, UT 84111

Stephen H. Bean
Utah Bar No.: 9240
**LEGENDS LAW GROUP, PLLC**
330 N Main
Kaysville, UT 84037
steve@legendslaw.com
(801) 337-4500

# EXHIBIT A

**Generated on:** This page was generated by TSDR on 2022-07-29 14:00:14 EDT

**Mark:** BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS



| | | | |
|---|---|---|---|
| **US Serial Number:** | 74608371 | **Application Filing Date:** | Dec. 08, 1994 |
| **US Registration Number:** | 1992074 | **Registration Date:** | Aug. 06, 1996 |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** The registration has been renewed.

**Status Date:** Sep. 10, 2015

**Publication Date:** Sep. 05, 1995 **Notice of Allowance Date:** Nov. 28, 1995

## Mark Information

**Mark Literal Elements:** BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS

**Standard Character Claim:** No

**Mark Drawing Type:** 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S)

**Disclaimer:** "CAKES" and "100% WHOLE GRAINS"

**Design Search Code(s):** 03.01.14 - Bears other than pandas or teddy bears; Koalas; Koala bears; Black bears; Grizzly bears; Polar bears
05.15.02 - Wreaths; Laurel leaves or branches (borders or frames)
24.09.01 - Flags, rectangular or square, excluding American flag or checkered flag
26.01.07 - Circles with a decorative border, including scalloped, ruffled and zig-zag edges
26.01.21 - Circles that are totally or partially shaded.
26.11.21 - Rectangles that are completely or partially shaded
26.11.25 - Rectangles with one or more curved sides

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** mixes for making bakery goods

| | | | |
|---|---|---|---|
| **International Class(es):** | 030 - Primary Class | **U.S Class(es):** | 046 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Nov. 27, 1995 | **Use in Commerce:** | Dec. 01, 1995 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |

| | | | |
|---|---|---|---|
| **Filed 44D:** No | | **Currently 44E:** No |
| **Filed 44E:** No | | **Currently 66A:** No |
| **Filed 66A:** No | | **Currently No Basis:** No |
| **Filed No Basis:** No | | |

# Current Owner(s) Information

**Owner Name:** KODIAK CAKES, LLC

**Owner Address:** 8163 Gorgoza Pines Rd.
Park City, UTAH UNITED STATES 84098

**Legal Entity Type:** LIMITED LIABILITY COMPANY   **State or Country** DELAWARE
**Where Organized:**

# Attorney/Correspondence Information

### Attorney of Record

**Attorney Name:** Nicholas D. Wells   **Docket Number:** 4805.02

**Attorney Primary Email Address:** nwells@legendslaw.com   **Attorney Email Authorized:** Yes

### Correspondent

**Correspondent Name/Address:** Nicholas D. Wells
Legends Law Group, PLLC
330 Main St.
Kaysville, UTAH UNITED STATES 84037

**Phone:** 8013374500

**Correspondent e-mail:** nwells@legendslaw.com
docket@legendslaw.com   **Correspondent e-mail Authorized:** Yes

### Domestic Representative - Not Found

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jul. 14, 2021 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Oct. 14, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Oct. 14, 2020 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Oct. 14, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 14, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 14, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Feb. 12, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Feb. 12, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 03, 2018 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Jun. 21, 2017 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Apr. 26, 2016 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 26, 2016 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Jan. 11, 2016 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Sep. 10, 2015 | NOTICE OF ACCEPTANCE OF SEC. 8 & 9 - E-MAILED | |
| Sep. 10, 2015 | REGISTERED AND RENEWED (SECOND RENEWAL - 10 YRS) | 68502 |
| Sep. 10, 2015 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | 68502 |
| Sep. 10, 2015 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 68502 |
| Aug. 11, 2015 | TEAS SECTION 8 & 9 RECEIVED | |
| Aug. 06, 2015 | COURTESY REMINDER - SEC. 8 (10-YR)/SEC. 9 E-MAILED | |
| Mar. 11, 2015 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Mar. 11, 2015 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Mar. 11, 2015 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |

| Date | Event | Number |
|------|-------|--------|
| Mar. 11, 2015 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Feb. 05, 2009 | WITHDRAWAL OF ATTORNEY GRANTED | |
| Feb. 05, 2009 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED | |
| Oct. 24, 2008 | NOTICE OF DESIGN SEARCH CODE MAILED | |
| Oct. 15, 2006 | REGISTERED AND RENEWED (FIRST RENEWAL - 10 YRS) | 73376 |
| Oct. 15, 2006 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | |
| Oct. 15, 2006 | ASSIGNED TO PARALEGAL | 73376 |
| Jul. 31, 2006 | REGISTERED - COMBINED SECTION 8 (10-YR) & SEC. 9 FILED | |
| Aug. 02, 2006 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Jul. 31, 2006 | TEAS SECTION 8 & 9 RECEIVED | |
| Jul. 17, 2006 | CASE FILE IN TICRS | |
| Sep. 14, 2002 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Aug. 07, 2002 | REGISTERED - SEC. 8 (6-YR) & SEC. 15 FILED | |
| Aug. 07, 2002 | PAPER RECEIVED | |
| Aug. 06, 1996 | REGISTERED-PRINCIPAL REGISTER | |
| May 08, 1996 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| May 08, 1996 | ASSIGNED TO EXAMINER | 70722 |
| Apr. 29, 1996 | STATEMENT OF USE PROCESSING COMPLETE | |
| Jan. 30, 1996 | USE AMENDMENT FILED | |
| Nov. 28, 1995 | NOA MAILED - SOU REQUIRED FROM APPLICANT | |
| Sep. 05, 1995 | PUBLISHED FOR OPPOSITION | |
| Aug. 04, 1995 | NOTICE OF PUBLICATION | |
| May 30, 1995 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| May 25, 1995 | EXAMINER'S AMENDMENT MAILED | |
| May 17, 1995 | ASSIGNED TO EXAMINER | 70722 |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | |
|---|---|
| Current Location: GENERIC WEB UPDATE | Date in Location: Sep. 10, 2015 |

# Assignment Abstract Of Title Information

**Summary**

| | |
|---|---|
| **Total Assignments:** 5 | **Registrant:** CLARK, JONATHAN |

**Assignment 1 of 5**

| | |
|---|---|
| **Conveyance:** ASSIGNS THE ENTIRE INTEREST | |
| **Reel/Frame:** 3357/0920 | **Pages:** 4 |
| **Date Recorded:** Jul. 31, 2006 | |
| **Supporting Documents:** assignment-tm-3357-0920.pdf | |

**Assignor**

| | |
|---|---|
| **Name:** JON CLARK | **Execution Date:** Jul. 26, 2006 |
| **Legal Entity Type:** INDIVIDUAL | **Citizenship:** UNITED STATES |

**Assignee**

| | |
|---|---|
| **Name:** BAKER MILLS, INC. | |
| **Legal Entity Type:** CORPORATION | **State or Country Where Organized:** UTAH |
| **Address:** P.O. BOX 521938<br>4104 S POWERS CIR<br>SALT LAKE CITY, UTAH 84124 | |

**Correspondent**

| | |
|---|---|
| **Correspondent Name:** RANDALL B. BATEMAN | |

| | |
|---|---|
| **Correspondent Address:** | P.O. BOX 1319<br>8 EAST BROADWAY, SUITE 550<br>SALT LAKE CITY, UT 84110 |

**Domestic Representative - Not Found**

### Assignment 2 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | ASSIGNS THE ENTIRE INTEREST | | |
| **Reel/Frame:** | 6076/0196 | **Pages:** | 4 |
| **Date Recorded:** | Jun. 02, 2017 | | |
| **Supporting Documents:** | assignment-tm-6076-0196.pdf | | |

**Assignor**

| | | | |
|---|---|---|---|
| **Name:** | BAKER MILLS, INC. | **Execution Date:** | May 25, 2017 |
| **Legal Entity Type:** | CORPORATION | **State or Country Where Organized:** | UTAH |

**Assignee**

| | | | |
|---|---|---|---|
| **Name:** | KODIAK CAKES, LLC | **State or Country Where Organized:** | DELAWARE |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | | |
| **Address:** | 3247 SANTA FE ROAD<br>PARK CITY, UTAH 84098 | | |

**Correspondent**

| | |
|---|---|
| **Correspondent Name:** | NICHOLAS D WELLS |
| **Correspondent Address:** | 330 N. MAIN ST.<br>KAYSVILLE, UT 84037 |

**Domestic Representative - Not Found**

### Assignment 3 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | SECURITY AGREEMENT | | |
| **Reel/Frame:** | 6445/0638 | **Pages:** | 11 |
| **Date Recorded:** | Sep. 27, 2018 | | |
| **Supporting Documents:** | assignment-tm-6445-0638.pdf | | |

**Assignor**

| | | | |
|---|---|---|---|
| **Name:** | KODIAK CAKES, LLC | **Execution Date:** | Sep. 27, 2018 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** | DELAWARE |

**Assignee**

| | | | |
|---|---|---|---|
| **Name:** | ACF FINCO I LP | **State or Country Where Organized:** | DELAWARE |
| **Legal Entity Type:** | LIMITED PARTNERSHIP | | |
| **Address:** | 560 WHITE PLAINS ROAD, SUITE 400<br>TARRYTOWN, NEW YORK 10591 | | |

**Correspondent**

| | |
|---|---|
| **Correspondent Name:** | JAMES MURRAY |
| **Correspondent Address:** | 4400 EASTON COMMONS WAY, SUITE 125<br>COLUMBUS, OH 43219 |

**Domestic Representative - Not Found**

### Assignment 4 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | SECURITY INTEREST | | |
| **Reel/Frame:** | 7344/0934 | **Pages:** | 10 |
| **Date Recorded:** | Jul. 02, 2021 | | |
| **Supporting Documents:** | assignment-tm-7344-0934.pdf | | |

| | | | |
|---|---|---|---|
| **Assignor** | | | |
| Name: | KODIAK CAKES, LLC | Execution Date: | Jun. 30, 2021 |
| Legal Entity Type: | LIMITED LIABILITY COMPANY | State or Country Where Organized: | DELAWARE |
| **Assignee** | | | |
| Name: | GOLUB CAPITAL LLC, AS COLLATERAL AGENT | State or Country Where Organized: | DELAWARE |
| Legal Entity Type: | LIMITED LIABILITY COMPANY | | |
| Address: | 200 PARK AVENUE NEW YORK, NEW YORK 10166 | | |
| **Correspondent** | | | |
| Correspondent Name: | LATHAM & WATKINS LLP C/O ANGELA M. AMARU | | |
| Correspondent Address: | 1271 AVENUE OF THE AMERICAS NEW YORK, NY 10020 | | |
| **Domestic Representative - Not Found** | | | |

## Assignment 5 of 5

| | | | |
|---|---|---|---|
| Conveyance: | RELEASE OF SECURITY INTEREST RECORDED AT REEL FRAME 6445/0638 | | |
| Reel/Frame: | 7347/0668 | Pages: | 7 |
| Date Recorded: | Jul. 07, 2021 | | |
| Supporting Documents: | assignment-tm-7347-0668.pdf | | |
| **Assignor** | | | |
| Name: | ACF FINCO I LP | Execution Date: | Jun. 30, 2021 |
| Legal Entity Type: | LIMITED PARTNERSHIP | State or Country Where Organized: | DELAWARE |
| **Assignee** | | | |
| Name: | KODIAK CAKES, LLC | State or Country Where Organized: | DELAWARE |
| Legal Entity Type: | LIMITED LIABILITY COMPANY | | |
| Address: | PO BOX 980992 PARK CITY, UTAH 84098 | | |
| **Correspondent** | | | |
| Correspondent Name: | ROB SONESON | | |
| Correspondent Address: | 300 N LASALLE KIRKLAND & ELLIS LLP CHICAGO, IL 60654 | | |
| **Domestic Representative - Not Found** | | | |

# Proceedings

| | |
|---|---|
| **Summary** | |
| Number of Proceedings: | 2 |

## Type of Proceeding: Opposition

| | | | |
|---|---|---|---|
| Proceeding Number: | 91264186 | Filing Date: | Aug 12, 2020 |
| Status: | Suspended | Status Date: | Jul 13, 2021 |
| Interlocutory Attorney: | MARY B MYLES | | |
| **Defendant** | | | |
| Name: | JRM NutraSciences, LLC | | |
| Correspondent Address: | HANI SAYED RUTAN & TUCKER LLP 611 ANTON BLVD, SUITE 1400 | | |

COSTA MESA CA UNITED STATES , 92626

Correspondent e-mail: trademarks@rutan.com , lherman@rutan.com , lweiland@rutan.com

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|------|-------------------|---------------|---------------------|
| KODIAK SPORTS NUTRITION | Abandoned - After Inter-Partes Decision | 86911351 | |

**Plaintiff(s)**

Name: Kodiak Cakes, LLC

Correspondent Address: NICHOLAS D WELLS
LEGENDS LAW GROUP PLLC
330 MAIN ST
KAYSVILLE UT UNITED STATES , 84037

Correspondent e-mail: nwells@legendslaw.com

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|------|-------------------|---------------|---------------------|
| KODIAK CAKES | REGISTERED AND RENEWED | 75031624 | 2052194 |
| KODIAK | Notice of Allowance - Issued | 88407044 | |
| 100% WHOLE GRAINS KODIAK CAKES PARK CITY | Registered | 87461577 | 5471172 |
| KODIAK SYRUP | Section 8 and 15 - Accepted and Acknowledged | 85965209 | 4509684 |
| KODIAK PARK CITY | Registered | 88404012 | 6639628 |
| SUPER FRUIT SYRUP PARK KODIAK CAKES CITY | Registered | 87606972 | 5458224 |
| BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS | REGISTERED AND RENEWED | 74608371 | 1992074 |
| 100% WHOLE GRAINS KODIAK PARK CITY | Registered | 88404043 | 6639629 |
| KODIAK CAKES | Notice of Allowance - Issued | 88406991 | |
| KODIAK | Registered | 88403983 | 6441657 |

**Prosecution History**

| Entry Number | History Text | Date | Due Date |
|--------------|-------------|------|----------|
| 8 | RESPONSE DUE 30 DAYS (DUE DATE) | Jul 13, 2022 | Aug 12, 2022 |
| 7 | SUSP PEND DISP OF CIVIL ACTION | Jul 13, 2021 | |
| 6 | D OPP/RESP TO MOTION | Jun 07, 2021 | |
| 5 | P MOT TO SUSP PEND DISP CIV ACTION | May 18, 2021 | |
| 4 | ANSWER | Sep 21, 2020 | |
| 3 | INSTITUTED | Aug 12, 2020 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Aug 12, 2020 | Sep 21, 2020 |
| 1 | FILED AND FEE | Aug 12, 2020 | |

## Type of Proceeding: Opposition

Proceeding Number: 91248870

Status: Terminated

Interlocutory Attorney: MARY B MYLES

Filing Date: Jun 17, 2019

Status Date: Apr 11, 2020

**Defendant**

Name: Bearpaw Heritage Grains LLC

Correspondent Address: BRIAN C NADLER
CHMELIK SITKIN & DAVIS PS
1500 RAILROAD AVE
BELLINGHAM WA UNITED STATES , 98225

Correspondent e-mail: ssweetin@chmelik.com , bnadler@chmelik.com

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|------|-------------------|---------------|---------------------|
| BEARPAW HERITAGE GRAINS | Abandoned - After Inter-Partes Decision | 87899855 | |

**Plaintiff(s)**

**Name:** Kodiak Cakes, LLC

**Correspondent Address:** LYNN E RZONCA
BALLARD SPAHR LLP
1735 MARKET STREET, 51ST FLOOR
PHILADELPHIA PA UNITED STATES , 19103-7599

**Correspondent e-mail:** rzoncal@ballardspahr.com , phila_tmdocketing@ballardspahr.com , seibelc@ballardspahr.com

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|------|--------------------|---------------|---------------------|
| BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS | REGISTERED AND RENEWED | 74608371 | 1992074 |

**Prosecution History**

| Entry Number | History Text | Date | Due Date |
|--------------|--------------|------|----------|
| 11 | TERMINATED | Apr 11, 2020 | |
| 10 | BD DECISION: OPP DISMISSED W/O PREJ | Apr 11, 2020 | |
| 9 | W/DRAW OF APPLICATION W/ CONSENT | Mar 31, 2020 | |
| 8 | SUSPENDED | Dec 18, 2019 | |
| 7 | D MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Dec 18, 2019 | |
| 6 | SUSPENDED | Sep 17, 2019 | |
| 5 | D MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Sep 17, 2019 | |
| 4 | ANSWER | Jul 26, 2019 | |
| 3 | INSTITUTED | Jun 17, 2019 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Jun 17, 2019 | Jul 27, 2019 |
| 1 | FILED AND FEE | Jun 17, 2019 | |

# EXHIBIT B

**Generated on:** This page was generated by TSDR on 2022-07-29 14:00:50 EDT

**Mark:** 100% WHOLE GRAINS KODIAK CAKES PARK CITY



| | | | |
|---|---|---|---|
| **US Serial Number:** | 87461577 | **Application Filing Date:** | May 23, 2017 |
| **US Registration Number:** | 5471172 | **Registration Date:** | May 15, 2018 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** May 15, 2018

**Publication Date:** Oct. 24, 2017 **Notice of Allowance Date:** Dec. 19, 2017

# Mark Information

**Mark Literal Elements:** 100% WHOLE GRAINS KODIAK CAKES PARK CITY

**Standard Character Claim:** No

**Mark Drawing Type:** 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S)

**Description of Mark:** The mark consists of a circular carrier having within its borders the wording "100% WHOLE GRAINS" on top and a wheat head curving along each side; within the circle is the torso and head of a bear with mouth open; across the bottom of the circular carrier appears a rectangular carrier with rounded ends and curving bottom, with the wording "KODIAK CAKES" in larger font and the wording "PARK" in smaller font to the left of "KODIAK" and "CITY" in smaller font to the right of "CAKES".

**Color(s) Claimed:** Color is not claimed as a feature of the mark.

**Disclaimer:** "100% WHOLE GRAINS", "CAKES" AND "PARK CITY"

**Design Search Code(s):** 03.01.20 - Heads of bears, excluding panda or teddy bears
03.01.23 - Stylized bears, excluding panda bears
05.07.02 - Stalks (grain); Haystacks; Bundles, grain
24.09.07 - Banners; Advertising, banners
26.01.17 - Two concentric circles; Concentric circles, two; Circles, two concentric
26.11.21 - Rectangles that are completely or partially shaded
26.11.28 - Rectangular shapes (miscellaneous overall shape); Miscellaneous designs with overall rectangular shape

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Mixes for bakery goods; Pancake mixes; waffle mixes; cookie mixes; brownie mixes; cornbread mixes; muffin mixes; waffles; cookies; brownies; cornbread; bread; muffins; cakes; Grain-based food bars and snack bars; Cereal based energy bars; Snack cakes; Grain-based snack foods; all of the aforementioned made in whole or in part from whole grains

**International Class(es):** 030 - Primary Class

**U.S Class(es):** 046

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Feb. 19, 2018          **Use in Commerce:** Feb. 19, 2018

## Basis Information (Case Level)

|  |  |
|---|---|
| **Filed Use:** No | **Currently Use:** Yes |
| **Filed ITU:** Yes | **Currently ITU:** No |
| **Filed 44D:** No | **Currently 44E:** No |
| **Filed 44E:** No | **Currently 66A:** No |
| **Filed 66A:** No | **Currently No Basis:** No |
| **Filed No Basis:** No | |

## Current Owner(s) Information

**Owner Name:** KODIAK CAKES, LLC

**Owner Address:** 8163 Gorgoza Pines Rd.
Park City, UTAH UNITED STATES 84098

**Legal Entity Type:** LIMITED LIABILITY COMPANY          **State or Country Where Organized:** DELAWARE

## Attorney/Correspondence Information

### Attorney of Record

**Attorney Name:** Nicholas D. Wells          **Docket Number:** 4805.54

**Attorney Primary Email Address:** nwells@legendslaw.com          **Attorney Email Authorized:** Yes

### Correspondent

**Correspondent Name/Address:** Nicholas D. Wells
Legends Law Group, PLLC
330 Main St.
Kaysville, UTAH UNITED STATES 84037

**Phone:** 8013374500

**Correspondent e-mail:** nwells@legendslaw.com
docket@legendslaw.com          **Correspondent e-mail Authorized:** Yes

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jan. 25, 2022 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Jan. 25, 2022 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Jan. 25, 2022 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Jan. 25, 2022 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Jan. 25, 2022 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Jul. 14, 2021 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Oct. 14, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Oct. 14, 2020 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Oct. 14, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 14, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 14, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Feb. 12, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Feb. 12, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 03, 2018 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| May 15, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Apr. 07, 2018 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |

| | | |
|---|---|---|
| Apr. 06, 2018 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Mar. 15, 2018 | STATEMENT OF USE PROCESSING COMPLETE | 66230 |
| Feb. 23, 2018 | USE AMENDMENT FILED | 66230 |
| Mar. 12, 2018 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 66230 |
| Feb. 23, 2018 | TEAS STATEMENT OF USE RECEIVED | |
| Dec. 19, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Oct. 24, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Oct. 24, 2017 | PUBLISHED FOR OPPOSITION | |
| Oct. 04, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Aug. 28, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Aug. 28, 2017 | EXAMINER'S AMENDMENT ENTERED | 88888 |
| Aug. 28, 2017 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 6328 |
| Aug. 28, 2017 | EXAMINERS AMENDMENT E-MAILED | 6328 |
| Aug. 28, 2017 | EXAMINERS AMENDMENT -WRITTEN | 81139 |
| Aug. 18, 2017 | ASSIGNED TO EXAMINER | 81139 |
| Jun. 01, 2017 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| May 31, 2017 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | |
| May 26, 2017 | NEW APPLICATION ENTERED IN TRAM | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | | |
|---|---|---|
| **Current Location:** | PUBLICATION AND ISSUE SECTION | **Date in Location:** Apr. 06, 2018 |

# Assignment Abstract Of Title Information

**Summary**

| | | |
|---|---|---|
| **Total Assignments:** 3 | | **Registrant:** KODIAK CAKES, LLC |

**Assignment 1 of 3**

| | | |
|---|---|---|
| **Conveyance:** | SECURITY AGREEMENT | |
| **Reel/Frame:** | 6445/0638 | **Pages:** 11 |
| **Date Recorded:** | Sep. 27, 2018 | |
| **Supporting Documents:** | assignment-tm-6445-0638.pdf | |

**Assignor**

| | | |
|---|---|---|
| **Name:** | KODIAK CAKES, LLC | **Execution Date:** Sep. 27, 2018 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** DELAWARE |

**Assignee**

| | | |
|---|---|---|
| **Name:** | ACF FINCO I LP | |
| **Legal Entity Type:** | LIMITED PARTNERSHIP | **State or Country Where Organized:** DELAWARE |
| **Address:** | 560 WHITE PLAINS ROAD, SUITE 400 TARRYTOWN, NEW YORK 10591 | |

**Correspondent**

| | |
|---|---|
| **Correspondent Name:** | JAMES MURRAY |
| **Correspondent Address:** | 4400 EASTON COMMONS WAY, SUITE 125 COLUMBUS, OH 43219 |

**Domestic Representative - Not Found**

**Assignment 2 of 3**

| | | |
|---|---|---|
| **Conveyance:** | SECURITY INTEREST | |
| **Reel/Frame:** | 7344/0934 | **Pages:** 10 |

**Date Recorded:** Jul. 02, 2021

**Supporting Documents:** assignment-tm-7344-0934.pdf

| Assignor | |
|---|---|
| **Name:** KODIAK CAKES, LLC | **Execution Date:** Jun. 30, 2021 |
| **Legal Entity Type:** LIMITED LIABILITY COMPANY | **State or Country Where Organized:** DELAWARE |

| Assignee | |
|---|---|
| **Name:** GOLUB CAPITAL LLC, AS COLLATERAL AGENT | **State or Country Where Organized:** DELAWARE |
| **Legal Entity Type:** LIMITED LIABILITY COMPANY | |
| **Address:** 200 PARK AVENUE NEW YORK, NEW YORK 10166 | |

| Correspondent |
|---|
| **Correspondent Name:** LATHAM & WATKINS LLP C/O ANGELA M. AMARU |
| **Correspondent Address:** 1271 AVENUE OF THE AMERICAS NEW YORK, NY 10020 |

**Domestic Representative - Not Found**

## Assignment 3 of 3

**Conveyance:** RELEASE OF SECURITY INTEREST RECORDED AT REEL FRAME 6445/0638

**Reel/Frame:** 7347/0668     **Pages:** 7

**Date Recorded:** Jul. 07, 2021

**Supporting Documents:** assignment-tm-7347-0668.pdf

| Assignor | |
|---|---|
| **Name:** ACF FINCO I LP | **Execution Date:** Jun. 30, 2021 |
| **Legal Entity Type:** LIMITED PARTNERSHIP | **State or Country Where Organized:** DELAWARE |

| Assignee | |
|---|---|
| **Name:** KODIAK CAKES, LLC | **State or Country Where Organized:** DELAWARE |
| **Legal Entity Type:** LIMITED LIABILITY COMPANY | |
| **Address:** PO BOX 980992 PARK CITY, UTAH 84098 | |

| Correspondent |
|---|
| **Correspondent Name:** ROB SONESON |
| **Correspondent Address:** 300 N LASALLE KIRKLAND & ELLIS LLP CHICAGO, IL 60654 |

**Domestic Representative - Not Found**

# Proceedings

| Summary |
|---|
| **Number of Proceedings:** 1 |

## Type of Proceeding: Opposition

| | |
|---|---|
| **Proceeding Number:** 91264186 | **Filing Date:** Aug 12, 2020 |
| **Status:** Suspended | **Status Date:** Jul 13, 2021 |
| **Interlocutory Attorney:** MARY B MYLES | |

| Defendant |
|---|
| **Name:** JRM NutraSciences, LLC |

|                        |                                                                                                      |
|------------------------|------------------------------------------------------------------------------------------------------|
| **Correspondent Address:** | HANI SAYED<br>RUTAN & TUCKER LLP<br>611 ANTON BLVD, SUITE 1400<br>COSTA MESA CA UNITED STATES , 92626 |
| **Correspondent e-mail:** | trademarks@rutan.com , lherman@rutan.com , lweiland@rutan.com |

### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|------|--------------------|---------------|---------------------|
| KODIAK SPORTS NUTRITION | Abandoned - After Inter-Partes Decision | 86911351 | |

### Plaintiff(s)

|                        |                                                                                      |
|------------------------|--------------------------------------------------------------------------------------|
| **Name:** | Kodiak Cakes, LLC |
| **Correspondent Address:** | NICHOLAS D WELLS<br>LEGENDS LAW GROUP PLLC<br>330 MAIN ST<br>KAYSVILLE UT UNITED STATES , 84037 |
| **Correspondent e-mail:** | nwells@legendslaw.com |

### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|------|--------------------|---------------|---------------------|
| KODIAK CAKES | REGISTERED AND RENEWED | 75031624 | 2052194 |
| KODIAK | Notice of Allowance - Issued | 88407044 | |
| 100% WHOLE GRAINS KODIAK CAKES PARK CITY | Registered | 87461577 | 5471172 |
| KODIAK SYRUP | Section 8 and 15 - Accepted and Acknowledged | 85965209 | 4509684 |
| KODIAK PARK CITY | Registered | 88404012 | 6639628 |
| SUPER FRUIT SYRUP PARK KODIAK CAKES CITY | Registered | 87606972 | 5458224 |
| BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS | REGISTERED AND RENEWED | 74608371 | 1992074 |
| 100% WHOLE GRAINS KODIAK PARK CITY | Registered | 88404043 | 6639629 |
| KODIAK CAKES | Notice of Allowance - Issued | 88406991 | |
| KODIAK | Registered | 88403983 | 6441657 |

### Prosecution History

| Entry Number | History Text | Date | Due Date |
|--------------|--------------|------|----------|
| 8 | RESPONSE DUE 30 DAYS (DUE DATE) | Jul 13, 2022 | Aug 12, 2022 |
| 7 | SUSP PEND DISP OF CIVIL ACTION | Jul 13, 2021 | |
| 6 | D OPP/RESP TO MOTION | Jun 07, 2021 | |
| 5 | P MOT TO SUSP PEND DISP CIV ACTION | May 18, 2021 | |
| 4 | ANSWER | Sep 21, 2020 | |
| 3 | INSTITUTED | Aug 12, 2020 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Aug 12, 2020 | Sep 21, 2020 |
| 1 | FILED AND FEE | Aug 12, 2020 | |

# EXHIBIT C

**Generated on:** This page was generated by TSDR on 2022-07-29 14:01:20 EDT

**Mark:** KODIAK



| | | | |
|---|---|---|---|
| **US Serial Number:** | 88403983 | **Application Filing Date:** | Apr. 26, 2019 |
| **US Registration Number:** | 6441657 | **Registration Date:** | Aug. 03, 2021 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Aug. 03, 2021

**Publication Date:** Aug. 13, 2019 **Notice of Allowance Date:** Oct. 08, 2019

## Mark Information

**Mark Literal Elements:** KODIAK

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## Related Properties Information

**Claimed Ownership of US Registrations:** 1992074, 2052194, 5471173 and others

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Mixes for bakery goods; pancake mixes; waffle mixes; cookie mixes; cake mixes; cupcakes mixes; brownie mixes; cornbread mixes; bread mixes; mixes for grain-based pastries; muffin mixes; waffles; cookies; graham crackers; crackers; brownies; cornbread; bread; muffins; pretzels; cupcakes; cakes; pastries; pudding; French toast; granola; grain-based food bars and snack bars; cereal based energy bars; snack cakes; grain-based snack foods; toaster pastries; sandwiches

**International Class(es):** 030 - Primary Class     **U.S Class(es):** 046

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Jan. 15, 2021     **Use in Commerce:** Jan. 15, 2021

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

# Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | KODIAK CAKES, LLC |
| **Owner Address:** | 8163 Gorgoza Pines Rd. Park City, UTAH UNITED STATES 84098 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY |
| **State or Country Where Organized:** | DELAWARE |

# Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Nicholas D. Wells | **Docket Number:** | 4805.230 |
| **Attorney Primary Email Address:** | nwells@legendslaw.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Nicholas D. Wells Legends Law Group, PLLC 330 Main St. Kaysville, UTAH UNITED STATES 84037 |
| **Phone:** | 8013374500 |
| **Correspondent e-mail:** | nwells@legendslaw.com docket@legendslaw.com |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jan. 25, 2022 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Jan. 25, 2022 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Jan. 25, 2022 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Jan. 25, 2022 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Jan. 25, 2022 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Aug. 03, 2021 | REGISTERED-PRINCIPAL REGISTER | |
| Jun. 29, 2021 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Jun. 28, 2021 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Jun. 28, 2021 | TEAS/EMAIL CORRESPONDENCE ENTERED | 70884 |
| Jun. 28, 2021 | CORRESPONDENCE RECEIVED IN LAW OFFICE | 70884 |
| Jun. 28, 2021 | ASSIGNED TO LIE | 70884 |
| Apr. 21, 2021 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Apr. 05, 2021 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Apr. 05, 2021 | NON-FINAL ACTION E-MAILED | |
| Apr. 05, 2021 | SU - NON-FINAL ACTION - WRITTEN | 91244 |
| Apr. 01, 2021 | STATEMENT OF USE PROCESSING COMPLETE | 65362 |
| Mar. 15, 2021 | USE AMENDMENT FILED | 65362 |
| Mar. 31, 2021 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | 65362 |
| Mar. 15, 2021 | TEAS STATEMENT OF USE RECEIVED | |
| Oct. 14, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Oct. 14, 2020 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Oct. 14, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Oct. 10, 2020 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |

| | | |
|---|---|---|
| Oct. 08, 2020 | SOU EXTENSION 2 GRANTED | 98765 |
| Oct. 08, 2020 | SOU EXTENSION 2 FILED | 98765 |
| Oct. 08, 2020 | TEAS EXTENSION RECEIVED | |
| Apr. 09, 2020 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Apr. 07, 2020 | SOU EXTENSION 1 GRANTED | 98765 |
| Apr. 07, 2020 | SOU EXTENSION 1 FILED | 98765 |
| Apr. 07, 2020 | TEAS EXTENSION RECEIVED | |
| Feb. 12, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Feb. 12, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Feb. 12, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 08, 2019 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Aug. 13, 2019 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Aug. 13, 2019 | PUBLISHED FOR OPPOSITION | |
| Jul. 24, 2019 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Jul. 01, 2019 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jun. 26, 2019 | ASSIGNED TO EXAMINER | 91244 |
| May 13, 2019 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | |
| Apr. 30, 2019 | NEW APPLICATION ENTERED IN TRAM | |

# TM Staff and Location Information

| | |
|---|---|
| **TM Staff Information - None** | |
| **File Location** | |
| Current Location: PUBLICATION AND ISSUE SECTION | Date in Location: Jun. 28, 2021 |

# Assignment Abstract Of Title Information

| | |
|---|---|
| **Summary** | |
| Total Assignments: 1 | Registrant: KODIAK CAKES, LLC |

### Assignment 1 of 1

| | |
|---|---|
| Conveyance: SECURITY INTEREST | |
| Reel/Frame: 7712/0024 | Pages: 7 |
| Date Recorded: May 04, 2022 | |
| Supporting Documents: assignment-tm-7712-0024.pdf | |

| | |
|---|---|
| **Assignor** | |
| Name: KODIAK CAKES, LLC | Execution Date: May 03, 2022 |
| Legal Entity Type: LIMITED LIABILITY COMPANY | State or Country Where Organized: DELAWARE |

| | |
|---|---|
| **Assignee** | |
| Name: GOLUB CAPITAL LLC, AS COLLATERAL AGENT | State or Country Where Organized: DELAWARE |
| Legal Entity Type: LIMITED LIABILITY COMPANY | |
| Address: 200 PARK AVENUE NEW YORK, NEW YORK 10166 | |

| | |
|---|---|
| **Correspondent** | |
| Correspondent Name: LATHAM & WATKINS LLP C/O ANGELA M. AMARU | |
| Correspondent Address: 1271 AVENUE OF THE AMERICAS NEW YORK, NY 10020 | |

| |
|---|
| **Domestic Representative - Not Found** |

# Proceedings

| |
|---|
| **Summary** |

| Number of Proceedings: | 1 |
|---|---|

## Type of Proceeding: Opposition

| Proceeding Number: | 91264186 | Filing Date: | Aug 12, 2020 |
|---|---|---|---|
| Status: | Suspended | Status Date: | Jul 13, 2021 |
| Interlocutory Attorney: | MARY B MYLES | | |

### Defendant

| Name: | JRM NutraSciences, LLC |
|---|---|
| Correspondent Address: | HANI SAYED<br>RUTAN & TUCKER LLP<br>611 ANTON BLVD, SUITE 1400<br>COSTA MESA CA UNITED STATES , 92626 |
| Correspondent e-mail: | trademarks@rutan.com , lherman@rutan.com , lweiland@rutan.com |

#### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| KODIAK SPORTS NUTRITION | Abandoned - After Inter-Partes Decision | 86911351 | |

### Plaintiff(s)

| Name: | Kodiak Cakes, LLC |
|---|---|
| Correspondent Address: | NICHOLAS D WELLS<br>LEGENDS LAW GROUP PLLC<br>330 MAIN ST<br>KAYSVILLE UT UNITED STATES , 84037 |
| Correspondent e-mail: | nwells@legendslaw.com |

#### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| KODIAK CAKES | REGISTERED AND RENEWED | 75031624 | 2052194 |
| KODIAK | Notice of Allowance - Issued | 88407044 | |
| 100% WHOLE GRAINS KODIAK CAKES PARK CITY | Registered | 87461577 | 5471172 |
| KODIAK SYRUP | Section 8 and 15 - Accepted and Acknowledged | 85965209 | 4509684 |
| KODIAK PARK CITY | Registered | 88404012 | 6639628 |
| SUPER FRUIT SYRUP PARK KODIAK CAKES CITY | Registered | 87606972 | 5458224 |
| BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS | REGISTERED AND RENEWED | 74608371 | 1992074 |
| 100% WHOLE GRAINS KODIAK PARK CITY | Registered | 88404043 | 6639629 |
| KODIAK CAKES | Notice of Allowance - Issued | 88406991 | |
| KODIAK | Registered | 88403983 | 6441657 |

### Prosecution History

| Entry Number | History Text | Date | Due Date |
|---|---|---|---|
| 8 | RESPONSE DUE 30 DAYS (DUE DATE) | Jul 13, 2022 | Aug 12, 2022 |
| 7 | SUSP PEND DISP OF CIVIL ACTION | Jul 13, 2021 | |
| 6 | D OPP/RESP TO MOTION | Jun 07, 2021 | |
| 5 | P MOT TO SUSP PEND DISP CIV ACTION | May 18, 2021 | |
| 4 | ANSWER | Sep 21, 2020 | |
| 3 | INSTITUTED | Aug 12, 2020 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Aug 12, 2020 | Sep 21, 2020 |
| 1 | FILED AND FEE | Aug 12, 2020 | |

# EXHIBIT D

MANNING CURTIS BRADSHAW
& BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
Michael E. Harmond, #17230
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com
cderum@mc2b.com
mharmond@mc2b.com

LEGENDS LAW GROUP, PLLC
Stephen H. Bean #9240
Nicholas Wells #10150
330 N Main
Kaysville, UT  84037
steve@legendslaw.com
nwells@legendslaw.com

*Attorneys for Plaintiff Kodiak Cakes, LLC*

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION**

---

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah limited liability corporation,<br><br>Plaintiff,<br><br>v.<br><br>JRM NUTRASCIENCES, LLC, a New York limited liability corporation, MUSCLE SPORTS PRODUCTS, LLC, a New York limited liability corporation, and JASON MANCUSO, an individual;<br><br>Defendant. | **DECLARATION OF JOEL CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ITS ESTABLISHMENT OF COMMON LAW RIGHTS TO THE KODIAK MARKS**<br><br>Civil No. 2:20-cv-00581-DBB-JCB<br><br>District Judge David Barlow<br>Magistrate Judge Jared C. Bennett<br><br><u>*CONFIDENTIAL – Filed Under Seal*</u> |

I, Joel Clark, declare as follows:

1.      I am a resident of the State of Utah.  I am over the age of twenty-one and competent to testify as to the following matters based on personal knowledge.

2.      I am the founder and CEO of Kodiak Cakes, LLC ("Kodiak"), located at 8163 Gorgoza Pines Rd., Park City, Utah 84098.

3.      My brother, Jon Clark, and I started Kodiak in 1994 to sell better-for-you, whole-grain pancake mixes based on our grandfather's recipe.  Our history selling health-focused, nutritious foods began in 1982 when my mother, Penny Clark, filled brown paper lunch sacks with my grandfather's mixes and sent us out into the neighborhood to sell these mixes to friends and family.

4.      Today, Kodiak sells a variety of grain-based breakfast and baking mixes, snacks, and frozen, ready-to-eat breakfast items, including pancakes, waffles, muffins, oatmeal, granola bars, baking mixes, and more.  Most of our products contain added protein and all of our products contain whole grains.

5.      Kodiak owns numerous trademarks that we use in connection with our products. Several of these trademarks include the term KODIAK, including both federally-registered and common-law or unregistered marks.

6.      The company's unregistered marks include the word KODIAK (the "Kodiak Word Mark") and a depiction of a roaring bear with a tilted head enclosed by a circle (the "Kodiak Bear Mark") (collectively, the "Kodiak Marks").

7.      An example of the Kodiak Bear Mark is shown as follows:



8.      Kodiak has used the Kodiak Marks for over 25 years—since November 27, 1995—in connection with health-focused, nutritious food products, including pancake mixes, muffins, baking mixes, and other products.  We've also used the Kodiak Marks since June 2014 in connection with protein-containing products such as protein-packed pancake and bakery mixes, waffles, granola bars, oatmeal, muffins, and more.  The Kodiak Marks have been used continuously on our goods, containers, packages, displays, and other forms of marketing and advertising.

9.      Kodiak has likewise used the mark KODIAK CAKES over the same period and as to the same products.

10.     Attached hereto as Exhibit 1 are true and correct examples of the Kodiak Marks being used in connection with our products, packages, containers, displays, and other forms of marketing and advertising.

11.     Kodiak's registered marks in the United States for the term KODIAK include the following:

- U.S. Reg. No. 2052194 – KODIAK CAKES

  International Class 030 – mixes for preparing bakery goods; chocolate topping; marshmallow topping and topping syrup for bakery goods.

- U.S. Reg. No. 1992074 – BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS



International Class 030 – mixes for preparing bakery goods.

- U.S. Reg. No. 5471173 – KODIAK CAKES PARK CITY

**KODIAK CAKES**
PARK CITY

International Class 030 – mixes for bakery goods; pancake mixes; waffle mixes;

cookie mixes; brownie mixes; cornbread mixes; muffin mixes; waffles; cookies;

brownies; cornbread; bread; muffins; cakes; grain-based food bars and snack bars;

cereal-based energy bars; snack cakes; grain-based snack foods;

- U.S. Reg. No. 5471172 – 100% WHOLE GRAINS KODIAK CAKES PARK CITY



International Class 030 – mixes for bakery goods; mixes for bakery goods; pancake

mixes; waffle mixes; cookie mixes; brownie mixes; cornbread mixes; muffin mixes;

waffles; cookies; brownies; cornbread; bread; muffins; cakes; grain-based food bars

and snack bars; cereal based energy bars; snack cakes; grain-based snack foods; all of
the aforementioned made in whole or in part from whole grains;

- U.S. Reg. No. 4509684 – KODIAK SYRUP

  International Class 030 – pancake syrup; topping syrup;

- U.S. Reg. No. 5458224 – SUPER FRUIT SYRUP PARK KODIAK CAKES CITY



  International Class 030 – pancake syrup; table syrup; topping syrup.

12.     When Jon and I first started this business, Jon initially wanted to name the
business "Bear Cakes."  However, we instead decided on the name "Kodiak Cakes" based on
Jon's lifelong fascination with Kodiak Island, Alaska.  The island personified the rustic, outdoor,
frontier feel we wanted to bring to the brand.

13.     Attached as Exhibit 2 is a true and correct copies of photographs of Jon in
approximately 1995 with Kodiak products.  The product packages in this photograph are branded
with and display the Kodiak Marks.

14.     In those early years, Jon and I sold our Kodiak mixes door-to-door to gift shops in
small ski towns across the west, including Park City, Utah, Sun Valley, Idaho, and Jackson,
Wyoming.

15.     I took over the business in 1997.

16.     In 2004, Kodiak scored the Safeway grocery store chain as our first major account, with retail stores across the country, including the West, Midwest, and East Coast of the United States.  Safeway was the first national retailer to begin selling products under the Kodiak Marks.

17.     In 2012, Kodiak landed a distribution deal with its second major account, Target. This was another big milestone for our business.

18.     Kodiak's next big milestones came in 2014.  Kodiak appeared on the TV show 'Shark Tank' on April 4, 2014, and launched its "Protein Power Cakes" products (pancake and waffle baking mixes with added protein) in June 2014.

19.     Appearing on Shark Tank resulted in huge publicity for Kodiak.  After the episode aired, sales of products bearing the Kodiak Marks spiked nationwide for the next six weeks.  In my estimation, the company earned     REDACTED     in incremental revenue during this period.

20.     We launched our "Protein Power Cakes" product—a pancake mix packed with 14 grams of protein per serving—in the wake of Shark Tank.  Protein Power Cakes debuted nationwide due to Kodiak's existing accounts with national retailers such as Target, Associated Food Stores, Costco, and Amazon.com.

21.     Like Kodiak's existing product packaging, the packaging of Power Cakes made use of both the Kodiak Word Mark and Kodiak Bear Mark.  Attached hereto as Exhibit 3 is a true and correct copy of the early product packaging for Power Cakes.

22.     Power Cakes were a runaway success with consumers and quickly became the top-selling pancake mix at Target.

23.     By the end of 2014, Kodiak was selling its health-focused, nutritious products under the Kodiak Marks across all 50 states through accounts with national retailers including Target, Costco, Kroger, Sam's Club, and UNFI. Kodiak's products are now sold in almost all major national retailers, including Costco, Kroger, and Walmart, as well as almost all major regional retail and grocery chains in all regions of the United States and Canada.  Attached hereto as Exhibit 4 is a true and correct copy of Kodiak's Distribution Chart spreadsheet for 2021 which identifies the retailers in which products are sold under the Kodiak Marks.

24.     Kodiak experienced significant growth following its "Shark Tank" appearance and the launch of Power Cakes.  The company grew REDACTED in revenue in 2014 to REDACTED   in 2021.

25.     The company's marketing and advertising budget has also steadily grown during this period, REDACTED in 2016 to REDACTED in 2021.

26.     Following the launch of Power Cakes, Kodiak has steadily expanded the protein-containing products sold under the Kodiak Marks to include waffles, muffins, granola bars, oatmeal, and a variety of baking mixes and ready-to-eat baked goods.  *See* Ex. 1.

27.     Throughout this time, Kodiak has sold hundreds of millions of units nationwide of its pancake mixes and other health-focused, nutritious, and protein-containing products under the Kodiak Marks.  Kodiak is the number-two bestselling pancake mix in the United States (by dollar sales)     REDACTED        .  The company  also has quickly become a top selling brand in the oatmeal and frozen waffle categories, challenging major legacy brands like Quaker and Eggo.

28.     Since appearing on Shark Tank, the Kodiak Marks and their associated products have also gone on to receive significant regular media attention, including outlets such as NPR,

Forbes, MSN, Buzzfeed, and others.  Examples of Kodiak's media coverage are attached hereto as Exhibit 5.

29.     Kodiak pursues an aggressive media strategy across print, digital, and social media channels to promote the Kodiak Marks.  In 2020 alone, placements in online outlets garnered     REDACTED     impressions nationwide, with print placements garnering REDAI

impressions.  Attached hereto as Exhibit 6 is a true and correct copy of a report from Kodiak's third-party PR firm highlighting these impressions. In 2021, advertising and public relations impressions     REDACTED     .

30.     The protein-containing products sold under the Kodiak Marks have also developed a following among health, fitness, and exercise conscious consumers, and Kodiak has executed on a number of successful partnerships with professional athletes that use and love Kodiak products.

31.     Many consumers organically display their affinity for products sold under the Kodiak Marks on social media.  Attached hereto as Exhibit 7 are true and correct copies of organic social media posts obtained by Kodiak's marketing department where users highlight their affinity for products sold under the Kodiak Marks.

32.     Kodiak also markets the protein-containing products sold under the Kodiak Marks through traditional and paid social media marketing.  True and correct examples of this marketing are attached hereto as Exhibit 8.

33.     In recent years, Kodiak has increasingly emphasized the Kodiak Word Mark in the marketing, advertising, and branding of its products.  The emphasis first started on Kodiak's website, where the company began using a logo containing the word KODIAK rather than KODIAK CAKES.  Since then, Kodiak has slowly introduced this updated logo across various

products and today, this updated logo is being used on almost all Kodiak products currently in market.  A true and correct copy of this logo, along with examples of its use on Kodiak's website, are attached hereto as Exhibit 9.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___27___th day of July, 2022

_____
Joel Clark

# Exhibit 1



KODIAK000022



KODIAK000013



KODIAK000016



KODIAK000012



KODIAK000063



KODIAK000015



CONFIDENTIAL
KODIAK000191



CONFIDENTIAL



KODIAK000258



KODIAK000262



KODIAK000268



KODIAK000277



KODIAK000292



KODIAK000317



KODIAK000337



KODIAK000373



KODIAK000386



KODIAK000396



KODIAK000406



KODIAK000452



KODIAK000485



KODIAK000499



CONFIDENTIAL

KODIAK000507



KODIAK000516



KODIAK000538



KODIAK000567



THEY AREN'T FROZEN, THEY'RE HIBERNATING

*Find new Kodiak Cakes Toaster Waffles & Flapjacks in the frozen aisle.*

PARK KODIAK CAKES CITY

NOURISHMENT FOR TODAY'S FRONTIER™

KODIAK000633



# NOURISHMENT FOR TODAY'S FRONTIER™

## PROTEIN-PACKED
### FLAPJACK & WAFFLE MIXES

## ORIGINAL RECIPE
### FLAPJACK & WAFFLE MIXES





 TOASTER WAFFLES
*Find them hibernating in the frozen aisle.*







## GREAT TASTE | 100% WHOLE GRAINS | PROTEIN-PACKED | NON-GMO

KODIAK000637

**Exhibit 2**





# Exhibit 3

REDACTED

# Exhibit 4



KODIAK000038

# Exhibit 5

REDACTED



# Kodiak Cakes and the Long, Passionate Game to Entrepreneurial Success

*Interview with Joel Clark, CEO, Kodiak Cakes*

By Tharawat Magazine  - 2019-01-25

*Image courtesy of Kodiak Cakes*



*The story of Joel Clark and Kodiak Cakes is a story of perseverance.*

*From the age of eight, Joel was knocking on doors to sell individual bags of his mother's all-natural, healthy pancake batter. As he grew older, he dreamt of his side business becoming a success. It would take many years of hard work to achieve his goal.*

*His tenacity extended far beyond the point where many others would have given up. Joel cites the unconditional support of his wife and an unwavering belief in his product as his motivation.*

*Eventually, consumers started to pay attention. In the mid-2000s, Joel's father helped him formalise the business. In a favourable turn of events, this coincided with a developing trend towards whole foods.*

*2014 was a year of incredible growth – Kodiak Cakes reached $6.7 million in sales thanks to an appearance on the television series Shark Tank combined with the success of their new high-protei*

x

KODIAK001185

**Okabashi: Sustainable Family Footwear**

FORWARD LEADERSHIP

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el…

**Five Industries That Will be Transformed by Virtual Reality…**

ALSO IN THIS ISSUE

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the …

In practice, Kodiak Cakes goes back to 1982 when I was eight years old. My mum wanted to sell her pancake recipe, so she started making little homemade lunch sacks full of pancake ingredients. She attached a hand-written recipe to each bag. We loaded up my red wagon, and I went around the neighbourhood selling this mix.

My mum was a natural-foods pioneer. Everything at that time was processed or refined, but mum knew the benefit of whole grains and healthy foods. She ground her own wheat and used it in this pancake recipe that we loved.



i
  
g

KODIAK001186

**Okabashi: Sustainable Family Footwear**

FORWARD LEADERSHIP

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el...

**Five Industries That Will be Transformed by Virtual Reality...**

ALSO IN THIS ISSUE

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the ...

where tourists frequent gift shops. We entered the market in Park City, Utah, where we're now based. Soon after, we began selling pancake mix in Sun Valley, Idaho, and Jackson, Wyoming.

An incredible amount of moonlighting kept Kodiak Cakes afloat – Jon worked another job by day and ran our business by night. At the end of 1997, he came to me and said he wanted to leave the company and go back to graduate school to get an MBA.

At 23, I took on Kodiak Cakes. It wasn't long before I realised the immensity of the task Jon had left me. Taking his example, I managed the business on the side, at night, for about seven years while acquiring my MBA. Then finally, in 2004, I quit my other job and dove into Kodiak Cakes full-time.

> *"Occasionally, I received letters from our customers saying, 'This is the best pancake mix I've ever had'…That, along with the unwavering support of my family, kept me going."*

## Did you ever come close to giving up?

We've always been emotionally attached to the business, and that can be both good and bad. Attachment means you run the risk of losing objectivity. It might cause you to persevere even when it's not going to work.

I was very conscious of this pitfall, but my mum was always supportive. She believed in it and was pragmatic in her belief. She knew there was a niche market for this product.

My wife was instrumental in keeping me motivated. If she had said, 'Joel, you've got to quit chasing this dream and go get a real job,' I would have done that. Luckily, she kept believing in it too.

**X**

i

   

g

KODIAK001187

**Okabashi: Sustainable Family Footwear**

**FORWARD LEADERSHIP**

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el...

**Five Industries That Will be Transformed by Virtual Reality...**

**ALSO IN THIS ISSUE**

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the ...



*Joel Clark, Courtesy of Kodiak Cakes*

## Today Kodiak Cakes is branded as part of a broader food revolution. When did your business become a part of something much larger?

Honestly, it took a long time. In the beginning, we knew we were different but weren't necessarily validated by anything other than that self-belief. We were selling something substantial. Every comparable product was just full of junk; empty calories, refined white flour and sugar.

From the beginning, we saw Kodiak Cakes as part of a wider trend towards healthy eating, but for

i

  

g

KODIAK001188

### Okabashi: Sustainable Family Footwear

**FORWARD LEADERSHIP**

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el...

. We appeared

ths after that sl

et first – a main

### Five Industries That Will be Transformed by Virtual Reality...

**ALSO IN THIS ISSUE**

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the ...

Many people who were not buying pancake mix in the past started buying Power Cakes because of the protein. In this way, we grew our consumer base.

## Related articles

Leadership · Sustainability · Lebanon · Germany · Innovation · Latin America · Amazon.com · Chile · Fashion · Agric



**Irish Premium Oysters: Generational Secrets of Oyster Farming**

March 24, 2020



**BESTMALZ: A Multigenerational Story on the Crest of New Trends**

March 17, 2020



**SAJES: Shaping the Fu Lebanon**

March 11, 2020

## How has the trend towards healthy eating and organic food contributed to your sales over the past five years?

It's been immensely beneficial. We had a great-tasting product, but that wasn't enough to revolutionise the category. Food awareness has driven our growth because those that embrace healthy eating are also willing to pay more to do so.

Social media has played a crucial role as well. I have two teenage daughters. They follow various

X

  

KODIAK001189



### Okabashi: Sustainable Family Footwear

**FORWARD LEADERSHIP**

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el…

### Five Industries That Will be Transformed by Virtual Reality…

**ALSO IN THIS ISSUE**

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the …

*Joel Clark making Kodiak Cakes, Courtesy of Kodiak Cakes*

## Taking on private equity is an uncommon direction in family business. What inspired that decision and what adjustments did you need to make?

Through 2014 and 2015, we grew exponentially. In 2016, we brought in a private equity partner as a means to secure additional capital. We had recently assembled a board of directors, and we had to build a professional management team.

I had to grow personally and transition from the role of a small business owner to CEO. We had scaled to the point where I started thinking about culture, which has become one of our success stories. We have a strong culture here at Kodiak Cakes, a prerequisite for long-term growth.

Since the transition, my focus has shifted such that I'm less concerned with hands-on, day-to-day

i

  

g

KODIAK001190



### Okabashi: Sustainable Family Footwear

**FORWARD LEADERSHIP**

When in the late 1970s the Iranian Revolution took hold, shoemaker and businessman Rahim Irvani was forced to leave his home country and start over el…

### Five Industries That Will be Transformed by Virtual Reality…

**ALSO IN THIS ISSUE**

To get a sense of what impact virtual reality (VR) will have across industries in the not-too-distant future, we must first turn our attention to the …



X

KODIAK001191







**Small Community. Big Education.**
**Infinite Possibilities.**

Learn More

Eat & Drink

**FOOD & DRINK**

# Kodiak Cakes Moves Beyond Pancakes

The Park City-based company is putting graham crackers on the whole-grain train.

By Virginia Nell Rainey • 6/19/2019 at 9:35am • Published in the Summer/Fall 2019 issue of *Park City Magazine*









KODIAK001192



Joel Clark (center right) with his brother John, and parents Penny and Richard.

IMAGE: COURTESY KODIAK CAKES

**K** ODIAK CAKES co-founder and CEO Joel Clark advocates whole grains with all of his healthy heart and soul, and his company's latest venture—a summer 2019 launch of whole-grain graham crackers with added protein—follows suit.

But he's no Sylvester Graham. Unlike the famously dour preacher who invented graham crackers in 1829, Clark is a progressive, philanthropic entrepreneur who loves the Park City life and thrives on optimism. So much so that after he walked away from a weak *Shark Tank* offer in 2014, his employee-owned company went on to hit $100 million in sales in 2019. Not bad for a kid who started out with a little red wagon and bags of pancake mix for sale.

KODIAK001193



**SPONSORED**

### Fueled by Demand, Private Residence Clubs Enjoy Growth and Expand for the Future

Presented by Talisker Club

As the family lore goes, Clark's mom, Penny, packaged the dry ingredients for her father's beloved whole-grain pancake mix in brown paper bags and enlisted her eight-year-old son to peddle the goods around the neighborhood. That tactic eventually sowed the seeds for a family business, which went on to become legendary in the packaged foods industry. Today, Kodiak's huge selection of whole-grain mixes ranges from muffins to brownies to the mainstay pancakes.

KODIAK001194



The graham crackers, called Bear Bites, stand to actually take a bite out of the white-flour graham cracker market that has dominated for years. With honey, cinnamon, and chocolate variations, s'more lovers everywhere should be smiling.

Beyond thriving sales, Kodiak is known for its obvious love of bears, ongoing support of conservation, and giving back. "With success comes responsibility, for both businesses and individuals," Clark says. "But I think philanthropy needs to be a priority, and you have to plan in advance how you plan to give back, or you may never do it."

So what's his favorite breakfast?

"I still love buttermilk pancakes with plenty of butter, bananas, berries, and raspberry syrup," he says. "You just can't beat it."

KODIAK001195

Filed under

Park City food

---

Show Comments



JULIE NESTER GALLERY

*DAYDREAM BELIEVER*

New paintings by Carol O'Malia • July 30 - August 27
Opening reception • Friday, July 30th • 6-8 PM

# News & Profiles ❯



**WORD ABOUT TOWN**

## Jennifer Wesselhoff Takes the Helm

12/23/2020 • By Tessa Woolf

KODIAK001196



# ZIONS BANK.



BUSINESS

# Speaking on Business: Kodiak Cakes

Kodiak Cakes is best known for their pancake mixes, made with 100 percent whole wheat.

*Chris Redgrave*  |  Nov 24, 2017

This is Chris Redgrave for Zions Bank Speaking on Business.

KODIAK001208

It was always Joel Clark's intention to take his business, Kodiak Cakes, full-time. But for many years, he wondered if he'd ever get there and operated it as a side gig throughout college. He continued creating the pancake mix that inspired the business and hit it big in 2014 when he launched his protein line and was featured on Shark Tank. Since then, Kodiak Cakes has more than quadrupled in size with 43 employees and 6 product lines.

Joel credits his brother, Jon, who started the company, and his mom, Penny Clark, as the inspiration for Kodiak Cakes. She learned the pancake recipe from her dad and felt others would love it too. So, Penny packaged up the mix and sent Joel selling it around the neighborhood with his wagon. The neighbors loved it, but it wasn't until 1995 that Kodiak Cakes launched.

Kodiak Cakes is best known for their pancake mixes, made with 100 percent whole wheat and based on Joel's grandfather's recipe. The product line also includes syrups, cup items and other baking mixes, like brownies, cornbread and muffins. The cup is a microwaveable baking mix that makes a muffin, pancake, oatmeal or granola in minutes, as a healthy breakfast option.

Find more online at www.kodiakcakes.com.

The Speaking on Business program is now in its twentieth year.

For Zions Bank, I'm Chris Redgrave, speaking on business.

# Related Articles

BUSINESS

### Speaking on Business: JulieAnn Caramels

3 Years ago

BUSINESS

KODIAK001209



BUSINESS

### Speaking on Business: Green Team Farm

3 Years ago

BUSINESS

### Speaking on Business: Utah Private Health Exchange

3 Years ago

## Share This Article With Your Community

### RATE THIS PAGE

How Are We Doing

About

Contact

FAQs

Agreement Center

Careers

Diversity

Site Map

Login to Desktop Banking

KODIAK001210



Privacy Notice

Online Privacy Statement

Do Not Sell My Personal Information

Data Collection and Rights

Customer Service
888-307-3411

Routing Number
124000054

NMLS Registry
#467014

## ZIONS BANK.

A Division of Zions Bancorporation, N.A. Member FDIC

⌂ Equal Housing Lender

© 2020 Zions Bancorporation, N.A. All Rights Reserved.

The information contained herein may not represent the views
and opinions of Zions Bank or its affiliates. It is presented for
general informational purposes only and does not constitute
tax, legal or business advice.

KODIAK001211



**SNACK FOOD & WHOLESALE BAKERY**

# Kodiak Cakes, our 2020 'Bakery of the Year,' is redefining bakery categories across the board

Better-for-you bakery pioneers



  

*March 18, 2020*

*Douglas J. Peckenpaugh*

Some people innately embody a strong entrepreneurial spirit. Such is the case with Joel Clark, CEO of Kodiak Cakes, Park City, UT, a pioneer in better-for-you baking, offering whole-grain, protein-enhanced products that currently span multiple categories across breakfast, snacking, and beyond.

KODIAK001212

"Kodiak Cakes was founded in 1995, but the original flapjack mix goes all the way back to when I was eight years old," says Clark. "It was my mom's recipe, and she was a bit of a natural foods pioneer, believing meals should be made with real, wholesome ingredients. She created the original recipe for the mix, and I would sell it door to door in my little red wagon to neighbors and friends."

The early days of the business were truly a family effort. "Years later, my brother began to develop that recipe into a business—with my mom's approval, of course," says Clark. "We originally started selling the mix to ski shops and resorts around Park City and eventually branched out into Wyoming. After a few years of slow growth, I took over the business. During that time, there were countless moments when I wanted to give up on Kodiak Cakes. But, occasionally, I would receive letters from fans of our mixes, and they inspired me to keep going."

Today, Kodiak Cakes is a multimillion dollar brand, with distribution from coast to coast and placement in top chains like Target, Walmart, Kroger, and Costco. Its product range brings better-for-you options to a wide range of key bakery product categories—options that clearly resonate with today's shoppers. The company has seen significant year-over-year growth in top product segments, far outpacing the industry average.

In recognition for this pioneering work and groundbreaking performance, *Snack Food & Wholesale Bakery* is honoring Kodiak Cakes as its 2020 "Bakery of the Year."

## Into the shark tank

In 2014, Kodiak Cakes had its first big moment with a feature on the reality show "Shark Tank" that coincided with the launch of its protein-enhanced line of products, the Buttermilk Power Cakes Flapjack and Waffle Mix, as well as expanded distribution into Costco and Target. "The timing could not have been better," says Clark, "and we saw exponential growth—despite turning down a deal with The Sharks."



Kodiak Cakes Power Flapjacks

Clark envisioned a rapid rise for Kodiak Cakes, and felt that The Sharks didn't make them a strong-enough offer during his appearance on the show. But the experience carried monumental value via exposure.

"'Shark Tank' was a massive awareness and momentum builder for us," says Cameron Smith, president and co-founder. "But I think what's unique about how it impacted us vs. other businesses that go on 'Shark Tank' was that we were able to leverage that momentum. Some businesses we speak to that went on 'Shark Tank' see a spike in online sales, and then it dips back down. We were at an advantage, because we already had solid distribution in retail grocery stores across the country, and we had national distribution at Target for our two original flapjack and waffle mixes. Target was mentioned on the show as a place to find Kodiak Cakes, and consumers went there and emptied the shelves right after the show aired."

### The Growth Potential of Better-for-You

Guest: Cameron Smith, President and Co-founder, Kodiak Cakes

The momentum behind the growth of Kodiak Cakes, the 2020 SF&WB "Bakery of the Year."

For access to more podcast episodes, click here.

---

Kodiak Cakes kicked into overdrive to keep up with the demand over the ensuing months. "In the first six or so weeks after the show aired, we figure we did an extra $1 million in sales as a result of the exposure," says Smith. "This gave us the means to continue to innovate and add new products, which allowed us to continually expand our consumer base."

## Steady expansion

Since 2014, Kodiak Cakes has seen significant growth. "We currently have 82 employees at Kodiak Cakes," says Smith. That number has grown from six in 2014. "We just built a brand-new office in Park City, UT to facilitate our employee growth. We've been steadily growing over the last few years."



*Kodiak Cakes Power Cakes & Carb-Conscious Flapjack and Waffle Mixes*

Clark notes that the last five years have brought the most concentrated change in the company's history, spurred by rapid growth. "For the most part, our story was one of very slow, consistent growth over many years," he says. "For example, it took us 16 years to break the $1 million mark, which finally happened in 2011. Then, in 2014, two major events happened that spurred exponential growth. The first was the launch of Power Cakes, and the second was the appearance on 'Shark Tank.' Both of those events were huge momentum drivers for the brand."

From that point, Kodiak Cakes capitalized on the momentum with innovation, as well as better marketing and content, adding people to help manage and continue brand growth. In 2014, notes Clark, the company saw revenue of $6.7 million. In 2019, Kodiak Cakes hit just under $160 million.

"Not only has the business changed, but we as leaders and employees have had to change, as well," says Clark. "We've had to scale right along with the business. It's been challenging, but incredibly fun to see what Kodiak Cakes has become, and it's because of the amazing team of people we have built."

Kodiak Cakes currently offers a products ranging from bakery mixes and frozen breakfast to graham crackers— and even microwave flapjack, brownie, and muffin cups:

- Flapjack & Waffle Mix
- Flapjack Unleashed Cup
- Brownie Unleashed Cup
- Muffin Unleashed Cup
- Oatmeal Unleashed Cup
- Baking Mixes—Muffin, Cornbread, Brownie, and Cookie
- Toaster Waffles & Flapjacks

KODIAK001214

- Bear Bites Frontier Graham Crackers
- Oatmeal Packets
- Power Fruit Syrups

Clark notes that the best-selling product at Kodiak Cakes is currently the Buttermilk Power Cakes Flapjack & Waffle Mix.

**At a Glance**

**Company:** Kodiak Cakes

**Headquarters:** Park City, UT

**Website address:** https://kodiakcakes.com

**Number of employees:** 82

**Annual sales:** $160 million

**Products:** Flapjack & Waffle Mix, Flapjack Cups, Brownie Cups, Muffin Cups, Oatmeal Cups, Baking Mixes, Toaster Waffles & Flapjacks, Graham Crackers, Oatmeal Packets, Fruit Syrups

**Brands:** Kodiak Cakes

Better-for-you, on-the-go snacking is a strategic area of expansion for Kodiak Cakes. "We launched our Bear Bites Frontier Graham Crackers in 2019 and expanded the line to include snack bags instead of only the bag-in-box offering," says Clark. "We are confident this will be a popular option for those looking for an on-the-go healthy snack. Bear Bites come in three flavors: honey, cinnamon, and chocolate."

Kodiak Cakes has found strong resonance with shoppers looking to align their food choices with their lifestyles. "Our protein-rich products are selling well, because we offer healthier options for food items once seen as indulgences," says Smith. "Our products are also packed with 100 percent whole grains, which

adds to the health benefits. Protein and whole grains combined keep people fuller for longer, so our products are a great option. They also taste delicious."

While Kodiak Cake products are great for anyone and all ages, Smith has found that the brand's core consumer has a focus on health and wellness. "We found our biggest fans are looking to enjoy filling, flavorful snack and meal options that match their healthy lifestyles," he says. "Additionally, as we continue to expand, we are proud to create snack foods that are a healthy choice that kids enjoy eating."

And the iconic Kodiak bear used across its branding is more than just an engaging graphic. Kodiak Cakes participates in conservation efforts, with a portion of company profits each year donated to wildlife foundations that support the protection of Kodiak bears and their habitats in the wild, notes Clark.

KODIAK001215



*Kodiak Cakes Bear Bites*

## Maintaining momentum

Kodiak Cakes caught onto the emerging protein-fortified at just the right time. Now carbohydrate consciousness is factoring into its R&D efforts.

"A big macro trend that is emerging and impacting our business is keto and the demonization of carbohydrates," says Smith. "We are balancing the effects of this macro trend in two ways. Firstly, we are doing our part to educate people on the types of carbohydrates and the role they play in nutrition. We strive to highlight that our products feature nutrient-dense, balanced carbohydrates and whole grains that should be included in a balanced diet. This is often overlooked as people work to reduce or eliminate carbs."

So the Kodiak Cakes team turned to innovation for a solution. "We identified the white space between keto and our standard dense-carb products," says Smith. "We created a new Kodiak Cakes Carb-Conscious Buttermilk Flapjack & Waffle Mix—launching March 2020—that has fewer carbs than other mixes in our lineup, but still tastes amazing. We hope this balance will help more people see the benefits of whole grains and the role that carbohydrates can play."

Innovation has long been a hallmark of company culture at Kodiak Cakes. "We like to think that we have a strategic advantage in terms of innovation and speed to market when it comes to that innovation," says Clark. "We can get awesome products out the door quickly, and as the food industry continues to change at an even more-rapid pace, speed to market is increasingly important. Another advantage is culture. In a positive culture, where people feel empowered and collaborate well, innovation can really thrive. In top-down, authoritarian cultures, innovation suffers because people don't feel psychologically safe and are afraid to speak up. We work hard to have a culture that fosters empowerment, collaboration, and innovation."

KODIAK001216



*Kodiak Cakes Power Waffles*

Kodiak Cakes has found great success in its recruiting efforts. The type of people the company has been able to attract has become a competitive advantage, says Clark. "If we didn't have this great of a team around us, Kodiak Cakes wouldn't be where it is. We have people who are scrappy, innovative, and who challenge the norms. We enjoy going to work every day, because it doesn't always feel like work."

This company culture continues to yield strong results. "We've been very fortunate to experience the amount of growth that we have in the past five years," says Smith. "We want to make sure we don't take that for granted and continue to build on the momentum that this brand has. We currently have products in six categories in the grocery store, and we see our footprint expanding in the future. We started in breakfast and are now in snacking. In a lot of ways, we feel like this is just the beginning for Kodiak Cakes."

## Recent Articles By Douglas Peckenpaugh

**State of the Industry 2021: Winning frozen breakfast with diversity**

**State of the Industry 2021: Fresh bread sees record growth**

**State of the Industry 2021: Bakery poised for continued growth**

**Doughnuts and permissible indulgence**

**Best New Snack & Bakery Products of 2020: Goldfish Veggie Crackers and DiGIORNO Croissant Crust Pizza**



*Douglas J. Peckenpaugh is Group Editorial Director of Snack, Bakery, Cannabis, Meat, Candy and Food Safety for BNP Media. He has over two decades of publishing experience following the food industry from farm to fork, covering agriculture, ingredient processing, CPG and foodservice R&D, retail and restaurant menu trends, and retail grocery branding. He is a member and past president of the International Foodservice Editorial Council. Doug studied Professional and Creative Writing at Purdue University.*

# Get our new eMagazine delivered to your inbox every month.
## Stay in the know on the latest snack and bakery industry trends.

SUBSCRIBE TODAY!

Copyright ©2021. All Rights Reserved BNP Media.

Design, CMS, Hosting & Web Development :: ePublishing

KODIAK001217

≡ **Entrepreneur**

SMARTER MONEY
MANAGEMENT

THE DIGEST

# This Entrepreneur Almost Quit Multiple Times, But After Appearing on 'Shark Tank' He Now Has a $100 Million Business

*Joel Clark struggled to get his pancake business off the ground, but after years of strained efforts, it's seen huge growth.*

   

NEXT ARTICLE



Image credit: Courtesy Kodiak Cakes

KODIAK001225

**Stephen J. Bronner**
*News Director*

  

May 7, 2018    7 min read

*In this ongoing column, The Digest,* Entrepreneur.com
*News Director Stephen J. Bronner speaks with food*
*entrepreneurs and executives to see what it took to get*
*their products into the mouths of customers.*

## Franchise Your Business

Schedule a FREE one-on-one session with one of
our Franchise Advisors today and we'll help you
start building your franchise organization.

**Get Started**

Joel Clark says he was excited when, in 1997, his
brother offered him the chance to take over Kodiak Cakes, the business he founded
based on their mother's pancake recipe.

"Going into entrepreneurship when you're young sounds really fun," says Clark, who
was 23 at the time.

**Related: This Popular Cookie Company Was Started on a Whim by a Couple Out
of Their Home**

But after years of slow growth and uncertainty about whether running Kodiak could
actually be a full-time time job, the harsh realities of entrepreneurship started sinking
in.

"It becomes about survival and trying to make something happen," says Clark, who
worked in healthcare consulting and went to graduate school while building the
company.

Not only did Kodiak Cakes survive, it's on track to do $100 million of business this
year. Two major moves helped Clark push the business forward: In 2009, he hired
Cameron Smith as COO, whom Clark says has become like a co-founder. Five years
after that, the pair appeared on *Shark Tank* and rejected an offer from the investors.
Still, the appearance paid off significantly.

KODIAK001226



*Image Credit: Courtesy Kodiak Cakes*

"It spiked our sales like crazy at Target," Clark says. "That became a huge inflection point for the brand itself."

The brand, which for years was a one SKU company, now offers multiple lines, including a popular protein pancake. Kodiak Cakes can be found in about 11,500 stores, including Target, Costco, Kroger and Amazon.

We spoke to Clark about his struggles in the early years, appearing on *Shark Tank* and how passion can take you far.

*This interview has been edited for length and clarity.*

KODIAK001227

## Can you tell us more about the origins of the company?

Kodiak Cakes was my mom's idea, and she always thought there was a need for more healthier items. When I was 8 years old she packed homemade pancake mixes in these lunch sacks and then she handwrote how to make them on the bags. I went around the neighborhood and sold these out of my red wagon. The original product is hardly changed. When I took it over, it had $29,000 in revenue. I did it by myself on the side for several years.

## How did you land your first big distribution deal and what can customers learn from that experience?

Before we landed Safeway, the business was really small. We probably had about 250 to 300 stores. I remember thinking the only way I'm ever going to do this thing full time was to land one big account. That's why I started going after Safeway, because at the time, there was one buyer for 1,200 stores.

I sent samples, and she gave me the runaround. I probably worked on that for two years. She finally took a hard look at Kodiak cakes and she brought it in. Persistence became the theme of Kodiak Cakes over the last 20 years, along with not giving up.

**Related:** Why Walking Away From Offers on 'Shark Tank' Was a Great Decision for These 3 Entrepreneurs

### Were all your efforts at that point focused on Safeway?

I had a list of five to 10 decent sized chains that I was working on, but because I knew I didn't have a lot of time, I couldn't be spread too thin. A lot of national food companies start in the natural channel -- you're going after mom-and-pop shops. I remember thinking, I don't have time to do that. I made an assumption that this product would do well in the mainstream channel, so out of necessity I went that way, and it worked.

### How did the business end up on *Shark Tank*?

The year before we aired on Shark Tank, we had done about $2.5 million in revenue. So we were still small, but we were starting to build a pretty good distribution base and had gotten into Target stores. We needed a publicity bump, but didn't have the money for traditional advertising. One day Cameron (the COO) comes to me and says, why don't we go on *Shark Tank*? He sends an email to *Shark Tank* in January 2013. I forgot about it, and then two months later, he gets a call from one of the producers.

### Would you recommend that as an avenue for other companies who are seeking growth?

I totally would. The exposure we got was incredible for the business. Also, going through the process was huge for us. Cameron and I spent so much time preparing for the show. We'd role play, question after question. All that was great prep for us and formulating a longer term strategy.

KODIAK001228

The immediate impact -- within six weeks of the show -- was probably worth a million dollars in revenue. But then it opened a lot of doors. Retail buyers knew that we were on the show, and so they were excited to talk to us. For them, it added to our credibility. The show aired in 2014. That year we did $3.6 million, in 2015 we did $6.7, in 2016 we did $16.5 and in 2017 we did over $50 million.



*Image Credit: Courtesy Kodiak Cakes*

### What has been the biggest challenge for Kodiak and how were you able to overcome it?

One of the biggest challenges that we faced was slow growth and no capital. I had to figure out how to stick it out and how to bootstrap for a long time. You get tired. I would set myself these six-month goals and say to myself, *I've got to move on if I can't make this thing happen.*

So many times I almost quit. I started to have kids, and it's like, I've got to make this happen; I've got to earn more money. The realities of life start setting in, and the dreams of all the cool things you think about entrepreneurship start to go away. It took a while, but I would see light and progress -- barely enough to stay in.

### What's the most unusual thing about working in the food space?

Right now is a crazy, cool time to be in this space, and it's because the pace of change in the last few years has been unbelievable. When I first started, the food world was kind of stagnant -- slow to change. Millennials are moving away from big established brands and trusting small brands more. It feels like tech in a lot of ways, because you've got to innovate quickly. There are a lot of food startups coming up with unique different products.

KODIAK001229

**Related: Why This Entrepreneur Jumped Into Making Olive Oil, Despite Knowing It Would Take Years to Get off the Ground**

**Can you tell me something interesting about yourself that you think helped you launch and grow the business?**

I always wanted to be an entrepreneur; it was in my blood. My dad drove it in my mind: If I wanted something, I had to get it. When I was growing up, I mowed lawns, shoveled driveways and washed windows.

I was able to get to this point because I had enough passion. In graduate school I argued on this final exam that passion was a legitimate reason for going into a business. I failed that exam. The professor said passion is subjective. You have to have passion: That's going to be the only thing that gets you through all the obstacles that are piled up against you. If you're not passionate enough, you're not going to make it.



**Instagram Live | July 12, 2PM EST: Harnessing the Power of Facebook**

Join Entrepreneur's Jason Feifer as he chats with Chef PriaVanda, head chef & owner of NYC-restaurant Desi Galli, about how she kept her restaurant open and launch two new businesses during lockdown.

Join Us Live On July 12 @ 2PM EST »

## More From Entrepreneur

KODIAK001230

# Exhibit 6

REDACTED

REDACTED

REDACTED

REDACTED

**Exhibit 7**



 healthyishandhungover · **Follow** •••

 **healthyishandhungover** Chocolate Chip Snickerdoodle Pancakes comin at you. I've been on a big pancake kick lately and these have been my favorite!
* 1 cup @kodiakcakes mix
* 1 scoop snickerdoodle protein (I use iheartmacros)
* 1 cup water
* 2 tbsp of chocolate chips

1 big pancake is 20 g of protein, 4 g of fat,

   

**20 likes**

14 HOURS AGO

Add a comment...          Post

KODIAK000961



 brianhemmelgarn · **Follow** 

 **brianhemmelgarn** The right way to Breakfast!!

5 TBs of @kodiakcakes
2 whole eggs
Splash of Milk
1 Scoop of Salted Carmel Protein
Healthy serving of Almond Butter

@axeandsledge
@kodiakcakes

   

**49 likes**

1 DAY AGO

Add a comment... Post

KODIAK000962




**letsgetwhaleyfit** · **Follow**



**letsgetwhaleyfit** Fuel up gang. It's bulking season for me. #kodiakcakes #thefitnessshoppe can't go wrong with these waffles,

@thefitnessshoppe

1d

   

**14 likes**

1 DAY AGO

Add a comment... 

KODIAK000963



stubaby_14 · **Follow**





**stubaby_14** School from home today....
@bpnsupps an @kodiakcakes muffins for
breakfast!!!
😂😂😋 MMMMM...lets gooo!! Can't wait
to smack on these...if the boys leave me
any!! Lmao 🤪🤪

What are you fueling ur body with
today?!? Easy recipe, if anyone wants it
definitely will share or post it!

   

**9 likes**

2 DAYS AGO

Add a comment...                                    Post

KODIAK000964



 genlvilla · **Follow** 

 **genlvilla** Dark Chocolate Chocolate Chip Protein Waffles 🍪😋

This is one of my favorite, go-to breakfasts, especially before or after an intense workout.

WHAT YOU'LL NEED:
✨1/2 cup of @kodiakcakes Dark Chocolate Power Cakes Flapjack & Waffle Mix
✨1 scoop of your favorite protein powder (mine is @ghostlifestyle Chips Ahoy)
✨Water (or any milk of your choosing)
✨Sugar free syrup (I love Mrs. Buttersworth)

   

**94 likes**

w.instagram.com/p/CKSx1aaAqfB/

KODIAK000965





amberchambers82 · **Follow**

**amberchambers82** Mixed my Shakeology today with some Kodiak oats and American Dream nut butter. Got the super foods from my Shakeology and some extra protein from the oats and peanut butter. Yum!!!

#beachbody #shakeology #kodiakcakes #americandreamnutbutter #beachbodycoach #coachlife #toddlermom #teenagermom

3d

**amberchambers82** Guess I need to make another one.

5 likes

w.instagram.com/p/CKM5AShHbTL/

**Exhibit 8**



# FUEL FOR YOUR FRONTIER





Real food is the fuel that lets us do more and be more. Kodiak Cakes Power Cakes has the nutrients you need to conquer your personal frontiers, whether that be a day of sledding with your cubs or pushing a sled at the gym.

**MANUFACTURER'S COUPON**

## $1.00 OFF

**ANY KODIAK CAKES FLAPJACK & WAFFLE MIX PRODUCT**

CONSUMER: OFFER LIMITED TO ONE COUPON PER PURCHASE. COUPON MAY NOT BE REPRODUCED OR TRANSFERRED.

RETAILER: KODIAK CAKES, LLC will redeem this coupon in accordance with our redemption policy, copies available upon request. Consumer must pay any sales tax. Cash value 1/100¢. Void where prohibited, taxed or restricted by law. Mail coupons to: Kodiak Cakes, LLC. P.O. Box 1715, Dept. 0062, Tecate, CA 91980

**EXPIRES 12/31/2019**

## 14G OF PROTEIN
per serving

@kodiakcakes

# KODIAK CAKES
## PARK CITY

**100% Whole Grains • Protein-Packed • Non-GMO**



0705599-010071

REDACTED

# Instagram

[ Search ]  **Log In**  Sign Up



**wittigworks**                                          •••





**wittigworks** The Wittig Sunday morning family tradition with @kodiakcakes. They are so easy to make and tastes amazing. This morning I used 1 cup of Buttermilk mix, 3/4 cup low-fat milk, a splash of oil, and two handfuls of blueberries. Topped with lite cool whip, sugar free syrup, and more blueberries. Pick up @kodiakcakes at most grocery stores or

                  

**239 likes**

JUNE 14, 2020

Log in to like or comment.

More posts from **wittigworks**



g in to see photos and videos from friends and discover other accounts you'll love.

Continue as

Sign

KODIAK001163

   

# Instagram

Search



## jennlabfit

Follow

•••

488 posts    36.7k followers    802 following

**Jenn | Fitness Rediscovered**
Fitness Trainer
Workouts + Balanced Eating + Mindset Coach for women after 40.
*FREE guide to transforming your body without deprivation or extremes*
jennlabfit.com/links/link-in-bio



kodiakcakes

 **jennlabfit**
Ormond Beach, Florida

•••

 **jennlabfit** How are you creating memories this holiday season? Personally, I'm very content to hibernate with my family, watch movies and eat some great food! Sometimes I think I'm boring 😴 but, most of the time I just don't care 🤷‍♀️ If you've followed me for a while you already know I'm a big @kodiakcakes fan! When it comes to baking I have two requirements – SIMPLE and YUMMY! A healthier

      

**682 likes**

DECEMBER 17, 2020

 Add a comment...    Post

KODIAK001178

Mariah Nonette ♡ ⚕ (@mariahwalkerr) • Instagram photos and videos



KODIAK001182

# Exhibit 9



KODIAK000775

FREE GROUND SHIPPING OVER $35

**HOME**   SHOP   RECIPES   EXPLORE



STORE LOCATOR   MY ACCOUNT   SHOPPING CART   CONTACT US   SEARCH





## A PIONEER PANTRY STAPLE

Food that was fit for the likes of lumberjacks, mountain men, and trailblazers — reimagined for today's frontier.

**LEARN MORE**

# WHOLE GRAINS TASTE BETTER®

## 100% WHOLE GRAINS • PROTEIN PACKED • NON-GMO

Before the days of over-processed, nutrient-deprived wheat, people relied on whole grains for the nourishment necessary to navigate life on the frontier. Here at Kodiak Cakes, we use 100% whole grains in every product we craft because they taste better and are full of fiber, B vitamins, and antioxidants to give you the long-lasting energy you need to explore your frontier — wherever that may be.



TRY THE NEW
## POWER CAKES
FLAPJACK & WAFFLE MIX

**SHOP THE NEW FLAVORS**



## KODIAK CUPS
### FLAVOR UNLEASHED

**TRY THEM NOW**



## POWER WAFFLES
### TOASTER READY

**MAKE THEM POP**

KODIAK000749

FREE GROUND SHIPPING OVER $35

HOME   SHOP   RECIPES   EXPLORE       STORE LOCATOR    MY ACCOUNT    SHOPPING CART    CONTACT US    SEARCH



## A FRONTIER
# FAMILY RECIPE

Kodiak Cakes began in 1982 when Penny Clark sent her 8-year-old son into the neighborhood with a red wagon full of paper bags that were filled with her father's heirloom flapjack mix and simple instructions written on the bags. He returned with an empty wagon and lifelong plans.



## A COMPANY
# MADE BY HAND
—

Though we've grown, we've remained family-owned and we still make each new product as if we were crafting a delicious family recipe to share with our friends and neighbors.



Fuel Your Adventure with Kodiak Cakes

Watch later   Share

KODIAK000767

FREE GROUND SHIPPING OVER $35

HOME    SHOP    RECIPES    EXPLORE         STORE LOCATOR    MY ACCOUNT    SHOPPING CART    CONTACT US    SEARCH



## OUR MISSION
To inspire healthier eating and active living with nourishment for today's frontier.

# RESTORING THE REAL FOOD TRADITION

Long ago, a hearty meal was the mainstay of frontier folk from the frigid Yukon to the High Sierra. These rugged explorers relied on real food with a rich source of carbohydrates, protein, and fiber.

Kodiak Cakes® is meant for those of us who, like the rugged old pioneers exploring the untamed wilderness, require nutrition, energy, and great taste to successfully navigate today's frontier.

## WHOLE GRAINS TASTE BETTER®

Apart from being the essential ingredient of the original frontier flapjacks, we use whole grains because they just taste better. They're also packed with the fiber, protein, vitamins, and minerals essential to fueling an active life. So instead of processing our wheat and "enriching" it with some of its original nutritional value, we left it as is—free of GMOs, preservatives, or artificial additives.





## POWERED BY PROTEIN

Protein plays an important part in our everyday lives, from powering us through big adventures to keeping us full and energized during busy days. It's also a key factor in muscle recovery after a tough workout. Combining the nourishment of whole grains with the benefits of high-quality protein just makes sense, so we add high-quality protein to many of our products and give you the option to add even more to your diet by using milk and an egg. Plus, you won't have to suffer through another chalky protein breakfast shake again. You're welcome.

KODIAK000764



CONFIDENTIAL

KODIAK000499



CONFIDENTIAL

KODIAK000507



KODIAK000516



KODIAK000538



KODIAK000567

# EXHIBIT E



Safeway Inc.
2004 Annual Report

Life is changing.









Safeway Inc. is one of the largest food and drug retailers in North America. As of January 1, 2005, the company operated 1,802 stores in the Western, Southwestern, Rocky Mountain, Midwestern and Mid-Atlantic regions of the United States and in western Canada. In support of its stores, Safeway has an extensive network of distribution, manufacturing and food processing facilities.



## Percentage of Stores with Specialty Departments

|  | 2004 |
|---|---|
| Bakery | 94% |
| Deli | 96 |
| Floral | 93 |
| Pharmacy | 74 |

## Manufacturing and Processing Facilities

|  | Year-end 2004 | |
|---|---|---|
|  | U.S. | Canada |
| Milk Plants | 6 | 3 |
| Bread Baking Plants | 5 | 2 |
| Ice Cream Plants | 2 | 2 |
| Cheese and Meat Packaging Plants | – | 2 |
| Soft Drink Bottling Plants | 4 | – |
| Fruit and Vegetable Processing Plants | 1 | 3 |
| Other Food Processing Plants | 2 | – |
| Pet Food Plant | 1 | – |
|  | 21 | 12 |



Pak 'n Save Foods

VONS

PAVILIONS



CARRS





GENUARDI'S
FAMILY MARKETS

## Contents

2 Letter to Stockholders

5 Editorial Material

14 Financial Contents

56 Directors and Principal Officers

57 Investor Information

# Financial Highlights

| (Dollars in millions, except per-share amounts) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 |
|---|---|---|---|
| **For the Year:** | | | |
| Sales and other revenue | $35,822.9 | $35,727.2 | $34,917.2 |
| Gross profit | 10,595.3 | 10,724.2 | 10,996.4 |
| Operating profit | 1,172.8 | 573.9 | 947.6 |
| Net income (loss) | 560.2 | (169.8) | (828.1) |
| Diluted earnings (loss) per share: | 1.25 | (0.38) | (1.77) |
| Cash capital expenditures | 1,212.5 | 935.8 | 1,467.4 |
| **At Year End:** | | | |
| Common shares outstanding (in millions) (Note 1) | 447.7 | 444.2 | 441.0 |
| Retail square feet (in millions) | 82.1 | 82.6 | 81.5 |
| Number of stores | 1,802 | 1,817 | 1,808 |

Note 1: Net of 130.8 million, 131.2 million and 132.0 million shares held in treasury in 2004, 2003 and 2002, respectively.

# To Our Stockholders

While 2004 was another difficult year for our industry, we made solid progress on several fronts and laid a strong foundation to support future growth. Among our most notable achievements, we generated exceptionally strong cash flow from operations, which allowed us to significantly reduce total debt; we dramatically improved the quality, selection and presentation of our perishable offerings; and we began the rollout of our highly successful Lifestyle stores through an aggressive remodeling program. We also made substantial progress restructuring labor contracts, which we believe will enable us to compete more effectively going forward.

## Results From Operations

Net income was $560.2 million ($1.25 per diluted share) in 2004 compared to a loss of $169.8 million ($0.38 per diluted share) in 2003.

As indicated in the table at the bottom of page 4, results for 2004 include total estimated charges of approximately $308.1 million, after tax ($0.68 per diluted share), related to the following items:

• Estimated impact of the Southern California strike;
• Dominick's store closures;
• Contributions to a UFCW multi-employer health and welfare plan in Northern California; and
• A lease expense adjustment in accordance with recent SEC guidance on "rent holidays."

Excluding these items, 2004 earnings would have been $1.93 per diluted share.[1]

For 2003, the same table outlines a total of almost $1.1 billion in after-tax charges ($2.43 per diluted share), related to the following items:

• Estimated impact of the Southern California strike;
• Dominick's impairment charges;
• Randall's impairment charges;
• Miscellaneous investments write-off;
• Inventory accounting change; and
• Restructuring and other expenses.

Excluding these items, net income in 2003 would have been $2.05 per diluted share.[1]

## Sales

Total sales rose only slightly to $35.8 billion in 2004 from $35.7 billion in 2003, primarily because of the strike and the extra week of operation in fiscal 2003, which was a 53-week year. Excluding strike-affected stores, comparable-store sales increased 1.5%, while identical-store sales (which do not include replacement stores) rose 0.9%. Further excluding fuel, comparable-store sales declined 0.2%, while identical-store sales were down 0.8%.

With the lingering effects of the strike gradually abating, total sales have improved in the first quarter of 2005. We are encouraged by this positive trend and expect it to continue as the year progresses.

## Gross Profit

Gross profit in 2004 declined 44 basis points to 29.58% of sales. The reduction was due primarily to increased fuel sales (which have a lower gross margin) and the estimated impact of the strike.

## Operating and Administrative Expense

Operating and administrative expense last year decreased 7 basis points to 26.30% of sales. The slight improvement was due to lower impairment charges and higher fuel sales, partly offset by the impact of the strike and higher wages, benefits and occupancy expenses.

We continued to make substantial progress renegotiating labor contracts under favorable terms. As of this writing, we have restructured collective bargaining agreements in all but two of our retail divisions, where contracts have expired and we are currently negotiating new ones. The modified agreements have begun to arrest the rapid increase in employee health care premiums and, over time, are expected to reduce the gap in our total labor costs versus those of our non-union competitors.

## Interest Expense

Interest expense declined $31.2 million to $411.2 million in 2004, primarily because strong cash flow from operations enabled us to reduce debt by $1.1 billion to $6.7 billion.

## Capital Spending

Cash capital expenditures increased to $1.2 billion in 2004. During the year we opened 33 new stores, all designed to our new Lifestyle format featured later in this report. We also expanded or remodeled 115 existing stores – 94 of which were refurbished to Lifestyle standards – and we closed 48 older stores.

In 2005, we plan to invest approximately $1.4 billion in cash capital expenditures and open 30 to 35 new Lifestyle stores while completing some 275 to 285 Lifestyle remodels. By the end of this year, we plan to operate approximately 450 Lifestyle stores, more than three times the current total.

We also opened 41 fuel centers adjacent to our stores. As of year-end 2004, 311 of our stores sold gasoline, boosting sales at these locations while enhancing one-stop shopping convenience for our customers.

## Cash Flow

Net cash flow from operating activities in 2004 rose $617 million to $2.2 billion, while net cash flow from investing activities, which consists principally of cash paid for property additions, increased $275 million to approximately $1.1 billion. Net cash flow used by financing activities – mainly cash used to retire debt – was also up significantly, to approximately $1.1 billion in 2004 from $724 million the prior year. As noted above, total debt declined to $6.7 billion at year-end 2004 from $7.8 billion at year-end 2003.

## Community Involvement

Each year we make cash and in-kind donations to hundreds of non-profit organizations throughout the communities we serve. Many of these contributions are channeled through The Safeway Foundation, which is sustained by fundraising events and an annual employee-giving campaign.

During 2004 in our U.S. retail operations alone, we donated more than $100 million worth of merchandise to Second Harvest food banks and other hunger-relief organizations. We also contributed more than $20 million to local schools through eScrip and other educational programs. In addition, we conducted major fundraising campaigns to support awareness, research and treatment programs for breast and prostate cancer as well as muscular dystrophy.

Although we generally limit our charitable giving to worthy causes within our operating areas, we made an exception for victims of the devastating tsunami in South Asia and Eastern Africa, raising more than $3.5 million to support relief efforts on their behalf earlier in 2005.

## Outlook

This is an exciting time to be at Safeway, as we fundamentally reinvent our business and the way we go to market. We continue to make excellent progress in establishing and communicating clear, compelling points of difference between our offerings and those of our competitors. At the same time, through an innovative new advertising campaign, we will be connecting with consumers – current customers and potential new ones – in ways that we believe will position Safeway as a uniquely responsive, more complete store. As noted on the following pages, life is changing, and so are we.

In closing, once again I'd like to acknowledge our employees for their tireless efforts. As we strive to establish a sustained competitive advantage in a challenging business environment, I'm reminded that "a company is only as good as its employees allow it to be." We're fortunate to have some of the best trained, most knowledgeable workers in the supermarket industry. We think they're the friendliest, most helpful employees in the business as well, a sentiment echoed by many of our customers. We have a winning team whose players thrive on challenges and take pride in outperforming the competition while enhancing customer satisfaction.

Based on our recent, positive sales trends, we are encouraged that our strategy is working and are convinced that Safeway is headed in the right direction for future growth. We are determined to deliver shareholder value.

Steven A. Burd
Chairman, President and Chief Executive Officer
March 15, 2005

### ¹Reconciliation of GAAP Net Income (Loss) to Adjusted Income (Unaudited)

(Dollars in millions, except per-share amounts)

| | 2004 | |
|---|---|---|
| | Amount | Per Diluted Share |
| Net income, as reported | $560.2 | $1.25 |
| Dominick's store closures | 28.5 | 0.06 |
| Estimated strike impact | 254.0 | 0.57 |
| Health and welfare contribution | 19.1 | 0.04 |
| Accrual for rent holidays | 6.5 | 0.01 |
| Adjusted income | $868.3 | $1.93 |

| | 2003 | |
|---|---|---|
| | Amount | Per Diluted Share |
| Net loss, as reported | $(169.8) | $(0.38) |
| Estimated strike impact | 102.9 | 0.23 |
| Dominick's impairment charges: | | |
| Goodwill | 275.9 | 0.62 |
| Assets | 190.9 | 0.43 |
| Randall's impairment charges | 447.7 | 1.00 |
| Miscellaneous investments write-off | 6.5 | 0.01 |
| Inventory loss accrual | 43.5 | 0.10 |
| Restructuring and other expenses | 15.6 | 0.04 |
| Adjusted income | $ 913.2 | $ 2.05 |

# Life is changing. So are we.



# Today's consumers expect

Consumers today are busier and more diverse than ever before. They're also more selective and have an unprecedented range of options when choosing where they shop for food. Increasing time constraints and shifting demographic trends – such as greater ethnicity, changing household composition and growing affluence – have accelerated the profusion of new retail formats, each trying to satisfy today's consumers' varied needs and desires.



# more from a food store.

When seeking a food store, consumers look for one that recognizes they live and eat differently today. More shoppers are demanding meal solutions customized to their lifestyles. At the same time, shopping for food has become a continuous series of trade-offs. Despite relentless time pressure, consumers are increasingly willing to swap convenience for more interesting, relevant shopping experiences – experiences that feed both needs and passions.



# Safeway is redefining the

Because life has changed, we're changing, too. We are fundamentally reinventing our business, establishing a solid framework to provide consistently high-quality food that fits consumers' changing lifestyles. Every day, in every department of every store, we strive to establish clear, compelling points of difference in our offerings so we will be demonstrably superior to our competitors and can provide an exceptionally satisfying shopping experience for our customers. This is particularly evident in the quality and presentation of our perishables and the level of customer service we deliver.



**QUALITY PRODUCE**

We have dramatically improved the quality and presentation of our fresh fruits and vegetables. To differentiate our produce from our competitors', we specify higher quality grades and select from the best, sweetest crops available, some of them unique items grown especially for us. For consumers seeking organically grown fruits and vegetables, we have expanded our assortment of top-quality, 100% Certified Organics to more than 80 items.

# food shopping experience.

Nowhere is the transformation and revitalization of Safeway more apparent than in our spectacular new Lifestyle stores. These stores highlight our passion for superb fresh foods and innovative, consumer-focused initiatives such as restaurant-quality meal solutions and organic produce. We have designed and merchandised our Lifestyle stores to reflect the way today's consumers shop. Our ultimate objective with this exciting new format is to make Safeway a complete food store, a one-of-kind store that offers shoppers an unparalleled array of uniquely responsive solutions and experiences, now and in the future.



# Key Marketing Initiatives

## Rancher's Reserve Beef

Safeway's exclusive line of *Rancher's Reserve* beef is naturally aged to ensure exceptional taste and tenderness. Our beef experts carefully select and trim every cut of *Rancher's Reserve* by hand. The result is beef that's guaranteed to please or we offer another cut *and* a full refund. We cut our customers' meat purchases any way they like them and gladly offer cooking tips and recommendations. We even season or marinade their purchases at no extra charge.



## Specialty Foods to Go

We're working hard to make our prepared meals program the finest of its kind. Our extensive *at your table* menu features fresh sushi, Milena's pizzeria-style pizzas, gourmet specialties such as teriyaki salmon and grilled rosemary chicken, and "comfort food" like traditional meatloaf. Busy shoppers can also select numerous ready-to-go offerings from our *Signature* line of premium sandwiches, soups and salads.



### SIGNATURE SANDWICHES

We prepare an extensive array of *Signature* Sandwiches created with the finest Old World-style *Primo Taglio* meats and cheeses, piled high between slices of fresh-from-the-oven Safeway SELECT *Artisan* breads. This popular, expanding line also includes low-carb wraps.





### SIGNATURE PANINI SANDWICHES

A popular new "grab 'n go" offering at Safeway is classic Italian panini. Shoppers can choose from delicious grilled sandwiches like Pastrami and Swiss or the Breakfast Panini. All are served fresh and hot off the grill.

### SIGNATURE SOUPS

One of our most successful initiatives in 2004 was the launch of our restaurant-quality line of *Signature* Soups. We offer them warm and ready to eat from specially-designed hot soup carts or pre-packaged to heat and serve later at home. Shoppers can select from several gourmet varieties such as Tuscan Tomato, Fajita Chicken & Toasted Corn Chowder, and Cravin' Crab & Sweet Corn. All are made with the finest, freshest ingredients.



In addition, our Lifestyle stores serve take-home family favorites cut to order at our carving station. Daily evening specials include roast turkey, pork tenderloin, prime rib and other classics served with popular side dishes.

## New Lifestyle Stores

Our new Lifestyle concept stores have been dramatically redesigned to showcase our commitment to quality, particularly in the perishable departments. Earth-toned décor, subdued lighting, custom flooring, unique display fixtures and other special features impart a warm ambiance that we believe significantly enhances the shopping experience. As of year-end 2004, we had built 34 new stores of this design and remodeled 108 existing stores to the same standards. Sales at these stores have been strong, reflecting positive customer response to the new format.



# Financial Contents

15    Company in Review

18    Five-Year Summary Financial Information

20    Financial Review

29    Consolidated Statements of Operations

30    Consolidated Balance Sheets

32    Consolidated Statements of Cash Flows

34    Consolidated Statements of Stockholders' Equity

35    Notes to Consolidated Financial Statements

53    Management's Annual Report on
      Internal Controls over Financial Reporting

54    Independent Auditors' Reports

56    Directors and Principal Officers

57    Investor Information

# Company in Review

Safeway Inc. ("Safeway" or the "Company") is one of the largest food and drug retailers in North America, with 1,802 stores at year-end 2004.

The Company's U.S. retail operations are located principally in California, Oregon, Washington, Alaska, Colorado, Arizona, Texas, the Chicago metropolitan area and the Mid-Atlantic region. The Company's Canadian retail operations are located principally in British Columbia, Alberta and Manitoba/Saskatchewan. In support of its retail operations, the Company has an extensive network of distribution, manufacturing and food processing facilities.

Safeway also has a 49% interest in Casa Ley, S.A. de C.V. ("Casa Ley") which operates 115 food and general merchandise stores in Western Mexico. In addition, the Company has a strategic alliance with and a 54% ownership interest in GroceryWorks Holdings, Inc., an Internet grocer.

STORES  Safeway's average store size is approximately 45,000 square feet. The Company determines the size of a new store based on a number of considerations, including the needs of the community the store serves, the location and site plan, and the estimated return on capital invested. Safeway's primary new store prototype, called the "Lifestyle Store," is 55,000 square feet. Lifestyle stores feature a warm and inviting décor, with special lighting to highlight products and departments.

Safeway's stores provide a full array of dry grocery items tailored to local preferences. Most stores offer a wide selection of food and general merchandise and feature a variety of specialty departments such as bakery, delicatessen, floral and pharmacy. In addition, many stores now offer Starbucks coffee shops and adjacent fuel centers.

Safeway continues to operate a number of smaller stores that also offer an extensive selection of food and general merchandise, and generally include one or more specialty departments. These stores remain an important part of the Company's store network in smaller communities and certain other locations where larger stores may not be feasible because of space limitations and/or community needs or restrictions.

The following table summarizes Safeway's stores by size at year-end 2004:

| Square Footage | Number of Stores | Percent of Total |
|---|---|---|
| Less than 30,000 | 275 | 15% |
| 30,000 to 50,000 | 767 | 43 |
| More than 50,000 | 760 | 42 |
| Total stores | 1,802 | 100% |

STORE OWNERSHIP  At year-end 2004, Safeway owned approximately one-third of its stores and leased its remaining stores. The Company prefers ownership because it provides control and flexibility with respect to financing terms, remodeling, expansions and closures.

MERCHANDISING  Safeway's operating strategy is to provide value to its customers by maintaining high store standards and a wide selection of high quality products at competitive prices. To provide one-stop shopping for today's busy shoppers, the Company emphasizes high quality produce and meat, and offers many specialty items through its various specialty departments.

Safeway is focused on differentiating its offering with high quality perishables. The Company is developing a reputation for having the absolute best produce in the market and the most tender and flavorful meat, through the Company's Rancher's Reserve Tender Beef offering. In addition, Safeway has developed a variety of new items in the deli/food service department, including Signature sandwiches, soups and salads that provide meal solutions to today's busy shoppers.

To showcase its commitment to quality, particularly in the perishable departments, Safeway has developed a store prototype called the "Lifestyle Store." The Lifestyle store has an earth-toned décor package, subdued lighting, custom flooring, unique display fixtures and other special features that impart a warm ambience that the Company believes significantly enhances the shopping experience.

Safeway has developed a line of some 1,300 premium corporate brand products since 1993 under the "Safeway SELECT" banner. The award-winning Safeway SELECT line is designed to offer premium quality products that the Company believes are equal or superior in quality to comparable best-selling nationally advertised brands, or are unique to the category and not available from national brand manufacturers.

The Safeway SELECT line of products includes carbonated soft drinks; unique salsas; bagged salads; whole bean coffees; the Indulgence line of cookies and other sweets; the Verdi line of frozen pizzas, fresh and frozen pastas, pasta sauces and olive oils; Milena's take & bake pizzas; the Primo Taglio line of meats, cheeses and sandwiches; Signature soups, sandwiches and salads; Artisan fresh-baked breads; NutraBalance pet food; and Ultra laundry detergents and dish soaps. The Safeway SELECT line also includes an extensive array of ice creams, frozen yogurts and sorbets; Healthy Advantage items such as low-fat ice creams, cereals and low-fat cereal bars; and Gourmet Club frozen entrees and hors d'oeuvres.

**MANUFACTURING AND WHOLESALE**  The principal function of manufacturing operations is to purchase, manufacture and process private label merchandise sold in stores operated by the Company. As measured by sales dollars, approximately 24% of Safeway's private label merchandise is manufactured in Company-owned plants, and the remainder is purchased from third parties.

Safeway's Canadian subsidiary has a wholesale operation that distributes both national brands and private label products to independent grocery stores and institutional customers.

Safeway operated the following manufacturing and processing facilities at year-end 2004:

|  | U.S. | Canada |
|---|---|---|
| Milk plants | 6 | 3 |
| Bread baking plants | 5 | 2 |
| Ice cream plants | 2 | 2 |
| Cheese and meat packaging plants | – | 2 |
| Soft drink bottling plants | 4 | – |
| Fruit and vegetable processing plants | 1 | 3 |
| Other food processing plants | 2 | – |
| Pet food plant | 1 | – |
| Total | 21 | 12 |

In addition, the Company operates laboratory facilities for quality assurance and research and development in certain of its plants and at its corporate offices.

**DISTRIBUTION**  Each of Safeway's 12 retail operating areas is served by a regional distribution center consisting of one or more facilities. Safeway has 17 distribution/warehousing centers (13 in the United States and four in Canada), which collectively provide the majority of all products to Safeway stores. The Company's distribution centers in Maryland, Alberta and British Columbia are operated by third parties.

**CAPITAL EXPENDITURE PROGRAM**  A key component of the Company's long-term strategy is its capital expenditure program. The Company's capital expenditure program funds, among other things, new stores, remodels, manufacturing plants, distribution facilities and information technology advances. Over the last several years, Safeway management has continued to strengthen its program to select and approve new capital investments.

The table below presents the Company's cash capital expenditures and details changes in the Company's store base over the last three years:

| (Dollars in millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Cash capital expenditures | $1,212.5 | $935.8 | $1,467.4 |
| Cash capital expenditures as a percentage of sales and other revenue | 3.4% | 2.6% | 4.2% |
| Stores opened | 33 | 40 | 75 |
| Stores closed | 48 | 31 | 40 |
| Remodels (Note 1) | 115 | 75 | 203 |
| Total retail square footage at year end (in millions) | 82.1 | 82.6 | 81.5 |
| Number of fuel stations at year end | 311 | 270 | 214 |

Note 1: Defined as store remodel projects (other than maintenance) generally requiring expenditures in excess of $200,000.

During 2004, Safeway invested $1.2 billion in cash capital expenditures. The Company opened 33 new Lifestyle stores, remodeled 115 existing stores – 94 of them were refurbished to Lifestyle standards – and closed 48 stores. In 2005, the Company expects to spend approximately $1.4 billion in cash capital expenditures and open approximately 30 to 35 new Lifestyle stores while completing some 275 to 285 Lifestyle remodels. By the end of 2005, Safeway plans to operate approximately 450 Lifestyle stores, more than three times the current total.

## MARKET RISK FROM FINANCIAL INSTRUMENTS

Safeway manages interest rate risk through the strategic use of fixed and variable interest rate debt and, from time to time, interest rate swaps. As of year-end 2004, the Company effectively converted $500 million of its 4.95% fixed-rate debt and $300 million of its 4.125% fixed-rate debt to floating rate debt through interest rate swap agreements.

The Company does not utilize financial instruments for trading or other speculative purposes, nor does it utilize leveraged financial instruments. The Company does not consider the potential declines in future earnings, fair values and cash flows from reasonably possible near-term changes in interest rates and exchange rates to be material.

The table below presents principal amounts and related weighted average rates by year of maturity for the Company's debt obligations at year-end 2004 (dollars in millions):

| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| Commercial paper: | | | | | | | | |
| Principal | – | $ 105.0 | – | – | – | – | $ 105.0 | $ 105.0 |
| Weighted average interest rate | – | 2.28% | – | – | – | – | 2.28% | |
| Long-term debt:[1] | | | | | | | | |
| Principal | $ 596.9 | $ 713.7 | $ 785.2 | $ 553.7 | $ 502.2 | $2,809.9 | $5,961.6 | $6,313.5 |
| Weighted average interest rate | 3.10% | 6.13% | 5.79% | 5.21% | 7.50% | 6.16% | 5.83% | |

(1) Primarily fixed-rate debt

# Five-Year Summary Financial Information

**SAFEWAY INC. AND SUBSIDIARIES**

| (Dollars in millions, except per-share amounts) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 | 52 Weeks 2001 | 52 Weeks 2000 |
|---|---|---|---|---|---|
| **Results of Operations** (Note 1) | | | | | |
| Sales and other revenue | $35,822.9 | $35,727.2 | $34,917.2 | $34,434.5 | $32,103.3 |
| Gross profit | 10,595.3 | 10,724.2 | 10,996.4 | 10,776.6 | 9,666.1 |
| Operating and administrative expense | (9,422.5) | (9,421.2) | (8,760.8) | (8,047.4) | (7,258.2) |
| Goodwill impairment charges | – | (729.1) | (1,288.0) | – | – |
| Goodwill amortization | – | – | – | (140.4) | (126.2) |
| Operating profit | 1,172.8 | 573.9 | 947.6 | 2,588.8 | 2,281.7 |
| Interest expense | (411.2) | (442.4) | (430.8) | (446.9) | (457.2) |
| Other income (expense), net | 32.3 | 9.6 | 15.5 | (46.9) | 42.0 |
| Income before income taxes and cumulative effect of accounting change | 793.9 | 141.1 | 532.3 | 2,095.0 | 1,866.5 |
| Income taxes | (233.7) | (310.9) | (660.4) | (841.1) | (774.6) |
| Income (loss) before cumulative effect of accounting change | 560.2 | (169.8) | (128.1) | 1,253.9 | 1,091.9 |
| Cumulative effect of accounting change | – | – | (700.0) | – | – |
| Net income (loss) | $ 560.2 | $ (169.8) | $ (828.1) | $ 1,253.9 | $ 1,091.9 |
| Basic earnings (loss) per share: | | | | | |
| Income (loss) before cumulative effect of accounting change | $ 1.26 | $ (0.38) | $ (0.27) | $ 2.49 | $ 2.19 |
| Cumulative effect of accounting change | – | – | (1.50) | – | – |
| Net income (loss) | $ 1.26 | $ (0.38) | $ (1.77) | $ 2.49 | $ 2.19 |
| Diluted earnings (loss) per share: | | | | | |
| Income (loss) before cumulative effect of accounting change | $ 1.25 | $ (0.38) | $ (0.27) | $ 2.44 | $ 2.13 |
| Cumulative effect of accounting change | – | – | (1.50) | – | – |
| Net income (loss) | $ 1.25 | $ (0.38) | $ (1.77) | $ 2.44 | $ 2.13 |

# Five-Year Summary Financial Information

| (Dollars in millions, except per-share amounts) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 | 52 Weeks 2001 | 52 Weeks 2000 |
|---|---|---|---|---|---|
| **Financial Statistics** (Note 1) | | | | | |
| Comparable-store sales increases (decreases) (Note 2) | 0.9% | (2.4%) | (0.7%) | 2.3% | 2.8% |
| Identical-store sales increases (decreases) (Note 2) | 0.3% | (2.8%) | (1.7%) | 1.6% | 2.2% |
| Gross profit margin | 29.58% | 30.02% | 31.49% | 31.30% | 30.11% |
| Operating and administrative expense as a percentage of sales (Note 3) | 26.30% | 26.37% | 25.09% | 23.37% | 22.61% |
| Operating profit as a percentage of sales | 3.3% | 1.6% | 2.7% | 7.5% | 7.1% |
| Cash capital expenditures | $ 1,212.5 | $  935.8 | $ 1,467.4 | $ 1,793.0 | $ 1,572.5 |
| Depreciation and amortization | 894.6 | 863.6 | 888.3 | 797.3 | 704.5 |
| Total assets | 15,377.4 | 15,096.7 | 16,047.2 | 17,462.6 | 15,965.2 |
| Total debt | 6,763.4 | 7,822.3 | 8,435.6 | 7,399.8 | 6,495.9 |
| Total stockholders' equity | 4,306.9 | 3,644.3 | 3,627.5 | 5,889.6 | 5,389.8 |
| Weighted average shares outstanding – basic (in millions) | 445.6 | 441.9 | 467.3 | 503.3 | 497.9 |
| Weighted average shares outstanding – diluted (in millions) | 449.1 | 441.9 | 467.3 | 513.2 | 511.6 |
| **Other Statistics** | | | | | |
| Genuardi's stores acquired during the year | – | – | – | 39 | – |
| Stores opened during the year | 33 | 40 | 75 | 95 | 75 |
| Stores closed during the year | 48 | 31 | 40 | 49 | 46 |
| Total stores at year-end | 1,802 | 1,817 | 1,808 | 1,773 | 1,688 |
| Remodels completed during the year (Note 4) | 115 | 75 | 203 | 255 | 275 |
| Total retail square footage at year-end (in millions) | 82.1 | 82.6 | 81.5 | 78.8 | 73.6 |

Note 1. The Company has classified certain minor revenue items as other revenues in 2004. These items had historically been classified as a reduction of costs and expenses. These items, and their effect on same-store sales, have been reclassified for prior periods to conform to the 2004 presentation. See page 22.

Note 2. Defined as stores operating the same period in both the current year and the previous year. Comparable stores include replacement stores while identical stores do not. 2004 sales increase includes the estimated 60-basis-point impact of Southern California strike. 2003 sales decrease includes the estimated 240-basis-point impact of Southern California strike. 2001 and 2000 sales increases include the estimated 50-basis-point impact of the 2000 Northern California distribution center strike.

Note 3. Management believes this ratio is relevant because it assists investors in evaluating Safeway's ability to control costs.

Note 4. Defined as store remodel projects (other than maintenance) generally requiring expenditures in excess of $200,000.

# Financial Review

## Results of Operations

Safeway reported net income of $560.2 million ($1.25 per diluted share) in 2004, a net loss of $169.8 million ($0.38 per diluted share) in 2003 and a net loss of $828.1 million ($1.77 per diluted share) in 2002. These results were significantly affected by a strike in Southern California, goodwill and asset impairments at Dominick's and Randall's and other unusual charges described below.

STRIKE IMPACT  On October 11, 2003, seven UFCW local unions struck the Company's 289 stores in Southern California. As a result, pursuant to the terms of a multi-employer bargaining arrangement, Kroger and Albertson's locked out certain of their retail union employees in Southern California food stores. An agreement ending the strike was ratified by the unions on February 28, 2004. Employees returned to work beginning March 5, 2004. Safeway estimates the overall cost of the strike and its residual effects reduced 2004 earnings by $412.2 million before taxes ($0.57 per diluted share) and 2003 earnings by $167.5 million before taxes ($0.23 per diluted share). Safeway estimated the impact of the strike by comparing internal forecasts immediately before the strike with actual results during and after the strike, at strike-affected stores. The estimate also includes the Company's benefit under an agreement with Kroger and Albertson's that arises out of the multi-employer bargaining process in Southern California.

DOMINICK'S  In the first quarter of 2002, Safeway adopted Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets," and recorded a pre-tax goodwill impairment charge of $589.0 million at Dominick's. In November 2002, Safeway announced the decision to sell Dominick's and exit the Chicago market due to labor issues. In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," Safeway recorded a pre-tax charge for the impairment of long-lived assets of $201.3 million in the fourth quarter of 2002 to adjust Dominick's to its estimated fair market value less cost to sell. Also in the fourth quarter

of 2002, Safeway performed its annual review of goodwill and recorded a pre-tax impairment charge of $583.8 million for Dominick's.

In the first 36 weeks of 2003, Safeway reduced the carrying value of Dominick's by writing down an additional $256.5 million of goodwill and $120.7 million of long-lived assets, based on indications of value received during the sale process. In November 2003, Safeway announced that it was taking Dominick's off the market after the winning bidder and the unions representing Dominick's could not reach an agreement on a labor contract. Safeway reclassified Dominick's from an "asset held for sale" to "assets held and used" and adjusted Dominick's individual long-lived assets to the lower of cost or fair value. As a result, in the fourth quarter of 2003 Safeway incurred a pre-tax, long-lived asset impairment charge of $190.7 million and a goodwill impairment charge of $24.9 million. As of year-end 2003, there is no goodwill remaining on Safeway's consolidated balance sheet related to Dominick's.

In the first quarter of 2004, Safeway closed 12 under-performing Dominick's stores which resulted in a store-lease exit charge of $45.7 million.

Pre-tax long-lived asset and goodwill impairment at Dominick's are summarized below (in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Cumulative effect of adopting SFAS No. 142 (goodwill impairment) | – | – | $589.0 |
| Goodwill impairment | – | $281.4 | 583.8 |
| Impairment of long-lived assets (included in operating and administrative expense) | – | 311.4 | 201.3 |
| Store lease exit costs (included in operating and administrative expense) | $45.7 | – | – |

Dominick's incurred operating losses and declining sales in each of the last three fiscal years and faces substantial hurdles to achieving satisfactory operating profit in the future. These hurdles include a highly competitive market and an unfavorable labor contract. Dominick's is operating under a labor contract that expired in 2003 and is currently negotiating a new labor contract. A more competitive labor contract is vital to Dominick's future viability. Safeway believes a satisfactory contract can be negotiated.

RANDALL'S  In the first quarter of 2002, Safeway recorded a pre-tax goodwill impairment charge of $111.0 million at Randall's when it adopted SFAS No. 142. During the fourth quarter of 2002, Safeway performed its annual review of goodwill and recorded a pre-tax impairment charge at Randall's of $704.2 million. In the fourth quarter of 2003, Safeway again performed its annual review of goodwill and wrote off the remaining $447.7 million of goodwill at Randall's. Pre-tax goodwill impairment charges at Randall's are summarized below (in millions):

|  | 2003 | 2002 |
| --- | --- | --- |
| Cumulative effect of adopting SFAS No. 142 (goodwill impairment) | – | $111.0 |
| Goodwill impairment | $447.7 | 704.2 |

Randall's has incurred operating losses and declining sales in each of the last two years due primarily to over-storing in Texas. Historically, other markets which were over-stored eventually self-corrected through population growth or as operators left the market. There can be no assurance that the Texas market will experience such a correction, and operating conditions in Texas are expected to remain extremely competitive in 2005.

OTHER CHARGES  Other significant pre-tax charges (credits) consist of the following (in millions):

|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
| Northern California health and welfare contribution | $31.1 | – | – |
| Accrual for rent holidays | 10.6 | – | – |
| Inventory loss accrual | – | $71.0 | – |
| Impairment of miscellaneous equity investments | – | 10.6 | – |
| Employee buyouts, severance costs and other related costs | – | 25.5 | – |
| Termination of in-store banking agreement | – | – | $(32.7) |
| Lease liability credits related to Furr's and Homeland bankruptcies | – | – | (12.1) |

In 2004, Safeway was notified that it was required to contribute an additional $31.1 million before tax ($0.04 per diluted share) during the year to two Northern California multi-employer health and welfare plans for its share of funding deficits.

Safeway incurred a lease expense adjustment of $10.6 million before tax ($0.01 per diluted share) in 2004 related to rent holidays. This adjustment conformed the Company's lease accounting policies to views expressed by the Office of the Chief Accountant of the SEC on February 7, 2005.

In 2003, Safeway changed its accounting policy to accrue estimated physical inventory losses for the period between the last physical inventory count and the balance sheet date. Safeway also made a change to its physical inventory loss calculation methodology to reflect more precise data from new financial software implemented in 2003. The effect of these changes was recorded in 2003. However, most of the adjustment was accumulated over many prior years. These charges reduced earnings by $71.0 million before tax ($0.10 per diluted share).

Safeway wrote off miscellaneous equity investments in 2003 totaling $10.6 million ($0.01 per diluted share), after determining they were impaired. Safeway also incurred pre-tax charges totaling $25.5 million ($0.04 per diluted share) for employee buyouts, severance costs and other related costs related to the restructuring of the Company's adminis-trative offices.

In 2002, Safeway received $32.7 million ($0.04 per diluted share) from a bank for the termination of an in-store banking agreement with Safeway.

In 1987, Safeway assigned a number of leases to Furr's Inc. ("Furr's") and Homeland Stores, Inc. ("Homeland") as part of the sale of the Company's former El Paso, Texas and Oklahoma City, Oklahoma divisions. Safeway is contingently liable if Furr's and Homeland are unable to continue making rental payments on these leases. In 2001, Furr's and Homeland declared bankruptcy and Safeway recorded a pre-tax charge to earnings of $42.7 million ($0.05 per diluted share) to recognize the estimated lease liabilities associated with these bankruptcies and for a single lease

SAFEWAY INC. AND SUBSIDIARIES

from Safeway's former Florida division. In 2002, Furr's and Homeland emerged from bankruptcy and, based on the resolution of various leases, Safeway reversed $12.1 million of this accrual.

**SALES**  Total sales increased only slightly to $35.8 billion in 2004 from $35.7 billion in 2003, primarily because of the strike and because fiscal 2004 had one fewer week than fiscal 2003.

Historically, Safeway has classified certain minor revenue items such as partner gift card and vending machine income as a reduction of costs and expenses. As the value of these items has grown, the Company has determined that they are more appropriately classified as other revenue in 2004. These items have been reclassified for prior periods to conform to the 2004 presentation. These reclassifications had no effect on previously reported operating profit or net income (loss) and are summarized below (in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Sales, before reclassifications | $ 35,621.9 | $ 35,552.7 | $ 34,767.5 |
| Reclassifications | 201.0 | 174.5 | 149.7 |
| Sales and other revenue, as adjusted | $ 35,822.9 | $ 35,727.2 | $ 34,917.2 |
| | | | |
| Cost of goods sold, before reclassifications | $(25,230.0) | $(25,018.9) | $(23,955.5) |
| Reclassifications | 2.4 | 15.9 | 34.7 |
| Cost of good sold, as adjusted | $(25,227.6) | $(25,003.0) | $(23,920.8) |
| | | | |
| Gross profit, before reclassifications | $ 10,391.9 | $ 10,533.8 | $ 10,812.0 |
| Reclassifications | 203.4 | 190.4 | 184.4 |
| Gross profit, as adjusted | $ 10,595.3 | $ 10,724.2 | $ 10,996.4 |
| | | | |
| Operating and administrative expense, before reclassifications | $ (9,219.1) | $ (9,230.8) | $ (8,576.4) |
| Reclassifications | (203.4) | (190.4) | (184.4) |
| Operating and administrative expense, as adjusted | $ (9,422.5) | $ (9,421.2) | $ (8,760.8) |

These reclassifications did not change previously reported comparable-store sales or identical-store sales by more than 10 basis points in either 2004, 2003 or 2002.

**Portions of 2004 Sales Dollar**



- Cost of Goods Sold: 70.4%
- Operating & Administrative Expense: 26.3%
- Operating Profit: 3.3%

Same-store sales increases (decreases) for 2004 were as follows:

|  | Comparable-Store Sales (includes replacement stores) | Identical-Store Sales (excludes replacement stores) |
|---|---|---|
| Including Fuel: | | |
| Excluding strike-affected stores | 1.5% | 0.9% |
| Including strike-affected stores | 0.9% | 0.3% |
| | | |
| Excluding Fuel: | | |
| Excluding strike-affected stores | (0.2%) | (0.8%) |
| Including strike-affected stores | (0.7%) | (1.3%) |

In 2003, total sales increased 2.3% to $35.7 billion from $34.9 billion in 2002 due primarily to the additional week in 2003, new store openings and additional fuel sales, partially offset by the estimated impact of the strike in Southern California. Excluding the estimated effects of the strike in Southern California, comparable-store sales were flat, while identical-store sales declined 0.4%. Further excluding the effects of fuel sales, 2003 comparable-store sales decreased 1.6% and identical-store sales decreased 2.0%.

In 2002, comparable-store sales decreased by 0.7%, while identical-store sales declined 1.7%. Excluding the effects of fuel sales, 2002 comparable-store sales decreased 1.3% and identical-store sales decreased 2.2%. Sales in 2002 were impacted by continued softness in the economy, an increase in competitive activity, an overly aggressive shrink-reduction effort and disruptions associated with the centralization of buying and merchandising.

GROSS PROFIT  Gross profit represents the portion of sales revenue remaining after deducting the costs of goods sold during the period, including purchase and distribution costs. These costs include inbound freight charges, purchasing and receiving costs, warehouse inspection costs, warehousing costs, and other costs of Safeway's distribution network. Advertising and promotional expenses are also a component of cost of goods sold.

Gross profit margin was 29.58% of sales in 2004, 30.02% in 2003, and 31.49% in 2002.

Gross profit declined 44 basis points in 2004. The strike in Southern California reduced gross profit by an estimated 41 basis points, and higher fuel sales (which have a lower gross margin) reduced gross profit by 40 basis points. Gross profit in 2003 was reduced by 20 basis points due to the $71.0 million charge to accrue estimated inventory losses. The remaining 17-basis-point increase was primarily the result of targeted pricing and promotion.

Gross profit declined 147 basis points in 2003. Higher fuel sales reduced gross profit by 38 basis points. The $71.0 million inventory loss accrual reduced gross profit 20 basis points. The strike in Southern California reduced gross profit by an estimated five basis points. The remaining 84-basis-point decline was primarily the result of targeted pricing and promotion.

Gross profit improved 19 basis points to 31.49% in 2002 primarily due to shrink control, improved buying practices and private-label growth. The increased gross margin dollars were largely reinvested in targeted pricing and promotion.

Vendor allowances totaled $2.2 billion in 2004, 2003 and 2002. Vendor allowances did not materially impact the Company's gross profit in 2004, 2003 and 2002 because Safeway spends the allowances received on pricing promotions, advertising expenses and slotting expenses. Vendor allowances can be grouped into the following broad categories: promotional allowances, slotting allowances and contract allowances. All vendor allowances are classified as an element of cost of goods sold.

Promotional allowances make up nearly three-quarters of all allowances. With promotional allowances, vendors pay Safeway to promote their product. The promotion may be any combination of a temporary price reduction, a feature in print ads, a feature in a Safeway circular, or a preferred location in the store. The promotions are typically one to two weeks long.

Slotting allowances are a small portion of total allowances (typically less than 5% of all allowances). With slotting allowances, the vendor reimburses Safeway for the cost of placing new product on the shelf. Safeway has no obligation or commitment to keep the product on the shelf for a minimum period.

Contract allowances make up the remainder of all allowances. Under the typical contract allowance, a vendor pays Safeway to keep product on the shelf for a minimum period of time or when volume thresholds are achieved.

OPERATING AND ADMINISTRATIVE EXPENSE  Operating and administrative expense consists primarily of store occupancy costs and backstage expenses, which, in turn, consist primarily of wages, employee benefits, rent, depreciation and utilities.

Operating and administrative expense was 26.30% of sales in 2004 compared to 26.37% in 2003 and 25.09% in 2002.

Operating and administrative expense decreased seven basis points in 2004. Lower impairment charges reduced operating and administrative expense as a percentage of sales by 77 basis points and higher fuel sales reduced operating and administrative expense by 39 basis points. These improvements were offset by a 22-basis-point increase from the strike in Southern California and 87 basis points due to higher wages, benefits and occupancy expense.

Operating and administrative expense increased 128 basis points in 2003. Higher Dominick's impairment charges increased operating and administration expense 30 basis points. Reduced sales from the Southern California strike increased operating and administrative expense by an estimated 29 basis points. Higher pension expense added 28 basis points, and higher workers' compensation expense

added 15 basis points. The remaining 26-basis-point increase was primarily due to higher employee benefit costs, soft sales and settlement income from the termination of an in-store banking agreement recorded in 2002 operating and administrative expense.

Operating and administrative expense increased 172 basis points in 2002. The Dominick's impairment charge added 55 basis points. This increase was partially offset by a decrease of approximately 9 basis points due to income received from a bank for the termination of an in-store banking agreement with Safeway. The remaining 126-basis-point increase was primarily due to higher employee benefit costs, higher real estate occupancy costs, higher pension expense and soft sales.

**INTEREST EXPENSE**   Interest expense was $411.2 million in 2004, compared to $442.4 million in 2003, and $430.8 in 2002. Interest expense decreased in 2004 primarily due to lower average borrowings in 2004 compared to 2003. Interest expense increased in 2003 primarily due to higher average borrowings in 2003 compared to 2002. Interest expense declined in 2002 primarily due to lower interest rates in 2002 compared to 2001.

**OTHER INCOME (LOSS)**   Other income consists of interest income, minority interest in a consolidated affiliate and equity in earnings from Safeway's unconsolidated affiliates. Interest income was $9.7 million in 2004, $5.4 million in 2003 and $8.5 million in 2002. Equity in earnings (losses) of unconsolidated affiliates was income of $12.6 million in 2004, a loss of $ 7.1 million in 2003 and a loss of $0.2 million in 2002. Equity in losses of unconsolidated affiliates in 2002 includes approximately $15.8 million in charges related to the resolution of physical inventory count discrepancies at Casa Ley.

## Critical Accounting Policies

Critical accounting policies are those accounting policies that management believes are important to the portrayal of Safeway's financial condition and results and require management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain.

**WORKERS' COMPENSATION**   The Company is primarily self-insured for workers' compensation, automobile and general liability costs. It is the Company's policy to record its self-insurance liability, as determined actuarially, based on claims filed and an estimate of claims incurred but not yet reported, discounted at a risk-free interest rate. Any actuarial projection of losses concerning workers' compensation and general liability is subject to a high degree of variability. Among the causes of this variability are unpredictable external factors affecting future inflation rates, discount rates, litigation trends, legal interpretations, benefit level changes and claim settlement patterns. An example of how change in discount rates can affect Safeway's reserve occurred in 2004 when a 25-basis point increase in the Company's discount rate, based on changes in market rates, reduced its liability by approximately $4.3 million.

The majority of the Company's workers' compensation liability is from claims occurring in California. California workers' compensation has received intense scrutiny from the state's politicians, insurers, employers and providers, as well as the public in general. Recent years have seen escalation in the number of legislative reforms, judicial rulings and social phenomena affecting this business. Some of the many sources of uncertainty in the Company's reserve estimates include changes in benefit levels, medical fee schedules, medical utilization guidelines, vocation rehabilitation and apportionment.

**STORE CLOSURES**   It is the Company's policy to recognize losses relating to the impairment of long-lived assets when expected net future cash flows are less than the assets' carrying values. For closed stores that are under long-term leases, the Company records a liability for the future minimum lease payments and related ancillary costs from

the date of closure to the end of the remaining lease term, net of estimated cost recoveries. In both cases, fair value is determined by estimating net future cash flows and discounting them using a risk-adjusted rate of interest. The Company estimates future cash flows based on its experience and knowledge of the market in which the closed store is located and, when necessary, uses real estate brokers. However, these estimates project future cash flow several years into the future and are affected by variable factors such as inflation, real estate markets and economic conditions.

EMPLOYEE BENEFIT PLANS  The determination of Safeway's obligation and expense for pension and other post-retirement benefits is dependent, in part, on the Company's selection of certain assumptions used by its actuaries in calculating these amounts. These assumptions are disclosed in Note I to the consolidated financial statements and include, among other things, the discount rate, the expected long-term rate of return on plan assets and the rates of compensation and health care costs. In accordance with generally accepted accounting principles, actual results that differ from the Company's assumptions are accumulated and amortized over future periods and, therefore, affect its recognized expense and recorded obligation in such future periods. While Safeway believes its assumptions are appropriate, significant differences in Safeway's actual experience or significant changes in the Company's assumptions may materially affect Safeway's pension and other post-retirement obligations and its future expense.

When not considering other changes in assumptions or actual return on plan assets, a 100-basis-point reduction in the year-end 2004 discount rate alone would negatively impact 2005 U.S. pension expense by approximately $28 million, and a 50-basis-point reduction in expected return on plan assets alone would negatively impact 2005 U.S. pension expense by approximately $8 million.

Not considering any changes in assumptions, a $100 million reduction in plan assets in 2004 would impact 2005 U.S. pension expense by approximately $18 million. The fair value of plan assets can vary significantly from year to year.

GOODWILL  Safeway accounts for goodwill in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets." As required by SFAS No. 142, Safeway tests for goodwill annually using a two-step approach with extensive use of accounting judgments and estimates of future operating results. Changes in estimates or application of alternative assumptions and definitions could produce significantly different results. The factors that most significantly affect the fair value calculation are market multiples and estimates of future cash flows. Fair value is determined by an independent third-party appraiser who primarily used the discounted cash flow method and the guideline company method.

## Liquidity and Financial Resources

Net cash flow from operating activities was $2,226.4 million in 2004, $1,609.6 million in 2003, and $2,034.7 million in 2002. Net cash flow from operating activities increased in 2004 largely due to increased net income and changes in working capital. Net cash flow from operating activities decreased in 2003 and 2002 primarily due to lower operating results and changes in working capital.

Cash flow used by investing activities was $1,070.3 million in 2004, $795.0 million in 2003 and $1,395.7 million in 2002. Cash flow used by investing activities increased in 2004 compared to 2003 because of higher capital expenditures. Cash flow used by investing activities decreased in 2003 compared to 2002 because of reduced capital expenditures in 2003. Cash flow used by investing activities declined in 2002 compared to 2001 primarily because of cash used to acquire Genuardi's in 2001, as well as reduced capital expenditures.

Capital expenditures were gradually scaled back in 2003 and 2002 as the economy softened. Capital expenditures increased in 2004 as the Company focused on remodeling its existing stores under its new "Lifestyle Store" prototype. In 2004, Safeway opened 33 new stores and completed 115 remodels. In 2003, Safeway opened 40 new stores and remodeled 75 stores. In 2005, Safeway expects to spend approximately $1.4 billion in cash capital expenditures, open approximately 30 to 35 new stores and complete approximately 275 to 285 remodels.

SAFEWAY INC. AND SUBSIDIARIES

Based upon the current level of operations, Safeway believes that net cash flow from operating activities and other sources of liquidity, including borrowing under the Company's commercial paper program and bank credit agreement, will be adequate to meet anticipated requirements for working capital, capital expenditures, interest payments and scheduled principal payments for the foreseeable future. There can be no assurance, however, that Safeway's business will continue to generate cash flow at or above current levels or that the Company will be able to maintain its ability to borrow under the commercial paper program and bank credit agreement.

If the Company's credit rating were to decline below its current level of Baa2/BBB, the ability to borrow under the commercial paper program would be adversely affected. Safeway's ability to borrow under the bank credit agreement is unaffected by Safeway's credit rating. However, if Safeway's 2004 Adjusted EBITDA to interest ratio of 5.04 to 1 were to decline to 2.0 to 1, or if Safeway's year-end 2004 debt to Adjusted EBITDA ratio of 3.26 to 1 were to grow to 4.0 to 1, Safeway's ability to borrow under the bank credit agreement would be impaired. The computation of Adjusted EBITDA, as defined by the bank credit agreement, is provided below solely to provide an understanding of the impact that Adjusted EBITDA has on Safeway's ability to borrow under the bank credit agreement. Adjusted EBITDA should not be considered as an alternative to net income or cash flows from operating activities (which are determined in accordance with GAAP) and is not being presented as an indicator of operating performance or a measure of liquidity. Other companies may define Adjusted EBITDA differently and, as a result, such measures may not be comparable to Safeway's Adjusted EBITDA.

| (Dollars in millions) | 52 weeks 2004 |
|---|---|
| Adjusted EBITDA: | |
| Net income | $  560.2 |
| Add (subtract): | |
| Income taxes | 233.7 |
| LIFO income | (15.2) |
| Interest expense | 411.2 |
| Depreciation and amortization | 894.6 |
| Equity in earnings of unconsolidated affiliates | (12.6) |
| Total Adjusted EBITDA | $2,071.9 |
| Adjusted EBITDA as a multiple of interest expense | 5.04x |
| Total debt at year-end 2004 | $6,763.4 |
| Debt to Adjusted EBITDA | 3.26x |

Total debt, including capital leases, was $6.76 billion in 2004, $7.82 billion in 2003 and $8.44 billion in 2002. Total debt declined in 2004 and 2003 as Safeway used cash flow from operations to pay down debt. Annual debt maturities over the next five years are set forth in Note D of the Company's 2004 consolidated financial statements.

The table below presents significant contractual obligations of the Company at year-end 2004:

| (In millions) | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Long-term debt | $ 596.9 | $ 818.7 | $ 785.2 | $ 553.7 | $ 502.2 | $2,809.9 | $6,066.6 |
| Capital lease obligations[1] | 42.8 | 40.8 | 41.8 | 42.5 | 43.7 | 485.2 | 696.8 |
| Operating leases | 405.9 | 396.8 | 380.9 | 362.5 | 328.3 | 2,778.6 | 4,653.0 |
| Self-insurance liability | 142.9 | 96.2 | 66.1 | 46.7 | 34.5 | 112.5 | 498.9 |
| Contracts for purchase of property, equipment and construction of buildings | 139.7 | – | – | – | – | – | 139.7 |
| Contracts for purchase of inventory | 486.9 | – | – | – | – | – | 486.9 |

(1) Minimum lease payments, less amounts representing interest

## New Accounting Standards

In January 2004, the FASB issued SFAS No. 106-1, "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003." This statement permits a sponsor to make a one-time election to defer accounting for the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, or the Prescription Drug Act. The Prescription Drug Act, signed into law in December 2003, establishes a prescription drug benefit under Medicare (Medicare Part D) and a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. SFAS No. 106-1 does not provide specific guidance as to whether a sponsor should recognize the effects of the Prescription Drug Act in its financial statements. The Prescription Drug Act introduces two new features to Medicare that must be considered when measuring accumulated postretirement benefit costs. The new features include a subsidy to the plan sponsors that is based on 28% of an individual beneficiary's annual prescription drug costs between $250 and $5,000 and an opportunity for a retiree to obtain a prescription drug benefit under Medicare. The Prescription Drug Act is not expected to reduce Safeway's net postretirement benefit costs.

Safeway has elected to defer adoption of SFAS No. 106-1 due to the lack of specific guidance. Therefore, the net postretirement benefit costs disclosed in the Company's financial statements do not reflect the impacts of the Prescription Drug Act on the plans. The deferral will continue to apply until specific authoritative accounting guidance for the federal subsidy is issued. Authoritative guidance on the accounting for the federal subsidy is pending and, when issued, could require information previously reported in the Company's financial statements to change. Safeway is currently investigating the impacts of SFAS No. 106-1's initial recognition, measurement and disclosure provisions on it's financial statements.

In December 2004, the FASB issued FASB Staff Position SFAS No. 109-2, "Accounting Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004," which provides accounting and disclosure guidance for the repatriation provisions of the American Jobs Creation Act of 2004 (the "Act"). The Act provides for a special one-time tax deduction of certain earnings repatriated in 2005. The Company is evaluating whether to take advantage of this provision with respect to its Canadian subsidiary, and expects to complete the evaluation by the fourth quarter of 2005. The Company anticipates that it could repatriate between zero and $734 million, and that the tax cost of the repatriation would be between zero and $75 million.

In December 2004, the FASB issued FASB Staff Position SFAS No. 109-1, "Application of FASB Statement No. 109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004," which provides accounting and disclosure guidance on the Act's qualified production activities deduction. The Company is currently evaluating the impact of this guidance on its effective tax rate for 2005 and subsequent periods.

In December 2004, the FASB issued SFAS No. 123 (Revised 2004), "Share-Based Payment" ("SFAS No. 123R"), which replaces SFAS No. 123, supersedes APB No. 25 and related interpretations and amends SFAS No. 95, "Statement of Cash Flows." The provisions of SFAS No. 123R are similar to those of SFAS No. 123; however, SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements as compensation cost based on their fair value on the date of grant. Fair value of share-based awards will be determined using option-pricing models (e.g. Black-Scholes or binomial models) and assumptions that appropriately reflect the specific circumstances of the awards. Compensation cost will be recognized over the vesting period based on the fair value of awards that actually vest.

The Company will be required to choose between the modified-prospective and modified-retrospective transition alternatives in adopting SFAS No. 123R. Under the modified-prospective-transition method, compensation cost will be recognized in financial statements issued subsequent to the date of adoption for all shared-based payments granted, modified or settled after the date of adoption, as well as for any unvested awards that were granted prior to the date of adoption. Under the modified-retrospective-transition method, prior period financial statements will be restated by recognizing compensation cost as previously reported in the pro forma disclosures under SFAS No. 123. The restatement provisions can be applied to either a) all periods presented or b) to the beginning of the fiscal year in which SFAS No. 123R is adopted. As the Company previously adopted only the pro forma disclosure provisions of SFAS No. 123, Safeway will recognize compensation cost relating to the unvested portion of awards granted prior to the date of adoption using the same estimate of the grant-date fair value and the same attribution method used to determine the pro forma disclosures under SFAS No. 123.

SFAS No. 123R is effective at the beginning of the first interim or annual period beginning after June 15, 2005, and early adoption is encouraged. Safeway has elected to early adopt this pronouncement beginning in the first quarter of 2005. The Company is in the process of evaluating the use of certain option-pricing models as well as the assumptions to be used in such models. When that evaluation is complete, Safeway will select a transition method.

## Forward-Looking Statements

This Annual Report contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such statements relate to, among other things, capital expenditures, acquisitions, the valuation of Safeway's investments, operating improvements and costs, tax rate and gross profit improvement, and are indicated by words or phrases such as "continuing," "ongoing," "expects" and similar words or phrases. The following are among the principal factors that could cause actual results to differ materially from the forward-looking statements: general business and economic conditions in our operating regions, including the rate of inflation, consumer spending levels, population, employment and job growth in our markets; pricing pressures and competitive factors, which could include pricing strategies, store openings and remodels by our competitors; results of our programs to control or reduce costs, improve buying practices and control shrink; results of our programs to increase sales, including private-label sales, improvement in our perishables departments and our promotional programs; results of our programs to improve capital management; the ability to integrate any companies we acquire and achieve operating improvements at those companies; changes in financial performance of our equity investments; increases in labor costs and relations with union bargaining units representing our employees or employees of third-party operators of our distribution centers; changes in state or federal legislation or regulation; the cost and stability of power sources; opportunities, acquisitions or dispositions that we pursue; performance in new business ventures; the rate of return on our pension assets; and the availability and terms of financing. Consequently, actual events and results may vary significantly from those included in or contemplated or implied by such statements. The Company undertakes no obligation to update forward-looking statements to reflect developments or information obtained after the date hereof and disclaims any obligation to do so.

# Consolidated Statements of Operations

| (In millions, except per-share amounts) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 |
|---|---|---|---|
| Sales and other revenue | $ 35,822.9 | $ 35,727.2 | $ 34,917.2 |
| Cost of goods sold | (25,227.6) | (25,003.0) | (23,920.8) |
| Gross profit | 10,595.3 | 10,724.2 | 10,996.4 |
| Operating and administrative expense | (9,422.5) | (9,421.2) | (8,760.8) |
| Goodwill impairment charges | – | (729.1) | (1,288.0) |
| Operating profit | 1,172.8 | 573.9 | 947.6 |
| Interest expense | (411.2) | (442.4) | (430.8) |
| Other income, net | 32.3 | 9.6 | 15.5 |
| Income before income taxes and cumulative effect of accounting change | 793.9 | 141.1 | 532.3 |
| Income taxes | (233.7) | (310.9) | (660.4) |
| Income (loss) before cumulative effect of accounting change | 560.2 | (169.8) | (128.1) |
| Cumulative effect of accounting change | – | – | (700.0) |
| Net income (loss) | $ 560.2 | $ (169.8) | $ (828.1) |

## Basic earnings (loss) per share:

| | | | |
|---|---|---|---|
| Income (loss) before cumulative effect of accounting change | $ 1.26 | $ (0.38) | $ (0.27) |
| Cumulative effect of accounting change | – | – | (1.50) |
| Net income (loss) | $ 1.26 | $ (0.38) | $ (1.77) |

## Diluted earnings (loss) per share:

| | | | |
|---|---|---|---|
| Income (loss) before cumulative effect of accounting change | $ 1.25 | $ (0.38) | $ (0.27) |
| Cumulative effect of accounting change | – | – | (1.50) |
| Net income (loss) | $ 1.25 | $ (0.38) | $ (1.77) |
| Weighted average shares outstanding – basic | 445.6 | 441.9 | 467.3 |
| Weighted average shares outstanding – diluted | 449.1 | 441.9 | 467.3 |

See accompanying notes to consolidated financial statements.

# Consolidated Balance Sheets

SAFEWAY INC. AND SUBSIDIARIES

| (In millions) | Year-end 2004 | Year-end 2003 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and equivalents | $    266.8 | $    174.8 |
| Receivables | 339.0 | 383.2 |
| Merchandise inventories, net of LIFO reserve of $48.6 and $63.8 | 2,740.7 | 2,642.2 |
| Prepaid expenses and other current assets | 251.2 | 307.5 |
| Total current assets | 3,597.7 | 3,507.7 |
| | | |
| Property: | | |
| Land | 1,396.0 | 1,384.9 |
| Buildings | 4,269.7 | 3,847.2 |
| Leasehold improvements | 2,621.9 | 2,494.8 |
| Fixtures and equipment | 5,981.3 | 5,539.8 |
| Property under capital leases | 773.8 | 758.1 |
| | 15,042.7 | 14,024.8 |
| Less accumulated depreciation and amortization | (6,353.3) | (5,619.0) |
| Total property, net | 8,689.4 | 8,405.8 |
| | | |
| Goodwill | 2,406.6 | 2,404.9 |
| Prepaid pension costs | 321.0 | 418.7 |
| Investments in unconsolidated affiliates | 187.6 | 191.8 |
| Other assets | 175.1 | 167.8 |
| | | |
| Total assets | $  15,377.4 | $  15,096.7 |

# Consolidated Balance Sheets

| (In millions, except per-share amounts) | Year-end 2004 | Year-end 2003 |
|---|---:|---:|
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current maturities of notes and debentures | $ 596.9 | $ 699.5 |
| Current obligations under capital leases | 42.8 | 50.5 |
| Accounts payable | 1,759.4 | 1,509.6 |
| Accrued salaries and wages | 426.4 | 406.0 |
| Income taxes | 270.3 | 134.0 |
| Other accrued liabilities | 696.3 | 664.7 |
| Total current liabilities | 3,792.1 | 3,464.3 |
| | | |
| Long-term debt: | | |
| Notes and debentures | 5,469.7 | 6,404.0 |
| Obligations under capital leases | 654.0 | 668.3 |
| Total long-term debt | 6,123.7 | 7,072.3 |
| | | |
| Deferred income taxes | 463.6 | 421.9 |
| Accrued claims and other liabilities | 691.1 | 493.9 |
| Total liabilities | 11,070.5 | 11,452.4 |
| | | |
| Commitments and contingencies | | |
| | | |
| Stockholders' equity: | | |
| Common stock: par value $0.01 per share; 1,500 shares authorized: | | |
| 578.5 and 575.4 shares outstanding | 5.8 | 5.8 |
| Additional paid-in capital | 3,373.1 | 3,334.6 |
| Treasury stock at cost; 130.8 and 131.2 shares | (3,879.7) | (3,887.4) |
| Deferred stock compensation | (15.2) | (14.0) |
| Accumulated other comprehensive income | 144.9 | 87.5 |
| Retained earnings | 4,678.0 | 4,117.8 |
| Total stockholders' equity | 4,306.9 | 3,644.3 |
| | | |
| Total liabilities and stockholders' equity | $ 15,377.4 | $ 15,096.7 |

See accompanying notes to consolidated financial statements.

# Consolidated Statements of Cash Flows

SAFEWAY INC. AND SUBSIDIARIES

| (In millions) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 |
|---|---|---|---|
| **Operating Activities:** | | | |
| Net income (loss) | $   560.2 | $ (169.8) | $  (828.1) |
| Cumulative effect of accounting change | – | – | 700.0 |
| Income (loss) before cumulative effect of accounting change | 560.2 | (169.8) | (128.1) |
| Reconciliation to net cash flow from operating activities: | | | |
| Goodwill impairment charges | – | 729.1 | 1,288.0 |
| Property impairment charges | 39.4 | 344.9 | 213.1 |
| Miscellaneous equity investment impairment charges | – | 10.6 | – |
| Depreciation and amortization | 894.6 | 863.6 | 888.3 |
| Amortization of deferred finance costs | 7.8 | 8.0 | 7.8 |
| Deferred income taxes | (29.2) | (77.9) | 64.9 |
| LIFO income | (15.2) | (1.3) | (17.6) |
| Equity in (earnings) losses of unconsolidated affiliates | (12.6) | 7.1 | 0.2 |
| Net pension expense | 112.9 | 130.9 | 30.3 |
| Contributions to pension plans | (15.1) | (12.1) | (32.0) |
| Restricted stock expense | 4.5 | 0.2 | – |
| Other | 2.2 | – | – |
| Long-term accrued claims and other liabilities | 118.1 | 52.7 | 11.0 |
| Loss (gain) on property retirements | 20.6 | (13.4) | 19.3 |
| Changes in working capital items: | | | |
| Receivables | 46.3 | 56.6 | (39.9) |
| Inventories at FIFO cost | (61.9) | 144.4 | (107.7) |
| Prepaid expenses and other current assets | 50.9 | (72.8) | 55.6 |
| Income taxes | 218.1 | 21.5 | (90.7) |
| Payables and accruals | 284.8 | (412.7) | (127.8) |
| Net cash flow from operating activities | 2,226.4 | 1,609.6 | 2,034.7 |
| | | | |
| **Investing Activities:** | | | |
| Cash paid for property additions | (1,212.5) | (935.8) | (1,467.4) |
| Proceeds from sale of property | 194.7 | 189.0 | 113.2 |
| Other | (52.5) | (48.2) | (41.5) |
| Net cash flow used by investing activities | (1,070.3) | (795.0) | (1,395.7) |

# Consolidated Statements of Cash Flows

SAFEWAY INC. AND SUBSIDIARIES

| (In millions) | 52 Weeks 2004 | 53 Weeks 2003 | 52 Weeks 2002 |
|---|---|---|---|
| **Financing Activities:** | | | |
| Additions to short-term borrowings | $    11.2 | $     2.6 | $      1.4 |
| Payments on short-term borrowings | (1.5) | (3.1) | (3.5) |
| Additions to long-term borrowings | 1,173.5 | 1,592.0 | 2,919.3 |
| Payments on long-term borrowings | (2,278.6) | (2,331.0) | (2,063.2) |
| Purchase of treasury stock | (0.4) | – | (1,502.6) |
| Net proceeds from exercise of stock options | 24.8 | 19.1 | 31.5 |
| Other | (6.6) | (3.6) | (14.2) |
| Net cash flow used by financing activities | (1,077.6) | (724.0) | (631.3) |
| Effect of changes in exchange rates on cash | 13.5 | 8.2 | (0.2) |
| Increase in cash and equivalents | 92.0 | 98.8 | 7.5 |
| **Cash and Equivalents:** | | | |
| Beginning of year | 174.8 | 76.0 | 68.5 |
| End of year | $  266.8 | $  174.8 | $   76.0 |
| **Other Cash Information:** | | | |
| Cash payments during the year for: | | | |
| Interest | $  434.8 | $  464.2 | $  440.6 |
| Income taxes, net of refunds | 43.8 | 361.6 | 686.2 |
| **Noncash Investing and Financing Activities:** | | | |
| Tax benefit from stock options exercised | $    17.4 | $   13.6 | $   29.2 |
| Capital lease obligations entered into | 35.9 | 113.2 | 174.9 |
| Mortgage notes assumed in property additions | 5.5 | – | 5.9 |

See accompanying notes to consolidated financial statements.

# Consolidated Statements of Stockholders' Equity

SAFEWAY INC. AND SUBSIDIARIES

| (In millions) | Common Stock | | Additional Paid-in Capital | Treasury Stock | | Deferred Stock Compensation | Retained Earnings | Accumulated Other Comprehensive (Loss) Income | Total Stockholders' Equity | Comprehensive (Loss) Income |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Cost | | | | | |
| Balance, year-end 2001 | 570.8 | $ 5.7 | $ 3,267.1 | (82.7) | $ (2,419.6) | – | $ 5,115.7 | $ (79.3) | $ 5,889.6 | |
| Net loss | – | – | – | – | – | – | (828.1) | – | (828.1) | $(828.1) |
| Translation adjustments | – | – | – | – | – | – | – | 10.3 | 10.3 | 10.3 |
| Other | – | – | – | – | – | – | – | 0.7 | 0.7 | 0.7 |
| Treasury stock purchased | – | – | – | (50.1) | (1,502.9) | – | – | – | (1,502.9) | – |
| Options exercised | 2.2 | – | 40.1 | 0.8 | 17.8 | – | – | – | 57.9 | – |
| Balance, year-end 2002 | 573.0 | 5.7 | 3,307.2 | (132.0) | (3,904.7) | – | 4,287.6 | (68.3) | 3,627.5 | $(817.1) |
| Net loss | – | – | – | – | – | – | (169.8) | – | (169.8) | $(169.8) |
| Translation adjustments | – | – | – | – | – | – | – | 154.9 | 154.9 | 154.9 |
| Other | – | – | – | – | – | – | – | 0.9 | 0.9 | 0.9 |
| Restricted stock granted | 0.7 | – | 14.2 | – | – | (14.2) | – | – | – | – |
| Amortization of restricted stock | – | – | – | – | – | 0.2 | – | – | 0.2 | – |
| Options exercised | 1.7 | 0.1 | 13.2 | 0.8 | 17.3 | – | – | – | 30.6 | – |
| Balance, year-end 2003 | 575.4 | 5.8 | 3,334.6 | (131.2) | (3,887.4) | (14.0) | 4,117.8 | 87.5 | 3,644.3 | $ (14.0) |
| Net income | – | – | – | – | – | – | 560.2 | – | 560.2 | $ 560.2 |
| Translation adjustments | – | – | – | – | – | – | – | 51.5 | 51.5 | 51.5 |
| Other | – | – | – | – | – | – | – | 5.9 | 5.9 | 5.9 |
| Restricted stock granted | 0.3 | – | 5.7 | – | – | (5.7) | – | – | – | – |
| Amortization of restricted stock | – | – | – | – | – | 4.5 | – | – | 4.5 | – |
| Treasury stock purchased | – | – | – | – | (0.4) | – | – | – | (0.4) | – |
| Options exercised | 2.8 | – | 32.8 | 0.4 | 8.1 | – | – | – | 40.9 | – |
| Balance, year-end 2004 | 578.5 | $ 5.8 | $ 3,373.1 | (130.8) | $ (3,879.7) | $ (15.2) | $ 4,678.0 | $ 144.9 | $ 4,306.9 | $ 617.6 |

See accompanying notes to consolidated financial statements.

# Notes to Consolidated Financial Statements

## Note A: The Company and Significant Accounting Policies

**THE COMPANY**  Safeway Inc. ("Safeway" or the "Company") is one of the largest food and drug retailers in North America, with 1,802 stores as of year-end 2004. Safeway's U.S. retail operations are located principally in California, Oregon, Washington, Alaska, Colorado, Arizona, Texas, the Chicago metropolitan area and the Mid-Atlantic region. The Company's Canadian retail operations are located principally in British Columbia, Alberta and Manitoba/Saskatchewan. In support of its retail operations, the Company has an extensive network of distribution, manufacturing and food processing facilities. The Company also has a 49% ownership interest in Casa Ley, S.A. de C.V. ("Casa Ley"), which operates 115 food and general merchandise stores in western Mexico. In addition, Safeway has a strategic alliance with and a 54% ownership interest in GroceryWorks Holdings, Inc. ("GroceryWorks"), an Internet grocer.

**BASIS OF CONSOLIDATION**  The consolidated financial statements include Safeway Inc., a Delaware corporation, and all majority-owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation. The Company's investment in Casa Ley is reported using the equity method and is recorded on a one-month delay basis because financial information for the latest month is not available from Casa Ley in time to be included in Safeway's consolidated results until the following reporting period.

**FISCAL YEAR**  The Company's fiscal year ends on the Saturday nearest December 31. The last three fiscal years consist of the 52-week period ended January 1, 2005, the 53-week period ended January 3, 2004 and the 52-week period ended December 28, 2002.

**RECLASSIFICATIONS**  Historically, Safeway has classified certain minor revenue items such as partner gift card and vending machine income as a reduction of costs and expenses. As the value of these items has grown, the Company has determined that they are more appropriately classified as other revenue in 2004. These items have been reclassified for prior periods to conform to the 2004 presentation. These reclassifications had no effect on previously reported operating profit or net income (loss) and are summarized as follows (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Sales, before reclassifications | $ 35,621.9 | $ 35,552.7 | $ 34,767.5 |
| Reclassifications | 201.0 | 174.5 | 149.7 |
| Sales and other revenue, as adjusted | $ 35,822.9 | $ 35,727.2 | $ 34,917.2 |
| | | | |
| Cost of goods sold, before reclassifications | $(25,230.0) | $(25,018.9) | $(23,955.5) |
| Reclassifications | 2.4 | 15.9 | 34.7 |
| Cost of goods sold, as adjusted | $(25,227.6) | $(25,003.0) | $(23,920.8) |
| | | | |
| Gross profit, before reclassifications | $ 10,391.9 | $ 10,533.8 | $ 10,812.0 |
| Reclassifications | 203.4 | 190.4 | 184.4 |
| Gross profit, as adjusted | $ 10,595.3 | $ 10,724.2 | $ 10,996.4 |
| | | | |
| Operating and administrative expense, before reclassifications | $ (9,219.1) | $ (9,230.8) | $ (8,576.4) |
| Reclassifications | (203.4) | (190.4) | (184.4) |
| Operating and administrative expense, as adjusted | $ (9,422.5) | $ (9,421.2) | $ (8,760.8) |

**REVENUE RECOGNITION**  Revenue is recognized at the point of sale for retail sales. Discounts provided to customers in connection with loyalty cards are accounted for as a reduction of sales.

**COST OF GOODS SOLD**  Cost of goods sold includes cost of inventory sold during the period, including purchase and distribution costs. These costs include inbound freight charges, purchasing and receiving costs, warehouse inspection costs, warehousing costs and other costs of Safeway's distribution network. Advertising and promotional expenses are also included as a component of cost of goods sold. Such costs are expensed in the period the advertisement occurs. Advertising and promotional expenses totaled $487.8 million in 2004, $419.9 million in 2003 and $384.6 million in 2002.

Vendor allowances totaled $2.2 billion in 2004, 2003 and 2002. Vendor allowances did not materially impact the Company's gross profit in 2004, 2003 and 2002 because Safeway spends the allowances received on pricing promotions, advertising expenses and slotting expenses. Vendor allowances can be grouped into the following broad categories: promotional allowances, slotting allowances, and contract allowances. All vendor allowances are classified as an element of cost of goods sold.

Promotional allowances make up nearly three-quarters of all allowances. With promotional allowances, vendors pay Safeway to promote their product. The promotion may be any combination of a temporary price reduction, a feature in print ads, a feature in a Safeway circular, or a preferred location in the store. The promotions are typically one to two weeks long.

Slotting allowances are a small portion of total allowances (typically less than 5% of all allowances). With slotting allowances, the vendor reimburses Safeway for the cost of placing new product on the shelf. Safeway has no obligation or commitment to keep the product on the shelf for a minimum period.

Contract allowances make up the remainder of all allowances. Under a typical contract allowance, a vendor pays Safeway to keep product on the shelf for a minimum period of time or when volume thresholds are achieved.

Prior to the adoption of Emerging Issues Task Force ("EITF") No. 02-16, slotting allowances were considered a reimbursement of Safeway's costs and recognized when the product was first stocked which is generally the point at which all the related expenses have been incurred. Promotional allowances were recognized when the promotion ran. Beginning with the adoption of EITF No. 02-16 in the first quarter of 2003, slotting and promotional allowances are accounted for as a reduction in the cost of purchased inventory and recognized when the related inventory is sold. Contract allowances are recognized as a reduction in the cost of goods sold as volume thresholds are achieved or through the passage of time.

USE OF ESTIMATES  The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

TRANSLATION OF FOREIGN CURRENCIES  Assets and liabilities of the Company's Canadian subsidiaries and Casa Ley are translated into U.S. dollars at year-end rates of exchange, and income and expenses are translated at average rates during the year. Adjustments resulting from translating financial statements into U.S. dollars are reported, net of applicable income taxes, as a separate component of comprehensive income in the consolidated statements of stockholders' equity.

CASH AND CASH EQUIVALENTS  Short-term investments with original maturities of less than three months are considered to be cash equivalents.

MERCHANDISE INVENTORIES  Merchandise inventory of $1,943 million at year-end 2004 and $1,903 million at year-end 2003 is valued at the lower of cost on a last-in, first-out ("LIFO") basis or market value. Such LIFO inventory had a replacement or current cost of $1,992 million at year-end 2004 and $1,967 million at year-end 2003. Liquidations of LIFO layers resulted in income of $2.3 million in 2004, expense of $1.9 million in 2003 and income of $5.3 million in 2002. All remaining inventory is valued at the lower of cost on a first-in, first-out ("FIFO") basis or market value. The FIFO cost of inventory approximates replacement or current cost. Physical inventories are taken on a cycle basis. The Company records an estimated inventory shrink adjustment for the period between the last physical inventory and the balance sheet date.

PROPERTY AND DEPRECIATION  Property is stated at cost. Depreciation expense on buildings and equipment is computed on the straight-line method using the following lives:

| | |
|---|---|
| Stores and other buildings | 7 to 40 years |
| Fixtures and equipment | 3 to 15 years |

Property under capital leases and leasehold improvements are amortized on a straight-line basis over the shorter of the remaining terms of the lease or the estimated useful lives of the assets.

SELF-INSURANCE  The Company is primarily self-insured for workers' compensation, automobile and general liability costs. The self-insurance liability is determined actuarially, based on claims filed and an estimate of claims incurred but not yet reported, and is discounted using a risk-free rate of interest. The present value of such claims was calculated using a discount rate of 3.25% in 2004 and 3.0% in 2003.

A summary of changes in Safeway's self-insurance liability is as follows (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | $409.5 | $340.6 | $320.4 |
| Expense | 247.4 | 235.2 | 166.5 |
| Claim payments | (158.0) | (166.3) | (146.3) |
| Ending balance | $498.9 | $409.5 | $340.6 |
| Less: current portion | (142.9) | (124.7) | (119.5) |
| Long-term portion | $356.0 | $284.8 | $221.1 |

The current portion of the self-insurance liability is included in other accrued liabilities, and the long-term portion is included in accrued claims and other liabilities in the consolidated balance sheets. The total undiscounted liability was $558.8 million at year-end 2004 and $451.4 million at year-end 2003.

RENT HOLIDAYS   Certain of the Company's operating leases contain rent holidays. For these leases, the Company recognizes the related rent expense on a straight-line basis at the earlier of the first rent payment or the date of possession of the leased property. The difference between the amounts charged to expense and the rent paid is recorded as deferred lease incentives and amortized over the lease term.

CONSTRUCTION ALLOWANCES   As part of certain lease agreements, the Company receives construction allowances from landlords. The construction allowances are deferred and amortized on a straight-line basis over the life of the lease as a reduction to rent expense.

INCOME TAXES   The Company provides income tax expense or benefit in accordance with Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes." Deferred income taxes represent future net tax effects resulting from temporary differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse.

OFF-BALANCE SHEET FINANCIAL INSTRUMENTS   The Company has, from time to time, entered into interest rate swap agreements to change its portfolio mix of fixed and floating-rate debt to more desirable levels. Interest rate swap agreements involve the exchange with a counterparty of fixed and floating-rate interest payments periodically over the life of the agreements without exchange of the underlying notional principal amounts. The differential to be paid or received is recognized over the life of the agreements as an adjustment to interest expense. The Company's counterparties have been major financial institutions.

FAIR VALUE OF FINANCIAL INSTRUMENTS   Generally accepted accounting principles require the disclosure of the fair value of certain financial instruments, whether or not recognized in the balance sheet, for which it is practicable to estimate fair value. Safeway estimated the fair values presented below using appropriate valuation methodologies

and market information available as of year-end. Considerable judgment is required to develop estimates of fair value, and the estimates presented are not necessarily indicative of the amounts that the Company could realize in a current market exchange. The use of different market assumptions or estimation methodologies could have a material effect on the estimated fair values. Additionally, these fair values were estimated at year-end, and current estimates of fair value may differ significantly from the amounts presented.

The following methods and assumptions were used to estimate the fair value of each class of financial instruments:

*Cash and equivalents, accounts receivable, accounts payable and short-term debt.*  The carrying amount of these items approximates fair value.

*Long-term debt.*  Market values quoted on the New York Stock Exchange are used to estimate the fair value of publicly traded debt. To estimate the fair value of debt issues that are not quoted on an exchange, the Company uses those interest rates that are currently available to it for issuance of debt with similar terms and remaining maturities. At year-end 2004, the estimated fair value of debt was $6.4 billion compared to a carrying value of $6.1 billion. At year-end 2003, the estimated fair value of debt was $7.5 billion compared to a carrying value of $7.1 billion.

*Off-balance-sheet instruments.*  The fair value of interest rate swap agreements are the amounts at which they could be settled based on estimates obtained from dealers. The net unrealized gain on such agreements was $6.1 million at year-end 2004.

STORE CLOSING AND IMPAIRMENT CHARGES   Safeway regularly reviews its stores' operating performance and assesses the Company's plans for certain store and plant closures. In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," losses related to the impairment of long-lived assets are recognized when expected future cash flows are less than the asset's carrying value. At the time a store is closed or because of changes in circumstances that indicate the carrying value of an asset may not be recoverable, the Company evaluates the carrying value of the assets in relation to its expected future cash flows. If the carrying value is greater than the future cash flows, a provision is made for the impairment of the assets to write the assets down to estimated fair value.

SAFEWAY INC. AND SUBSIDIARIES

Fair value is determined by estimating net future cash flows, discounted using a risk-adjusted rate of return. The Company calculates impairment on a store-by-store basis. These provisions are recorded as a component of operating and administrative expense and are disclosed in Note C.

For stores to be closed that are under long-term leases, the Company records a liability for the future minimum lease payments and related ancillary costs, from the date of closure to the end of the remaining lease term, net of estimated cost recoveries that may be achieved through subletting properties or through favorable lease terminations, discounted using a risk-adjusted rate of interest. This liability is recorded at the time the store is closed. Activity included in the reserve for store lease exit costs is disclosed in Note C.

STOCK-BASED COMPENSATION  Safeway accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees." The following table illustrates the effect on net income (loss) and earnings (loss) per share if the Company had applied the fair value recognition provisions of SFAS No. 123, as amended by SFAS No. 148:

| (In millions, except per-share amounts) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net income (loss) – as reported | $560.2 | $(169.8) | $(828.1) |
| Add: | | | |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | 2.8 | 0.1 | – |
| Less: | | | |
| Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (47.6) | (51.2) | (49.6) |
| Net income (loss) – pro forma | $515.4 | $(220.9) | $(877.7) |
| Basic earnings (loss) per share: | | | |
| As reported | $1.26 | $(0.38) | $(1.77) |
| Pro forma | 1.16 | (0.50) | (1.88) |
| Diluted earnings (loss) per share: | | | |
| As reported | $1.25 | $(0.38) | $(1.77) |
| Pro forma | 1.15 | (0.50) | (1.88) |

NEW ACCOUNTING STANDARDS  In December 2003, the FASB revised SFAS No. 132, "Employer's Disclosures about Pensions and Other Postretirement Benefits." This revised statement requires new annual disclosures about the types of plan assets, investment strategy, measurement date, plan obligations and cash flows as well as components of the net periodic benefit cost recognized in interim periods. The new annual disclosure requirements apply to fiscal years ending after December 15, 2003, except for the disclosure of expected future benefit payment, which must be disclosed for fiscal years ending after June 15, 2004. Interim period disclosures are generally effective for interim periods beginning after December 15, 2003. The Company has included the disclosures required by SFAS No. 132 in its financial statements for the year ended January 1, 2005.

In January 2004, the FASB issued SFAS No. 106-1, "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003." This statement permits a sponsor to make a one-time election to defer accounting for the effects of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, or the Prescription Drug Act. The Prescription Drug Act, signed into law in December 2003, establishes a prescription drug benefit under Medicare (Medicare Part D) and a federal subsidy to sponsors of retiree health care benefit plans that provide a benefit that is at least actuarially equivalent to Medicare Part D. SFAS No. 106-1 does not provide specific guidance as to whether a sponsor should recognize the effects of the Prescription Drug Act in its financial statements. The Prescription Drug Act introduces two new features to Medicare that must be considered when measuring accumulated postretirement benefit costs. The new features include a subsidy to the plan sponsors that is based on 28% of an individual beneficiary's annual prescription drug costs between $250 and $5,000 and an opportunity for a retiree to obtain a prescription drug benefit under Medicare. The Prescription Drug Act is not expected to reduce Safeway's net postretirement benefit costs.

Safeway has elected to defer adoption of SFAS No. 106-1 due to the lack of specific guidance. Therefore, the net postretirement benefit costs disclosed in the Company's financial statements do not reflect the impacts of the Prescription Drug Act on the plans. The deferral will continue to apply until specific authoritative accounting guidance for the federal subsidy is issued. Authoritative guidance on the accounting for the federal subsidy is pending and, when issued, could require information previously reported in the Company's financial statements to change. Safeway is currently investigating the impacts of SFAS No. 106-1's initial recognition, measurement and disclosure provisions on its financial statements.

In December 2004, the FASB issued FASB Staff Position SFAS No. 109-2, "Accounting Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004," which provides accounting and disclosure guidance for the repatriation provisions of the American Jobs Creation Act of 2004 (the "Act"). The Act provides for a special one-time tax deduction of certain earnings repatriated in 2005. The Company is evaluating whether to take advantage of this provision with respect to its Canadian subsidiary, and expects to complete the evaluation by the fourth quarter of 2005. The Company anticipates that it could repatriate between zero and $734 million, and that the tax cost of the repatriation would be between zero and $75 million.

In December 2004, the FASB issued FASB Staff Position SFAS No. 109-1, "Application of FASB Statement No. 109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004," which provides accounting and disclosure guidance on the Act's qualified production activities deduction. The Company is currently evaluating the impact of this guidance on its effective tax rate for 2005 and subsequent periods.

In December 2004, the FASB issued SFAS No. 123 (Revised 2004), "Share-Based Payment" ("SFAS No. 123R"), which replaces SFAS No. 123, supersedes APB 25 and related interpretations and amends SFAS No. 95, "Statement of Cash Flows." The provisions of SFAS No. 123R are similar to those of SFAS No. 123; however, SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements as compensation cost based on their fair value on the date of grant. Fair value of share-based awards will be determined using option-pricing models (e.g. Black-Scholes or binomial models) and assumptions that appropriately reflect the specific circumstances of the awards. Compensation cost will be recognized over the vesting period based on the fair value of awards that actually vest.

The Company will be required to choose between the modified-prospective and modified-retrospective transition alternatives in adopting SFAS No. 123R. Under the modified-prospective-transition method, compensation cost will be recognized in financial statements issued subsequent to the date of adoption for all shared-based payments granted, modified or settled after the date of adoption, as well as for any unvested awards that were granted prior to the date of adoption. Under the modified-retrospective-transition method, prior period financial statements will also be restated by recognizing compensation cost as previously reported in the pro forma disclosures under SFAS No. 123. The restatement provisions can be applied to either a) all periods presented or b) to the beginning of the fiscal year in which SFAS No. 123R is adopted. As the Company previously adopted only the pro forma disclosure provisions of SFAS No. 123, Safeway will recognize compensation cost relating to the unvested portion of awards granted prior to the date of adoption using the same estimate of the grant-date fair value and the same attribution method used to determine the pro forma disclosures under SFAS No. 123.

SFAS No. 123R is effective at the beginning of the first interim or annual period beginning after June 15, 2005, and early adoption is encouraged. Safeway has elected to early adopt this pronouncement beginning in the first quarter of 2005. The Company is in the process of evaluating the use of certain option-pricing models as well as the assumptions to be used in such models. When that evaluation is complete, Safeway will select a transition method.

## Note B: Goodwill

A summary of changes in Safeway's goodwill during 2004 and 2003 by geographic area is as follows:

| (In millions) | 2004 | | | 2003 | | |
|---|---|---|---|---|---|---|
| | U.S. | Canada | Total | U.S. | Canada | Total |
| Balance – beginning of the year | $2,328.3 | $76.6 | $2,404.9 | $3,062.9 | $62.8 | $3,125.7 |
| Impairment charges | – | – | – | (729.1) | – | (729.1) |
| Other adjustments | (2.7)[1] | 4.4[2] | 1.7 | (5.5)[1] | 13.8[2] | 8.3 |
| Balance – end of year | $2,325.6 | $81.0 | $2,406.6 | $2,328.3 | $76.6 | $2,404.9 |

(1) Primarily represents revised estimate of pre-acquisition tax accrual.
(2) Represents foreign currency translation adjustments in Canada.

SAFEWAY INC. AND SUBSIDIARIES

The Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," on December 30, 2001. Under the transitional provisions of SFAS No. 142, the Company's goodwill was tested for impairment as of December 30, 2001. Each of the Company's reporting units were tested for impairment by comparing the fair value of each reporting unit with its carrying value. Fair value was determined based on a valuation study performed by an independent third party who primarily considered the discounted cash flow, guideline company and similar transaction methods. As a result of the Company's impairment test, the Company recorded an impairment loss to reduce the carrying value of goodwill at Dominick's by $589.0 million and Randall's by $111.0 million to its implied fair value. Impairment in both cases was due to a combination of factors including acquisition price, post-acquisition capital expenditures and operating performance. In accordance with SFAS No. 142, the impairment charge was reflected as a cumulative effect of accounting change in the Company's statement of operations.

As required by SFAS No. 142, Safeway tested goodwill for impairment again in the fourth quarter of 2002, which represents the annual impairment testing date selected by Safeway. Fair value was determined based on a valuation study performed by an independent third party which primarily considered the discounted cash flow and guideline company method. As a result of this annual review, Safeway recorded an impairment charge for Dominick's goodwill of $583.8 million and for Randall's goodwill of $704.2 million. These additional charges reflect declining multiples in the retail grocery industry and operating performance.

Also in the fourth quarter of 2003, Safeway performed its annual review of goodwill. Fair value was determined based on a valuation study performed by an independent third party which primarily considered the discounted cash flow and guideline company method. As a result of this annual review, Safeway recorded an impairment charge for Randall's goodwill of $447.7 million. The additional charges reflect declining multiples in the retail grocery industry and operating performance. There was no remaining goodwill for Dominick's or Randall's on Safeway's consolidated balance sheet at year-end 2003.

Safeway completed its annual impairment test in the fourth quarter of 2004. Fair value was determined based on a valuation study performed by an independent third party which primarily considered the discounted cash flow and guideline company method. As a result of this annual review, Safeway concluded that no impairment charge was required.

## Note C: Store Closing and Impairment Charges

**IMPAIRMENT WRITE-DOWNS** Safeway recognized impairment charges on the write-down of long-lived assets of $39.4 million in 2004, $344.9 million in 2003 and $213.1 million in 2002. This includes Dominick's impairment charges of $311.4 million in 2003 and $201.3 million in 2002. These charges are included as a component of operating and administrative expense.

In November 2002, Safeway announced the decision to sell Dominick's and exit the Chicago market due to labor issues. In accordance with SFAS No. 144, Safeway recorded a pre-tax charge for the impairment of long-lived assets of $201.3 million in the fourth quarter of 2002 to adjust Dominick's to its estimated fair market value less cost to sell.

In the first 36 weeks of 2003, Safeway reduced the carrying value of Dominick's in part by writing down an additional $120.7 million of long-lived assets, based on indications of value received during the sale process. In November 2003, Safeway announced that it was taking Dominick's off the market. Safeway reclassified Dominick's from an "asset held for sale" to "asset held and used" and adjusted Dominick's individual long-lived assets to the lower of cost or fair value. As a result, in the fourth quarter of 2003, Safeway incurred a pre-tax, long-lived asset impairment charge of $190.7 million.

**STORE LEASE EXIT COSTS** The reserve for store lease exit costs includes the following activity for 2004, 2003 and 2002 (in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Beginning balance | $129.1 | $132.1 | $132.4 |
| Provision for estimated net future cash flows of additional closed stores[1] | 55.1 | 3.7 | 30.6 |
| Net cash flows, interest accretion, changes in estimates of net future cash flows | (17.1) | (6.7) | (30.9) |
| Ending balance | $167.1 | $129.1 | $132.1 |

(1) Estimated net future cash flows represents future minimum lease payments and related ancillary costs from the date of closure to the end of the remaining lease term, net of estimated cost recoveries that may be achieved through subletting properties or through favorable lease terminations.

Store lease exit costs are included as a component of operating and administrative expense and the liability is included in accrued claims and other liabilities.

Store lease exit costs related to the Furr's and Homeland bankruptcies are not included above but are discussed in Note L.

## Note D: Financing

Notes and debentures were composed of the following at year-end (in millions):

| | 2004 | 2003 |
|---|---|---|
| Commercial paper | $ 105.0 | $1,210.6 |
| Bank credit agreement, unsecured | – | – |
| Other bank borrowings, unsecured | 18.2 | 8.0 |
| Mortgage notes payable, secured | 26.1 | 33.7 |
| 9.30% Senior Secured Debentures due 2007 | 24.3 | 24.3 |
| 6.85% Senior Notes due 2004, unsecured | – | 200.0 |
| 7.25% Senior Notes due 2004, unsecured | – | 400.0 |
| 2.50% Senior Notes due 2005, unsecured | 200.0 | 200.0 |
| Floating Rate Senior Notes due 2005, unsecured | 150.0 | 150.0 |
| 3.80% Senior Notes due 2005, unsecured | 225.0 | 225.0 |
| 6.15% Senior Notes due 2006, unsecured | 700.0 | 700.0 |
| 4.80% Senior Notes due 2007, unsecured | 480.0 | 480.0 |
| 7.00% Senior Notes due 2007, unsecured | 250.0 | 250.0 |
| 4.125% Senior Notes due 2008, unsecured | 300.0 | 300.0 |
| 6.50% Senior Notes due 2008, unsecured | 250.0 | 250.0 |
| 7.50% Senior Notes due 2009, unsecured | 500.0 | 500.0 |
| 4.95% Senior Notes due 2010, unsecured | 500.0 | – |
| 6.50% Senior Notes due 2011, unsecured | 500.0 | 500.0 |
| 5.80% Senior Notes due 2012, unsecured | 800.0 | 800.0 |
| 5.625% Senior Notes due 2014, unsecured | 250.0 | – |
| 7.45% Senior Debentures due 2027, unsecured | 150.0 | 150.0 |
| 7.25% Senior Debentures due 2031, unsecured | 600.0 | 600.0 |
| 9.65% Senior Subordinated Debentures due 2004, unsecured | – | 81.2 |
| 9.875% Senior Subordinated Debentures due 2007, unsecured | 24.2 | 24.2 |
| Other notes payable, unsecured | 13.8 | 16.5 |
| | 6,066.6 | 7,103.5 |
| Less current maturities | (596.9) | (699.5) |
| Long-term portion | $5,469.7 | $6,404.0 |

COMMERCIAL PAPER  The amount of commercial paper borrowings is limited to the unused borrowing capacity under the bank credit agreement. Commercial paper is classified as long-term because the Company intends to and has the ability to refinance these borrowings on a long-term basis through either continued commercial paper borrowings or utilization of the bank credit agreement, which matures in 2006. The weighted average interest rate on commercial paper borrowings was 1.22% during 2004 and 2.28% at year-end 2004.

BANK CREDIT AGREEMENT  Safeway's total borrowing capacity under the bank credit agreement is $2.4 billion. Of the $2.4 billion credit line, $1.25 billion matures in 2006 and has a one-year extension option requiring lender consent. Another $1.15 billion is renewable annually through 2006 and can be extended by the Company for an additional year through a term-loan conversion feature or through a one-year extension option requiring lender consent. The restrictive covenants of the bank credit agreement limit Safeway with respect to, among other things, creating liens upon its assets and disposing of material amounts of assets other than in the ordinary course of business. Safeway is also required to maintain a minimum Adjusted EBITDA to interest expense ratio of 2.0 to 1 and not exceed a total debt to Adjusted EBITDA ratio of 4.0 to 1. As part of the second amendment to the bank credit agreement dated May 20, 2004, the Debt to Adjusted EBITDA ratio was temporarily increased to 4.0 to 1 from 3.5 to 1 for a period of one year. At year-end 2004, the Company had total unused borrowing capacity under the bank credit agreement of $2.25 billion.

U.S. borrowings under the bank credit agreement carry interest at one of the following rates selected by the Company: (i) the prime rate: (ii) a rate based on rates at which Eurodollar deposits are offered to first-class banks by the lenders in the bank credit agreement plus a pricing margin based on the Company's debt rating or interest coverage ratio (the "Pricing Margin"); or (iii) rates quoted at the discretion of the lenders. Canadian borrowings denominated in U.S. dollars carry interest at one of the following rates selected by the Company: (a) the Canadian base rate or (b) the Canadian Eurodollar rate plus the Pricing Margin. Canadian borrowings denominated in Canadian dollars carry interest at one of the following rates selected by the Company: (i) the Canadian prime rate or (ii) the rate for Canadian bankers acceptances plus the Pricing Margin.

During 2004, the Company had no outstanding borrowing under its bank revolving credit agreement. During the year, the Company paid facility fees ranging from 0.08% to 0.145% on the total amount of the credit facility.

OTHER BANK BORROWINGS  Other bank borrowings at year-end 2004 have remaining terms ranging from two days to two years and a weighted average interest rate of 4.0%.

SAFEWAY INC. AND SUBSIDIARIES

MORTGAGE NOTES PAYABLE  Mortgage notes payable at year-end 2004 have remaining terms ranging from one to 19 years, have a weighted average interest rate of 8.28% and are secured by properties with a net book value of approximately $160.2 million.

SENIOR SECURED INDEBTEDNESS  The 9.30% Senior Secured Debentures due 2007 are secured by a deed of trust that created a lien on the land, buildings and equipment owned by Safeway at its distribution center in Tracy, California.

SENIOR UNSECURED INDEBTEDNESS  In August 2004, Safeway issued senior unsecured debt securities consisting of $500.0 million of 4.95% Notes due 2010 and $250.0 million of 5.625% Notes due 2014.

In October 2003, Safeway issued senior unsecured debt facilities consisting of $150.0 million of Floating Rate Notes (LIBOR plus 0.47%) due 2005, $200.0 million of 2.50% Notes due 2005 and $300.0 million of 4.125% Notes due 2008.

SENIOR SUBORDINATED INDEBTEDNESS  The 9.875% Senior Subordinated Debentures due 2007 are subordinated in right of payment to, among other things, the Company's borrowings under the bank credit agreement, the 9.30% Senior Secured Debentures, the Senior Unsecured Indebtedness and mortgage notes payable.

OTHER NOTES PAYABLE  Other notes payable at year-end 2004 have remaining terms ranging from one to 18 years and a weighted average interest rate of 1.58%.

ANNUAL DEBT MATURITIES  As of year-end 2004, annual debt maturities were as follows (in millions):

| | |
|---|---|
| 2005 | $ 596.9 |
| 2006 | 818.7 |
| 2007 | 785.2 |
| 2008 | 553.7 |
| 2009 | 502.2 |
| Thereafter | 2,809.9 |
| | $6,066.6 |

LETTERS OF CREDIT  The Company had letters of credit of $79.0 million outstanding at year-end 2004, of which $41.8 million were issued under the bank credit agreement. The letters of credit are maintained primarily to support performance, payment, deposit or surety obligations of the Company. The Company pays commissions ranging from 0.15% to 1.00% on the face amount of the letters of credit.

## Note E: Lease Obligations

Approximately two-thirds of the premises that the Company occupies are leased. The Company had approximately 1,600 leases at year-end 2004, including approximately 230 that are capitalized for financial reporting purposes. Most leases have renewal options, some with terms and conditions similar to the original lease, others with reduced rental rates during the option periods. Certain of these leases contain options to purchase the property at amounts that approximate fair market value.

As of year-end 2004, future minimum rental payments applicable to non-cancelable capital and operating leases with remaining terms in excess of one year were as follows (in millions):

| | Capital Leases | Operating Leases |
|---|---|---|
| 2005 | $ 111.6 | $ 405.9 |
| 2006 | 105.5 | 396.8 |
| 2007 | 102.4 | 380.9 |
| 2008 | 99.0 | 362.5 |
| 2009 | 96.0 | 328.3 |
| Thereafter | 902.1 | 2,778.6 |
| Total minimum lease payments | 1,416.6 | $4,653.0 |
| Less amounts representing interest | (719.8) | |
| Present value of net minimum lease payments | 696.8 | |
| Less current obligations | (42.8) | |
| Long-term obligations | $ 654.0 | |

Future minimum lease payments under non-cancelable capital and operating lease agreements have not been reduced by minimum sublease rental income of $161.5 million.

Amortization expense for property under capital leases was $43.4 million in 2004, $35.4 million in 2003 and $42.4 million in 2002. Accumulated amortization of property under capital leases was $230.9 million at year-end 2004 and $181.6 million at year-end 2003.

The following schedule shows the composition of total rental expense for all operating leases (in millions). In general, contingent rentals are based on individual store sales.

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Property leases: | | | |
| Minimum rentals | $406.9 | $411.4 | $388.7 |
| Contingent rentals | 20.7 | 25.6 | 17.0 |
| Less rentals from subleases | (28.1) | (31.4) | (31.3) |
| | 399.5 | 405.6 | 374.4 |
| Equipment leases | 24.1 | 25.2 | 25.6 |
| | $423.6 | $430.8 | $400.0 |

## Note F: Interest Expense

Interest expense consisted of the following (in millions):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Commercial paper | $ 7.8 | $ 16.4 | $ 32.0 |
| Bank credit agreement | 4.0 | 3.5 | 3.1 |
| Other bank borrowings | 0.4 | 0.4 | – |
| Mortgage notes payable | 2.4 | 3.3 | 4.2 |
| 9.30% Senior Secured Debentures | 2.3 | 2.3 | 2.3 |
| 10% Senior Notes | – | – | 0.5 |
| 7.00% Senior Notes | – | – | 29.4 |
| 3.625% Senior Notes | – | 12.3 | 14.5 |
| 6.05% Senior Notes | – | 18.3 | 21.2 |
| 6.85% Senior Notes | 9.8 | 13.7 | 13.7 |
| 7.25% Senior Notes | 20.3 | 29.0 | 29.0 |
| 2.50% Senior Notes | 5.0 | 0.9 | – |
| Floating Rate Senior Notes | 2.9 | 0.4 | – |
| 3.80% Senior Notes | 8.6 | 8.6 | 3.3 |
| 6.15% Senior Notes | 43.1 | 43.1 | 43.1 |
| 4.80% Senior Notes | 23.0 | 23.0 | 10.5 |
| 7.00% Senior Notes | 17.5 | 17.5 | 17.5 |
| 4.125% Senior Notes | 12.4 | 2.3 | – |
| 6.50% Senior Notes | 16.3 | 16.3 | 16.3 |
| 7.50% Senior Notes | 37.5 | 37.5 | 37.5 |
| 4.95% Senior Notes | 9.7 | – | – |
| 6.50% Senior Notes | 32.5 | 32.5 | 32.5 |
| 5.80% Senior Notes | 46.4 | 46.4 | 17.7 |
| 5.625% Senior Notes | 5.5 | – | – |
| 7.45% Senior Debentures | 11.2 | 11.2 | 11.2 |
| 7.25% Senior Debentures | 43.5 | 43.5 | 43.5 |
| 9.65% Senior Subordinated Debentures | 0.2 | 7.8 | 7.8 |
| 9.875% Senior Subordinated Debentures | 2.4 | 2.4 | 2.4 |
| Other notes payable | 0.7 | 0.7 | 1.8 |
| Medium-term notes | – | 0.4 | 1.4 |
| Obligations under capital leases | 66.0 | 63.1 | 57.0 |
| Amortization of deferred finance costs | 7.8 | 8.0 | 7.8 |
| Interest rate swap agreements | (8.3) | (0.5) | 0.6 |
| Capitalized interest | (19.7) | (21.9) | (31.0) |
| | $411.2 | $442.4 | $430.8 |

The Company effectively converted $500 million of its 4.95% fixed-rate debt to floating rate debt through an interest swap agreement in 2004. In 2003, the Company effectively converted $300.0 million of its 4.125% fixed-rate debt to floating rate debt through an interest rate swap agreement.

## Note G: Capital Stock

SHARES AUTHORIZED AND ISSUED  Authorized preferred stock consists of 25 million shares, of which none was outstanding during 2004, 2003 or 2002. Authorized common stock consists of 1.5 billion shares at $0.01 par value. Common stock outstanding at year-end 2004 was 447.7 million shares (net of 130.8 million shares of treasury stock) and 444.2 million shares at year-end 2003 (net of 131.2 million shares of treasury stock).

STOCK OPTION PLANS  Under Safeway's stock option plans, the Company may grant incentive and non-qualified options to purchase common stock at an exercise price equal to or greater than the fair market value at the grant date, as determined by the Compensation and Stock Option Committee of the Board of Directors. Options generally vest over five or seven years. Vested options are exercisable in part or in full at any time prior to the expiration date of 10 to 15 years from the date of the grant. Options to purchase 24.4 million shares were available for grant at year-end 2004.

On July 31, 2002, the Board of Directors adopted the 2002 Equity Incentive Plan of Safeway Inc. (the "2002 Plan"), under which awards of non-qualified stock options and stock-based awards may be made. There are 2.0 million shares of common stock authorized for issuance pursuant to grants under the 2002 plan. As of year-end 2004, no options have been granted under this plan.

In September 2004, Safeway initiated a voluntary exchange program for stock options and stock rights having an exercise price greater than $35.00 to eligible employees. The Company's executive officers, members of the Board of Directors and former employees were not eligible to participate. The exchange program ended on October 5, 2004 and approximately 9.7 million stock options and rights were surrendered and cancelled. Replacement stock options and replacement stock rights totaling approximately 4.5 million will be issued on or after April 7, 2005 at the fair market value on the date of the grant to those eligible employees still employed at the date of issuance. Such replacement stock options will have a six year term and will vest over five years.

RESTRICTED STOCK  The Company awarded 263,135 shares of restricted stock in 2004 and 706,236 shares of restricted stock in 2003 to certain officers and key employees. No restricted stock awards were granted in 2002. These shares vest over a period of between three to four years and are subject to certain transfer restrictions and forfeiture prior to vesting. Deferred stock compensation, representing the fair value of the stock at the measurement date of the award, is amortized to compensation expense over the vesting period. The amortization of this restricted stock resulted in $4.5 million in compensation expense in 2004 and $0.2 million in compensation expense in 2003. As of January 1, 2005, 176,554 restricted shares were vested, 792,817 restricted shares were unvested and 22,730 shares have been returned to Safeway to satisfy tax withholding obligations of employees.

Activity in the Company's stock option plans for the three-year period ended January 1, 2005 was as follows:

| | Options | Weighted Average Exercise Price |
|---|---|---|
| Outstanding, year-end 2001 | 38,646,881 | $29.61 |
| **2002 Activity:** | | |
| Granted | 5,044,297 | 39.57 |
| Canceled | (2,727,671) | 39.08 |
| Exercised | (3,019,997) | 10.64 |
| Outstanding, year-end 2002 | 37,943,510 | 31.70 |
| **2003 Activity:** | | |
| Granted | 4,230,118 | 21.87 |
| Canceled | (3,355,444) | 38.42 |
| Exercised | (2,511,557) | 6.85 |
| Outstanding, year-end 2003 | 36,306,627 | 31.51 |
| **2004 Activity:** | | |
| Granted | 5,871,639 | 20.60 |
| Canceled | (12,167,123) | 44.07 |
| Exercised | (3,196,582) | 6.78 |
| Outstanding, year-end 2004 | 26,814,561 | 26.37 |
| Exercisable, year-end 2002 | 19,960,460 | 20.60 |
| Exercisable, year-end 2003 | 21,697,133 | 27.24 |
| Exercisable, year-end 2004 | 15,218,373 | 26.35 |

Weighted average fair value of options granted during the year:
| | |
|---|---|
| 2002 | $18.46 |
| 2003 | 9.64 |
| 2004 | 8.57 |

The following table summarizes stock option information at year-end 2004:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number of Options | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number of Options | Weighted-Average Exercise Price |
| $ 1.57 to $ 2.81 | 2,606,969 | 3.10 years | $ 2.75 | 2,606,969 | $ 2.75 |
| 3.00 to 8.87 | 1,869,411 | 1.53 | 4.35 | 1,869,411 | 4.35 |
| 8.88 to 19.60 | 1,794,717 | 3.53 | 14.66 | 1,329,407 | 13.09 |
| 19.76 to 19.99 | 3,993,710 | 5.58 | 19.96 | 97,452 | 19.76 |
| 20.00 to 22.78 | 3,263,653 | 5.67 | 20.90 | 419,918 | 20.25 |
| 22.83 to 27.15 | 3,565,683 | 5.95 | 25.22 | 1,927,525 | 25.30 |
| 27.40 to 40.94 | 2,900,344 | 5.06 | 33.57 | 1,971,445 | 33.98 |
| 41.00 to 50.31 | 3,925,251 | 5.28 | 44.26 | 2,763,507 | 43.98 |
| 50.44 to 62.50 | 2,894,823 | 5.89 | 54.22 | 2,232,739 | 53.97 |
| 1.57 to 62.50 | 26,814,561 | 4.92 | 26.37 | 15,218,373 | 26.35 |

ADDITIONAL STOCK PLAN INFORMATION  The Company accounts for its stock-based awards using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and its related interpretations. Accordingly, no compensation expense has been recognized in the financial statements for employee stock option awards granted at fair market value.

SFAS No. 123, "Accounting for Stock-Based Compensation," as amended by SFAS No. 148, requires the disclosure of pro forma net income and earnings per share as if the Company had adopted the fair value method as of the beginning of fiscal 1995. Under SFAS No. 123, the fair value of stock-based awards to employees is calculated through the use of option pricing models, even though such models were developed to estimate the fair value of freely tradable, fully transferable options without vesting restrictions, which significantly differ from the Company's stock option awards. These models also require subjective assumptions, including future stock price volatility and expected time to exercise, which greatly affect the calculated values. The Company's calculations were made using the Black-Scholes option pricing model with the following weighted average assumptions: five to seven years expected life; stock volatility of 34.8% in 2004, 37.0% in 2003 and 36.0% in 2002; risk-free interest rates of 3.97% in 2004, 3.53% in 2003 and 4.35% in 2002; and no dividends during the expected term.

The Company's calculations are based on a single-option valuation approach and forfeitures are recognized as they occur. However, the impact of outstanding unvested stock options granted prior to 1995 has been excluded from the pro forma calculation; accordingly, the pro forma results presented are not indicative of future period pro forma results. Had compensation cost for Safeway's stock option plans been determined based on the fair value at the grant date for awards from 1996 through 2002, consistent with the provisions of SFAS No. 123, the Company's net income and earnings per share would have been reduced to the pro forma amounts disclosed in Note A.

## Note H: Taxes on Income

The components of income tax expense are as follows (in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $153.5 | $251.5 | $470.0 |
| State | 25.7 | 51.8 | 63.6 |
| Foreign | 83.7 | 85.5 | 61.9 |
|  | 262.9 | 388.8 | 595.5 |
| Deferred: |  |  |  |
| Federal | (17.4) | (48.5) | 81.6 |
| State | (10.6) | (24.5) | (15.1) |
| Foreign | (1.2) | (4.9) | (1.6) |
|  | (29.2) | (77.9) | 64.9 |
|  | $233.7 | $310.9 | $660.4 |

Reconciliation of the provision for income taxes at the U.S. federal statutory income tax rate to the Company's income taxes is as follows (dollars in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Statutory rate | 35% | 35% | 35% |
| Income tax expense using federal statutory rate | $277.9 | $ 49.4 | $186.3 |
| State taxes on income net of federal benefit | 9.8 | 17.7 | 31.5 |
| Nondeductible goodwill impairment | – | 255.2 | 450.8 |
| Equity earnings of foreign affiliates | (1.5) | 7.0 | (2.7) |
| Charitable donations of inventory | (9.8) | (8.5) | (7.4) |
| Affiliate's losses not currently benefitted | 3.3 | 4.1 | 18.4 |
| Tax settlements | (40.0) | (6.2) | (19.2) |
| Other | (6.0) | (7.8) | 2.7 |
|  | $233.7 | $310.9 | $660.4 |

Significant components of the Company's net deferred tax liability at year-end were as follows (in millions):

|  | 2004 | 2003 |
|---|---|---|
| Deferred tax assets: |  |  |
| Workers' compensation and other claims | $ 201.1 | $ 166.5 |
| Reserves not currently deductible | 95.1 | 66.3 |
| Accrued claims and other liabilities | 34.1 | 38.6 |
| Employee benefits | 56.7 | 24.6 |
| Charitable contribution carryforwards | 29.0 | – |
| Operating loss carryforwards | 74.4 | 66.3 |
| Other assets | 56.5 | 108.4 |
|  | 546.9 | 470.7 |
| Valuation allowance | (74.4) | (66.3) |
|  | $ 472.5 | $ 404.4 |

SAFEWAY INC. AND SUBSIDIARIES

| | 2004 | 2003 |
|---|---|---|
| Deferred tax liabilities: | | |
| Property | $(514.6) | $(440.4) |
| Prepaid pension costs | (121.1) | (176.5) |
| Inventory | (193.9) | (175.3) |
| Investments in foreign operations | (123.6) | (114.8) |
| | (953.2) | (907.0) |
| Net deferred tax liability | (480.7) | (502.6) |
| Less: current liability | (17.1) | (80.7) |
| Long-term portion | $(463.6) | $(421.9) |

At January 1, 2005, certain undistributed earnings of the Company's foreign operations totaling $1,190.7 million were considered to be permanently reinvested. No deferred tax liability has been recognized for the remittance of such earnings to the United States, since it is the Company's intention to utilize those earnings in the foreign operations for an indefinite period of time, or to repatriate such earnings only when tax efficient to do so. Determination of the amount of unrecognized deferred U.S. income tax liability is not practicable; however, unrecognized foreign tax credits may be available to reduce some portion of the U.S. income tax liability.

At January 1, 2005, GroceryWorks had net operating loss ("NOL") carryforwards for federal income tax purposes of approximately $209 million and net operating loss carryforwards for state income tax purposes of approximately $38 million. The NOL carryforwards expire at various dates from 2006 to 2024. Until sufficient evidence exists that GroceryWorks will have future taxable income to absorb the NOL carryforwards, Safeway will provide a valuation allowance for the entire deferred tax asset relating to these carryforwards. In the case of any subsequent reversal of this valuation allowance, approximately $22.3 million of the tax benefit realized will result in a reduction of GroceryWorks' goodwill or other noncurrent intangible assets.

At January 1, 2005 the Company had federal and certain state charitable contribution tax carryforwards of $78.8 million which expire in 2008.

## Note I: Employee Benefit Plans and Collective Bargaining Agreements

RETIREMENT PLANS  The Company maintains defined benefit, non-contributory retirement plans for substantially all of its employees not participating in multi-employer pension plans.

In connection with the Genuardi's acquisition in 2001, the Randall's acquisition in 1999 and the Vons merger in 1997, the Company assumed the sponsorship and obligations of Genuardi's, Randall's and Vons' retirement plans. During 2003, the Randall's plan was merged with the Safeway plan. The actuarial assumptions for the existing Genuardi's and Vons retirement plans are comparable to those for the Safeway retirement plan. Genuardi's and Vons' retirement plans have been combined with Safeway's for financial statement presentation.

The following tables provide a reconciliation of the changes in the retirement plans' benefit obligation and fair value of assets over the two-year period ended January 1, 2005 and a statement of the funded status as of year-end 2004 and 2003 (in millions):

| | 2004 | 2003 |
|---|---|---|
| Change in benefit obligation: | | |
| Beginning balance | $ 1,820.6 | $ 1,519.2 |
| Service cost | 109.9 | 95.8 |
| Interest cost | 107.8 | 102.2 |
| Plan amendments | 11.4 | 7.3 |
| Actuarial loss | 34.1 | 129.1 |
| Benefit payments | (101.7) | (93.5) |
| Currency translation adjustment | 23.4 | 60.5 |
| Ending balance | $ 2,005.5 | $ 1,820.6 |

| | 2004 | 2003 |
|---|---|---|
| Change in fair value of plan assets: | | |
| Beginning balance | $ 1,905.5 | $ 1,572.4 |
| Actual return (loss) on plan assets | 190.3 | 357.1 |
| Employer contributions | 15.4 | 14.2 |
| Benefit payments | (101.7) | (93.5) |
| Currency translation adjustment | 20.2 | 55.3 |
| Ending balance | $ 2,029.7 | $ 1,905.5 |

| | 2004 | 2003 |
|---|---|---|
| Funded status: | | |
| Fair value of plan assets | $ 2,029.7 | $ 1,905.5 |
| Projected benefit obligation | (2,005.5) | (1,820.6) |
| Funded status | 24.2 | 84.9 |
| Adjustment for difference in book and tax basis of assets | (165.1) | (165.1) |
| Unamortized prior service cost | 90.7 | 95.9 |
| Unrecognized loss | 372.0 | 403.0 |
| Other comprehensive loss | (0.8) | – |
| Prepaid pension cost | $   321.0 | $   418.7 |

The following table provides the components of 2004, 2003 and 2002 net pension expense for the retirement plans (in millions):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Estimated return on assets | $ 154.0 | $ 132.5 | $143.7 |
| Service cost | (109.9) | (95.8) | (74.6) |
| Interest cost | (107.8) | (102.2) | (82.9) |
| Amortization of prior service cost | (16.6) | (15.5) | (14.7) |
| Amortization of unrecognized losses | (32.6) | (49.9) | (1.8) |
| Net pension expense | $(112.9) | $(130.9) | $ (30.3) |

Prior service costs are amortized on a straight-line basis over the average remaining service period of active participants. Actuarial gains and losses are amortized over the average remaining service life of active participants when the accumulation of such gains and losses exceeds 10% of the greater of the projected benefit obligation and the fair value of plan assets. The Company uses its fiscal year-end date as the measurement date for its plans. The accumulated benefit obligation for all Safeway plans was $1,703.4 million at year-end 2004 and $1,545.8 million at year-end 2003.

The actuarial assumptions used to determine year-end projected benefit obligation were as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Discount rate: |  |  |  |
| United States plans | 5.8% | 6.0% | 6.5% |
| Canadian plans | 5.8 | 6.0 | 6.5 |
| Combined weighted average rate | 5.8 | 6.0 | 6.5 |
|  |  |  |  |
| Rate of compensation increase: |  |  |  |
| United States plans | 5.0% | 5.0% | 5.0% |
| Canadian plans | 3.5 | 3.5 | 3.5 |

The actuarial assumptions used to determine net periodic benefit cost were as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Discount rate: |  |  |  |
| United States plans | 6.0% | 6.5% | 7.5% |
| Canadian plans | 6.0 | 6.5 | 7.0 |
| Combined weighted average rate | 6.0 | 6.5 | 7.4 |
|  |  |  |  |
| Expected return on plan assets: |  |  |  |
| United States plans | 8.5% | 8.5% | 9.0% |
| Canadian plans | 7.0 | 7.5 | 8.0 |
|  |  |  |  |
| Rate of compensation increase: |  |  |  |
| United States plans | 5.0% | 5.0% | 5.0% |
| Canadian plans | 3.5 | 3.5 | 5.0 |

The Company has adopted and implemented an investment policy for the defined benefit pension plans that incorporates a strategic long-term asset allocation mix designed to meet the Company's long-term pension requirements. This asset allocation policy is reviewed annually and, on a regular basis, actual allocations are rebalanced to the prevailing targets. The following table summarizes actual allocations for Safeway's plans at year-end 2004 and 2003:

| Asset Category | Target | Plan Assets | |
|---|---|---|---|
|  |  | 2004 | 2003 |
| Equity | 65% | 67.4% | 69.1% |
| Fixed income | 35 | 31.5 | 29.3 |
| Cash and other | – | 1.1 | 1.6 |
| Total | 100% | 100.0% | 100.0% |

The investment policy also emphasizes the following key objectives: (1) maintain a diversified portfolio among asset classes and investment styles, (2) maintain an acceptable level of risk in pursuit of long-term economic benefit, (3) maximize the opportunity for value-added returns from active management, and (4) maintain adequate controls over administrative costs.

To meet these objectives, the Company's investment policy reflects the following major themes: (1) diversify holdings to achieve broad coverage of both stock and bond markets; and (2) use active investment managers with disciplined, clearly defined strategies, while establishing investment guidelines and monitoring procedures for each investment manager to ensure the characteristics of the portfolio is consistent with the original investment mandate.

Expected rates of return on plan assets were developed by determining projected stock and bond returns and then applying these returns to the target asset allocations of the employee benefit trusts, resulting in a weighted average rate of return on plan assets. Equity returns were based primarily on historical returns of the S&P 500 Index. Fixed-income projected returns were based primarily on historical returns for the broad U.S. bond market.

Safeway expects to contribute approximately $12.0 million to its defined benefit pension plan trusts in 2005.

**RETIREMENT RESTORATION PLAN**  The Retirement Restoration Plan provides death benefits and supplemental income payments for senior executives after retirement. The Company recognized expense of $7.1 million in 2004, $6.7 million in 2003 and $5.7 million in 2002. The aggregate projected benefit obligation of the Retirement Restoration Plan was approximately $74.4 million at year-end 2004 and $73.3 million at year-end 2003.

**POSTRETIREMENT BENEFITS OTHER THAN PENSIONS**
In addition to the Company's retirement plans and the Retirement Restoration Plan benefits, the Company sponsors plans that provide postretirement medical and life insurance benefits to certain employees. Retirees share a portion of the cost of the postretirement medical plans. Safeway pays all the costs of the life insurance plans. The plans are not funded.

The Company's accrued postretirement benefit obligation ("APBO") was $77.8 million at year-end 2004 and $67.8 million at year-end 2003. The APBO represents the actuarial present value of the benefits expected to be paid after retirement. Postretirement benefit expense was $10.3 million in 2004, $9.2 million in 2003 and $8.0 million in 2002.

**ESTIMATED FUTURE BENEFIT PAYMENTS**  The following benefit payments, which reflect expected future service as appropriate, are expected to be paid (in millions):

|  | Pension Benefits | Other Benefits |
|---|---|---|
| 2005 | $113.9 | $ 5.8 |
| 2006 | 119.8 | 5.9 |
| 2007 | 125.2 | 6.0 |
| 2008 | 130.2 | 6.1 |
| 2009 | 134.3 | 6.2 |
| 2010 – 2014 | 741.1 | 33.8 |

**MULTI-EMPLOYER PENSION PLANS**  Safeway participates in various multi-employer retirement plans, covering substantially all Company employees not covered under the Company's non-contributory retirement plans, pursuant to agreements between the Company and various unions. These plans are generally defined benefit plans; however, in many cases, specific benefit levels are not negotiated with or known by the employer-contributors. Contributions of $196.8 million in 2004, $172.1 million in 2003 and $151.6 million in 2002 were made and charged to expense.

Under U.S. law applicable to such pension plans, a company is required to continue funding its proportionate share of a plan's unfunded vested benefits in the event of withdrawal (as defined by the law) from a plan or plan termination. Safeway participates in a number of these pension plans, and the potential liability as a participant in these plans may be significant. The information required to determine the total amount of this contingent liability, as well as the total amount of accumulated benefits and net assets of such plans, is not readily available. During 1988 and 1987, the Company sold certain operations. In most cases, the party acquiring the operation agreed to continue making contributions to the plans. Safeway is relieved of the obligations related to these sold operations to the extent that the acquiring parties continue to make contributions. Whether such sales could result in withdrawal under ERISA and, if so, whether such withdrawals could result in liability to the Company, is not determinable at this time.

**COLLECTIVE BARGAINING AGREEMENTS**  At year-end 2004, Safeway had approximately 191,000 full and part-time employees. Approximately 77% of Safeway's employees in the United States and Canada are covered by collective bargaining agreements negotiated with local unions affiliated with one of 10 different international unions. There are approximately 400 such agreements, typically having three-year terms, with some agreements having terms up to five years. Accordingly, Safeway renegotiates a significant number of these agreements every year.

## Note J: Investment In Unconsolidated Affiliates

At year-end 2004, 2003 and 2002, Safeway's investment in unconsolidated affiliates consists of a 49% ownership interest in Casa Ley, which operates 115 food and general merchandise stores in western Mexico.

Equity in earnings (losses) from Safeway's unconsolidated affiliates, which is included in other income (expense), was income of $12.6 million in 2004, a loss of $7.1 million in 2003 and a loss of $0.2 million in 2002. Equity in income in 2002 includes approximately $15.8 million in charges related to the resolution of physical inventory count discrepancies at Casa Ley.

## Note K: Related Party Transactions

Casa Ley's General Director was one of the Company's directors until December 2004. Safeway sold products to Casa Ley totaling approximately $6.8 million in 2004, $12.0 million in 2003 and $19.0 million in 2002 for resale in Casa Ley's retail stores.

# Note L: Commitments and Contingencies

LEGAL MATTERS  In July 1988, there was a major fire at the Company's dry grocery warehouse in Richmond, California. Through March 1, 2005, in excess of 126,000 claims for personal injury and property damage arising from the fire have been settled for an aggregate amount of approximately $125 million. The Company's loss as a result of the fire damage to its property and settlement of the above claims was substantially covered by insurance.

As of March 1, 2005, there were still pending approximately 600 claims against the Company for personal injury (including punitive damages), and approximately 290 separate active claims for property damage, arising from the smoke, ash and embers generated by the fire. A substantial percentage of these claims have been asserted in lawsuits against the Company filed in the Superior Court for Alameda County, California. There can be no assurance that the pending claims will be settled or otherwise disposed of for amounts and on terms comparable to those settled to date. Safeway continues to believe that coverage under its insurance policy will be sufficient and available for resolution of all remaining personal injury and property damage claims arising out of the fire.

On August 23, 2000, a lawsuit entitled *Baker, et al. v. Jewel Food Stores, Inc., et al.* was filed in the Circuit Court of Cook County, Illinois, against the Company's subsidiary, Dominick's Finer Foods, Inc. (predecessor of Dominick's Finer Foods, LLC), and Jewel Food Stores, a subsidiary of Albertson's, Inc. The complaint alleges, among other things, that Dominick's and Jewel conspired to fix the retail price of milk in nine Illinois counties in the Chicago area, in violation of the Illinois Antitrust Act. The court certified the lawsuit as a class action on behalf of all persons residing in the nine-county area who purchased milk from the defendants' retail stores in these counties during August 1996 to August 2000. In January 2003, trial began to a judge, without a jury. At trial plaintiffs' expert calculated damages against both defendants in amounts ranging from $51 million to $126 million, which amount would be trebled under applicable law. The judge, after hearing three weeks of testimony, dismissed the action at the end of plaintiffs' case, without requiring Dominick's and Jewel to present the defense case. Plaintiffs filed an appeal in the Illinois Appellate Court, which affirmed the trial court's judgment on January 12, 2005. Plaintiffs have sought leave to appeal to the Illinois Supreme Court.

On or about November 21, 2003, four shareholder derivative lawsuits were filed in the California State Superior Court for San Mateo County, California, which actions have been consolidated into a single action entitled *In re Safeway, Inc. Derivative Litigation*, with a single shareholder plaintiff. The action is brought against the nine individuals who were serving as Safeway's directors at the time the suit was filed, Kohlberg Kravis Roberts & Co. ("KKR"), two Company officers, and the Company as a nominal defendant. The complaint alleges, among other things, that the Company's directors concealed information about poor performance at some of the Company's divisions in order to enable KKR and certain directors and officers to sell shares of Company stock at an inflated price. The complaint asserts causes of action for breach of fiduciary duty, abuse of control, violations of the California Corporations Code and other claims. The parties have entered into a Memorandum of Understanding dated as of March 11, 2005, pursuant to which the Company has agreed to implement certain corporate governance enhancements and the plaintiffs have agreed to dismiss all claims with prejudice. The Memorandum of Understanding is subject to execution of a definitive stipulation of settlement and approval by the Court.

On February 2, 2004, the Attorney General for the State of California filed an action in the United States District Court for the Central District of California (Los Angeles), entitled *State of California, ex rel. Bill Lockyer v. Safeway Inc. dba Vons, et al.*, against the Company's subsidiary, The Vons Companies, Inc., Albertson's, Inc. and Ralphs Grocery Company, a division of the Kroger Company. The complaint alleges that certain provisions of a Mutual Strike Assistance Agreement entered into by the defendants in connection with the Southern California grocery strike that began on October 11, 2003 constituted a violation of section 1 of the Sherman Antitrust Act. The complaint seeks declaratory and injunctive relief. Defendants filed a motion for summary judgment based on the federal non-statutory labor exemption to the antitrust laws, which was heard by the court on February 10, 2005.

There are also pending against the Company various claims and lawsuits arising in the normal course of business, some of which seek damages and other relief, which, if granted, would require very large expenditures.

It is management's opinion that although the amount of liability with respect to all of the above matters cannot be ascertained at this time, any resulting liability, including any punitive damages, will not have a material adverse effect on the Company's consolidated financial statements taken as a whole.

SAFEWAY INC. AND SUBSIDIARIES

**FURR'S AND HOMELAND CHARGE**  In 1987, Safeway assigned a number of leases to Furr's Inc. ("Furr's") and Homeland Stores, Inc. ("Homeland") as part of the sale of the Company's former El Paso, Texas and Oklahoma City, Oklahoma divisions. Safeway is contingently liable if Furr's and Homeland are unable to continue making rental payments on these leases. In 2001, Safeway recorded a pre-tax charge to earnings of $42.7 million to recognize the estimated lease liabilities associated with the Furr's and Homeland bankruptcies and for a single lease from Safeway's former Florida division. In 2002, Furr's began the liquidation process and Homeland emerged from bankruptcy and, based on the resolution of various leases, Safeway reversed $12.1 million of this accrual.

Safeway is unable to determine its maximum potential obligation with respect to other divested operations, should there be any similar defaults, because information about the total numbers of leases from these divestitures that are still outstanding is not available. Based on an internal assessment by the Company, performed by taking the original inventory of assigned leases at the time of the divestitures and accounting for the passage of time, Safeway expects that any potential losses beyond those recorded, should there be any similar defaults, would not be material to Safeway's operating results, cash flow or financial position.

**COMMITMENTS**  The Company has commitments under contracts for the purchase of property and equipment and for the construction of buildings. Portions of such contracts not completed at year-end are not reflected in the consol-idated financial statements. These unrecorded commitments were $139.7 million at year-end 2004.

## Note M: Segments

Safeway's retail grocery business, which represents more than 98% of consolidated sales and other revenue and operates in the United States and Canada, is its only reportable segment.

The following table presents information about the Company by geographic area (in millions):

|  | U.S. | Canada | Total |
|---|---|---|---|
| **2004** |  |  |  |
| Sales and other revenue | $31,463.0 | $4,359.9 | $35,822.9 |
| Operating profit | 928.9 | 243.9 | 1,172.8 |
| Income before income taxes | 550.2 | 243.7 | 793.9 |
| Long-lived assets, net | 7,796.9 | 892.5 | 8,689.4 |
| Total assets | 13,753.5 | 1,623.9 | 15,377.4 |
| **2003** |  |  |  |
| Sales and other revenue | $31,678.7 | $4,048.5 | $35,727.2 |
| Operating profit | 344.1 | 229.8 | 573.9 |
| (Loss) income before income taxes | (86.2) | 227.3 | 141.1 |
| Long-lived assets, net | 7,607.9 | 797.9 | 8,405.8 |
| Total assets | 13,679.8 | 1,416.9 | 15,096.7 |
| **2002** |  |  |  |
| Sales and other revenue | $31,437.4 | $3,479.8 | $34,917.2 |
| Operating profit | 773.0 | 174.6 | 947.6 |
| Income before income taxes and cumulative effect of accounting change | 363.3 | 169.0 | 532.3 |
| Long-lived assets, net | 7,876.8 | 654.0 | 8,530.8 |
| Total assets | 14,948.8 | 1,098.4 | 16,047.2 |

# Note N: Computation of Earnings (Loss) Per Share

| (In millions, except per-share amounts) | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Diluted | Basic | Diluted | Basic | Diluted | Basic |
| Income (loss) before cumulative effect of accounting change | $ 560.2 | $ 560.2 | $(169.8) | $(169.8) | $(128.1) | $(128.1) |
| Cumulative effect of accounting change | – | – | – | – | (700.0) | (700.0) |
| Net income (loss) | $ 560.2 | $ 560.2 | $(169.8) | $(169.8) | $(828.1) | $(828.1) |
| Weighted average common shares outstanding | 445.6 | 445.6 | 441.9 | 441.9 | 467.3 | 467.3 |
| Common share equivalents | 3.5 | | | | | |
| Weighted average shares outstanding | 449.1 | | | | | |
| Earnings (loss) per common share and common share equivalent: | | | | | | |
| Income (loss) before cumulative effect of accounting change | $  1.25 | $  1.26 | $  (0.38) | $  (0.38) | $  (0.27) | $  (0.27) |
| Cumulative effect of accounting change | – | – | – | – | (1.50) | (1.50) |
| Net income (loss) | $  1.25 | $  1.26 | $  (0.38) | $  (0.38) | $  (1.77) | $  (1.77) |
| Calculation of common share equivalents: | | | | | | |
| Options to purchase common shares | 12.6 | | | | | |
| Common shares assumed purchased with potential proceeds | (9.1) | | | | | |
| Common share equivalents | 3.5 | | | | | |
| Calculation of common shares assumed purchased with potential proceeds: | | | | | | |
| Potential proceeds from exercise of options to purchase common shares | $ 192.8 | | | | | |
| Common stock price used under the treasury stock method | $ 21.26 | | | | | |
| Common shares assumed purchased with potential proceeds | 9.1 | | | | | |

Anti-dilutive shares totaling 22.3 million in 2004, 26.2 million in 2003 and 21.7 million in 2002 have been excluded from diluted weighted average shares outstanding.

# Note O: Guarantees

Safeway has applied the measurement and disclosure provisions of FASB Interpretation ("FIN") No. 45 to the Company's agreements that contain guarantee and indemnification clauses. FIN No. 45 requires that upon issuance of a guarantee, the guarantor must disclose and recognize a liability for the fair value of the obligation it assumes under the guarantee. The initial recognition and measurement provisions of FIN No. 45 were effective for guarantees issued or modified after December 31, 2002. As of January 1, 2005, Safeway did not have any material guarantees that were issued or modified subsequent to December 31, 2002.

   However, the Company is party to a variety of contractual agreements under which Safeway may be obligated to indemnify the other party for certain matters. These contracts primarily relate to Safeway's commercial contracts, operating leases and other real estate contracts, trademarks, intellectual property, financial agreements and various other agreements. Under these agreements, the Company may provide certain routine indemnifications relating to representations and warranties (for example ownership of assets, environmental or tax indemnifications) or personal injury matters. The terms of these indemnifications range in duration and may not be explicitly defined. Historically, Safeway has not made significant payments for these indemnifications. The Company believes that if it were to incur a loss in any of these manners, the loss would not have a material effect on the Company's financial condition or results of operations.

## Note P: Quarterly Information (Unaudited)

The summarized quarterly financial data presented below reflect all adjustments which, in the opinion of management, are of a normal and recurring nature necessary to present fairly the results of operations for the periods presented. (Rounding affects some totals.)

| (In millions, except per-share amounts) | 52 Weeks | Last 16 Weeks[2] | Third 12 Weeks[3] | Second 12 Weeks[4] | First 12 Weeks[5] |
|---|---|---|---|---|---|
| **2004** | | | | | |
| Sales, before reclassifications | $35,621.9 | $11,325.0 | $8,297.0 | $8,361.1 | $7,638.8 |
| Reclassifications[1] | 201.0 | 65.4 | 46.2 | 45.4 | 43.9 |
| Sales and other revenue, as adjusted | 35,822.9 | 11,390.4 | 8,343.2 | 8,406.5 | 7,682.7 |
| Gross profit, before reclassifications | 10,391.9 | 3,295.0 | 2,416.6 | 2,403.7 | 2,276.6 |
| Reclassifications[1] | 203.4 | 61.7 | 49.4 | 48.0 | 44.4 |
| Gross profit, as adjusted | 10,595.3 | 3,356.7 | 2,466.0 | 2,451.7 | 2,321.0 |
| Operating profit | 1,172.8 | 406.2 | 294.5 | 317.0 | 155.2 |
| Income before income taxes | 793.9 | 303.9 | 201.7 | 226.2 | 62.1 |
| Net income | 560.2 | 202.7 | 159.2 | 155.2 | 43.1 |
| Net income per share – basic | $   1.26 | $   0.45 | $   0.36 | $   0.35 | $   0.10 |
| Net income per share – diluted | 1.25 | 0.45 | 0.35 | 0.35 | 0.10 |
| Price range, New York Stock Exchange | $  25.64 | $  21.17 | $  25.64 | $  24.67 | $  23.80 |
| | to 17.26 | to 17.26 | to 19.52 | to 19.92 | to 19.72 |

| (In millions, except per-share amounts) | 53 Weeks | Last 17 Weeks[6] | Third 12 Weeks[7] | Second 12 Weeks[8] | First 12 Weeks[9] |
|---|---|---|---|---|---|
| **2003** | | | | | |
| Sales, before reclassifications | $35,552.7 | $10,984.7 | $8,276.5 | $8,248.1 | $8,043.3 |
| Reclassifications[1] | 174.5 | 59.1 | 37.4 | 41.3 | 36.7 |
| Sales and other revenue, as adjusted | 35,727.2 | 11,043.8 | 8,313.9 | 8,289.4 | 8,080.0 |
| Gross profit, before reclassifications | 10,533.8 | 3,187.3 | 2,474.3 | 2,483.8 | 2,388.3 |
| Reclassifications[1] | 190.4 | 62.9 | 43.5 | 42.4 | 41.6 |
| Gross profit, as adjusted | 10,724.2 | 3,250.2 | 2,517.8 | 2,526.2 | 2,429.9 |
| Operating profit (loss) | 573.9 | (321.7) | 426.1 | 357.4 | 112.1 |
| Income (loss) before income taxes | 141.1 | (458.0) | 330.1 | 258.1 | 10.9 |
| Net (loss) income | (169.8) | (695.9) | 202.5 | 161.0 | 162.6 |
| Net (loss) income per share – basic | $  (0.38) | $  (1.57) | $   0.46 | $   0.36 | $   0.37 |
| Net (loss) income per share – diluted | (0.38) | (1.57) | 0.45 | 0.36 | 0.36 |
| Price range, New York Stock Exchange | $  25.80 | $  25.76 | $  25.66 | $  20.50 | $  25.80 |
| | to 16.45 | to 19.87 | to 19.79 | to 16.45 | to 17.59 |

(1) Reclassifications are discussed in Note A.
(2) Net income for the last 16 weeks of 2004 includes an estimated $37.0 million after-tax impact of the Southern California strike and $6.5 million after-tax for an accrual for rent holidays. Income tax expense includes a tax benefit of $8.8 million due to tax law changes and the resolution of certain tax issues.
(3) Net income for the third 12 weeks of 2004 includes an estimated $45.0 million after-tax impact of the Southern California strike partially offset by a tax benefit of $32.4 million arising from the resolution of certain tax issues.
(4) Net income for the second 12 weeks of 2004 includes an estimated $50.0 million after-tax impact of the Southern California strike.
(5) Net income for the first 12 weeks of 2004 includes an estimated $122.0 million after-tax impact of the Southern California strike and a $28.5 million after-tax charge related to closing 12 under-performing Dominick's stores.
(6) Net loss for the last 17 weeks of 2003 includes an estimated $102.9 million after-tax impact of the Southern California strike, a $447.7 million after-tax goodwill impairment charge for Randall's, a $24.4 million after-tax goodwill impairment charge and a $116.9 million after-tax property impairment charge for Dominick's, a $249.6 million reversal of tax benefits initially recognized on the proposed sale of Dominick's during the first 36 weeks of 2003 and reversed when Dominick's was taken off the market, an after-tax charge of $6.5 million to write off miscellaneous investments and a $43.5 million after-tax charge for inventory reserve adjustments.
(7) Net income for the third 12 weeks of 2003 includes a $2.9 million after-tax property impairment charge for Dominick's and restructuring and other expenses totaling $6.0 million, after-tax.
(8) Net income for the second 12 weeks of 2003 includes a $41.6 million after-tax property impairment charge for Dominick's and restructuring and other expenses totaling $9.9 million, after-tax.
(9) Net income for the first 12 weeks of 2003 includes a $6.4 million after-tax charge to adopt EITF No. 02-16, a $251.5 million after-tax goodwill impairment charge and a $28.3 million after-tax property impairment charge for Dominick's, partially offset by a tax benefit of $249.6 million related to the planned Dominick's sale that was subsequently reversed in the fourth quarter of 2003.

# Management's Annual Report on Internal Controls over Financial Reporting

SAFEWAY INC. AND SUBSIDIARIES

Management of the Company, including the Chief Executive Officer and the Chief Financial Officer, is responsible for establishing and maintaining adequate internal controls over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934, as amended. The Company's internal controls were designed to provide reasonable assurance as to the reliability of its financial reporting and the preparation and presentation of the consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States and includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

The Company conducted an evaluation of the effectiveness of its internal controls over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. This evaluation included review of the documentation of controls, evaluation of the design effectiveness of controls, testing of the operating effectiveness of controls and a conclusion on this evaluation. Through this evaluation, management did not identify any material weakness in the Company's internal controls. There are inherent limitations in the effectiveness of any system of internal controls over financial reporting; however, based on the evaluation, management has concluded the Company's internal controls over financial reporting were effective as of January 1, 2005.

STEVEN A. BURD
Chairman, President and
Chief Executive Officer
March 15, 2005

ROBERT L. EDWARDS
Executive Vice President
and Chief Financial Officer
March 15, 2005

# Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

### The Board of Directors and Stockholders of Safeway Inc:

We have audited management's assessment, included in the accompanying "Management's Annual Report on Internal Controls Over Financial Reporting," that Safeway Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of January 1, 2005, based on criteria established in *Internal Control–Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of January 1, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control–Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 1, 2005, based on the criteria established in *Internal Control–Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended January 1, 2005 of the Company, and our report dated March 15, 2005 expressed an unqualified opinion (and included an explanatory paragraph relating to the adoption of a new accounting standard) on those consolidated financial statements.

*Deloitte & Touche LLP*

San Francisco, California
March 15, 2005

# Report of Independent Registered Public Accounting Firm

## To the Board of Directors and Stockholders of Safeway Inc:

We have audited the accompanying consolidated balance sheets of Safeway Inc. and subsidiaries (the "Company") as of January 1, 2005 and January 3, 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended January 1, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Safeway Inc. and subsidiaries as of January 1, 2005 and January 3, 2004, and the results of their operations and their cash flows for each of the three years in the period ended January 1, 2005, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note B to the consolidated financial statements, in fiscal 2002, the Company changed its method of accounting for goodwill and other intangible assets to conform to Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of January 1, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 15, 2005 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

*Deloitte & Touche LLP*

San Francisco, California
March 15, 2005

# Directors and Principal Officers

SAFEWAY INC. AND SUBSIDIARIES

## Directors

**STEVEN A. BURD**
Chairman, President
and Chief Executive Officer
Safeway Inc.

**PAUL HAZEN**
Lead Independent Director
Former Chairman and
Chief Executive Officer
Wells Fargo & Co
Deputy Chairman
Vodafone Group PLC

**JANET E. GROVE**
Chair and Chief Executive Officer
Federated Merchandising Group
Vice Chair
Federated Department Stores, Inc.

**MOHAN GYANI**
Former President and
Chief Executive Officer
Mobility Services
AT&T Wireless Services, Inc.

**ROBERT I. MACDONNELL**
Retired Partner
KKR & Co.

**DOUGLAS J. MACKENZIE**
Partner
Kleiner Perkins Caufield & Byers

**REBECCA A. STIRN**
Business Consultant

**WILLIAM Y. TAUSCHER**
Managing Member
The Tauscher Group

**RAYMOND G. VIAULT**
Former Vice Chairman
General Mills, Inc.

## Executive Officers

**STEVEN A. BURD**
Chairman, President and
Chief Executive Officer

**BRIAN C. CORNELL**
Executive Vice President and
Chief Marketing Officer

**ROBERT L. EDWARDS**
Executive Vice President and
Chief Financial Officer

**BRUCE L. EVERETTE**
Executive Vice President

**LARREE M. RENDA**
Executive Vice President
Retail Operations, Human Resources,
Public Affairs, Labor and Government
Relations, Reengineering and
Communications

**DAVID F. BOND**
Senior Vice President
Finance and Control

**DAVID T. CHING**
Senior Vice President and
Chief Information Officer

**DICK W. GONZALES**
Senior Vice President
Human Resources

**ROBERT A. GORDON**
Senior Vice President,
General Counsel and
Chief Governance Officer

**MELISSA C. PLAISANCE**
Senior Vice President
Finance and Investor Relations

**KENNETH M. SHACHMUT**
Senior Vice President
Reengineering and
Marketing Analysis

**DAVID R. STERN**
Senior Vice President
Planning and Business Development

**JERRY TIDWELL**
Senior Vice President
Supply Operations

**DONALD P. WRIGHT**
Senior Vice President
Real Estate and Engineering

## Division Presidents

**BRUCE L. EVERETTE**
Dominick's Finer Foods, LLC

**HENRY A. COMINIELLO**
Acting Eastern Division President

**SCOTT GRIMMETT**
Denver Division

**KARL SCHROEDER**
Northern California Division

**GREGORY A. SPARKS**
Seattle Division

**DANIEL J. VALENZUELA**
Phoenix Division

**LYLE A. WATERMAN**
Portland Division

**THOMAS C. KELLER**
The Vons Companies, Inc.

**STEVEN R. FRISBY**
Randall's Food & Drugs, LP

**MITCHELL RHODES**
GroceryWorks Holdings, Inc.
(Internet Grocer)

## Foreign Subsidiary

CANADA SAFEWAY LIMITED

**CHUCK MULVENNA**
President and Chief Operating Officer

## Equity Affiliate

CASA LEY, S.A. DE C.V. (MEXICO)

**JUAN MANUEL LEY LOPEZ**
Chairman and Chief Executive Officer

# Investor Information

SAFEWAY INC. AND SUBSIDIARIES

## Executive Offices

Mailing Address:
Safeway Inc.
P.O. Box 99
Pleasanton, CA 94566-0009

## Internet Address

Safeway's web site on the Internet can be accessed at www.safeway.com. We do not incorporate the information on our web site into this annual report, and you should not consider it part of this annual report.

## Stock Transfer Agent and Registrar

EquiServe Trust Company, N.A.
P.O. Box 43069
Providence, RI 02940-3069
877-498-8861
Hearing impaired: 800-952-9245
www.equiserve.com

## Form 10-K

Safeway's 2004 Form 10-K filed with the Securities and Exchange Commission can be accessed online at www.safeway. com/investor_relations. Alternately, a copy of the form may be obtained by writing to the Investor Relations Department at our executive offices or by calling 925-467-3790.

## Certifications

The company submitted a Section 12(a) CEO certification to the New York Stock Exchange within 30 days of its 2004 Annual Meeting of Stockholders. The company filed the CEO/CFO certifications required under Section 302 of the Sarbanes-Oxley Act of 2002 as an exhibit to the company's 2004 Annual Report on Form 10-K.

## Independent Auditors

Deloitte & Touche LLP
San Francisco, California

## Annual Meeting

The 2005 Annual Meeting of Stockholders will be held on May 25, 2005. A notice of the meeting, together with a proxy statement and a form of proxy, will be mailed to stockholders within 120 days of the end of the fiscal year.

## Stock Exchange Listing

The company's common stock, which trades under the symbol SWY, and certain debentures and notes are listed on the New York Stock Exchange.

## Investor Inquiries

Communication regarding investor records, including changes of address or ownership, should be directed to the company's transfer agent, EquiServe Trust Company, N.A., at the address listed on the left. To inquire by phone, please call 877-498-8861, or visit their web site at www.equiserve.com.

Investors, security analysts and members of the media should direct their financial inquiries to our Investor Relations Department at 925-467-3832.

To access or obtain financial reports, please visit our web site at www. safeway. com/investor_relations, write to our Investor Relations Department or call 925-467-3790.

## EEO-1 Report

As an equal opportunity employer, Safeway values and actively supports diversity in the workplace. A copy of the company's 2004 summary EEO-1 report, filed with the federal Equal Employment Opportunity Commission, is available upon request at our executive offices.

## Trustees and Paying Agents

2.50% Senior Notes
3.80% Senior Notes
4.125% Senior Notes
4.80% Senior Notes
4.95% Senior Notes
5.625% Senior Notes
5.80% Senior Notes
6.15% Senior Notes
6.50% Senior Notes
7.00% Senior Notes
7.25% Senior Debentures
7.45% Senior Debentures
7.50% Senior Notes
9.875% Senior Subordinated
    Debentures
Floating Rate Senior Notes

The Bank of New York
Bondholder Relations Department
Corporate Trust Division
Fiscal Agencies Department
101 Barclay Street, 7-East
New York, NY 10286
800-548-5075

9.30% Senior Secured Debentures

JPMorgan Chase & Co.
Institutional Trust Services
P.O. Box 2320
Dallas, TX 75221-2320
800-275-2048

DESIGN BROOM & BROOM, INC. SAN FRANCISCO



**SAFEWAY INC.**
P.O. Box 99
Pleasanton, CA 94566-0009

# EXHIBIT F

**EXPERT REPORT OF DAVID FRANKLYN REGARDING LEVEL OF CONFUSION BETWEEN KODIAK SPORTS NUTRITION AND KODIAK CAKES**

PREPARED BY:

David Franklyn

November 1, 2021

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE----------------------------------   4
STUDY AUTHORSHIP & QUALIFICATIONS ------------------   7
OVERVIEW OF STUDIES --------------------------------------   9
SUMMARY OF KEY FINDINGS -------------------------------   11
SURVEY 1 METHODOLOGY -----------------------------------   12
     EXPERIMENTAL DESIGN-------------------------------------   12
     THE RELEVANT UNIVERSE OF INTEREST-------------   27
     SAMPLING PLAN ------------------------------------------   28
     DOUBLE-BLIND INTERVIEWING -------------------------   28
     INTERVIEWING PROCEDURES----------------------------   28
     INTERVIEWING PERIOD-----------------------------------   29
     QUALITY CONTROL ---------------------------------------   29
SURVEY 2 METHODOLOGY -----------------------------------   32
     EXPERIMENTAL DESIGN-------------------------------------   32
     THE RELEVANT UNIVERSE OF INTEREST-------------   41
     SAMPLING PLAN ------------------------------------------   46
     DOUBLE-BLIND INTERVIEWING -------------------------   47
     INTERVIEWING PROCEDURES----------------------------   47
     INTERVIEWING PERIOD-----------------------------------   48
     QUALITY CONTROL ---------------------------------------   48
SURVEY 3 METHODOLOGY -----------------------------------   51
     EXPERIMENTAL DESIGN-------------------------------------   51
     THE RELEVANT UNIVERSE OF INTEREST-------------   62
     SAMPLING PLAN ------------------------------------------   66
     DOUBLE-BLIND INTERVIEWING -------------------------   67
     INTERVIEWING PROCEDURES----------------------------   68
     INTERVIEWING PERIOD-----------------------------------   68
     QUALITY CONTROL ---------------------------------------   69

SURVEY 4 METHODOLOGY----------------------------------------   72
    EXPERIMENTAL DESIGN------------------------------------   72
    THE RELEVANT UNIVERSE OF INTEREST-------------   75
    SAMPLING PLAN -----------------------------------------   79
    DOUBLE-BLIND INTERVIEWING -------------------------   81
    INTERVIEWING PROCEDURES----------------------------   81
    INTERVIEWING PERIOD------------------------------------   82
    QUALITY CONTROL --------------------------------------   82
SURVEY 1 REPORT & DISCUSSION -----------------------------   85
SURVEY 2 REPORT & DISCUSSION-------------------------------   91
SURVEY 3 REPORT & DISCUSSION-------------------------------   98
SURVEY 4 REPORT & DISCUSSION-------------------------------   103
CONCLUSION-------------------------------------------------------   108

APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRES/INSTRUCTIONS
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA
APPENDIX E:   MATERIALS CONSIDERED

*BACKGROUND AND PURPOSE*

I understand that since 1994, Kodiak Cakes, LLC has been selling high-protein products, including a variety of ready-to-eat products and baking mixes under the single-word KODIAK mark, the KODIAK CAKES mark, and a bear logo.



I understand that in 2016, JRM NutraSciences, LLC began selling products under the KODIAK mark, including the single word-KODIAK mark, the marks KODIAK SPORTS NUTRITION and KODIAK NUTRITION, and a bear logo.



I have been retained to assess, using standard and generally accepted statistical and consumer market survey methods, the level of confusion, if any, stemming from the usage of the KODIAK mark by JRM NutraSciences and/or its licensees including Muscle Sports Products, LLC.

Furthermore, I have been retained to assess, using standard and generally accepted statistical and consumer market survey methods, the level of association that an interested universe of consumers have between the term "Kodiak" and products commonly sold under the Kodiak Cakes, LLC's KODIAK and KODIAK CAKES brands.

Based on the extensive consumer research and statistical analysis I describe in this report, it is clear that a significant percentage of consumers recognize the KODIAK mark in relation with the products commonly sold by Kodiak Cakes, LLC and that the usage of the Kodiak term by JRM NutraSciences, LLC creates significant consumer confusion with Kodiak Cakes' KODIAK brands.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented under my supervision.

I am currently a Professor of Law at Arizona State University.  I hold an appointment within the Sandra Day O'Connor College of Law.   I am also the Executive Director of the McCarthy Institute, which is focused on scholarship and research in the areas of trademark law, branding and consumer perception.  Furthermore, I am editor-in-chief and co-author of McCarthy's Desk Encyclopedia of Intellectual Property Law.

Formerly, between 2000 and 2018, I was a Professor of Law and Executive Director of the McCarthy Institute for Intellectual Property and Technology Law at University of San Francisco and Director of the Center for the Empirical Study of Trademark Law (CEST).

I have consulted and/or qualified as an expert witness on behalf of clients in numerous cases involving consumer perception and behavior issues and related damages issues, including in matters in the United States (federal and various state courts), Asia, the European Union, the Middle East, and South America.

In addition to my survey research experience, I hold a J.D. from University of Michigan Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## <u>OVERVIEW OF STUDIES</u>

In order to assess consumer perceptions, I conducted four discrete surveys.

In **<u>Survey 1</u>**, I utilized a Modified Lineup survey format and exposed consumers to six images of products containing added protein. Consumers were asked to review these images, and were then asked whether or not any of the products were put out by the same company.

Those indicating that they believed that two or more products were put out by the same company were asked to select the products they believe were put out by the same company, and were asked to provide a rationale for their decision.

In **<u>Survey 2</u>**, I utilized an identical Modified Lineup survey format as in Survey 1, however I used six images of websites for products containing added protein.  Questioning was identical to Survey 1, with consumers being asked to review these images, and then being asked whether or not any of the websites were maintained by the same company.

Those indicating that they believed that two or more websites were maintained by the same company were asked to select the websites they believe were put out by the same company, and were asked to provide a rationale for their decision.

In **Survey 3**, I utilized an Eveready survey format and exposed consumers to the protein powder as depicted on the Kodiak Sports Nutrition website. Consumers were asked to review the image, and were asked a series of questions as to the maker of the product, sponsorship or approval by another company, and business affiliation or connection with another company.  Consumers were also asked to identify any other products made or put out by the maker of this product.

In **Survey 4**, I used two distinct approaches to assess recognition of the term "Kodiak" as a brand.  Approximately half of respondents were asked "When you hear the name 'Kodiak', what does it mean to you?" to provide understanding of the 'Kodiak' term without specific reference to the protein category.

The other half were asked "Do you associate the name 'Kodiak' with the protein-enhanced products of one, or more than one, company?" Consumers selecting "one company" were then asked "What protein-

enhanced products do you associate with the name 'Kodiak'?" This provide understanding of the "Kodiak" term specific to the protein category.

## SUMMARY OF KEY FINDINGS

In total, I collected 1,857 qualified survey responses from respondents across all fifty states.

Within Survey 1, I find that after viewing the KODIAK-branded products of Kodiak Cakes, LLC and JRM Nutrasciences, LLC in a lineup, a significant percentage of consumers are confused as to the relationship between the brands.

Within Survey 2, I find that after viewing the websites of Kodiak Cakes, LLC and JRM Nutrasciences, LLC in a lineup, a significant percentage of consumers are confused as to the source of the KODIAK-branded products presented on the respective websites.

Within Survey 3, I find that after viewing the KODIAK SPORTS NUTRITION protein product, a significant percentage of consumers definitively link the product with KODIAK and KODIAK CAKES-branded products commonly sold by Kodiak Cakes, LLC.

Within Survey 4, I find that Kodiak Cakes, LLC has created a strong connection between the KODIAK brand and protein products in the minds of consumers, both when specifically asked about protein products and when asked more generally.

## SURVEY 1 METHODOLOGY

### Experimental Design

After passing screening criteria and qualifying to take the survey, consumers were first asked to review six images of protein product packages presented in random order.

Products were placed on an image carousel and respondents could click the arrows to toggle between products.



This survey utilized a test-and-control design.  The only difference between the test-and-control cell was the stimuli shown for the KODIAK SPORTS NUTRITION product.

Within the test cell, consumers saw the product with the single word KODIAK mark and a bear logo presented on the top of the canister.



Within the control cell, consumers saw an altered product with the single word KODIAK mark and bear logo removed from the top of the canister.



All other stimuli were identical across the test and control cell.

While these and subsequent images are reduced in size to fit on this page, the images appeared larger to consumers responding to the survey. Further, consumers were required to take this survey on a non-mobile device and could adjust the size of the image using standard browser zooming features. Consumers were also asked to state whether they could see the images. Those indicating they could not see the images were terminated from the survey.

To ensure review of the images, a 30-second wait time was required before respondents were allowed to proceed with the survey.

Consumers were then shown the products again and were asked if those products were made from the same company or if they think that two or more are from the same company.



Consumers who indicated that two or more products are from the same company were asked to select which products they believe are affiliated or connected.

Which products do you believe are from the same company or are affiliated or connected?

Please select only two images.













Next

Consumers were then asked to provide a rationale.



Next, consumers who indicated that two or more products are from the same company were asked to select if they believe that any additional products shown in the images are from the same company or are affiliated in any way.

Your responses have been recorded.

Besides the products you just mentioned, do you think that any additional products shown in the images are from the same company or are affiliated or connected in anyway?

○ Yes, I believe that there are additional products that are from the same company or are affiliated/connected

○ No, I believe that all remaining products are from separate companies

○ I do not know or have no opinion

Next

Consumers who indicated that two or more products are from the same company were asked again to select which product they believe are affiliated or connected and why. If a respondent continually selected yes, they were shown this question three times in addition to the first time they saw it.





Next, consumers were asked if prior to taking the survey they were aware of Kodiak Cakes.



Then consumers were asked if prior taking the survey, they were aware of Kodiak Nutrition.

Prior to taking this survey, were you aware of Kodiak Nutrition?

○ Yes, I was aware of Kodiak Nutrition prior to taking this survey

○ No, I was not aware of Kodiak Nutrition prior to taking this survey

○ No opinion/don't know

Next

Consumers who indicated they were aware of Kodiak Nutrition were asked to mention the products Kodiak Nutrition makes or sells.

In the prior question, you mentioned that you were aware of Kodiak Nutrition. What products do they make or sell?

Next

Next, consumers were asked if prior taking the survey they were aware of Kodiak Sports Nutrition.

Prior to taking this survey, were you aware of Kodiak Sports Nutrition?

○ Yes, I was aware of Kodiak Sports Nutrition prior to taking this survey

○ No, I was not aware of Kodiak Sports Nutrition prior to taking this survey

○ No opinion/don't know

Next

Consumers who indicated they were aware of Kodiak Sports Nutrition were asked to mention the products Kodiak Nutrition makes or sells.

In the prior question, you mentioned that you were aware of Kodiak Sports Nutrition. What products do they make or sell?

Next

## The Relevant Universe of Interest

The interested universe of this study was past or future purchasers of protein products.

Consumers were first asked about their age.



Consumers who selected "Under 18" or "Prefer not to answer" were terminated from the survey.

Next, they were asked their gender. Options for "Female" and "Male" were randomized.



Consumers were then asked where they currently reside.



Those selecting "I do not live in the United States" were terminated.

Consumers were then asked a sensitive industry question. Options were randomized.

> Do you or does anyone in your household work in the following industries? Select all that apply.
>
> ☐ In market research
> ☐ In advertising
> ☐ None of the above
>
> [Next]

Consumers were terminated if they indicated an existing relationship with advertising or market research.

Consumers were then asked about their purchasing of a variety of nutritional products. Options were randomized.



If a respondent indicated that they had purchased any of these products, they were then asked about where they bought those products.

Consumers were then asked about their intended purchasing of this same list of products. Options were randomized.

Within the next 12 months, are you likely to purchase any of the following types of nutritional products? Please select all products you are likely to purchase.

☐ Meal replacement alternatives

☐ Foods with added protein

☐ Protein powder

☐ Multi-vitamins

☐ Plant-based meat alternatives

☐ Pre or post workout supplements

☐ Milk alternatives (nut milk, oat milk, soy milk)

☐ None of the above

[Next]

Next, consumers were asked about where they are likely to purchase those products.

In the prior question, you mentioned that you are likely to purchase the following types of nutritional products in the next 12 months? Where do you intend to purchase these products. Select all that apply.

|  | In a physical store | From an online retailer | Other | None of the above |
|---|---|---|---|---|
| Protein powder | ☐ | ☐ | ☐ | ☐ |
| Foods with added protein | ☐ | ☐ | ☐ | ☐ |

[Next]

In order to qualify for the survey, consumers had to select that they had either purchased Protein powder and/or intended to purchase protein powder or Foods with added protein in the next 12 months.

## Sampling plan

The sampling plan involved a random selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Lucid, a leading supplier of online sample for surveys. Lucid offers the world's largest pool of global consumers and is highly regarded as a reputable source of consumers for online surveys within the field of market research. Lucid utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Furthermore, Lucid regularly tracks quality and authentication metrics through a variety of metrics including survey response metrics, acceptance of buyer-accepted survey completes, and the consistency of responses over time.

Lucid also ensures data integrity through their continued review of their panelists' behavior on a variety of metrics to reduce sampling

bias, including their tracking of brand preference, value-seeking behavior, and technology usage.

To ensure applicability of the research findings, rough quotas were set up in line with census distributions for age, gender, and region.

## Double-Blind Interviewing

It is important to point out that the study was administered under "double-blind" conditions. Consumers were uninformed as to the purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

## Interviewing Procedures

The online survey questionnaire was constructed, programmed, and hosted under my direction by Halsted Strategy Group, a leading market research company with expertise in online survey design, programming and data collection and processing. Halsted Strategy Group staff and I thoroughly tested the programmed survey prior to any potential consumers receiving the invitation to participate in the survey.

Data was collected by Halsted Strategy Group through its online portal. The data set showing each consumer's answers to all questions will be provided in electronic form.

## Interviewing Period

Interviewing was conducted September 16, 2021 through September 22, 2021.

## Quality Control

Several quality control metrics were employed to ensure the validity of responses.

Consumers were required to complete a CAPTCHA. CAPTCHA is widely used in online surveys within the world of market research, in order to eliminate computer programs from taking the survey.



Second, consumers were required to complete a quality assurance question, and were required to enter "west" in the blank next to the "other" option. Consumers who clicked any of the first five options were immediately terminated.

For quality assurance, please type the word "west" in the blank next to the "Other" box below and then click to continue.

○ Strongly agree

○ Agree

○ Neutral

○ Disagree

○ Strongly disagree

○ Other [                    ]

[ Next ]

This ensures that consumers are actively paying attention to the survey questions. During quality control checks, anyone who typed in a response other than "west" was removed prior to analysis.

Third, consumers were first provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

You have qualified to take this survey. Before continuing, please carefully read these instructions:

* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other websites or other electronic or written materials.
* Please answer all questions on your own without consulting any other person.
* Please do not guess. If you don't know for any question, please indicate so.
* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

○ I understand and agree to the above instructions

○ I do not understand or do not agree to the above instructions

[ Next ]

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

Fourth, the survey was restricted from being taken on mobile devices to ensure clear viewing of the stimuli.

Finally, the dataset was cleaned prior to analysis. This includes the removal of consumers who did not correctly enter "west" at the attention check question, and consumers who entered gibberish into open-ended responses. Furthermore, survey responses were removed for those who took the survey in under 2 minutes and 3 seconds, which is half of the median survey completion time of 4 minutes and 6 seconds, and those who took longer than 16 minutes and 24 seconds to complete the survey, which is four times longer than the median survey completion time.

## SURVEY 2 METHODOLOGY

## Experimental Design

After passing screening criteria and qualifying into the survey, consumers were first asked to review six images of websites offering protein products, in random order.

Products were placed on an image carousel and respondents could click the arrows to toggle between products, as shown below



This survey utilized a test and control design.  The only difference between the test and control cell was the stimuli shown for the KODIAK SPORTS NUTRITION product.

Within the test cell, consumers saw an image of the website as currently available.



Within the control cell, consumers saw an altered webpage with the single word "Kodiak" mark and bear logo removed from the top of the canister, and the word "Kodiak" removed from the URL and the page header.



All other stimuli were identical across the test and control cell.

While these and subsequent images are reduced in size to fit on this page, the images appeared larger to consumers responding to the survey. Further, consumers were required to take this survey on a non-mobile device and could adjust the size of the image using standard browser zooming features. Consumers were also asked to state whether they could see the images. Those indicating they could not see the images were terminated.

Consumers were then shown the images again and were asked if each of these products is from a separate company or if two or more are from the same company.



Consumers who indicated that two or more products are from the same company were asked to select which products are from the same company or affiliated/connected.



Consumers were then asked to provide a rationale.



Next, consumers who indicated that two or more products are from the same company were asked to select if they believe that any additional products shown in the images are from the same company or are affiliated in any way.

Your responses have been recorded.

Besides the products you just mentioned, do you think that any additional products shown in the images are from the same company or are affiliated or connected in anyway?

○ Yes, I believe that there are additional products that are from the same company or are affiliated/connected

○ No, I believe that all remaining products are from separate companies

○ I do not know or have no opinion

Next

Consumers who indicated that two or more products are from the same company were asked again to select which product they believe are affiliated or connected and why. If a respondent continually selected yes, they were shown this question three times in addition to the first time they saw it.

Which products do you believe are from the same company or are affiliated or connected?

Please select only two images.





Next, consumers were asked if prior taking the survey, they were aware of Kodiak Cakes.



Then consumers were asked if prior taking the survey, they were aware of Kodiak Nutrition.

Prior to taking this survey, were you aware of Kodiak Nutrition?

○ Yes, I was aware of Kodiak Nutrition prior to taking this survey

○ No, I was not aware of Kodiak Nutrition prior to taking this survey

○ No opinion/don't know

Next

Consumers who indicated they were aware of Kodiak Nutrition were asked to identify the products Kodiak Nutrition make or sell.

In the prior question, you mentioned that you were aware of Kodiak Nutrition. What products do they make or sell?

Next

Next, consumers were asked if prior taking the survey, they were aware of Kodiak Sports Nutrition.

Prior to taking this survey, were you aware of Kodiak Sports Nutrition?

○ Yes, I was aware of Kodiak Sports Nutrition prior to taking this survey

○ No, I was not aware of Kodiak Sports Nutrition prior to taking this survey

○ No opinion/don't know

[ Next ]

Consumers who indicated they were aware of Kodiak Sports Nutrition were asked to mention the products Kodiak Sports Nutrition makes or sells.

In the prior question, you mentioned that you were aware of Kodiak Sports Nutrition. What products do they make or sell?

[ Next ]

## The Relevant Universe of Interest

The interested universe of this study was past or future purchasers of protein products.

Consumers were first asked about their age.



Consumers who selected "Under 18" or "Prefer not to answer" were terminated from the survey.

Next, they were asked their gender. Options for "Female" and "Male" were randomized.



Consumers were then asked where they currently reside.



Those selecting "I do not live in the United States" were terminated.

Consumers were then asked a sensitive industry question. Options were randomized.

Do you or does anyone in your household work in the following industries? Select all that apply.

- ☐ In market research
- ☐ In advertising
- ☐ None of the above

[Next]

Consumers were terminated if they indicated an existing relationship with advertising or market research.

Consumers were then asked about their purchasing of a variety of nutritional products. Options were randomized.

Within the past 12 months, have you purchased any of the following types of nutritional products?

☐ Multi-vitamins

☐ Protein powder

☐ Meal replacement alternatives

☐ Milk alternatives (nut milk, oat milk, soy milk)

☐ Foods with added protein

☐ Pre or post workout supplements

☐ Plant-based meat alternatives

☐ None of the above

[Next]

If a respondent indicated that they had purchased any of these products, they were then asked about where they bought those products.

In the prior question, you mentioned that you have purchased the following types of nutritional products in the past 12 months? Where have you purchased these products. Select all that apply.

|  | In a physical store | From an online retailer | Other | None of the above |
|---|---|---|---|---|
| Protein powder | ☐ | ☐ | ☐ | ☐ |
| Multi-vitamins | ☐ | ☐ | ☐ | ☐ |

[Next]

Consumers were then asked about their intended purchasing of this same list of products. Options were randomized.



Within the next 12 months, are you likely to purchase any of the following types of nutritional products? Please select all products you are likely to purchase.

☐ Meal replacement alternatives

☐ Foods with added protein

☐ Protein powder

☐ Multi-vitamins

☐ Plant-based meat alternatives

☐ Pre or post workout supplements

☐ Milk alternatives (nut milk, oat milk, soy milk)

☐ None of the above

Next, consumers were asked about where they are likely to purchase those products.

In the prior question, you mentioned that you are likely to purchase the following types of nutritional products in the next 12 months? Where do you intend to purchase these products. Select all that apply.

| | In a physical store | From an online retailer | Other | None of the above |
|---|---|---|---|---|
| Protein powder | ☐ | ☐ | ☐ | ☐ |
| Foods with added protein | ☐ | ☐ | ☐ | ☐ |

In order to qualify for the survey, consumers had to select that they had either purchased Protein powder and/or intended to purchase protein powder or Foods with added protein in the next 12 months.

## Sampling plan

The sampling plan involved a random selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Lucid, a leading supplier of online sample for surveys. Lucid offers the world's largest pool of global consumers and is highly regarded as a reputable source of consumers for online surveys within the field of market research. Lucid utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Furthermore, Lucid regularly tracks quality and authentication metrics through a variety of metrics including survey response metrics, acceptance of buyer-accepted survey completes, and the consistency of responses over time.

Lucid also ensures data integrity through their continued review of their panelists' behavior on a variety of metrics to reduce sampling

bias, including their tracking of brand preference, value-seeking behavior, and technology usage.

To ensure applicability of the research findings, rough quotas were set up in line with census distributions for age, gender, and region.

## Double-Blind Interviewing

It is important to point out that the study was administered under "double-blind" conditions. Consumers were uninformed as to the purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

## Interviewing Procedures

The online survey questionnaire was constructed, programmed, and hosted under my direction by Halsted Strategy Group, a leading market research company with expertise in online survey design, programming and data collection and processing. Halsted Strategy Group staff and I thoroughly tested the programmed survey prior to any potential consumers receiving the invitation to participate in the survey.

Data was collected by Halsted Strategy Group through its online portal. The data set showing each consumer's answers to all questions will be provided in electronic form.

## Interviewing Period

Interviewing was conducted September 16, 2021 through September 22, 2021.

## Quality Control

Several quality control metrics were employed to ensure the validity of responses.

Consumers were required to complete a CAPTCHA. CAPTCHA is widely used in online surveys within the world of market research, in order to eliminate computer programs from taking the survey.



Second, consumers were required to complete a quality assurance question, and were required to enter "west" in the blank next to the

"other" option. Consumers who clicked any of the first five options were immediately terminated.

For quality assurance, please type the word "west" in the blank next to the "Other" box below and then click to continue.

○ Strongly agree

○ Agree

○ Neutral

○ Disagree

○ Strongly disagree

○ Other [                    ]

[ Next ]

This ensures that consumers are actively paying attention to the survey questions. During quality control checks, anyone who typed in a response other than "west" was removed prior to analysis.

Third, consumers were first provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

You have qualified to take this survey. Before continuing, please carefully read these instructions:

* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other websites or other electronic or written materials.
* Please answer all questions on your own without consulting any other person.
* Please do not guess. If you don't know for any question, please indicate so.
* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

   ◯ I understand and agree to the above instructions

   ◯ I do not understand or do not agree to the above instructions

                                           **Next**

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

Fourth, the survey was restricted from being taken on mobile devices to ensure clear viewing of the stimuli.

Finally, the dataset was cleaned prior to analysis. This includes the removal of consumers who did not correctly enter "west" at the attention check question, and consumers who entered gibberish into open-ended responses. Furthermore, survey responses were removed for those who took the survey in under 2 minutes and 10 seconds, which is half of the median survey completion time of 4 minutes and 21 seconds, and those who took longer than 17 minutes and 22 seconds to complete the survey, which is four times longer than the median survey completion time.

## SURVEY 3 METHODOLOGY

## Experimental Design

After passing screening criteria and qualifying into the survey, consumers were asked to review an image of KODIAK SPORTS NUTRITION Protein Powder. Images of all survey screenshots are included within Appendix C of this Report.



This survey utilized a test and control design. The only difference between the test and control cell was the stimuli shown.

Within the test cell, consumers saw the product with the single-word KODIAK mark and a bear logo presented on the top of the canister.



Within the control cell, consumers saw an altered product with the single-word KODIAK mark and bear logo removed from the top of the canister.



While these and subsequent images are reduced in size to fit on this page, the images appeared larger to consumers responding to the survey. Further, consumers were required to take this survey on a non-mobile device and could adjust the size of the image using standard browser zooming features. Consumers were also asked to state whether they could see the images. Those indicating they could not see the images were terminated.

Next, consumers were shown the same image and asked which company they believe made the product.

Here is the same image as shown on the previous page.



What company makes or puts out this product?

Next

Next, consumers were asked to provide a rationale for their response.

Why do you say that?

Next

Next, consumers were shown the same image and asked whether or not they believe that the product is sponsored or approved by another company.

Here is the same image as shown on the previous page.



Do you believe this product:

○ Is sponsored or approved by another company

○ Is not sponsored or approved by any other company

○ I don't know or have no opinion

Next

Consumers who indicated they believe the product is sponsored or approved by another company were asked about which company they think is the sponsor of the product.

What other company do you believe sponsored or approved this product?

Next

Next, consumers were asked to provide a rationale for their response.

Why do you say that?

Next

Next, consumers were shown the same image and asked whether or not the company that makes the product has a business affiliation or connection with another company.

Here is the same image as shown on the previous page.



Do you believe whoever makes this product:

⭘ Does not have a business affiliation or connection with another company

⭘ Has a business affiliation or connection with another company

⭘ I don't know or have no opinion

Next

Consumers who indicated they believe the company has a business affiliation or connection with another company were what other company they think has a business affiliation or connection with whoever makes the product.

What other company do you believe has a business affiliation or connection with whoever makes this product?

Next

Next, consumers were asked to provide a rationale for their response.

Why do you say that?

Next

Consumers were then asked to name other products made by the company that makes this product.

Here is the same image as shown on the previous page.



Please name any other products made by the company shown in this image.

Next

Next, consumers were asked if prior taking the survey, they were aware of Kodiak Cakes.

Prior to taking this survey, were you aware of Kodiak Cakes?

◯ Yes, I was aware of Kodiak Cakes prior to taking this survey

◯ No, I was not aware of Kodiak Cakes prior to taking this survey

◯ No opinion/don't know

[Next]

Then consumers were asked if prior taking the survey, they were aware of Kodiak Nutrition.

Prior to taking this survey, were you aware of Kodiak Nutrition?

◯ Yes, I was aware of Kodiak Nutrition prior to taking this survey

◯ No, I was not aware of Kodiak Nutrition prior to taking this survey

◯ No opinion/don't know

[Next]

Consumers who indicated they were aware of Kodiak Nutrition were asked to mention the products Kodiak Nutrition make or sell.

In the prior question, you mentioned that you were aware of Kodiak Nutrition. What products do they make or sell?

Next

Next, consumers were asked if prior taking the survey, they were aware of Kodiak Sports Nutrition.

Prior to taking this survey, were you aware of Kodiak Sports Nutrition?

○ Yes, I was aware of Kodiak Sports Nutrition prior to taking this survey

○ No, I was not aware of Kodiak Sports Nutrition prior to taking this survey

○ No opinion/don't know

Next

Consumers who indicated they were aware of Kodiak Sports Nutrition were asked to mention the products Kodiak Nutrition makes or sells.

In the prior question, you mentioned that you were aware of Kodiak Sports Nutrition. What products do they make or sell?

Next

## <u>The Relevant Universe of Interest</u>

The interested universe of this study was past or future purchasers of protein products.

Consumers were first asked about their age.



Consumers who selected "Under 18" or "Prefer not to answer" were terminated from the survey.

Next, they were asked their gender. Options for "Female" and "Male" were randomized.

What is your gender?

○ Male
○ Female
○ Prefer not to answer

Next

Consumers were then asked where they currently reside.

In which state do you currently reside?

-- Please Select --

Next

Those selecting "I do not live in the United States" were terminated.

Consumers were then asked a sensitive industry question. Options were randomized.

Do you or does anyone in your household work in the following industries? Select all that apply.

☐ In market research

☐ In advertising

☐ None of the above

[ Next ]

Consumers were terminated if they indicated an existing relationship with advertising or market research.

Consumers were then asked about their purchasing of a variety of nutritional products. Options were randomized.

Within the past 12 months, have you purchased any of the following types of nutritional products?

☐ Multi-vitamins

☐ Protein powder

☐ Meal replacement alternatives

☐ Milk alternatives (nut milk, oat milk, soy milk)

☐ Foods with added protein

☐ Pre or post workout supplements

☐ Plant-based meat alternatives

☐ None of the above

[ Next ]

If a respondent indicated that they had purchased any of these products, they were then asked about where they bought those products.



Consumers were then asked about their intended purchasing of this same list of products. Options were randomized.



Next, consumers were asked about where they are likely to purchase those products.

In the prior question, you mentioned that you are likely to purchase the following types of nutritional products in the next 12 months? Where do you intend to purchase these products. Select all that apply.

| | In a physical store | From an online retailer | Other | None of the above |
|---|---|---|---|---|
| Protein powder | ☐ | ☐ | ☐ | ☐ |
| Foods with added protein | ☐ | ☐ | ☐ | ☐ |

Next

In order to qualify for the survey, consumers had to select that they had either purchased Protein powder and/or intended to purchase protein powder or Foods with added protein in the next 12 months.

## Sampling plan

The sampling plan involved a random selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make
decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Lucid, a leading supplier of online sample for surveys. Lucid offers the world's

largest pool of global consumers and is highly regarded as a reputable source of consumers for online surveys within the field of market research. Lucid utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Furthermore, Lucid regularly tracks quality and authentication metrics through a variety of metrics including survey response metrics, acceptance of buyer-accepted survey completes, and the consistency of responses over time.

Lucid also ensures data integrity through their continued review of their panelists' behavior on a variety of metrics to reduce sampling bias, including their tracking of brand preference, value-seeking behavior, and technology usage.

To ensure applicability of the research findings, rough quotas were set up in line with census distributions for age, gender, and region.

## Double-Blind Interviewing

It is important to point out that the study was administered under "double-blind" conditions. Consumers were uninformed as to the purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

## Interviewing Procedures

The online survey questionnaire was constructed, programmed, and hosted under my direction by Halsted Strategy Group, a leading market research company with expertise in online survey design, programming and data collection and processing. Halsted Strategy Group staff and I thoroughly tested the programmed survey prior to any potential consumers receiving the invitation to participate in the survey.

Data was collected by Halsted Strategy Group through its online portal. The data set showing each consumer's answers to all questions will be provided in electronic form.

## Interviewing Period

Interviewing was conducted September 16, 2021 through September 22, 2021.

## **Quality Control**

Several quality control metrics were employed to ensure the validity of responses.

Consumers were required to complete a CAPTCHA. CAPTCHA is widely used in online surveys within the world of market research, in order to eliminate computer programs from taking the survey.



Second, consumers were required to complete a quality assurance question, and were required to enter "west" in the blank next to the "other" option. Consumers who clicked any of the first five options were immediately terminated.

For quality assurance, please type the word "west" in the blank next to the "Other" box below and then click to continue.

○ Strongly agree

○ Agree

○ Neutral

○ Disagree

○ Strongly disagree

○ Other [                    ]

[ Next ]

This ensures that consumers are actively paying attention to the survey questions. During quality control checks, anyone who typed in a response other than "west" was removed prior to analysis.

Third, consumers were first provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

You have qualified to take this survey. Before continuing, please carefully read these instructions:

* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other websites or other electronic or written materials.
* Please answer all questions on your own without consulting any other person.
* Please do not guess. If you don't know for any question, please indicate so.
* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

○ I understand and agree to the above instructions

○ I do not understand or do not agree to the above instructions

[ Next ]

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

Fourth, the survey was restricted from being taken on mobile devices to ensure clear viewing of the stimuli.

Finally, the dataset was cleaned prior to analysis. This includes the removal of consumers who did not correctly enter "west" at the attention check question, and consumers who entered gibberish into open-ended responses. Furthermore, survey responses were removed for those who took the survey in under 2 minutes and 29 seconds, which is half of the median survey completion time of 4 minutes and 59 seconds, and those who took longer than 19 minutes and 54 seconds to complete the survey, which is four times longer than the median survey completion time.

## SURVEY 4 METHODOLOGY

### Experimental Design

After passing screening criteria and qualifying into the survey, consumers randomly assigned one of two questions. Images of all survey screenshots are included within Appendix C of this Report.

Half of consumers were asked what "Kodiak" means, agnostic of any specific category.



Half of consumers were asked whether they associate the single-word KODIAK brand in connection with the protein-enhanced products of one or more than one company.



Do you associate the name "Kodiak" with the protein-enhanced products of one, or more than one, company?

○ One company

○ More than one company

○ I do not know or have no opinion

Consumers who selected either "One company" or "More than one company" were then asked to provide a rationale.

Why do you say that?

This same audience was asked about the products they associate with the single-word KODIAK brand.

What protein-enhanced products do you associate with the name "Kodiak"?

[ Next ]

Finally, consumers were asked about their awareness and relationship with a variety of brands offering protein-enhanced products.

Which of the following best describes your relationship with the following brands of protein-enhanced products?

| | I have never heard of this brand | I have heard of this brand, but I'm not very familiar with them | I am familiar with this brand, but never considered purchasing products from them | I have considered purchasing products from this brand in the past | I have purchased products from this brand in the past |
|---|---|---|---|---|---|
| Modern Table | ◯ | ◯ | ◯ | ◯ | ◯ |
| PB2 | ◯ | ◯ | ◯ | ◯ | ◯ |
| Kodiak Cakes | ◯ | ◯ | ◯ | ◯ | ◯ |
| Oikos | ◯ | ◯ | ◯ | ◯ | ◯ |
| Quest | ◯ | ◯ | ◯ | ◯ | ◯ |
| Soyrifood | ◯ | ◯ | ◯ | ◯ | ◯ |

[ Submit ]

## __The Relevant Universe of Interest__

The interested universe of this study was past or future purchasers of protein products.

Consumers were first asked about their age.



Consumers who selected "Under 18" or "Prefer not to answer" were terminated from the survey.

Next, they were asked their gender. Options for "Female" and "Male" were randomized.



Consumers were then asked where they currently reside.



Those selecting "I do not live in the United States" were terminated.

Consumers were then asked a sensitive industry question. Options were randomized.

Do you or does anyone in your household work in the following industries? Select all that apply.

☐ In market research

☐ In advertising

☐ None of the above

[ Next ]

Consumers were terminated if they indicated an existing relationship with advertising or market research.

Consumers were then asked about their purchasing of a variety of nutritional products. Options were randomized.

Within the past 12 months, have you purchased any of the following types of nutritional products?

☐ Multi-vitamins

☐ Protein powder

☐ Meal replacement alternatives

☐ Milk alternatives (nut milk, oat milk, soy milk)

☐ Foods with added protein

☐ Pre or post workout supplements

☐ Plant-based meat alternatives

☐ None of the above

[ Next ]

If a respondent indicated that they had purchased any of these products, they were then asked about where they bought those products.



Consumers were then asked about their intended purchasing of this same list of products. Options were randomized.

Next, consumers were asked about where they are likely to purchase those products.

In the prior question, you mentioned that you are likely to purchase the following types of nutritional products in the next 12 months? Where do you intend to purchase these products. Select all that apply.

| | In a physical store | From an online retailer | Other | None of the above |
|---|---|---|---|---|
| Protein powder | ☐ | ☐ | ☐ | ☐ |
| Foods with added protein | ☐ | ☐ | ☐ | ☐ |

Next

In order to qualify for the survey, consumers had to select that they had either purchased Protein powder and/or intended to purchase protein powder or Foods with added protein in the next 12 months.

## Sampling plan

The sampling plan involved a random selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make

decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence

in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Lucid, a leading supplier of online sample for surveys. Lucid offers the world's largest pool of global consumers and is highly regarded as a reputable source of consumers for online surveys within the field of market research. Lucid utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Furthermore, Lucid regularly tracks quality and authentication metrics through a variety of metrics including survey response metrics, acceptance of buyer-accepted survey completes, and the consistency of responses over time.

Lucid also ensures data integrity through their continued review of their panelists' behavior on a variety of metrics to reduce sampling bias, including their tracking of brand preference, value-seeking behavior, and technology usage.

To ensure applicability of the research findings, rough quotas were set up in line with census distributions for age, gender, and region.

## Double-Blind Interviewing

It is important to point out that the study was administered under "double-blind" conditions. Consumers were uninformed as to the purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the survey that can do anything to influence the results.

## Interviewing Procedures

The online survey questionnaire was constructed, programmed, and hosted under my direction by Halsted Strategy Group, a leading market research company with expertise in online survey design, programming and data collection and processing. Halsted Strategy Group staff and I thoroughly tested the programmed survey prior to any potential consumers receiving the invitation to participate in the survey.

Data was collected by Halsted Strategy Group through its online portal. The data set showing each consumer's answers to all questions will be provided in electronic form.

## **Interviewing Period**

Interviewing was conducted September 16, 2021 through September 22, 2021.

## **Quality Control**

Several quality control metrics were employed to ensure the validity of responses.

Consumers were required to complete a CAPTCHA. CAPTCHA is widely used in online surveys within the world of market research, in order to eliminate computer programs from taking the survey.



Second, consumers were required to complete a quality assurance question, and were required to enter "west" in the blank next to the "other" option. Consumers who clicked any of the first five options were immediately terminated.

For quality assurance, please type the word "west" in the blank next to the "Other" box below and then click to continue.

○ Strongly agree

○ Agree

○ Neutral

○ Disagree

○ Strongly disagree

○ Other [                    ]

[Next]

This ensures that consumers are actively paying attention to the survey questions. During quality control checks, anyone who typed in a response other than "west" was removed prior to analysis.

Third, consumers were first provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

You have qualified to take this survey. Before continuing, please carefully read these instructions:

* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other websites or other electronic or written materials.
* Please answer all questions on your own without consulting any other person.
* Please do not guess. If you don't know for any question, please indicate so.
* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

○ I understand and agree to the above instructions

○ I do not understand or do not agree to the above instructions

[Next]

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

Fourth, the survey was restricted from being taken on mobile devices to ensure clear viewing of the stimuli.

Finally, the dataset was cleaned prior to analysis. This includes the removal of consumers who did not correctly enter "west" at the attention check question, and consumers who entered gibberish into open-ended responses. Furthermore, survey responses were removed for those who took the survey in under 1 minute and 30 seconds, which is half of the median survey completion time of 2 minutes and 59 seconds, and those who took longer than 11 minutes and 56 seconds to complete the survey, which is four times longer than the median survey completion time.

## SURVEY 1 REPORT AND DISCUSSION

**After viewing the KODIAK-branded products of Kodiak Cakes, LLC and JRM Nutrasciences, LLC in a lineup,  a significant percentage of consumers are confused as to the relationship between the brands.**

As detailed in the Experimental Design section, consumers were randomly assigned to either the test or control cell, and were shown six images of protein-enhanced products in random order.

Within the test cell, consumers saw the KODIAK SPORTS NUTRITION protein product in unaltered trade dress, with the single-word KODIAK mark and a bear logo on the canister.

Within the control cell, consumers saw the KODIAK SPORTS NUTRITION protein product in altered trade dress, with the single-word KODIAK mark and bear logo removed from the canister.

After indicating that they could clearly see the images, respondents were asked if they believed that each product was from a separate company, or whether two or more products were from the same company, or were connected or affiliated.

Table I –Relationship Between Products

| Do you think that each of these products is from a separate company, or do you think that two or more are from the same company or are affiliated or connected in any way? If you don't know, please feel free to say so. | Test Cell n = 268 | Control Cell n = 264 |
|---|---|---|
| I believe each product is from a separate company | 47% | 65% |
| I believe that two or more products are from the same company or are affiliated/connected | 34% | 22% |
| I do not know or have no opinion | 19% | 13% |

Within the test cell, significantly more consumers indicated a relationship between the products.

Consumers were then asked to click on the products that they believe were from the same company or affiliated/connected.

The chart below shows the percentage of the total universe that selected the Kodiak Cakes, LLC product and the KODIAK SPORTS NUTRITION product images.

Table II –Selection of Kodiak Cakes, LLC Product And The
KODIAK SPORTS NUTRITION Product Images

| Which products do you believe are from the same company or are affiliated or connected? | Test Cell<br><br>n = 268 | Control Cell<br><br>n = 264 |
|---|---|---|
| Selected Kodiak Cakes, LLC product and KODIAK SPORTS NUTRITION product images | 19.8% | 2.3% |
| Not Shown Question | 66% | 78% |

Within the test cell, 19.8% selected the Kodiak Cakes, LLC product and KODIAK SPORTS NUTRITION product images. Within the control cell, 2.3% selected the Kodiak Cakes, LLC product and KODIAK SPORTS NUTRITION product images.

After controlling for noise (i.e. consumers in the control cell who associate the products in absence of the single-word KODIAK mark and bear logo), I find a significant level of confusion: 17.5%.

After selecting products, consumers were asked to provide a rationale for why they believe the products are from the same company, affiliated, or connected.

Here are the responses for all respondents indicating that relationship, in both the test and control cell.

Table III -Rationale for Selecting Kodiak Cakes, LLC Product And KODIAK SPORTS NUTRITION Product Images

Why do you say that?

| Respondent ID | Cell | Rationale |
|---|---|---|
| 97 | Test Cell | *they just look like they are related* |
| 419 | Test Cell | Both have Kodiak on the packaging |
| 495 | Test Cell | same name on that both products |
| 605 | Test Cell | I was looking at the product name on the featured samples. |
| 616 | Test Cell | both show kodiak |
| 709 | Test Cell | They both have Kodiak on them. |
| 720 | Test Cell | They both have KODIAK in the company name. |
| 746 | Test Cell | because the brand is kodiak |
| 782 | Test Cell | they both have kodiack on them |
| 828 | Test Cell | They both have Kodiak on the labels. |
| 917 | Test Cell | kodiac products |
| 1067 | Test Cell | They have the same name. |
| 1086 | Test Cell | They both say Kodiak on the packaging/seal |
| 1212 | Test Cell | Both have Kodiak on the label. |
| 1222 | Test Cell | They are both made by Kodiak |
| 1315 | Test Cell | They both have Kodiak in their name and the same logo on packaging. |
| 1318 | Test Cell | Kodiak name |
| 1531 | Test Cell | because of koudiack name on both proudact |

| 1588 | Test Cell | Kodiak branding |
|------|-----------|-----------------|
| 1765 | Test Cell | both have kodiak in the name |
| 1814 | Test Cell | They both say Kodiak on the packages. |
| 1839 | Test Cell | The label, 'Kodiak', is on both products. |
| 1847 | Test Cell | I see the name 'Kodiak' on both of these products. |
| 2127 | Test Cell | Labeled under the same company |
| 2213 | Test Cell | The colors of the products are similar and the name Kodiak is the same on both |
| 2287 | Test Cell | they both say kodiak |
| 2295 | Test Cell | saw the name Kodiak on them |
| 2713 | Test Cell | The labels have the name. |
| 2821 | Test Cell | Both have kodiak |
| 2865 | Test Cell | Because they both say Kodiak on the label |
| 2887 | Test Cell | Because they both say kodiak on them |
| 2910 | Test Cell | Kodak on package |
| 3213 | Test Cell | kodiak was on each package |
| 3309 | Test Cell | well they say kodiak right there |
| 3594 | Test Cell | Because of the word Kodiak |
| 3778 | Test Cell | they both say kodiak |
| 3810 | Test Cell | both say kodiak |
| 4202 | Test Cell | They both say 'Kodiak' on their labels. |
| 4486 | Test Cell | They both say 'Kodiak' |
| 4567 | Test Cell | kodiak |
| 4689 | Test Cell | They both have the name 'Kodiak' on them |
| 4723 | Test Cell | both have the word kodiak |
| 4876 | Test Cell | They both say Kodiak |
| 4999 | Test Cell | Both products have the name 'Kodiak' in them and are listed on the packaging |
| 5035 | Test Cell | They have the same name and bear logo. |
| 5090 | Test Cell | They both have Kodiak on the packages. |
| 5123 | Test Cell | Both have kodiak on the branding |

| 5174 | Test Cell | they both have the name Kodiak |
|---|---|---|
| 5289 | Test Cell | They both use the Kodiak brand. |
| 5304 | Test Cell | They both had Kodiak on the packaging |
| 5328 | Test Cell | They both ahd Kodiak on the product |
| 5359 | Test Cell | They both contain the name 'Kodiak' |
| 5423 | Test Cell | probably because they say Kodiak? |
| 35 | Control Cell | *The lettering is very similar and both packages are intense.* |
| 908 | Control Cell | *Both are loaded with protein.* |
| 1032 | Control Cell | *Just a guess, seems like that would sell more than one protein product,* |
| 1546 | Control Cell | *the dark brown saying at the top* |
| 2332 | Control Cell | *Both healthy products.* |
| 3475 | Control Cell | *I am just assuming by the type of brand it is.* |

I've italicized all responses that I find to be ambiguous or unrelated to the product name.

By my account, 52 out of the 53 respondents in the test cell who indicated a relationship did so because of the single-word KODIAK mark on the packaging, because they explicitly said "Kodiak" or referenced the identical name/brand.

Within the control cell, no respondents explicitly said "Kodiak" and the only reference to brand was an assumption on the part of the respondent.

As a result of the test and control methodology, this survey proves that nearly all of the confusion between the products is directly linked to the single-word KODIAK mark on the KODIAK SPORTS NUTRITION product packaging.

## SURVEY 2 REPORT AND DISCUSSION

**After viewing the websites of Kodiak Cakes, LLC and JRM Nutrasciences, LLC in a lineup, a significant percentage of consumers are confused as to the relationship between the KODIAK brands of these two companies.**

As detailed in the Experimental Design section, consumers were randomly assigned to either the test or control cell, and were shown six images of websites for protein-enhanced products in random order.

Within the test cell, consumers saw the JRM Nutrasciences, LLC website for the KODIAK SPORTS NUTRITION protein product in unaltered trade dress, with the single-word KODIAK mark and a bear logo on the canister, the stylized KODIAK mark, and the name "Kodiak" in the URL bar.

Within the control cell, consumers saw the JRM Nutrasciences, LLC website for the KODIAK SPORTS NUTRITION protein product in altered trade dress, where the aforementioned references to "Kodiak" were digitally removed.

After indicating that they could clearly see the images, respondents were asked if they believed that each product was from a separate company, or whether two or more products were from the same company, or were connected or affiliated.

Table IV –Relationship Between Products - Website Images

| Do you think that each of these products is from a separate company, or do you think that two or more are from the same company or are affiliated or connected in any way? If you don't know, please feel free to say so. | Test Cell n = 274 | Control Cell n = 264 |
|---|---|---|
| I believe each product is from a separate company | 49% | 66% |
| I believe that two or more products are from the same company or are affiliated/connected | 37% | 16% |
| I do not know or have no opinion | 15% | 19% |

Within the test cell, significantly more consumers indicated a relationship between the products.

Consumers were then asked to click on the products that they believe were from the same company or affiliated/connected.

The chart below shows the percentage of the total universe that selected the KODIAK-branded products shown on the Kodiak Cakes, LLC website and the KODIAK SPORTS NUTRITION-branded products shown on the JRM Nutrasciences, LLC website.

Table V –Selection of Kodiak Cakes and Kodiak Sports Nutrition Products - Website Images

| Which products do you believe are from the same company or are affiliated or connected? | Test Cell n = 274 | Control Cell n = 264 |
|---|---|---|
| Selected Kodiak Cakes and Kodiak Sports Nutrition products | 19.7% | 0.0% |
| Not Shown Question | 64% | 85% |

Within the test cell, 19.7% selected the KODIAK-branded products shown on the Kodiak Cakes, LLC website and the KODIAK SPORTS

NUTRITION-branded products shown on the JRM Nutrasciences, LLC website. Within the control cell, no respondent selected the Kodiak Cakes, LLC products and the JRM Nutrasciences, LLC products.

After controlling for noise (i.e. consumers in the control cell who associate the websites in absence of the single-word KODIAK mark, the bear logo, the stylized KODIAK mark, and "Kodiak" in the URL), I find a significant level of confusion (19.7%).

After selecting the website images, consumers were asked to provide a rationale for why they believe the product websites are from the same company, affiliated, or connected.

Here are the responses for all respondents indicating that relationship.

Table VI -Rationale for Selecting Kodiak Cakes and Kodiak Sports Nutrition Product Websites

Why do you say that?

| Respondent ID | Cell | Rationale |
|---|---|---|
| 37 | Test Cell | kodiak |
| 323 | Test Cell | They have the same name 'Kodiak'. |
| 359 | Test Cell | They're both marked as 'Kodiak' |

| 564 | Test Cell | *they have it in the title* |
|---|---|---|
| 594 | Test Cell | They both have the name Kodiak |
| 671 | Test Cell | both have Kodiak on package |
| 935 | Test Cell | IN THE ADVERTISING YOU CAN SEE THAT THEY ARE THE SAME BRAND |
| 960 | Test Cell | Both say Kodiak on label |
| 961 | Test Cell | Both had the same name on the top. |
| 1107 | Test Cell | They both have 'Kodiak' on them. |
| 1207 | Test Cell | They are both Kodak. |
| 1302 | Test Cell | The logo |
| 1395 | Test Cell | They both have Kodiak branding on their labels |
| 1447 | Test Cell | Kodiak in both product ads |
| 1589 | Test Cell | The information on the site says they are a kodiak brand. |
| 1647 | Test Cell | The URL for the Whey Protein Isolate had the word Kodiak in it. |
| 1654 | Test Cell | they both have the name kodiak on them. |
| 1757 | Test Cell | They are both Kodiak |
| 1883 | Test Cell | I say that because the products have the same brand name. |
| 1910 | Test Cell | The Kodiak logo is available in both images. |
| 1924 | Test Cell | *THE BANNER* |
| 1933 | Test Cell | I believe that they have the same parent company |
| 2024 | Test Cell | They both say Kodiak |
| 2043 | Test Cell | They both have the name 'Kodiak' in the label. |
| 2154 | Test Cell | *I say that because they are about the same product* |
| 2234 | Test Cell | both Kodiak - and it stands out for me because I buy and love their oatmeal |
| 2392 | Test Cell | They both are branded as Kodiak. |

| 2417 | Test Cell | *I believe that these are both owned by the sameparent company* |
| 2426 | Test Cell | They both share the same name (at least partially). |
| 2429 | Test Cell | The word Kodiak |
| 2467 | Test Cell | *The label Kayak is branded on those two products.* |
| 2568 | Test Cell | because they both have the same brand name |
| 2983 | Test Cell | they both have the same company brand |
| 2999 | Test Cell | They both say Kodiak and have a bear in the logo. |
| 3034 | Test Cell | It reads 'Kodak' on the website for two of the images that are different |
| 3069 | Test Cell | The 'Kodiak' brand was visible in each image. |
| 3166 | Test Cell | they both have the Kodiak logo on the top of the page |
| 3337 | Test Cell | both of them are from Kodiak |
| 3455 | Test Cell | They have the name on the package |
| 3466 | Test Cell | both show 'Kodiak' on top banner |
| 3480 | Test Cell | BOTH HAVE THE SAME NAME KODIAK |
| 3856 | Test Cell | based on the brand logo i can know that they are from same company |
| 3972 | Test Cell | Because they both had the name 'Kodiak' on them that appeared to be brand names. |
| 4183 | Test Cell | both are on kodiak website |
| 4193 | Test Cell | The website both had kodiak in the upper left hand corner of the image of the url link. |
| 4339 | Test Cell | The website banner is the same word |
| 4401 | Test Cell | Kodiak branding is on each image |
| 4739 | Test Cell | both say kodiak on the package |

| 4912 | Test Cell | *no idea* |
|------|-----------|-----------|
| 4916 | Test Cell | Both have say Kodiak |
| 4926 | Test Cell | Both are branded 'Kodiak', they both have a bear in their logo, and both are protein based brands. |
| 4965 | Test Cell | The Whey Isolate has 'Kodiak' on the lid wrapper, the pancake mix is from Kodiak |
| 5320 | Test Cell | They are both labeled KODIAK in very similar fonts |
| 5373 | Test Cell | Because the name is the same |

I've italicized all responses that I find to be ambiguous or unrelated to the product name.

Among the italicized responses, one respondent mentioned "Kodak" which is likely a spelling error on their part, one respondent mentioned "Kayak" which is likely a spelling error, a respondent referenced the "banner", and another respondent stated "they have it in the title". While I do believe it could be reasonably inferred that these were references to the single word "Kodiak"mark, out of an abundance of caution I have not treated them as direct evidence of confusion.

However, after discounting these and several other responses, 48 out of the 54 respondents in the test cell who indicated a relationship did so because of the single-word KODIAK mark on the packaging,

because they explicitly mentioned "Kodiak" or referenced the identical name/brand.   This still represents an overwhelming majority of the respondents, which could be even higher for the aforementioned reasons.

As a result of the test and control methodology, this survey proves that nearly all of the confusion between the product websites is directly linked to the inclusion of the single-word KODIAK mark and bear logo on the KODIAK SPORTS NUTRITION protein product packaging, the stylized KODIAK mark, and the presence of "Kodiak" in the website URL.

## SURVEY 3 REPORT AND DISCUSSION

**After viewing the KODIAK SPORTS NUTRITION protein product, a significant percentage of consumers definitively link the product with products commonly sold by Kodiak Cakes, LLC.**

As detailed in the Experimental Design section, consumers were randomly assigned to either the test or control cell, and were shown an image of the KODIAK SPORTS NUTRITION protein powder product.

Within the test cell, consumers saw the KODIAK SPORTS NUTRITION protein product in unaltered trade dress, with the single-word KODIAK mark and bear logo on the canister.

Within the control cell, consumers saw the KODIAK SPORTS NUTRITION protein product in altered trade dress, with the single-word KODIAK mark and bear logo removed from the canister.

After indicating that they could clearly see the images, respondents were asked who made or put out this product.

Table VII –Source of Product

| What company makes or puts out this product? | Test Cell n = 268 | Control Cell n = 263 |
|---|---|---|
| Coded 'Kodiak' | 77% | 1% |
| Coded '1Whey' or 'Whey' | 14% | 63% |
| Other | 9% | 36% |

Within the test cell, the majority of respondents indicated "Kodiak" to be a maker of the product.

While questions pertaining to sponsorship, approval, and affiliation were asked, I reviewed them and found that the preponderance of confusion was attributable to source with minimal incremental confusion from consumers who thought that Kodiak Cakes, LLC had sponsored, approved, or was affiliated with the maker of this product.

Respondents were then asked about other products made by the company shown in the image.  To further investigate the source confusion, I isolated the 207 respondents in the test cell who identified "Kodiak" as the maker of this product.

Of these 207 respondents, I found 38 which directly referenced products made by Kodiak Cakes, LLC.

Table VIII - Other Products Made by Maker of Product – Responses By Those Indicating "Kodiak" As Maker of Product

Please name any other products made by the company shown in this image.

| Respondent ID | Cell |
|---|---|
| 57 | kodiak cakes,power cakes |
| 146 | if it is kodiak who makes this then they make a pancake mix with extra protein in it. |

| 179 | pancake mix |
|---|---|
| 450 | pancakes |
| 629 | pancakes? |
| 1030 | Kodiak Cakes |
| 1047 | Kodiak Pancakes Mix |
| 1437 | I know of Kodiak cakes |
| 1480 | this brand makes many products such as protein waffles and pancakes in a cup |
| 1484 | If it's the same company, Kodiak makes nutritious breakfast foods, like oatmeal, cakes, waffles, and pancakes. |
| 1553 | pancake mix and granola bars |
| 1714 | pancake mix.  protein bars. |
| 1769 | I think they make pancakes mix |
| 2007 | They make pancake mix. That is all I know of at the moment. Also probably this protein in other flavors. |
| 2081 | Pancake mix |
| 2373 | Protein pancakes and cakes waffle mixes. |
| 2398 | Kodiak pancakes |
| 2411 | protein pancake mix   protein cornbread mix |
| 2608 | Kodiak pancake mix, Kodiak muffin, oatmeal, flapjack cups |
| 2879 | If it is the Kodiak that I am thinking of, they make dry mixes for things like pancakes and muffins, they also make granola bars. |
| 2882 | pancake mix? |
| 2954 | pancake mix |
| 3126 | cakes, waffles? |
| 3186 | pancakes |
| 3218 | pancakes,waffles,oatmeal |
| 3304 | Kodiak pancake mix, Kodiak frozen waffles, Kodial oatmeal. |
| 3779 | pancakes |
| 4029 | really good low carb pancake mix |
| 4192 | kodiak cakes |
| 4440 | Pancake mix, cereal |

| 4503 | pancakes |
| 4516 | Kodiak Cakes |
| 4539 | Instant pancake mix in a cup, also in a box. |
| 4726 | Pancake mixes. |
| 4823 | Pancake mix |
| 4859 | Pancake mix? |
| 5184 | Kodiak pancake mixes |
| 5369 | Kodiak pancake and waffle mix |

These 38 responses represent 18.4% of the 207 respondents who identified "Kodiak" as the maker of the product, and 14.2% of the total interested universe.

In order to exhibit confusion, respondents must first be aware of Kodiak Cakes, LLC's  KODIAK CAKES brand.

Within my survey, I asked about awareness of Kodiak Cakes, LLC's KODIAK CAKES brand.

Table IX –Kodiak Cakes Awareness

| Prior to taking this survey, were you aware of Kodiak Cakes? | Test Cell<br><br>n = 268 | Control Cell<br><br>n = 263 |
|---|---|---|
| Yes, I was aware of Kodiak Cakes prior to taking this survey | 35% | 40% |

| No, I was not aware of Kodiak Cakes prior to taking this survey | 62% | 57% |
|---|---|---|
| No opinion/don't know | 2% | 3% |

Across the cells, there is a similar level of awareness for the brand KODIAK CAKES. Specifically within the test cell, there were 95 respondents aware of the KODIAK CAKES brand. Of the aforementioned 38 respondents who identified products made by Kodiak Cakes, LLC all of them had prior awareness of the KODIAK CAKES brand.

When isolating for awareness, 40% (38 out of 95) of those previously aware of the KODIAK CAKES brand referenced products made by Kodiak Cakes, LLC after viewing the JRM Nutrasciences, LLC's KODIAK SPORTS NUTRITION protein product.

## SURVEY 4 REPORT AND DISCUSSION

**Kodiak Cakes has created a strong connection between the single-word KODIAK brand and protein products in the minds of consumers, as demonstrated by consumer responses both when specifically asked about protein products and when asked about generally about the single-word KODIAK mark.**

As detailed in the Experimental Design section, consumers were randomly assigned to provide input on the term "Kodiak", either agnostic of category or specific to protein-products.

To provide a general lens into consumer perception, consumers were asked "When you hear the name 'Kodiak', what does it mean to you?" The codified results are shown below.

Table X –Kodiak Meaning

| When you hear the name 'Kodiak', what does it mean to you? | n = 131 |
|---|---|
| Bear | 39% |
| Photography / Kodak / Camera | 21% |
| Alaska / Cold / Island | 19% |
| Protein / Pancakes | 10% |
| Chewing Tobacco / Dip | 5% |
| Nothing / Don't Know | 6% |
| Other | 12% |

Consumers predominantly associate the term "Kodiak" with bears, Alaska, and photography (due to Kodak).

10% of the interested universe associates the term "Kodiak" with protein or pancakes, even when not asked questions specific to the category.

To provide a category-specific lens, consumers were asked "Do you associate the name 'Kodiak' with the protein-enhanced products of one, or more than one, company?"

Table XI –Association of Kodiak with Protein-Enhanced Products

| Do you associate the name "Kodiak" with the protein-enhanced products of one, or more than one, company? | Test Cell n = 125 |
|---|---|
| One company | 44% |
| More than one company | 3% |
| I do not know or have no opinion | 53% |

For those who have formed an opinion, there is a major skew towards a single source, with 44% of consumers associating the single-word KODIAK brand with one company and only 3% of consumers associating it with multiple companies.

Consumers offering an opinion (i.e. who did not select I don't know) were asked "What protein-enhanced products do you associate with the name 'Kodiak?'"

Based on my review of the open-ended responses for those selecting "One company", I found 40 respondents which referenced products made by "Kodiak" or "Kodiak Cakes," as listed below.

Table XII – Protein-Enhance Products Associated With "Kodiak"

What protein-enhanced products do you associate with the name "Kodiak?"

| Respondent ID | Rationale |
|---|---|
| 48 | Breakfast foods |
| 282 | pancake mix |
| 413 | Waffles |
| 621 | Oatmeal, Waffles, Pancakes, Muffins |
| 822 | Pancakes |
| 1031 | Mixes for baked goods, oatmeal, pancakes |
| 1227 | pancakes |
| 1592 | pancakes & cookies |
| 1812 | Basically what I have seen are mixes like pancake and waffle mixes. |
| 1860 | Waffles, pancakes, etc. |
| 1978 | Protein Powder and Oatmeal |
| 2340 | Waffles |
| 2778 | pancake batter |

| 2825 | pancakes, muffins, cookies, waffles, cupcakes |
| 2839 | The baking mix maybe I am not sure if it has added protein or not. |
| 2877 | Pancake mix, waffles |
| 3102 | Pancakes, waffles, muffins |
| 3432 | I think it was oatmeal. |
| 3436 | pancake mix, frozen breakfast products, muffin mix |
| 3792 | frozen waffles, protein snack |
| 3919 | pancakes mix |
| 3928 | Breakfast foods |
| 4105 | snack bars, cereal |
| 4180 | waffles pancakes cereals |
| 4248 | Pancakes |
| 4555 | pancake mix |
| 4598 | protein pancake mix, protein oatmeal |
| 4627 | Grain Bars, Cereals, breakfast alternatives |
| 4707 | Kodiak flours and grains |
| 4819 | pancake mix |
| 4982 | kodiak cakes  pancake powder |
| 5390 | pancakes and waffles |
| 5463 | pancakes |
| 5564 | Pancakes |
| 5745 | Pancakesm bread |
| 6023 | Muffin and pancake mix. |
| 6065 | Pancakes, waffles, Oatmeal, muffins |
| 6211 | Pancakes |
| 6256 | pancakes |
| 6311 | I associate pancakes, waffles, oatmeal, and other products that the company offers. |

These 40 responses represent 31% of the interested universe, and represent a significant association between the single-word KODIAK mark and protein-enhanced products.

Additionally, in my analysis of the open-ended responses, I found one respondent (Respondent 1140) who indicated that "Kodiak" was related to a single company connected to the 1whey product. I consider this to be evidence of association for JRM Nutrasciences, LLC's KODIAK SPORTS NUTRITION protein product.  This respondent represents 0.8% of the interested universe.

## CONCLUSION

Based on the extensive research I describe in this report, it is clear that the combination of JRM Nutrasciences, LLC's use of the single-word KODIAK mark and bear logo on its KODIAK SPORT NUTRITION protein product has created a significant level of consumer confusion within the interested universe.

If consumers experienced Kodiak Cakes, LLC's and JRM Nutrasciences, LLC's KODIAK-branded products in physical or temporal proximity, as tested by Survey 1, a significant portion of the interested universe would be confused as to source, sponsorship, or affiliation between the companies.

If consumers experienced these KODIAK-branded product websites in physical or temporal proximity, as tested by Survey 2, a significant portion of the interested universe would be confused as to source, sponsorship, or affiliation between the companies.

If consumers viewed the JRM Nutrasciences, LLC KODIAK SPORTS NUTRITION protein product in isolation, a significant percentage of those aware of Kodiak Cakes, LLC's KODIAK-branded products would have source confusion, believing that the JRM Nutrasciences, LLC product was made by the same company that makes the pancakes, baking mixes, and other protein-enhanced goods offered under the single-word KODIAK mark.

Furthermore, the Kodiak Cakes, LLC company has invested significant time, effort, and money in order to build the brand awareness so that the brand is recognizable to consumers.

When asked generally about the term "Kodiak," 10% of consumers associate the single-word KODIAK mark with protein products, pancakes, or other items sold by Kodiak Cakes, LLC.

When specifically asked about protein-enhanced products, a significant percentage of the interested universe identifies the single-word KODIAK mark with the protein-enhanced products of one company and specifically name products sold by Kodiak Cakes, LLC.

Based on their general and category-specific recognition, alongside their presence in the market since 1994, it is my opinion that Kodiak Cakes, LLC has established KODIAK as a strong source identifier within protein-enhanced products[1].

*David J. Franklyn*

David J. Franklyn, November 1, 2021

---

[1] It is well established that source identification created in a mark or symbol results in common law trademark rights for this mark or symbol. *See, e.g.*, 2 J. Thomas McCarthy, McCarthy on Trademarks, § 16:1 (5th ed. 2021) ("At common law, ownership of trademark or trade dress rights in the United States is obtained by actual use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others"); *Viacom Int'l v. IJR Capital Invest., LLC*, 891 F.3d 178, 186-189 (5th Cir. 2018) (recognizing common law rights in name of fictional restaurant in television program where name served as source identifier for program); *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1366 (Fed. Cir. 1999) (marks that "identif[y] and distinguish [ ] the owner's goods from others" enjoy common law protection); *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989) (common law trademark protection requires establishing that a mark "is recognized by the public as identifying and distinguishing plaintiff's goods or services") (*citing* 1 J. Thomas McCarthy, Trademarks and Unfair Competition, § 15:1 (2d ed. 1984)).

# EXHIBIT G

**David J. Franklyn**

5602 East Via Buena Vista
Paradise Valley AZ 85253

(650) 436-2815 (mobile)
f r a n k l y n i p l a w @ g m a i l . c o m

<u>**Academic Appointments**</u>

**Arizona State University**
**Sandra Day O'Connor College of Law**

      Professor of Intellectual Property Law, June 2021- present
      Executive Director, McCarthy Institute, June 2021 - present

**Golden Gate University**
**School of Law**, August 2018-2021

      Professor of Intellectual Property Law, July 2018- June 2021

**Golden Gate University,**
**Edward S. Ageno School of Business**

      Professor of Business, Marketing and Advertising – July 2018- June 2021

**Golden Gate University**
**School of Law and Edward S. Ageno School of Business**

      Director, McCarthy Institute, July 2018- June 2021

      Director, Center for Empirical Study of Consumer Perceptions, July 2018- June 2021

**University of San Francisco School of Law**

      Professor of Intellectual Property Law, 2000 – June 2018

            Subjects Taught: Trademark Law; Copyright Law; Right of Publicity; International IP Law;
            IP Survey; IP Theory Seminar; Moral Philosophy Seminar

      Director, J. Thomas McCarthy Institute for IP & Technology Law

      Director, Center for Empirical Study of Trademark Law (CEST)

      Director, Domestic and International LL.M. Program in IP Law

**University of California, Hastings College of Law**

      Visiting Professor of Law, January 2006 – May 2006; January 2007 – June 2007

**Salmon P. Chase College of Law, Northern Kentucky University**

Associate Professor of Law, 1999 – 2000

Assistant Professor of Law, 1996 – 2000

*Lukowsky Award for Outstanding Professor of the Year*, 1999

**University of Cincinnati College of Law**

Visiting Assistant Professor of Law, August 1999 – December 1999

**Pater Noster High School, Los Angeles**

Teacher & Dean of Students, 1984-87

<u>**Education and State Bar Admissions**</u>

Admitted to practice in California and Illinois

University of Michigan Law School, J.D., 1990, *cum laude*, Order of the Coif

Evangel College, B.A., 1983, *magna cum laude*, History, Philosophy, Religion; Outstanding Philosophy
Graduate; Baccalaureate Speaker, 1983

<u>**Publications/Research**</u>

*Revisiting Consumer Perceptions of Google Search Results As Google Shifts Labeling Practices* (in progress)

*Can On-line Consumers tell the Difference between Real News and Paid Commercial or Political Advertorials Masquerading as News?*

*Going Native: Can Consumers Recognize Advertising?*, 19 YALE JOURNAL OF LAW & TECHNOLOGY 77
(2017) (with David Hyman and Calla Yee)

*The Problem of Mop Heads in the Era of Apps: Toward More Rigorous Standards of Value Apportionment in
Contemporary Patent Law*, 98 JOURNAL OF THE PATENT AND TRADEMARK OFFICE SOCIETY (2016) (with
Adam Kuhn) (2016 Rossman Award winning article for most significant contribution to IP scholarship)

*Trademarks As Search Engine Keywords: Much Ado About Something?,* 26 HARVARD JOURNAL OF LAW
& TECHNOLOGY 481 (2013) (with David A. Hyman)

*Trademark Surveys: An Undulating Path,* 92 TEXAS LAW REVIEW 2117 (2014) (with Shari Diamond)

*Owning Oneself In a World of Others — Towards a Paid-For First Amendment,* 49 WAKE FOREST LAW REVIEW
977 (2014) (with Adam H. Kuhn)

*Trademarks as Keywords: Who Buys Them,* 92 TEXAS LAW REVIEW 2019 (2014) (with David A. Hyman)

*Trademark Surveys and Icebergs – It's What's Under the Water* ___ TRADEMARK REPORTER ___
(forthcoming) (with Shari Diamond)

*Search Bias and the Limits of Antitrust: An Empirical Perspective on Remedies,* ILLINOIS PROGRAM IN LAW, BEHAVIOR, AND SOCIAL SCIENCE  (2015) (with David A. Hyman)

*An Empirical Analysis of Google's Antitrust Settlement in the EU* (forthcoming)  (with David A. Hyman)

*An Empirical Study of Search Results Labeling and Arrangement* (multi-scale empirical research underway in Europe and U.S.)

*An Empirical Study of the Right of Publicity and the First Amendment* (review of all U.S. right of publicity cases involving first amendment/free speech issues since 1980 to determine common decisional factors)

*The European Court of Justice Rules on Keyword Ads and Trademark Rights*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 89 (2010)

*The New Federal Anti-Dilution Act: Reinstating the Myth of 'Likely' Dilutive Harm as a Mask for Anti-Free-Rider Liability,* 11 INTELLECTUAL PROPERTY LAW BULLETIN 199 (2007)

MCCARTHY'S DESK ENCYCLOPEDIA OF INTELLECTUAL PROPERTY LAW, editor-in-chief and coauthor with J. Thomas McCarthy and Roger Schechter (3d ed. 2005)

*Debunking Dilution Doctrine: Justifying the Anti-Free-Rider Principle in American Trademark Law*, 56 HASTINGS LAW JOURNAL 117 (2004)

*Owning Words in Cyberspace: The Accidental Trademark Regime*, 2001 WISCONSIN LAW REVIEW 1251 (2001)

*The Apparent Manufacturer Doctrine, Trademark Licensors & the Third Restatement of Torts*, 49 CASE WESTERN RESERVE LAW REVIEW 762 (1999)

*The Third Restatement of Torts: Symposium Introduction*, 26 NORTHERN KENTUCKY LAW REVIEW 531 (1999)

*Toward A Coherent Theory of Strict Tort Liability for Trademark Licensors*, 72 SOUTHERN CALIFORNIA LAW REVIEW 1 (1998)

*A Property Theory of Trademark Law* (in progress)

*Trademarks as Keywords: Beyond Confusion* (in progress)

*The First Amendment as a Market Allocation Device in Right of Publicity Cases: Towards a Comprehensive Theory of Add- On Value, Collateral Rights and Free Riding in Intellectual Property Law* (in progress)

## Professional Consulting Experience

I have written expert reports, been deposed, drafted briefs, designed, conducted and analyzed trademark and

other consumer perception surveys, counseled clients on USPTO matters, drafted license agreements, drafted settlement agreements, prepared counsel for oral argument and offered counsel on litigation strategy in a wide variety of intellectual property matters.

**Keystone Strategy LLC**, San Francisco and New York, December 2013 – present

Function as a trademark and empirical survey expert and IP consultant in a number of trademark and patent matters.

**Franklyn IP Consulting**, San Francisco, 2000 – present

I have served as an independent consultant and expert witness in numerous IP cases (including patent, trade secret, antitrust, copyright, trademark, and right of publicity) on behalf of individuals and corporations, including, among others:

**Representative Clients and Matters:**

OVERHEAD GARAGE DOOR INC.

OTIS MCCALLISTER

NEWMARK REALTY CAPITAL

BOBCAT

YETI

DEFENDER

ICANN

MAHINDRA (v. Jeep)

APPLE

AMAZON

THE COCA-COLA COMPANY

THE BUFFALO BILLS

ORACLE

FREEFLY SYSTEMS (MOVI)

ROCKWELL AUTOMATION

CROCS

DIRECTV

GREWAL

MERIT MEDICAL SYSTEMS

NOVADAQ

NUSENDA

POLO RALPH LAUREN

REINSDORF

SERVICE NOW

SPOTIFY

THE THINK GROUP

JOIN

KIMBERLY-CLARK

AMAZON

DIAGEO BRANDS

PALM RESTAURANTS

INTERNATIONAL OLYMPIC COMMITTEE (consultation for 2016 Olympics- trademarks and copyrights)

FAIRSEARCH.org (conducted consumer perception surveys in UK)

FACEBOOK

3-FORM CHROMA (3-D trademark)

POM WONDERFUL

BUGATTI (international trademark issues)

RAYTHEON (filed affidavits in 10 foreign countries re: PAVEWAY mark)

FORAY TECHNOLGIES

FLOWIL, INTERNATIONAL (SYLVANIA – international mark analysis)

HERBALIFE

ALLERGEN (BOTOX)

MAUI PINEAPPLE

CONVERSE

BELVEDERE VODKA

MOET HENNESEY

MICROSOFT

SONIA DAKAR COSMETICS

KING OF THAI NOODLES

LSI INDUSTRIES

PIZZA MAN

GoGo SPORTS

LEVI STRAUSS

NIKE

NISSAN (dealership franchises and co-branding analysis)

VOLKSWAGEN USA

ION MEDIA NETWORKS

PURITY COSMETICS

ESTATE OF SIR ARTHUR CONNAN DOYLE (protecting SHERLOCK HOLMES)

ESTATE OF WILLIAM CASTE (producer of Rosemary's Baby)

HARD ROCK CAFÉ (international licensing issues)

ING FERTILITY

FIRST NIAGRA INSURANCE

CRISTOFF (against TASTERS CHOICE (owned by NESTLE))

DIOPTI CS MEDICAL PRODUCTS WINDOW WORLD

BAD BOY INC (filed affidavits in several foreign countries) SILVERS (GOOGLE children's books)

DUFF (against True Religion Jeans) SUNDBERG

ISABELA'S KITCHEN

BIG ISLAND CANDIES

BLUE SHIELD OF CALIFORNIA

IGB ENERGY GROUP

HOOD RIVER DISTILLERIES

THE ROLL GROUP/Paramount Citrus (CUTIES brand oranges)

GERAWAN FARMS (PRIMA brand fruit)

GLIDEWELL Labs (BruxZir dental crown mark)

ROCKWELL INDUSTRIES

BOMBARDIER RECREATIONAL PRODUCTS

MAHINDRA

ALCON

HUBERT HANSEN FAMILY TRUST

SEAPORT HOTELS

FIX-IT AUTO

KITCHEN CAFÉ

FLORABAMA

LENS.COM

HYBRID ATHLETICS

HEARTLAND FOODS (SPLENDA)

EMERSON RADIO

BONDURANT HIGH PERFORMANCE DRIVING SCHOOL

**Prior Deposition, Court or Arbitration Testimony**

Chanel Inc V. WGACA LLC, et al., Case 1:18-cv-02253-LLS, June 2021 Deposition

Nike Inc. V. Vans Inc. TTAB Opposition No. 91253064, June 2021 Deposition

MGFB Properties Inc. v. Viacom CBS Inc, Case No. 5:19-cv-00257, District Court, N.D. Florida, April 2021

Emerson Radio Corporation v. Emerson Quiet Kool Co. Ltd., et al., Case 2:17-cv-05358-SDW-LDW, October 2020 Deposition

Hubert Hansen Family Trust v. Coca-Cola, San Diego County Superior Court, January 2020, No. 37-2016-00021046-CU-MC-CTL (Jury Trial Testimony and Deposition)

OGD Equip Co. v. Overhead Door Corp., Eastern District of Texas, November 2019, No. 4:17-cv-0898-ALM-KPJ (Deposition)

Fix Auto USA v. Mondofix Inc. , Montreal Arbitration, October 2019 (Arbitration Testimony)

FCA v. Mahindra, Eastern District of Michigan, June 2019, No. 2:2018cv12645, (Trial Testimony - ITC Matter; Deposition in both matters)

JLG v. BRP, Eastern District of Michigan, January 2019 2:16-cv-13386-gAD-SDD (Trial Testimony and Deposition)

Mitchell Hyman v. Linda Cummings-Ramone, WL 2447709 (Arbitration Testimony)

Coca-Cola v. Internal Revenue Service, DC Tax Court, 2018, Docket No. 31183-15 (Trial Testimony and Deposition)

Gary Ganzi et al v. Walter Ganzi, New York State Court, 2017 653074/2012 (Trial Testimony and Deposition)

Sound View v. Facebook, Northern District of California, 2017, No: 2:2017cv04275 (Deposition)

Rockwell v. Radwell, US International Trade Commission, 2018, Civil No. 15-5246(RBK/JS) (Deposition)

Rockwell v. Radwell, US District Court, District of New Jersey, 2018, Civil No. 1:15-cv-05246-rbk-js (Deposition)

Singh Management Co., v. Singh Building et al., Eastern District of Michigan, 2016, No: 2:2015cv11478 (Deposition and Arbitration Testimony)

Polo Ralph Lauren USA Holdings v. United States Polo Association, Southern District of New York, 2016, No. 1:2013cv07147 (Deposition)

Pom Wonderful v. Pur Pom, Federal Court Case in Central District of California, May 2016, CASE NO. CV 13–06917 MMM (CWx) (Deposition)

Reinsdorf v. Lavely & Singer, Los Angeles, March 2016 121003141440 (Deposition and Arbitration Testimony)

Gerawan v. Townsend, Townsend & Crew, Superior Court of the State of California – Fresno, 10cecg03427, December 2015, (Deposition)

BMC Software v. ServiceNow, Eastern District of Texas, December 2015, 2:14-CV-903-JRG (Deposition)

Novidaq v. Karl Storz, Northern District of California, July 2015, 333244 (Deposition)

Indacon v. Facebook, Eastern District of Texas, August 2014, SA-10-CA-00966-OLG (Deposition)

Major Brands v. Diageo, Missouri State Court, St. Louis, September 2014, No. 1322-CC00534 (Deposition)

Amazon v. IRS, Federal Tax Court, Seattle, November 2014, No. 17-72922 (Trial Testimony and Deposition)

Rembrandt v. Facebook, Eastern District of Virginia, July 2013, 1:13–CV–158 (Deposition)

Glidewell Labs v Keating, Southern District of California, 2012, SACV 11-1309-DOC ANX (Deposition)

FTC v Direct TV, United States District Court, for the Northern District of California San Francisco Division, 2016, 3:15-cv-01129 HSG (Deposition)

Sun Pacific Group v. Paramount Group, American Arbitration Association Commercial Arbitration Tribunal, 2012, 72/180/y/01187-11, (Deposition and Arbitration Testimony)

Millennium v. Reed Smith, New York State Court, New York City, November 2012 (Deposition)

Milton Okun v. Peter Morton, California Superior Court, Los Angeles, 2010, BC369660 (Deposition)

PWI v. Horizonte, US District Court, Southern District of Florida, 2009, 08-20738CIV-jordan\mcALLIEY (Deposition)

## Law Firm Experience

**Mayer Brown**, *Litigation Attorney*, Chicago, IL, 1991-1996

**United States District Court for the Eastern District of Michigan,** *Law Clerk to the Honorable John Feikens*, 1990 -1991

**Sonnenschein, Nath & Rosenthal**, *Summer Associate*, Chicago, IL, 1990

**O'Melveny & Myers**, *Summer Associate*, Los Angeles, CA, 1989

**Mayer Brown**, *Summer Associate*, Chicago, IL, 1988

## Presentations, Symposium s, and Conferences

*Non-traditional Trademarks in the United States,* Presented at the European Union Intellectual Property Office Conference in

      Alicante Spain (May 2018)

*Tutorial on the Use of Empirical Surveys in United States Trademark Registration and Litigation,* Presented to Judges and staff of

      the European Union Intellectual Property Office, in Alicante Spain (May 2018)

The McCarthy Institute Goes to Google:  Trademark Law and its Challenges in 2018.  Planned, organized, presented and

      hosted annual conference on trademark law (February 2018).

*Northern Kentucky University Law Review Symposium.* Presented published research findings on native advertising and consumer perceptions  (March, 2017).

*The McCarthy Institute Goes to Seattle: Trademark Law and its Challenges in 2017.* Planned, organized, spoke, and presented at trademark conference co-hosted by Microsoft & INTA and held at Amazon Corporate Conference Center (February 17, 2017).

*The McCarthy Institute Goes to San Francisco: Trademark Law and its Challenges in 2015.* Planned, organized, spoke, and presented at trademark conference co-hosted by Microsoft & INTA and held at The University of San Francisco (September 26, 2015).

*Trademark Year in Review,* Los Angeles IP Lawyers Assoc. January, 2015

*New Paradigms in Patent Monetization and Damages,* Hanson & Bridget, 2015

*The McCarthy Institute Goes to London: Trademark Law and its Challenges in 2014.* Planned, organized, spoke, and presented empirical research on Internet search regulation at conference co-hosted by Microsoft and Oxford held at the British Library in London and at Oxford University (March 13-14, 2014).

*The Use of Surveys in Trademark Litigation*, University of Texas Law Review Symposium (January, 2014).

*The Purchase of Trademarks as Keywords*, University of Texas Law Review Symposium (January, 2014).

*Trademarks as Keywords: Much Ado About Something*? Oxford/NYU Empirical Trademark Conference, USPTO, Washington, D.C. (September 26, 2013).

*Patent Trolls*, Keynote Speaker, ABA IP Section Lunch, San Francisco (August, 2013).

*Trademarks as Keywords, Much Ado About Something?* Association of Law and Economics Annual Conference, Vanderbilt Law School (May 9, 2013).

*The McCarthy Institute Goes to L.A.: Trademark Law and its Challenges in 2013* Planned, organized, and spoke at conference co-hosted by Fox and Microsoft held at Fox Entertainment in Los Angeles (February 28, 2013).

*Presented Empirical scholarship on Internet search algorithms*, Stanford Law School (November, 2012).

*The McCarthy Institute Goes to New York City: Trademark Law and its Challenges in 2012.* Planned, organized, spoke, and presented on topics covering gTLDS, DMCA, and SOPA/PIPA legislation at conference co-hosted by Time Warner and Microsoft at Time Warner in New York (February 9, 2012).

*The McCarthy Institute Goes to Redmond: Trademark Law and its Challenges in 2011.* Planned, sponsored, moderated, and presented empirical research on keyword advertising, trademarks, and consumer perceptions of the online advertising environment at conference co-hosted by Microsoft held at Microsoft in Redmond, Washington. Organized panels on dilution; keyword advertising; Chinese trademark law; ICANN's planned roll-out of new gTLds; keynote address by J. Thomas McCarthy; Horacio

Gutierrez (Head of Global IP, Microsoft); and Judge Kong (Chief Judge, Chinese Supreme Court for

IP) (February, 2011)

Hosted Horacio Gutierrez (Head of IP-Global; Microsoft) in a discussion on IP in the cloud, USF School of Law (October, 2010).

*Keywords, Trademarks and Consumer Perceptions: What do Consumers Really Want When They Use Trademark as Keyword*

Search Terms? USF School of Law Presentation with McCarthy Institute Academic Affiliates,

Professors David Hyman (University of Illinois School of Law) and Ben Edelman (Harvard Business

School) (November, 2010).

*The Right of Publicity in Film*, co-presenter with top in-house IP attorneys for PIXAR and LUCAS FILM at ABA meeting, San Francisco (August, 2010).

*The Effect on Trademark Owners of ICANN's planned roll-out of new top-level generic domain names (gTLDs)*, sponsored by the Center for Domain Name Abuse (CADA) meeting, San Francisco (June 2, 2010).

*Trademark Year in Review 2010*, Los Angeles Intellectual Property Lawyer's Meeting, Las Vegas (May, 2010).

*Trademark Year in Review 2010*, San Francisco Intellectual Property Lawyer's Meeting, Napa (May, 2010).

*Trademark Year in Review 2009*, California Bar Association IP Section Annual Meeting, San Diego (November 14, 2009).

*The Brand as Property: Trademark Law and its Challenges in the New Era,* organizer, moderator, and speaker; international trademark law symposium co-sponsored by McCarthy Institute, Microsoft, WIPO and Unitalen (a prominent Chinese IP law firm) (November 4, 2009).

*Trademark Use, Wonder Doctrine or Wrong Turn?* Vail Colorado IP Lawyers Association Retreat (January, 2009).

*INTA Conference*, Panelist on Trademark and Internet Blogging, Seattle (May, 2009).

*Symposium on Derivative Works and Fair Use in Copyright Law,* Speaker, moderator, and organizer, McCarthy Institute for IP & Technology Law, USF School of Law (November 1, 2008).

*International Trademark and Copyright Law*, guest lecturer, St. Charles University, Prague (July,

2008). Speaker, California Bar Association Meeting, Intellectual Property Section, (November,

2008).

Speaker, International Association of Trademark Lawyers, Meeting in Aspen Colorado (January, 2009).

*Trademark Year in Review*, California Intellectual Property Lawyer's Association, Santa Barbara (May, 2008).

*Network Neutrality – What is It?* Symposium planner and moderator, University of San Francisco School of Law (January, 2008).

*Trademark Year in Review 2007*, San Francisco Intellectual Property Lawyers Association, Napa (May, 2007).

*Trademark Year in Review 2006*, Silicon Valley Intellectual Property Lawyers Association, Palo Alto (November, 2006).

*Trademark Trends*, California Intellectual Property Lawyers Conference, Santa Barbara (November, 2006).

*The Google Library Project: Fair Use or Misappropriation?* USF School of Law (October, 2006).

*International IP: Who Should be Responsible for Top-Level Domain Name Governance*, Speaker and Panel Moderator, Bay Area High Tech Conference, Stanford Law School (April, 2005).

*Trademark and Copyright Update 2005*, Andrews IP Conference, San Francisco (October, 2005).

*The Anti-Free-Rider Impulse in Intellectual Property Law*, Katz-Kiley Distinguished IP Lecturer, University of Houston Law School (November, 2004).

*Trends in Trademark Law*, Northern and Southern California Associations of Intellectual Property Attorneys, Palm Springs (June, 2005).

*Trademark Year in Review 2005*, Cooley, Gotlieb, San Francisco (June, 2005).

*The Right of Publicity and First Amendment*; panelist with Judge Alex Kozinski; Northern California Chapter of the Copyright Society of America (May, 2005).

*Trademark Update: 2004 Year in Review*, San Francisco Intellectual Property Annual Meeting, Lake Tahoe (June, 2004).

*Toward a New Understanding of Dilution and the Anti-Free Rider Impulse,* Silicon Valley Intellectual Property Lawyer's Association (October, 2003).

*Exploring the Anti-Free-Rider Impulse in American Dilution Law*, Salmon P. Chase College of Law Lecture Series (September, 2003).

*Symposium on Comparative Analysis of Business Method and Software Patenting in the European Union and the United States*, moderator and organizer; co-sponsored by the McCarthy Institute and Kilburn & Strode, a London IP firm (June, 2003).

*Symposium on Biotech Patent Issues*, moderator and organizer; co-sponsored by the McCarthy Institute and

Morrison Foerster (March, 2003).

*Victoria's Secret and Dastar: Remaking Trademark Law,* Los Angeles Association of IP Attorneys (June, 2003).

*The Right of Publicity and the First Amendment*, Golden Gate University IP Symposium, San Francisco (October, 2002).

*First Amendment Limits on the Right of Publicity*, ABA Intellectual Property Section Annual Meeting, Philadelphia

(June, 2002).

*The Boundaries of Language Commodification On-Line*, Northern Kentucky Law Review Symposium on Trademark and Cyberlaw Issues (February, 2001).

*Symposium on Intellectual Property Law*, moderator and coordinator, Northern Kentucky Law Review (February, 2000).

*Symposium on the Third Restatement of Torts,* moderator, Northern Kentucky Law Review (February, 1999).

*Symposium on the Regulation of Media Violence & the First Amendment*, moderator and coordinator, Northern Kentucky Law Review (November, 1999).

*Trends in Mass Tort Litigation*, Panel on Mass Tort Litigation Joint Meeting of ABA Products Liability and Litigation Sections, Dallas (April, 1999).

# EXHIBIT H

Dax D. Anderson (USB 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com


*Attorney for Defendants, JRM Nutrasciences, LLC,*
*Muscle Sports Products, LLC and Jason Mancuso*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company,<br><br>    Plaintiff,<br><br>vs.<br><br>JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual;<br><br>    Defendants. | Case No.: 2:20-CV-0000581-DBB-JCB<br><br>Judge: David Barlow<br><br>Magistrate Judge Jared C. Bennett<br><br>**DEFENDANT MUSCLE SPORTS PRODUCTS, LLC RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS** |

Defendant, Muscle Sports Products, LLC ("Defendant" and/or "MSP" and/or "Responding Party"), by and through their undersigned counsel, and pursuant to Rules 26 and 33, of the Federal Rules of Civil Procedure, hereby responds to Kodiak Cakes, LLC's ("Plaintiff") First Set of Discovery Requests as follows:

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are subject to all objections as to competence, relevance, materiality, propriety, and admissibility and any and all

objections and grounds that would require the exclusion of any statement made herein if such statement were made by a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

No incidental or implied admission is intended by the responses herein. The fact that Responding Party responds or objects to any request for admission should not be taken as an admission that Responding Party accepts or admits the existence of any facts assumed by such request for admission.  The fact that Responding Party responds to part or all of any request is not intended and shall not be construed to be a waiver by Responding Party of any part of any objection to any request for admission.

Responding Party's responses herein are based on, and reflect, the current state of Responding Party's knowledge.  Responding Party expressly reserves the right to amend or supplement these responses at a later time should it deem such supplementation necessary or appropriate.

Responding Party's responses herein are made without waiving, and expressly reserving, Responding Party's right: (a) to object on any ground to the use of the information provided at any stage or proceeding in this action or any other action; and/or (b) to object on any ground to other discovery requests regarding the subject matter of any individual request for admission herein.

All responses are made on an express reservation of objections as set forth above and in some instances below, and no response shall be deemed, and specifically is stated not to be, a waiver of such objection.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**Request No. 1.**     Admit that you sell, market, and distribute products that display Defendants'

Marks.

**Answer:**     MSP admits the allegations in Request no. 1.

**Request No. 2.**     Admit that you sell and market products through the website

www.kodiaksupps.com.

**Answer:**     MSP admits the allegations in Request no. 2.

**Request No. 3.**     Admit that you are responsible for the creation and publication of the textual

and visual content displayed on www.kodiaksupps.com.

**Answer:**     MSP admits the allegations in Request no. 3.

**Request No. 4.**     Admit that you state on the home page of www.kodiaksupps.com that

"Kodiak Nutrition" is "dedicated to . . . supporting Brick & Mortar Retail stores all over the

world."

**Answer:**     With regard to Request for Admission No. 4, MSP asserts that the request does

not fully quote the language on the referenced website and asserts that the published language

speaks for itself. MSP therefore neither admits nor denies the allegations in Request No. 4.

**Request No. 5.**     Admit that you were aware of one or more of Plaintiff's Marks before the

selection and adoption of Defendants' Marks.

**Answer:**     MSP denies the allegations in Request No. 5.

**Request No. 6.**     Admit that Defendant's Products have been sold in Utah.

**Answer:**     MSP admits the allegations in Request No. 6.

**Request No. 7.**    Admit that you are licensed by JRM NutraSciences to use the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351.

**Answer:**    MSP admits the allegations in Request no. 7.

**Request No. 8.**    Admit that Jason Mancuso is your Chief Executive Officer.

**Answer:**    MSP admits the allegations in Request No. 8.

**Request No. 9.**    Admit that the word "Kodiak" does not describe a characteristic, quality, or ingredient of the products sold under Plaintiff's Marks.

**Answer:**    MSP admits that the dictionary definition of the word "Kodiak" does not describe any ingredient of the products sold under Plaintiff's Marks.  As to the remaining allegations in Request for Admission No. 9, MSP asserts that the definition of "Kodiak" includes an Alaskan brown bear and implies the characteristics and qualities of said bear and therefore denies the remaining allegations in Request No. 9.

**Request No. 10.**    Admit that the word "Kodiak" does not suggest anything about the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**Answer:**    MSP denies the allegations in Request No. 10 and refers Plaintiff to its response to Request No. 9.

**Request No. 11.**    Admit that the word "Kodiak" bears no relationship to the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**Answer:**    MSP denies the allegations in Request No. 11 and refers Plaintiff to its response to Request No. 9

4

**Request No. 12.**     Admit that products sold in connection with Defendants' Marks use a visual mark containing a roaring bear with a tilted head enclosed by a circle.

**Answer:**     MSP admits the allegations in Request for Admission 12.

**Request No. 13.**     Admit that products sold in connection with Defendants' Marks include one or more protein supplements.

**Answer:**     MSP admits the allegations in Request for Admission 13.

## ANSWERS TO INTERROGATORIES

**Interrogatory No. 1.**     Identify the persons principally involved in the creation and design of all marketing, advertising, and promotional materials (whether print or digital) on which Defendants' Marks ever been displayed.

**Answer:**     Graphic designer Greg Helton, an employee of Musclesport Products, LLC.

**Interrogatory No. 2.**     Identify each search conducted by you or on your behalf to determine whether the use of Defendants' Marks would conflict with Plaintiff's or anyone else's intellectual property rights.

**Answer:**     Neither MSP or Mancuso conducted and searches related to the use of Defendants' Marks.  MSP engaged the services of attorney Thomas Foster related to the use of the Defendants' Marks.  Neither MSP nor Mancuso has any knowledge as to the searches conducted by Mr. Foster.  MSP and Mancuso were notified by Foster of a potentially conflicting mark owed by Kodiak Sciences.  Neither MSP nor Mancuso were ever notified of any search results involving Plaintiff's intellectual property rights.

5

**Interrogatory No. 3.**    Identify the date in which Defendants' Marks were first used in the United States in connection with the sale or advertising of Defendant's Products.

**Answer:**    The Defendants' Marks were first used in the United States in early 2016.

**Interrogatory No. 4.**    Identify each U.S. state in which any product bearing Defendants' Marks has been sold, offered for sale, or intended to be sold.

**Answer:**    Defendants' Marks are available to be viewed on MSP's website and Instagram social media site and therefore available for sale in every U.S. state.  Defendant is unable to run sales report by state but believes products have been sold in nearly every, if not every U.S. State.

**Interrogatory No. 5.**    Identify and describe all trade and/or distribution channels through which any product bearing Defendants' Marks has been sold or offered for sale.

**Answer:**    MSP sells its products exclusively through its website and social media site.

**Interrogatory No. 6.**    Identify each brick and mortar retail store in the U.S. in which any product bearing Defendants' Marks has been sold, offered for sale, or intended to be sold.

**Answer:**    MSP is without knowledge or information sufficient to form a belief as to what brick and mortar stores offer its products for sale.  As stated in response to Interrogatory No. 5, MSP sells its products exclusives through its website and social media site.

**Interrogatory No. 7.**    Identify all methods and/or media through which Defendants' Marks have been advertised or promoted.

**Answer:**    In response to Interrogatory No 7, MSP states that it advertises, sells and promotes its products exclusively through its website and its social media site.

**Interrogatory No. 8.**      Describe the target demographic market for Defendant's Products by age, gender, mean household income, and geographic location.

**Answer:**      In response to Interrogatory No. 8, MSP states that its target demographic market is 18-35 year old males and females located anywhere on the third rock from the Sun.

**Interrogatory No. 9.**      Identify on an annual basis for each year since the date of first use of Defendants' Marks the dollar amount of revenue derived from Defendant's Products.

**Answer:**      MSP is in the process of separating sales information for products containing Defendants' Marks from sales not containing Defendants' Marks and will supplement its responses when that analysis is complete.

**Interrogatory No. 10.**      Identify on an annual basis for each year since the date of first use of Defendants' Marks the dollar amount of net profits derived from Defendant's Products and the details of the method used in calculating those profits.

**Answer:**      MSP is in the process of separating sales information for products containing Defendants' Marks from sales not containing Defendants' Marks and will supplement its responses when that analysis is complete.

**Interrogatory No. 11.**      Identify all surveys, polls, or other studies of which you are aware concerning any mark containing the term "Kodiak."

**Answer:**      MSP is unaware of any surveys, polls, or other studies concerning marks containing the term "Kodiak."

**Interrogatory No. 12.**      Describe any instances, of which you (including any of your employees or agents) are aware, when any third party has inquired about whether there is an association or other connection between Defendant's Products and Plaintiff's Products.

**Answer:**      MSP is unaware of any scenario described in Interrogatory No. 12.

**Interrogatory No. 13.**     Identify the date when you first became aware of Plaintiff's use of the word mark "Kodiak" and the details and circumstances of such awareness.

**Answer:**      MSP does not recall the exact date when it became aware of Plaintiff's use of the work mark "Kodiak" but asserts that it was when it received the legal notices/letters related to the ultimate filing of this lawsuit.

**Interrogatory No. 14.**     Identify all trade names and/or "DBA (Doing Business As)" names under which you operate or otherwise conduct business.

**Answer:**      JRM has not formally registered any DBA's but has used the name of "Elite Sports Distribution."

**Interrogatory No. 15.**     Identify all persons and/or entities whom you are aware of that are licensed to sell any products bearing Defendants Marks.

**Answer:**      None.


DATED this 9th day of April, 2021.

/s/ Jason Macuso
Jason Mancuso, member

DATED this 9th day of April 2021, as to objection.

KIRTON McCONKIE

By: _  /s/Jeremy C. Sink_
Dax D. Anderson
Jeremy Sink

Counsel for Defendants

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April, 2021, a true and correct copy of the

foregoing DEFENDANT MUSCLE SPORTS PRODUCTS, LLC RESPONSES TO

PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS were served on counsel by email

addressed as follows:


     Alan C. Bradshaw    *abradshaw@mc2b.com*
     Chad R. Derum    *cderum@mc2b.com*
     Michael Harmond    *mharmond@mc2b.com*
     MANNING CURTIS BRADSHAW & BEDNAR
     136 East South Temple, Suite 1300
     Salt Lake City, UT 84111


     Stephen H. Bean    *steve@legendslaw.com*
     Nicholas Wells    *nwells@legendslaw.com*
     LEGENDS LAW GROUP
     330 N. Main
     Kaysville, UT 84037


                  By:   */s/Margaret Carlson*

# EXHIBIT I

# In The Matter Of:

*KODIAK CAKES, LLC v.*

*JRM NUTRASCIENCES, LLC*

---

*DOMINICK WALSH*

*September 22, 2021*

---

## *Cindy Afanador*

### COURT REPORTING,INC.

CONFERENCE SUITES
MANHATTAN —BRONX —BROOKLYN -QUEENS
GARDEN CITY —MELVILLE —HAUPPAUGE -RIVERHEAD

HTTP://WWW.CINDYCOURTREPORTING.COM

**1-877-337-6968**

*Original File FINAL REVISED SEPTEMBER 22 2021 KODIAK_1.txt*

*Min-U-Script®*

Case 2:20-cv-00581-DBB-JCB   Document 94-1   Filed 07/29/22   PageID.1825   Page 338 of
440
KODIAK CAKES, LLC v.
JRM NUTRASCIENCES, LLC
DOMINICK WALSH
September 22, 2021

Page 29

Dominick Walsh

1
2        **(Exhibit 20, Document bearing**
3    **Bates stamps JRM 20 through 23, marked**
4    **for identification.)**
5        Q.    Handing you what has been marked
6    as Exhibit 20 (handing).
7        Do you recognize this?
8        **A.    Yeah, I don't recall if I've seen**
9    **this before or not.**
10       Q.    This is a document produced by
11   defendants, it's JRM 20 through 23 on the
12   Bates numbers.
13       It's entitled Exclusive License
14   of Intellectual Property, and it's a draft
15   agreement between JRM NutraSciences and Muscle
16   Sports Products, LLC; do you see that?
17       **A.    Yes.**
18       Q.    All right.
19       This document is not signed.  Do
20   you know why that would be?
21       **A.    I don't know.**
22       Q.    Have you ever talked with Jason
23   Mancuso about whether there is a written
24   agreement between Muscle Sports and JRM with
25   respect to the licensing of intellectual

Page 30

Dominick Walsh

1
2    property?
3        **A.    Not that I recall.**
4        Q.    What's your understanding about
5    what that -- the nature of that relationship
6    is and how it's documented, if at all?
7        **A.    That's -- JRM licenses the use of**
8    **the intellectual property to Muscle Sports.**
9        Q.    And does JRM receive a licensing
10   fee for that licensing?
11       **A.    It's my understanding that they**
12   **do.**
13       Q.    Do you know what that is?
14       **A.    I do not.**
15       Q.    Do you know if that fee is the
16   same for each of the Muscle Sports Products?
17       **A.    I'm not sure I understand the**
18   **question.**
19       Q.    Sure.
20       So the licensing fee that JRM
21   receives, is that the same -- is that fee the
22   same for the Muscle Sports line of products as
23   it is for the Kodiak products as it is for
24   Archetype or Liberty Labs or any of the
25   others; do you know?

Page 31

Dominick Walsh

1
2        **A.    I'm not sure.**
3        Q.    Do you know whether, other than
4    this document, Exhibit 20, there is a written
5    licensing agreement between JRM and Muscle
6    Sports?
7        **A.    That I am not aware of.**
8        Q.    And if we look at the end of the
9    document -- well, let me back up.
10       Let's go back up to the very top
11   of Exhibit 20 in the preamble to the
12   agreement, it references Muscle Sports
13   Products, LLC, d/b/a Elite Sports
14   Distribution.  Let me ask you this:  What is
15   Elite Sports Distribution and how is it
16   different, if at all, from Muscle Sports
17   Products?
18       **A.    Elite was set up as a**
19   **distribution company to interact with**
20   **retailers.**
21       Q.    When was it set up, if you know?
22       **A.    I don't know the specific date.**
23       Q.    And so Elite Sports Distribution
24   handles the distribution side and relationship
25   with retailers; what other business activities

Page 32

Dominick Walsh

1
2    outside of that distribution channel through
3    Elite Sports Distribution does Muscle Sports
4    Products, LLC have; what else does Muscle
5    Sports Products do other than the distribution
6    side is my question?
7        **A.    I'm not sure that I understand.**
8        Q.    Okay.
9        We've distinguished in Exhibit 20
10   that there is an entity Muscle Sports
11   Products, LLC, right?
12       **A.    Yes.**
13       Q.    And there is a d/b/a, Elite
14   Sports Distribution, right?
15       **A.    Yes.**
16       Q.    Now, the d/b/a is involved with
17   being customer facing, right, working with
18   retailers to distribute Muscle Sports
19   Products, correct?
20       **A.    Yes.**
21       Q.    Okay.
22       So if we carve out that piece,
23   what else does Muscle Sports do, other than
24   engage with retailers?
25       **A.    I mean, Muscle Sports is also a**

Page 33

Dominick Walsh

1  brand of products.
2  Q.    And to fan out just a little bit,
3  you are saying Muscle Sports Products has its
4  own lineup of supplements, right?
5  **A.    Correct.**
6  Q.    Okay.
7        So what is the entity that's
8  responsible for things like manufacturing
9  contracts, you know, obtaining ingredients,
10 promotion, marketing, are those all under the
11 Muscle Sports umbrella as well or is there
12 some other entity that handles those
13 functions?
14 **A.    So Muscle Sports uses a contract**
15 **manufacturing.**
16 Q.    And is Muscle Sports the
17 contracting party in that relationship, to
18 your knowledge?
19 **A.    My understanding is yes.**
20 Q.    Are there any other entities
21 other than JRM, Muscle Sports Products, LLC
22 and Elite Sports Distribution that are within
23 the -- under the Muscle Sports umbrella in
24 terms of business organization or entities

Page 34

Dominick Walsh

1  that you are aware of?
2  **A.    Under Muscle Sports I think that**
3  **is all of them.**
4  Q.    How about JRM, does JRM have any
5  other affiliates, to your knowledge?
6  **A.    When you say affiliates, I'm not**
7  **sure --**
8  Q.    Other than its relationship with
9  Muscle Sports Products, do you know if JRM has
10 any other business function or business
11 relationships outside of that relationship
12 with Muscle Sports?
13 **A.    I think that is the only**
14 **relationship, to my understanding.**
15 Q.    And do you know what licensing
16 fee JRM makes on Muscle Sports Products's sale
17 of the Kodiak brands?
18 **A.    I don't know a specific number.**
19 Q.    So at the beginning of the
20 deposition we talked about sales and revenue.
21 You talked about there being $60,000 net
22 profit year to date for Muscle Sports
23 Products, that's after you take out all of the
24 overhead, right?

Page 35

Dominick Walsh

1  **A.    Correct.**
2  Q.    Okay.
3        Is the licensing fee that Muscle
4  Sports pays to JRM part of that overhead?
5  **A.    That I am not sure.**
6  Q.    How would we know that?
7  **A.    I mean, I probably would have to**
8  **ask the accountant.**
9  Q.    And who would be the beneficiary
10 of those licensing fees, JRM?
11 **A.    Yes.**
12 Q.    And, to your knowledge, does JRM
13 have any owner other than Jason Mancuso?
14 **A.    Not that I'm aware of.**
15 Q.    And JRM, the title of that
16 company, I understand from a prior deposition
17 that Jason Mancuso's deposition or excuse me
18 initials are JRM and that stands for Jason
19 Robert Mancuso; is that consistent with your
20 understanding?
21 **A.    Yes.**
22        **(Exhibit 21, List of products,**
23        **marked for identification.)**
24 Q.    This is Exhibit 21.

Page 36

Dominick Walsh

1        Do you recognize this document?
2  **A.    Yes.**
3  Q.    What is this?
4  **A.    A list of Muscle Sports Products**
5  **or Elite Sports products.**
6  Q.    Elite Sports products -- so Elite
7  Sports, again, is a d/b/a of Muscle Sports and
8  interfaces with customers, retailers?
9  **A.    Correct.**
10 Q.    Does it only handle
11 brick-and-mortar retail relationships or does
12 it also handle online sales?
13 **A.    Just the brick-and-mortar.**
14 Q.    And is this a document that
15 Muscle Sports would prepare and use in the
16 course of its business?
17 **A.    Yes.**
18 Q.    Does this document -- is this
19 document actually provided directly to
20 retailers?
21 **A.    Yes, this or a version of it,**
22 **yes.**
23 Q.    We see at the top there is a big
24 heading, Muscle Sports; do you see that?

Page 37

Dominick Walsh

1   A.   Yes.
2
3   Q.   And Muscle Sports is both the
4 entity under which all of these other -- under
5 which several other brands are owned, but it
6 also has its own lineup of products, right?
7   A.   Yes.
8   Q.   And at the top here we see a list
9 of the Muscle Sports Products under the Muscle
10 Sports logo; do you see that?
11   A.   Yes.
12   Q.   And then there are other brands
13 as well, the Muscle Sports Pro Series; do you
14 see that?
15   A.   Yes.
16   Q.   Juiced, which is a juice bar
17 series; do you see that?
18   A.   Yes.
19   Q.   Is that a separate brand as well?
20   A.   Yes.
21   Q.   Hyper Genetic Laboratories; do
22 you see that?
23   A.   Yes.
24   Q.   Kodiak on the next page; do you
25 see that?

Page 38

Dominick Walsh

1
2   A.   Yes.
3   Q.   Purge Supps; do you see that?
4   A.   Yes.
5   Q.   Liberty Labs?
6   A.   Yes.
7   Q.   Optitune?
8   A.   Yes.
9   Q.   Archetype?
10   A.   Yes.
11   Q.   And Muscle Militia?
12   A.   Yes.
13   Q.   Are there any other brands under
14 the Muscle Sports umbrella that you are aware
15 of?
16   A.   That should be all of them.
17   Q.   So this list is current as of
18 today, to the best of your knowledge; is that
19 fair to say?
20   A.   The Archetype brand has been
21 discontinued, but there may be some specific
22 items that under each brand that are, but it's
23 relatively up to date.
24   Q.   Okay.
25     So specific product offerings

Page 39

Dominick Walsh

1 under a brand might have changed?
2
3   A.   Yes.
4   Q.   But the brands themselves under
5 the Archetype are the -- are current?
6   A.   DNA Pharma I think is also
7 discontinued.
8   Q.   DNA Pharma?
9   A.   Yes.
10   Q.   Were those brands just
11 underperforming; was there some other reason
12 why they stopped?
13   A.   Yes. Well, low sales, yes.
14   Q.   Which is the highest performing
15 brand represented on Exhibit 21?
16   A.   Muscle Sports.
17     MR. SINK: Objection. Object as
18   to relevance.
19   Q.   And what percentage of total
20 sales does the Muscle Sports Muscle Sports
21 Products lineup represent?
22     MR. SINK: Same objection,
23   relevance.
24   A.   I'd say about 85.
25   Q.   Meaning 85 percent of sales are

Page 40

Dominick Walsh

1 Muscle Sports Products?
2
3   A.   Yes, that's an estimate.
4   Q.   And what is the purpose of having
5 multiple product lines rather than just having
6 one brand Muscle Sports Products and selling
7 all of your products under that brand name?
8   A.   To provide retailers with
9 multiple brand options.
10   Q.   Do retailers understand -- are
11 they informed that all of the brands that are
12 under the Elite Sports Distribution umbrella
13 are actually all Muscle Sports Products?
14     MR. SINK: Object to that
15   question, Counsel, as compound. I'm not
16   quite sure if he's answering understand
17   or are they informed, so can you clarify
18   that question before he answers.
19   Q.   I think the question was clear.
20 Go ahead.
21     MR. SINK: No, it wasn't. You
22   asked a compound question, Counsel. You
23   asked do they understand or are they
24   informed and those are two very
25   different things.

Case 2:20-cv-00581-DBB-JCB   Document 94-1   Filed 07/29/22   PageID.1828   Page 341 of
440
KODIAK CAKES, LLC v.
JRM NUTRASCIENCES, LLC

DOMINICK WALSH
September 22, 2021

Page 41

Dominick Walsh

1
2      Cindy, can read it back, if you
3   want to.  I just want you to
4   differentiate what you are actually
5   asking him.  It's a compound question.
6      **MR. DERUM:** Stop coaching the
7   witness.
8   Q.    You can answer the question.
9      **MR. SINK:** Cindy, can you read
10  back the question.
11     **MR. DERUM:** You don't control the
12  deposition, Jeremy, I do.  Go ahead.
13     **MR. SINK:** Well, it's a compound
14  question.  Do you understand the
15  question, Chad (sic)?
16     **MR. DERUM:** Note your objection,
17  and leave it at that.
18  **A.    Can you repeat it.**
19  Q.    Do retailers understand that all
20  the products that are sold under the Elite
21  Sports Distribution umbrella are, in fact,
22  Muscle Sports Products?
23     **MR. SINK:** Objection, form,
24  speculation.
25  **A.    Yeah, I mean, it would be hard**

Page 42

Dominick Walsh

1
2   **for me to speculate on what they do or don't**
3   **understand.**
4   Q.    Do you inform them -- does Muscle
5   Sports Products or Elite Sports Distribution
6   inform retailers that all of these products
7   are related in some way in the sense that they
8   have common ownership?
9   **A.    Well, they are getting this**
10  **Exhibit 21.**
11  Q.    Right, but I think you've made a
12  distinction that Elite Sports Distribution is
13  a d/b/a of Muscle Sports, right?
14     **MR. SINK:** Objection,
15  mischaracterizes testimony.
16  Q.    That's true, isn't it?
17  **A.    Elite yeah, is a d/b/a.**
18  Q.    And so my question is, there
19  isn't anything on Exhibit 21 that I see
20  anyway, you correct me if I'm wrong, that says
21  Elite Sports Distribution is actually owned by
22  Muscle Sports rather than being a separate
23  entity?
24     **MR. SINK:** Objection, form.
25  Document speaks for itself.

Page 43

Dominick Walsh

1
2   **A.    I'm sorry, can you repeat that?**
3   Q.    Maybe I'll just back up.
4      Does Muscle Sports actively
5   communicate to retailers that each of the
6   products listed or excuse me, each of the
7   brand names listed on Exhibit 21 actually has
8   common ownership under the Muscle Sports
9   umbrella?
10  **A.    I don't know that I could answer**
11  **that.**
12  Q.    Would you prefer or does Muscle
13  Sports prefer retailers to believe that each
14  of these brand names was distinct from Muscle
15  Sports?
16  **A.    I don't know that it would**
17  **matter.**
18  Q.    Were there particular
19  distinguishing factors that drive each brand
20  in terms of what sets them apart from one
21  another and would be the basis for having a
22  separate brand rather than having, you know,
23  all these products under one brand?
24  **A.    In some cases, yes.**
25  Q.    What are those cases?

Page 44

Dominick Walsh

1
2   **A.    So the Juiced line, for instance,**
3   **is bulk size, designed for juice bars.**
4   Q.    So particular audience for that
5   provides the juice bar, which may be different
6   than consumers?
7   **A.    Correct.**
8   Q.    Any other distinctions that stand
9   out to you in this brand lineup?
10  **A.    The Hyper Genetic, it's kind of**
11  **more of a hardcore lineup.**
12  Q.    There is one product rather for
13  Hyper Genetic, the Killer Bees product?
14  **A.    Yes.**
15  Q.    What is that a stimulant of some
16  kind?
17  **A.    Yes.**
18  Q.    Is it your understanding that
19  Muscle Sports is licensed by JRM to use the
20  Kodiak Sports Nutrition mark?
21  **A.    Yes.**
22     **(Exhibit 22, Trademark service**
23     **mark application for Kodiak Sports**
24     **Nutrition, with a filing date of**
25     **February 17, 2016, marked for**

Page 45

Dominick Walsh

1
2       identification.)
3       Q.    This is Exhibit 22.
4             Do you recognize this document?
5       A.    I have not viewed it before.
6       Q.    All right.
7             This is a document produced by
8   defendants. This is the trademark service
9   mark application for Kodiak Sports Nutrition,
10  with a filing date of February 17, 2016; do
11  you see that at the top?
12      A.    Yes.
13      Q.    And Kodiak Sports Nutrition is
14  the name of the mark for which JRM
15  NutraSciences sought trademark approval,
16  correct?
17      A.    Yes.
18      Q.    And this mark uses the word
19  "Kodiak," right?
20      A.    Yes.
21            (Exhibit 23, Document bearing the
22            Kodiak logo, bearing Bates stamp
23            MSP 974, marked for identification.)
24      Q.    This is Exhibit 23.
25            Do you recognize this?

Page 46

Dominick Walsh

1
2       A.    Yes.
3       Q.    What is this?
4       A.    The Kodiak logo.
5       Q.    This is a document produced by
6   defendants, MSP 974. In the middle of the
7   page is a logo for Kodiak Sports Nutrition; do
8   you see that?
9       A.    Yes.
10      Q.    And in the bottom right it says
11  master logo?
12      A.    Yes.
13            MR. SINK: I apologize, Chad, can
14      you give me the Bates number again?
15            MR. DERUM: Yes, 974.
16            MR. SINK: Thank you.
17      Q.    And this is the, to your
18  understanding, the master logo for Kodiak
19  Sports Nutrition?
20      A.    Yes.
21      Q.    And this logo also uses the word
22  "Kodiak Cakes" -- the word "Kodiak"?
23      A.    Yes.
24      Q.    There is a picture of a roaring
25  bear to the left of the word "Kodiak"?

Page 47

Dominick Walsh

1
2       A.    Yes.
3       Q.    With a tilted head, correct?
4       A.    Yes.
5       Q.    And closed within a circle; do
6   you see this?
7       A.    Yes.
8       Q.    Now, if you look on the far right
9   of the mark, you see the trademark
10  registration symbol, it's an R with -- inside
11  a circle?
12      A.    Yes.
13      Q.    And what does that mean, to the
14  best of your knowledge?
15      A.    I don't know that I could -- I'm
16  not sure -- what are you referring to?
17      Q.    You see that registration symbol
18  next to the word "Kodiak," I just want to know
19  what you believe that means; what's the
20  significance of having that symbol placed
21  where it is?
22      A.    That a registration was filed.
23      Q.    Filed or obtained?
24      A.    Filed.
25      Q.    And that's next to the word

Page 48

Dominick Walsh

1
2   "Kodiak", right?
3       A.    Yes.
4       Q.    Okay.
5             Now, we know from Exhibit 22 that
6   the name of the mark Kodiak Sports Nutrition
7   or excuse me the name of the mark that JRM
8   NutraSciences filed on is Kodiak Sports
9   Nutrition, correct?
10            MR. SINK: Objection, form, legal
11      conclusion.
12      Q.    If you look at Exhibit 22, the
13  name of the mark is Kodiak Sports Nutrition,
14  right?
15            MR. SINK: Same objection.
16      A.    Yes.
17      Q.    Okay.
18            And in Exhibit 23 that trademark
19  symbol that we noted that's after the word
20  "Kodiak," right, it's not at the end of the
21  name -- full name of the mark, correct? In
22  other words, it doesn't come after Sports
23  Nutrition, right?
24      A.    Correct.
25      Q.    We also see in this mark the word

Page 49

Dominick Walsh

1  begins and ends with a K, right?
2  **A.    Yes.**
3  Q.    And on the left-hand side that K
4  has an arc at the bottom of it that extends
5  below the rest of the text in that word,
6  correct?
7  **A.    Yes.**
8  Q.    And similarly on the right-hand
9  side, the K at the end of the word also has an
10 arc that extends down below the rest of the
11 text in that line, right?
12 **A.    Yes.**
13     **(Exhibit 24, Kodiak brand guide**
14     **bearing Bates stamps MSP 972 through**
15     **978, marked for identification.)**
16 Q.    This is Exhibit 24 (handing).
17     **MR. DERUM:** Jeremy, just so you
18     know, I have three copies of each of
19     these documents, one for me, one for the
20     witness and one for you.  I'm setting
21     aside a separate stack of exhibits for
22     you and I'm numbering them as we go
23     along.  I'll leave those with your
24     witness, and he can pass those along to

Page 50

Dominick Walsh

1  you after the deposition.
2     **MR. SINK:** Okay.  Thank you.
3  Q.    Do you recognize Exhibit 24?
4  **A.    Yes.**
5  Q.    What is this?
6  **A.    The Kodiak brand guide.**
7  Q.    And this is dated 2018, it looks
8  like from the first page of the document; do
9  you see that?
10 **A.    Yes.**
11 Q.    Does that pre or postdate the
12 beginning of your employment with Muscle
13 Sports?
14 **A.    Pre.**
15 Q.    Okay.
16     So have you seen this document
17 before, Exhibit 24?
18 **A.    Parts of it.**
19 Q.    This is MSP 972 through 978, the
20 Bates numbers showing on this; do you see
21 those control numbers on the bottom?
22 **A.    Yes.**
23 Q.    Which pages have you seen?
24 **A.    The 972, 974, 975, those pages**

Page 51

Dominick Walsh

1  **that I listed.**
2  Q.    And the Kodiak Sports Nutrition
3  brand uses the color red as part of the logo,
4  right?
5  **A.    Yes.**
6  Q.    And the color black as well,
7  correct?
8  **A.    Yes.**
9  Q.    And the color white, true?
10 **A.    Yes.**
11 Q.    From looking at this 975, those
12 colors that I just mentioned are the colors
13 that the Kodiak brand uses, it doesn't
14 generally use other colors in connection with
15 the brand name of, excuse me, for when the
16 Kodiak name appears; is that correct?
17 **A.    Correct.**
18 Q.    Do you know why red, black, white
19 and yellow were selected and not other colors?
20 **A.    My understanding is the --**
21 **particularly the yellow was selected to stand**
22 **out on a retail shelf.**
23 Q.    And is that something somebody
24 told you or is it something that you just

Page 52

Dominick Walsh

1  simply understand having been in the business?
2  **A.    I would say the latter.**
3  Q.    So Jason Mancuso or somebody else
4  didn't say, hey, Dominick, you know, we chose
5  the yellow for some particular reason; you
6  didn't have that conversation?
7  **A.    It's possible that we did.  I**
8  **just don't recall a specific conversation.**
9  Q.    How about any of those other
10 colors; black, red, white, do you know why any
11 of those particular colors were chosen over
12 other colors?
13 **A.    That I could not answer.**
14     **(Exhibit 25, Documents bearing**
15     **Bates stamps JRM 53 through 100, marked**
16     **for identification.)**
17 Q.    I'm handing you what is marked as
18 Exhibit 25 (handing).
19     These are also documents produced
20 by defendants as JRM 53 through 100.
21     Do you recognize these?
22 **A.    Yes.**
23 Q.    And what are these documents?
24 **A.    The ones that I've looked at so**

# EXHIBIT J



**ELITE**SPORTS
SUPPLEMENT DISTRIBUTION

Elite Sports Distribution is the exclusive distributor of the MAP Protected RETAIL ONLY brands Musclesport International™, Kodiak Sports Nutrition™, DNA Pharma™, Vitacore™ and HyperGenetic Labs™

| PRODUCTS | SKU # | SIZE | SERVINGS | WHOLESALE PRICE | SUGGESTED RETAIL PRICE | YOUR PRICE |
|---|---|---|---|---|---|---|
| **MUSCLESPORT** | | | | | | |
| **INTRA - POST SERIES** | | | | | | |
| | | | | | | |
| **LEAN WHEY REVOLUTION™ 2LB *** GOURMET WHEY PROTEIN ISOLATE *** ** | | | | | | |
| VANILLA ICE CREAM | 718117089619 | 2LB | 28 | $41.99 | $69.99 | |
| CHOCOLATE ICE CREAM | 718117089480 | 2LB | 28 | $41.99 | $69.99 | |
| CHOCOLATE PEANUT BUTTER | 718117089497 | 2LB | 28 | $41.99 | $69.99 | |
| STRAWBERRY CRÈME | 754697670533 | 2LB | 28 | $41.99 | $69.99 | |
| COOKIES & CREAM | 718117089503 | 2LB | 28 | $41.99 | $69.99 | |
| CRISPY COOKIE | 660845918139 | 2LB | 28 | $41.99 | $69.99 | |
| PROTELLA | 754697665492 | 2LB | 28 | $41.99 | $69.99 | |
| CINNA CRUNCH | 754697662392 | 2LB | 28 | $41.99 | $69.99 | |
| PEANUT BUTTER CRUNCH | 754697663603 | 2LB | 28 | $41.99 | $69.99 | |
| UNICORN COOKIE SHAKE | 754697664709 | 2LB | 28 | $41.99 | $69.99 | |
| COCONUT CARAMEL | 754697664723 | 2LB | 28 | $41.99 | $69.99 | |
| FLUFFER NUTTER | 754697664709 | 2LB | 28 | $41.99 | $69.99 | |
| | | | | | | |
| **LEAN WHEY REVOLUTION™ 5LB *** GOURMET WHEY PROTEIN ISOLATE *** ** | | | | | | |
| VANILLA ICE CREAM | 718117089626 | 5LB | 67 | $71.99 | $119.99 | |
| CHOCOLATE ICE CREAM | 718117089640 | 5LB | 67 | $71.99 | $119.99 | |
| CHOCOLATE PEANUT BUTTER | 718117089657 | 5LB | 67 | $71.99 | $119.99 | |
| STRAWBERRY CRÈME | 754697670540 | 5LB | 67 | $71.99 | $119.99 | |
| COOKIES & CREAM | 718117089664 | 5LB | 67 | $71.99 | $119.99 | |
| CRISPY COOKIE | 660845918122 | 5LB | 67 | $71.99 | $119.99 | |
| PROTELLA | | 5LB | 67 | $71.99 | $119.99 | |
| CINNA CRUNCH | 754697662408 | 5LB | 67 | $71.99 | $119.99 | |
| PEANUT BUTTER CRUNCH | 754697663597 | 5LB | 67 | $71.99 | $119.99 | |
| UNICORN COOKIE SHAKE | 754697664464 | 5LB | 67 | $71.99 | $119.99 | |
| COCONUT CARAMEL | 754697665225 | 5LB | 67 | $71.99 | $119.99 | |
| FLUFFER NUTTER | 754697665249 | 5LB | 67 | $71.99 | $119.99 | |
| | | | | | | |
| **PROTEIN 8 REVOLUTION™ (8 SOURCE PROTEIN BLEND W/BEEF-ISO™)** | | | | | | |
| VANILLA | 660845919365 | 5LB | 50 | $53.99 | $89.99 | |
| CHOCOLATE | 660845919303 | 5LB | 50 | $53.99 | $89.99 | |
| BIRTHDAY CAKE | 660845919105 | 5LB | 50 | $53.99 | $89.99 | |
| | | | | | | |
| **MASS REVOLUTION™ (WEIGHT GAINER)** | | | | | | |
| VANILLA | 718117089589 | 6LB | 15 | $53.99 | $89.99 | |
| CHOCOLATE | 718117089572 | 6LB | 15 | $53.99 | $89.99 | |
| COOKIES & CREAM | 718117089596 | 6LB | 15 | $53.99 | $89.99 | |
| COCONUT CARAMEL *** NEW *** | | 6LB | 15 | $53.99 | $89.99 | |
| | | | | | | |
| VANILLA | | 12LB | 30 | $74.99 | $149.99 | |
| CHOCOLATE | | 12LB | 30 | $74.99 | $149.99 | |
| COOKIES & CREAM *** NEW *** | | 12LB | 30 | $74.99 | $149.99 | |
| COCONUT CARAMEL *** NEW *** | | 12LB | 30 | $74.99 | $149.99 | |
| | | | | | | |
| **BCAA REVOLUTION™** | | | | | | |
| MANGO BLAST | 718117088902 | 450GM | 30 | $32.99 | $54.99 | |
| WATERMELON | | 450GM | 30 | $32.99 | $54.99 | |
| STRAWBERRY DAIQUIRI | 660845917231 | 450GM | 30 | $32.99 | $54.99 | |
| RAINBOW ITALIAN ICE | 660845917248 | 450GM | 30 | $32.99 | $54.99 | |
| SUNSET PUNCH | 660845918252 | 450GM | 30 | $32.99 | $54.99 | |
| STRAWBERRY LEMONADE | | 450GM | 30 | $32.99 | $54.99 | |
| LIME ICE | 754697661708 | 450GM | 30 | $32.99 | $54.99 | |
| JUNGLE JUICE | | 450GM | 30 | $32.99 | $54.99 | |
| BLUEBERRY LEMONADE | | 450GM | 30 | $32.99 | $54.99 | |
| BAJA SPLASH *** COMING SOON *** | | 450GM | 30 | $32.99 | $54.99 | |
| | | | | | | |
| **BCAA NRG REVOLUTION™ (W/CAFFEINE)** | | | | | | |
| FIRECRACKER BLAST (w/PEAK02) | 718117089831 | 450GM | 30 | $35.99 | $59.99 | |
| HALF & HALF (w/PEAK02) | | 450GM | 30 | $35.99 | $59.99 | |
| PEACH MANGO (w/PEAK02) | 754697662118 | 450GM | 30 | $35.99 | $59.99 | |
| | | | | | | |
| **AMINO REVOLUTION™ *** NEW! NOW AVAILABLE! *** ** | | | | | | |
| FROZEN LIMARITA | 754697664914 | 390GM | 30 | $35.99 | $59.99 | |
| PATRIOT POPSICLE | 754697664877 | 390GM | 30 | $35.99 | $59.99 | |
| CANDY BLAST *** NEW *** | 754697670274 | 390GM | 30 | $35.99 | $59.99 | |

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT
21

MSP 000613

## PRE SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| **RHINO RAMPAGE** | | | | | | |
| JUNGLE JUICE | | 210GM | 30 | $29.99 | $49.99 | |
| MANGO | | 210GM | 30 | $29.99 | $49.99 | |
| WILDBERRY | | 210GM | 30 | $29.99 | $49.99 | |
| RAINBOW CANDY | | 210GM | 30 | $29.99 | $49.99 | |
| | | | | | | |
| RHINO RAMPAGE **(CAPSULE PRE-WORKOUT)** | | 150CAP | 25 | $47.99 | $79.99 | |
| | | | | | | |

## BLACK SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| *LIMITED EDITION FLAVOR / FORMULA:* | | | | | | |
| RHINO BLACK - *** FORBIDDEN FRUIT *** PREMIUM PRE-WORKOUT | | 460GM | 20/40 | $47.99 | $79.99 | |
| | | | | | | |
| **RHINO BLACK V2** | | | | | | |
| JUNGLE JUICE | | 460GM | 20/40 | $41.99 | $69.99 | |
| SUNSET PUNCH | 754697665935 | 460GM | 20/40 | $41.99 | $69.99 | |
| BLUE DEMON | | 460GM | 20/40 | $41.99 | $69.99 | |
| WHITE DRAGON | | 460GM | 20/40 | $41.99 | $69.99 | |
| BLACK CHERRY LEMONADE | 754697665911 | 460GM | 20/40 | $41.99 | $69.99 | |
| MANGO MANIA | | 460GM | 20/40 | $41.99 | $69.99 | |
| | | | | | | |
| **RHINO BLACK PUMPED** | | | | | | |
| JUNGLE JUICE | | 400GM | 20/40 | $44.99 | $74.99 | |
| PINEAPPLE | | 400GM | 20/40 | $44.99 | $74.99 | |
| COSMIC CANDY | | 400GM | 20/40 | $44.99 | $74.99 | |
| | | | | | | |
| **ALPHA BURN w/Lean GBB** | | | | | | |
| PINEAPPLE | | 150GM | 30 | $41.99 | $69.99 | |
| COSMIC CANDY | 718117089800 | 150GM | 30 | $41.99 | $69.99 | |
| | | | | | | |
| THERMAL BLACK - Fat Burner | 6608845919457 | 30CAP | 30 | $34.99 | $79.99 | |
| TEST BLACK | | 120CAP | 30 | $39.99 | $89.99 | |
| ALPHA~SRM™ - Body Recomp Tool | | 90CAP | 30 | $59.99 | $99.99 | |
| KRE4MAX™ - Krealkalyn Creatine Complex | 660845919334 | 120CAP | 30 | $34.99 | $79.99 | |
| CARNISLIM™ | 660845918979 | 90CAP | 30 | $29.99 | $59.99 | |
| ALPHA SHRED™ KIT | | 3 BOTTLES | 30 Day Supply | $89.99 | $189.99 | |
| ESTROX - **ESTROGEN BLOCKER** | | 90CAP | 30 | $41.99 | $69.99 | |
| | | | | | | |
| **AMINO REV *** BCAA / EAA + ADVANCED HYDRATION SYSTEM ***** | | | | | | |
| COSMIC CANDY | | 390GM | 30 | $47.99 | $79.99 | |
| GRAPE LIMEADE | | 390GM | 30 | $47.99 | $79.99 | |
| | | | | | | |
| **TRU BHB™ *** PREMIUM EXOGENOUS KETONES *** *** NEW ***** | | | | | | |
| SALTED CARAMEL | 754697664594 | 320GM | 20 | $41.99 | $69.99 | |
| RAINBOW CANDY | 754697665652 | 360GM | 20 | $41.99 | $69.99 | |
| | | | | | | |

## HER SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| **COLLAGEN PEPTIDES™ *** NEW! NOW AVAILABLE! ***** | | | | | | |
| FRUITY CEREAL | | 360GM | 30 | $35.99 | $59.99 | |
| LEAN CHARMS | | 360GM | 30 | $35.99 | $59.99 | |
| STRAWBERRY SHORTCAKE | | 360GM | 30 | $35.99 | $59.99 | |
| UNICORN COOKIE SHAKE **(COMING SOON)** | | 360GM | 30 | $35.99 | $59.99 | |
| UNFLAVORED | | 360GM | 30 | $35.99 | $59.99 | |
| | | | | | | |
| **SLIM WHEY™ FOR HER** | | | | | | |
| VANILLA CRÈME | 660845918184 | 1.85LB | 30 | $35.99 | $59.99 | |
| CHOCOLATE CAKE | 660845918191 | 1.85LB | 30 | $35.99 | $59.99 | |
| SKINNY MINT | 660845918207 | 1.85LB | 30 | $35.99 | $59.99 | |
| | | | | | | |
| **CARDIOBURN™ FOR HER** | | | | | | |
| SWEET & SASSY *** NEW FORMULA *** | | 165GM | 30 | $29.99 | $49.99 | |
| RAINBOW FRUIT *** NEW FORMULA *** | | 165GM | 30 | $29.99 | $49.99 | |
| TROPICAL SUNRISE *** NEW FORMULA *** | | 165GM | 30 | $29.99 | $49.99 | |
| | | | | | | |
| FEMME BURN™ - Fat Burner | 660845918030 | 90CAP | 30 | $35.99 | $59.99 | |
| LIPOSLIM™ FOR HER - Non Stim Fat Metabolizer | 660845918016 | 60 Softgels | 30 | $35.99 | $59.99 | |
| DETOX FOR HER | 718117089794 | 90CAP | 30 | $35.99 | $59.99 | |
| SLIM KIT™ FOR HER | 660845919235 | 3BOTTLES | 30 Day Supply | $89.99 | $149.99 | |
| | | | | | | |
| HAIR, SKIN, & NAILS | 718117089800 | 90CAP | 30 | $35.99 | $59.99 | |
| | | | | | | |

## RX SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| LIVER PRO REVOLUTION™ | 660845917774 | 60CAP | 30 | $35.99 | $59.99 | |
| LIFE SHIELD REVOLUTION™ | 660845917781 | 120CAP | 60 | $35.99 | $59.99 | |
| JOINT REVOLUTION™ | 780672311146 | 80CAP | 20 | $35.99 | $59.99 | |
| MULTI VITA REVOLUTION™ | 780672311122 | 90CAP | 30 | $35.99 | $59.99 | |
| ADRENAL REVOLUTION™ | 780672311139 | 90CAP | 30 | $35.99 | $59.99 | |
| DIGESTIVE NZYMES REVOLUTION | 660845919099 | 60 Veg.Cap | 30 | $29.99 | $49.99 | |

### DIET SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| THERMAL REVOLUTION™ – Fat Burner | 718117089275 | 60CAP | 30 | $35.99 | $59.99 | |
| LIPOSLIM REVOLUTION™ – Non Stim Fat Metabolizer | 718117089329 | 100 Softgels | 100 | $35.99 | $59.99 | |
| DETOX REVOLUTION™ | 660845917132 | 90CAP | 30 | $35.99 | $59.99 | |
| H20 REVOLUTION™ | 718117089282 | 90CAP | 30 | $35.99 | $59.99 | |

## REVOLUTION SERIES *** NEW ***

| | | | | | | |
|---|---|---|---|---|---|---|
| SUPER CARB REVOLUTION™ w/BHB SALTS *** NOW AVAILABLE *** | | | | | | |
| TROPICAL PUNCH | 754697665676 | 480GM | 20 | $29.99 | $49.99 | |
| LIME ICE | 754697665683 | 480GM | 20 | $29.99 | $49.99 | |



**MUSCLESPORT® Pro SERIES**

*ALL PRO SERIES SKU'S ARE SOLD BY CASE QUANTITIES, PER FLAVOR*

### INTRA - POST SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| WHEY REVOLUTION™ 5LB (WHEY BLEND) *** 4 UNITS PER CASE *** | | | | | | |
| VANILLA ICE CREAM | | 5LB | 65 | $53.99 | $89.99 | |
| CHOCOLATE DELIGHT | 660845918085 | 5LB | 65 | $53.99 | $89.99 | |
| PEANUT BUTTER CUP | | 5LB | 65 | $53.99 | $89.99 | |
| PROTELLA | | 5LB | 65 | $53.99 | $89.99 | |
| PEANUT BUTTER GONE BANANAS | | 5LB | 65 | $53.99 | $89.99 | |
| STRAWBERRY BANANA | | 5LB | 65 | $53.99 | $89.99 | |
| BIRTHDAY CAKE *** NEW *** | | 5LB | 65 | $53.99 | $89.99 | |
| CHOCOLATE CARAMEL *** NEW *** | | 5LB | 65 | $53.99 | $89.99 | |

**Juiced™ Juice Bar Bulk Supply**

### JUICE BAR SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| JUICE BAR PROTEIN - VANILLA | | 25LBS | 380 | $240.00 | X | |
| JUICE BAR PROTEIN - CHOCOLATE | | 25LBS | 380 | $240.00 | X | |
| JUICE BAR PROTEIN - STRAWBERRY | | 25LBS | 380 | $240.00 | X | |

### RAW SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| AGMATINE SULFATE REVOLUTION | 718117088926 | 100GM | 100 | $47.99 | $79.99 | |
| BETA-ALANINE REVOLUTION | | 320GM | 100 | $29.99 | $49.99 | |
| BETAINE REVOLUTION | | 120GM | 60 | $23.99 | $39.99 | |
| CITRULLINE MALATE REVOLUTION | 718117089022 | 200GM | 100 | $29.99 | $49.99 | |
| CREATINE MONO REVOLUTION 300GRAMS | | 300GM | 60 | $14.99 | $24.99 | |
| CREATINE MONO REVOLUTION 500GRAMS | | 500GM | 100 | $23.39 | $38.99 | |
| CREATINE MONO REVOLUTION 1,000GRAMS | | 1,000GM | 200 | $44.99 | $74.99 | |
| CREATINE MAGNAPOWER REV. | 718117089008 | 300GM | 120 | $29.99 | $49.99 | |
| **CYCLIC DEXTRIN - UNFLAVORED** | 718117089558 | **1.85LB** | **30** | **$41.99** | **$69.99** | |
| **CYCLIC DEXTRIN - FIRECRACKER** | 718117089565 | **1.85LB** | **30** | **$41.99** | **$69.99** | |
| L-GLUTAMINE REVOLUTION 300GRAMS | 718117089039 | 300GM | 60 | $23.39 | $38.99 | |
| L-GLUTAMINE REVOLUTION 500GRAMS | | 500GM | 100 | $31.79 | $52.99 | |
| L-GLUTAMINE REVOLUTION 1,000GRAMS | | 1,000GM | 200 | $60.59 | $100.99 | |
| L-CARNITINE REVOLUTION | 802991328459 | 60CAP | 60 | $23.99 | $39.99 | |
| NITROSIGINE™ REVOLUTION | 660845917767 | 90CAP | 45 | $35.99 | $59.99 | |
| TUDCA | 660845918504 | 60CAP | 60 | $47.99 | $79.99 | |

**HYPERGENETIC LABORATORIES**

| | | | | | | |
|---|---|---|---|---|---|---|
| KILLER BEE'S - *** Worlds Strongest Fat Burner *** | | 60CAP | 60 | $35.99 | $59.99 | |



**DNA PHARMA** PHARMACEUTICAL GRADE PRODUCTS

CONFIDENTIAL - ATTORNEYS EYES ONLY

## CAPSULES

| | | | | | |
|---|---|---|---|---|---|
| HIBERN8™ – GH Stimulator* | | 90CAP | 30 | $29.99 | $49.99 |

# KODIAK
### SPORTS NUTRITION

## INTRA - POST SERIES

| | | | | | |
|---|---|---|---|---|---|
| **1 WHEY™ 100% WHEY PROTEIN ISOLATE 2LB** | | | | | |
| VANILLA CUPCAKE | | 2LB | 30 | $35.99 | $59.99 |
| CHOCOLATE STRAWBERRY | | 2LB | 30 | $35.99 | $59.99 |
| BLUEBERRY CRUMB PIE | | 2LB | 30 | $35.99 | $59.99 |
| ORANGE CREAMSICLE | | 2LB | 30 | $35.99 | $59.99 |
| MILK CHOCOLATE | | 2LB | 30 | $35.99 | $59.99 |
| | | | | | |
| **AMMO™ BCAA PERFORMANCE SERIES** | | | | | |
| PINEAPPLE SPLASH (NEW) | | 225GM | 30 | $21.99 | $44.99 |
| RAINBOW FRUIT (NEW) | | 225GM | 30 | $21.99 | $44.99 |
| STARPUNCH (NEW) | | 225GM | 30 | $21.99 | $44.99 |
| STRAWBERRY (NEW) | | 225GM | 30 | $21.99 | $44.99 |
| | | | | | |
| PINEAPPLE SPLASH (NEW) | | 675GM | 90 | $49.99 | $104.99 |
| RAINBOW FRUIT (NEW) | | 675GM | 90 | $49.99 | $104.99 |
| STARPUNCH (NEW) | | 675GM | 90 | $49.99 | $104.99 |
| STRAWBERRY (NEW) | | 675GM | 90 | $49.99 | $104.99 |

## PRE SERIES

| | | | | | |
|---|---|---|---|---|---|
| **ATTACK™ PRE-WORKOUT-CANDY SERIES** | | | | | |
| GEEKY GRAPE | | 250GM | 25 | $29.99 | $49.99 |
| RAINBOW FRUIT | 660845919495 | 250GM | 25 | $29.99 | $49.99 |
| STARPUNCH | | 250GM | 25 | $29.99 | $49.99 |
| SWEETISH PUNCH | | 250GM | 25 | $29.99 | $49.99 |
| SWEET & TANGY | 660845918269 | 250GM | 25 | $29.99 | $49.99 |
| SOUR RASPBERRY | | 250GM | 25 | $29.99 | $49.99 |
| JOLLY WATERMELON | | 250GM | 25 | $29.99 | $49.99 |
| PINEAPPLE | | 250GM | 25 | $29.99 | $49.99 |
| GUMMY BEAR | | 250GM | 25 | $29.99 | $49.99 |
| GRAPE LIME LOLLIPOP | | 250GM | 25 | $29.99 | $49.99 |

## DIET SERIES

| | | | | | |
|---|---|---|---|---|---|
| TORCH™ – Fat Burner | 660845918696 | 60CAP | 60 | $35.99 | $59.99 |
| KETOGEN™ – Non Stim Fat Metabolizer | 660845919181 | 90CAP | 30 | $35.99 | $59.99 |
| | | | | | |
| **CARNISHRED w/Lean GBB PRE-CARDIO-CANDY SERIES** | | | | | |
| RAINBOW FRUIT | 660845919426 | 120GM | 60 | $29.99 | $49.99 |
| SWEET & TANGY | 660845919389 | 120GM | 60 | $29.99 | $49.99 |
| SWEETISH PUNCH | 754697660800 | 120GM | 60 | $29.99 | $49.99 |
| GUMMY BEAR | | 120GM | 60 | $29.99 | $49.99 |
| | | | | | |
| **ANABOLIC COMA™ DEEP REM SLEEP & RECOVERY ACTIVATOR*** | | | | | |
| LEMON DROP | | 330GM | 30 | $35.97 | $59.95 |
| RAINBOW FRUIT | | 330GM | 30 | $35.97 | $59.95 |
| WILDBERRY DREAMIN' | | 330GM | 30 | $35.97 | $59.95 |

# PURGESUPPS™
## ENGINEERED FOR PERFECTION.

| | | | | | |
|---|---|---|---|---|---|
| **PRE V2™ *** PRE-WORKOUT POWERHOUSE *** ** | | | | | |
| LEMONRAID | | 500GM | 25 | $38.99 | $64.99 |
| BLUE RAGE (Blue Raspberry, Coconut) | | 500GM | 25 | $38.99 | $64.99 |
| MANGO MADNESS (Peach Mango) | | 500GM | 25 | $38.99 | $64.99 |
| CANDY RIOT (Rainbow Fruit, Sweet & Tangy) | | 500GM | 25 | $38.99 | $64.99 |
| MAUI WOWI (Mango, Pineapple, Banana) | | 500GM | 25 | $38.99 | $64.99 |
| | | | | | |
| **HYPE X™ *** HYPERDRIVE STIM COMPLEX *** NEW! NOW AVAILABLE! *** ** | | | | | |
| CANDY RIOT | | 300GM | 25 | $35.99 | $59.99 |
| MANGO MADNESS | | 300GM | 25 | $35.99 | $59.99 |

CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | | | | |
|---|---|---|---|---|---|---|
| PURPLE HAZE | | 300GM | 25 | $35.99 | $59.99 | |
| | | | | | | |
| | | | | | | |
| **BCAA X™ *** BCAA / EAA + HYDRATION COMPLEX *** | | | | | | |
| PEACH LIME | | 390GM | 30 | $32.99 | $54.99 | |
| ISLAND PUNCH (Pineapple, Pear, Banana) | | 390GM | 30 | $32.99 | $54.99 | |
| | | | | | | |
| **RIPT X™ *** THERMOGENIC STIM COMPLEX *** | | | | | | |
| CANDY RIOT | | 165GM | 30 | $35.99 | $59.99 | |
| PURPLE HAZE | | 165GM | 30 | $35.99 | $59.99 | |
| | | | | | | |
| **THERM X™ *** STIM-FREE FAT BURNER *** | | | | | | |
| BLUE RAGE (Blue Raspberry, Coconut) | | 135GM | 30 | $35.99 | $59.99 | |
| BERRY BLAZE | | 135GM | 30 | $35.99 | $59.99 | |



| | | | | | | |
|---|---|---|---|---|---|---|
| **STAND THE F%#K UP™ *** VERY INTENSE PRE-WORKOUT *** | | | | | | |
| ROCKET MAN (Bomb Pop Flavor) | | 180GM | 30 | $33.59 | $55.99 | |
| STAR SPANGLED BERRY (Tropical Berry Blend) | | 180GM | 30 | $33.59 | $55.99 | |
| RIGGED RASPBERRY | | 180GM | 30 | $33.59 | $55.99 | |
| | | | | | | |
| **PANDEMIC™ *** ANARCHY APPROVED EXTREMELY POTENT PRE-WORKOUT *** | | | | | | |
| ANTIDOTE APPLE (NEW) | | 250GM | 25 | $35.99 | $59.99 | |
| FAKE NEWS (NEW) | | 250GM | 25 | $35.99 | $59.99 | |
| GULAG GRAPE (NEW) | | 250GM | 25 | $35.99 | $59.99 | |

## INTRA - POST SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| **ALL AMERICAN EAA'S *** Powered By LAXOPURE™ *** | | | | | | |
| GEORGIA PEACH | | 390GM | 30 | $29.99 | $49.99 | |
| PRESIDENTIAL PUNCH | | 390GM | 30 | $29.99 | $49.99 | |

## DIET SERIES

| | | | | | | |
|---|---|---|---|---|---|---|
| LIT THE F%#K UP™ – Fat Burner w/ Ephedra | | 60CAP | 60 | $35.99 | $59.99 | |

## OPTITUNE

| | | | | | | |
|---|---|---|---|---|---|---|
| **KEY: N/A - NOT AVAILABLE** | | | | | | |

### Healthy Fats

| | | | | | | |
|---|---|---|---|---|---|---|
| CLA 80% 1000mg | | 100 Softgels | 100 | $12.74 | $16.99 | |
| MCT Softgels (550mg C8, 440mg C10) | | 180 Softgels | 180 | $18.74 | $24.99 | |
| Omega 3, 6, 9 Softgels 1000mg 180/120 | | 90 Softgels | 90 | $11.24 | $14.99 | |

### Nootropics

| | | | | | | |
|---|---|---|---|---|---|---|
| Acetyl L Carnitine 500mg | | 60 Capsules | 60 | $18.74 | $24.99 | |
| Alpha GPC 300mg | | 60 Capsules | 60 | $22.49 | $29.99 | |
| Lions Mane NRG + Caffeine | | 60 Capsules | 30 | $33.74 | $44.99 | |
| Noopept 30mg | | 56 Capsules | 56 | $33.74 | $44.99 | |
| Prodigy - Focus & Flow Cognitive Enhancer* *** COMING SOON *** | | 90 Capsules | 30 | $22.49 | $29.99 | |
| Uridine 5 300mg | | 60 Veg.Cap | 60 | $22.49 | $29.99 | |

### VITAMINS, MINERALS, & WELLNESS

| | | | | | | |
|---|---|---|---|---|---|---|
| Alpha Lipoic Acid 300mg | | 120 Softgels | 120 | $14.99 | $19.99 | |
| Caffeine Anhydrous 100mg | | 60 Capsules | 60 | $9.74 | $12.99 | |
| Cissus Quadrangularis 5% 1600mg | | 120 Capsules | 60 | $14.99 | $19.99 | |
| CoQ10 100mg (In Olive Oil) | | 100 Softgels | 100 | $22.49 | $29.99 | |
| DIMolish | | 60 Capsules | 60 | $18.74 | $24.99 | |
| HMB 1000mg *** COMING SOON **** | | 120 Capsules | 120 | $26.24 | $34.99 | |
| L-Carnitine 550mg | | 60 Capsules | 60 | $14.99 | $19.99 | |
| **Next CBD 400mg Yielding 10mg CBD** | | **30 Softgels** | **30** | **$44.99** | **$59.99** | |
| Oxaloacetate (thermally Stabilized Oxaloacetic Acid) 100mg | | 30 Veg.Cap | 30 | $22.49 | $29.99 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Suppress-P (Prolactin) | | 60 Capsules | 60 | $18.74 | $24.99 | |
| Tudca 250mg | | 60 Capsules | 60 | $33.74 | $44.99 | |
| Vitamin C 1000mg (Ascorbic Acid) | | 60 Capsules | 60 | $14.99 | $19.99 | |
| Vitamin C 1000mg (Ascorbic Acid) | | 180 Capsules | 180 | $24.79 | $32.99 | |
| Vitamin D3 5000IU (In Olive Oil) | | 120 Softgels | 120 | $11.24 | $14.99 | |
| Vitamin E (Natural D Alpha Tocopherol Acetate) | | 120 Softgels | 120 | $14.99 | $19.99 | |
| Zinc 30mg (Zinc Gluconate) | | 90 Capsules | 90 | $14.99 | $19.99 | |
| | | | | | | |
| ## WELLNESS COMPLEXES | | | | | | |
| | | | | | | |
| Absorb More w/Astragin/Bioperine and Fulvic Acid | | 30 Capsules | 30 | $11.24 | $14.99 | |
| Adrenal Support W/**KSM®** Ashwaghanda | | 90 Capsules | 30 | $22.49 | $29.99 | |
| Apple Cider Vinegar + (Turmeric & Cayenne) | | 90 Capsules | 30 | $18.74 | $24.99 | |
| Digestive Enzyme Complex | | 60 Veg.Cap | 30 | $18.74 | $24.99 | |
| Digestive Enzyme Complex | | 180 Capsules | 90 | $44.99 | $59.99 | |
| Hair, Skin and Nails | | 90 Capsules | 30 | $18.74 | $24.99 | |
| Hair, Skin and Nails Gummies - Blue Razz **(NEW)** | | 90 Gummies | 45 | $22.49 | $29.99 | |
| Immunity + (Seasonal Cold/Flu Support) | | 90 Capsules | 30 | $22.49 | $29.99 | |
| Immunity + Powder (Seasonal Cold/Flu Support) Pineapple Splash | | 180GM | 30 | $26.24 | $34.99 | |
| Immunity + Powder (Seasonal Cold/Flu Support) Berry Boost | | 180GM | 30 | $26.24 | $34.99 | |
| Liver Support W/Glutathione | | 60 Capsules | 30 | $18.74 | $24.99 | |
| OptiGut™ – Advanced Prebiotic / Probiotic Gut Health* ***COMING SOON *** | | 90 Capsules | 30 | $22.49 | $29.99 | |
| Synergy Multi Vitamin For Her | | 60 Capsules | 30 | $14.99 | $19.99 | |
| Synergy Multi Vitamin For Him | | 60 Capsules | 30 | $14.99 | $19.99 | |
| | | | | | | |
| ## POWDERED SUPPORT | | | | | | |
| | | | | | | |
| FRUITS & GREENS™ (Sweetened with Truvia) Pineapple | | 225GM | 30 | $29.99 | $39.99 | |
| FRUITS & GREENS™ (Sweetened with Truvia) Chocolate | | 225GM | 30 | $29.99 | $39.99 | |
| FRUITS & GREENS™ (Sweetened with Truvia) Peach Mango | | 225GM | 30 | $29.99 | $39.99 | |
| Synergy Multi Vitamin Powder Berry Blast | | 300GM | 30 | $22.49 | $29.99 | |
| Synergy Multi Vitamin Powder Orange Blast | | 300GM | 30 | $22.49 | $29.99 | |
| Vegan Protein (Pea, Rice, Hemp, Sacha Inchi) N/A | | 2LB | 30 | X | X | |



| | | | | | | |
|---|---|---|---|---|---|---|
| ● KETO & LOW-CARB FRIENDLY SPORT & LIFESTYLE PRODUCTS | | | | ● PREMIUM FORMULATIONS | | |
| ● DOCTOR FORMULATED | | | | ● TRANSPARENT LABEL // EFFICACIOUS DOSING | | |
| | | | | | | |
| ## KETO LIFESTYLE | | | | | | |
| | | | | | | |
| KETO FREE™ w/BHB *** GLUCOSE DISPOSAL AGENT *** | | 120CAP | 30 | $29.99 | $49.99 | |
| | | | | | | |
| ## PERFORMANCE | | | | | | |
| | | | | | | |
| REX PRE™ w/BHB *** KETOGENIC PRE-WORKOUT *** | | | | | | |
| CHERRY LIMEADE | | 380GM | 20 | $29.99 | $49.99 | |
| RAINBOW CANDY | | 380GM | 20 | $29.99 | $49.99 | |
| | | | | | | |
| ## WEIGHT LOSS | | | | | | |
| | | | | | | |
| KETO THERM™ w/BHB ** ADVANCED FATLOSS CATALYST ** | | 90CAP | 30 | $29.99 | $49.99 | |



| PRODUCTS | | | SIZE | SERVINGS | WHOLESALE PRICE | SUGGESTED RETAIL PRICE | YOUR PRICE |
|---|---|---|---|---|---|---|---|
| | | *TERRITORIES  AVAILABLE. INQUIRE W/ YOUR REP.* | | | | | |
| ## PRE-WORKOUT | | | | | | | |
| | | | | | | | |
| RAGE *** EXTREME PRE-WORKOUT FORMULA *** | | | | | | | |
| RAINBOW FRUIT | | | 250GM | 25 | $29.99 | $49.99 | |
| SOUR RASPBERRY | | | 250GM | 25 | $29.99 | $49.99 | |
| STARPUNCH | | | 250GM | 25 | $29.99 | $49.99 | |
| SWEET & TANGY | | | 250GM | 25 | $29.99 | $49.99 | |
| WATERMELON | | | 250GM | 25 | $29.99 | $49.99 | |
| PINEAPPLE | | | 250GM | 25 | $29.99 | $49.99 | |
| DORKIES | | | 250GM | 25 | $29.99 | $49.99 | |

| RAGE: GHOST OF WAR *** *LIMITED EDITION* PRE-WORKOUT *** | | | | | |
|---|---|---|---|---|---|
| SAVAGE SUNSET | | 460GM | 20/40 | $41.99 | $69.99 |
| GUERRILLA GRAPE | | 460GM | 20/40 | $41.99 | $69.99 |
| | | | | | |
| | | | | | |
| ## FAT BURNING / WEIGHT LOSS | | | | | |
| | | | | | |
| BURNR *** ADVANCED THERMOGENIC FAT BURNER *** | | 60CAP | 60 | $35.99 | $59.99 |
| | | | | | |
| | | | | | |
| ## ANABOLIC / HORMONE SUPPORT | | | | | |
| | | | | | |
| TOR-ACTIV *** POWERFUL M-TOR ACTIVATOR *** | | 105CAP | 21 | $50.99 | $84.99 |
| | | | | | |
| T-MAXX *** EXTREME ANABOLIC ACTIVATOR *** | | 90CAP | 30 | $47.99 | $79.99 |
| | | | | | |
| RECOMP *** BODY RECOMPOSITION ACCELERATOR *** | | 60CAP | 30 | $35.99 | $59.99 |
| | | | | | |
| CORTX *** ADAPTOGENIC CORTISOL BALANCE *** | | 60CAP | 30 | $29.99 | $49.99 |
| | | | | | |
| RENEW GH *** ADVANCED GH SECRETAGOGUE SUPPORT *** | | 90CAP | 30 | $29.99 | $49.99 |
| | | | | | |
| AROMASTOP *** ADVANCED AROMATASE BALANCE FORMULA *** | | 60CAP | 60 | $29.99 | $49.99 |
| | | | | | |
| TX-2 *** NATURAL TESTOSTERONE AMPLIFIER *** | | 90CAP | 30 | $47.99 | $79.99 |
| | | | | | |
| | | | | | |

**MUSCLESPORT,  KODIAK SPORTS NUTRITION AND ALL BRANDS DISTRIBUTED BY ELITE SPORTS DISTRIBUTION ARE RETAIL ONLY, NON INTERNET, M.A.P PRICING PROTECTED BRANDS. BY ACCEPTING AN ORDER YOU AGREE TO THESE CONDITIONS AND TO A  M.A.P. PRICING STRUCTURE OF 40% OFF RETAIL PRICE ON ALL NON PROTEIN ITEMS AND 30% OFF PROTEIN ITEMS.**

**For more information or to place an order please contact a Sales Representative at *631 755 1388*  or Toll Free at *844 91 RHINO***

CONFIDENTIAL - ATTORNEYS EYES ONLY                    MSP 000619

# EXHIBIT K

Michael Rossiter (Utah Bar No. 15914)
Benjamin C. Deming (admitted *pro hac vice*)
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Tel: 714-641-5100
mrossiter@rutan.com
bdeming@rutan.com

Attorneys for Defendant JRM NutraSciences, LLC

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah limited liability corporation;<br><br>Plaintiff,<br><br>v.<br><br>JRM NUTRASCIENCES, LLC, A New York limited liability corporation;<br><br>Defendant. | **DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**<br><br>Civil Case No. 2:20-cv-00581-DBB<br><br>Hon. David Barlow |

Defendant JRM NutraSciences, LLC ("Responding Party") hereby responds to plaintiff Kodiak Cakes, LLC's ("Propounding Party") First Set of Interrogatories, as follows:

## **PRELIMINARY STATEMENT AND OBJECTIONS**

1.      The responses to these Interrogatories are provided for purpose of this litigation only.  Each response is subject to all appropriate objections (including but not limited to objections concerning competency, relevancy, materiality, propriety and admissibility) that would require the exclusion of any requested information if the information were sought to be introduced into evidence at the time of trial.  All such objections and grounds are reserved and will be interposed at the time of trial or other appropriate proceedings.

2.      Responding Party  has not yet completed his investigation of the facts relating to this action, his discovery, or his preparation for trial.  The following responses are given without prejudice to Responding Party 's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts and to introduce all information, whenever discovered, relating to the proof of subsequently discovered material facts.  Responding Party  does not assume any duty to amend these responses.

3.      If any information within the scope of the attorney-client privilege or the attorney work-product doctrine is inadvertently disclosed in these responses, Responding Party  has not done so intentionally and reserves his right to assert those privileges at any time in these proceedings and further reserves the right to seek the return of all privileged information— including any copies or abstracts of that information.

4.      This Preliminary Statement applies to each and every response or objection below and is incorporated in each as though set forth in full therein.  Unless otherwise noted, Responding Party is not withholding any information based on the objections set forth herein.

5.      Responding Party  objects to each Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.  Responding Party will not produce any privileged and/or work-product information in response to these Interrogatories.  Inadvertent production of privileged information shall not constitute a waiver of any applicable privilege.

6.      Responding Party  objects to each Interrogatory to the extent it is premature and beyond the scope of the limited discovery authorized by the Court.

7.      Responding Party  objects to each Interrogatory to the extent it is vague and ambiguous.  Except as noted herein, Responding Party  has relied on Defendant's defined terms and interpreted each Interrogatory in good faith.

2705/102038-0000
15792624.1 a12/14/20                    -2-                    Case No. 2:20-cv-00581-DBB
JRM's Response to First Set of Interrogatories

8.      Responding Party  objects to each Interrogatory to the extent it requests information from documents that are not in Responding Party 's possession, custody, or control.  Responding Party  has no obligation under the discovery rules to seek documents from third parties.

9.      Responding Party  provides the following responses subject to and without waiving the foregoing Preliminary Statement and Objections, each of which are incorporated by reference into each response below.


## INTERROGATORIES AND RESPONSES THERETO

**INTERROGATORY NO. 1**:

If your response to any Request for Admission is anything other than an unqualified admission, state in detail the factual and legal basis for your failure to admit the request(s).

**RESPONSE TO INTERROGATORY NO. 1**:

Responding Party objects to this request to the extent it calls for the production of privileged attorney-client communications or attorney work product materials.  Responding Party incorporates by reference the objections contained in its responses to the first set of requests for admission.  Subject to those objections, Responding Party responds as follows:

Not applicable.


**INTERROGATORY NO. 2**:

Identify the person and/or entity related to JRM NutraSciences, LLC to whom you referred in the attorney planning meeting, as referenced in Request for Admission No. 3.

**RESPONSE TO INTERROGATORY NO. 2**:

Responding Party objects that the term "person and/or entity related to JRM

NutraSciences, LLC" renders the request vague and ambiguous.  Responding Party further objects that the phrase "to whom you referred in the attorney planning meeting" is an ambiguous, incomplete, or incorrect recitation of facts that renders the interrogatory vague and ambiguous. Subject to those objections, Responding Party responds as follows:

Muscle Sports Products, LLC is the sister company referenced in response to Request for Admission No. 3.


**INTERROGATORY NO. 3**:

Identify all persons and/or entities who own, control, and/or sell products through the website www.kodiaksupps.com.  If any of these entities are limited liability companies, identify their individual members, and the members of those members, until all members of such referenced limited liability companies have been identified to the level of individual human beings or corporations.

**RESPONSE TO INTERROGATORY NO. 3**:

Responding Party objects that the phrase "all persons and/or entities who own, control, and/or sell products through the website www.kodiaksupps.com" renders the request vague and ambiguous.  In responding to the request, Responding Party will assume that the phrase is intended to be construed as "all persons and/or entities who own [the website], control [the website], and/or sell products through the website www.kodiaksupps.com."  Subject to those objections, Responding Party responds as follows:

The website is owned by Jason Mancuso.  Products are sold through the website by Muscle Sports Products, LLC.  The sole member of Muscle Sports Products, LLC is Jason Mancuso.

**INTERROGATORY NO. 4**:

Identify all persons and/or entities who, to your knowledge, currently sell or have ever sold products under the name "Kodiak Supplements" and/or the name "Kodiak Sports Nutrition."

**RESPONSE TO INTERROGATORY NO. 4**:

Responding Party believes that Muscle Sports Products, LLC sells products under the name "Kodiak Sports Nutrition."  Responding Party is also aware of a company believed to be based in Atlanta, Georgia that sells products under the name "Kodiak Supplements" via the websites www.KodiakSupplements.com and www.Amazon.com.

**INTERROGATORY NO. 5**:

Identify all persons and/or entities authorized by license or otherwise to use the marks "Kodiak Supplements" and/or "Kodiak Sports Nutrition."

**RESPONSE TO INTERROGATORY NO. 5**:

Responding Party objects that this interrogatory is vague and ambiguous because it seeks information relating to "all persons and/or entities authorized to use the marks…" without regard to the source of the authorization.  In responding to this interrogatory, Responding Party will assume that the interrogatory seeks information relating to authorization from Responding Party. Subject to those objections, Responding Party responds as follows:

Muscle Sports Products, LLC is authorized by Responding Party to sell products using the mark "KODIAK SPORTS NUTRITION."

**INTERROGATORY NO. 6**:

State the nature of your relationship with the entity identified on www.kodiaksupps.com as Kodiak Nutrition.

**RESPONSE TO INTERROGATORY NO. 6**:

Responding Party objects to this interrogatory because it assumes facts or mischaracterizes the information that is the subject of the interrogatory.  Responding Party further objects that the interrogatory is vague and ambiguous because it refers to the "the entity identified… as Kodiak Nutrition."  The website in question does not make reference to any such entity.  Subject to those objections, Responding Party responds as follows:

Responding Party has reviewed the website www.kodiaksupps.com and does not see any "entity identified on www.kodiaksupps.com as Kodiak Nutrition."  The website in question refers to a brand name or product line called "Kodiak Nutrition$^{TM}$."

**INTERROGATORY NO. 7**:

Identify all persons and/or entities who have an interest in Kodiak Nutrition and/or the marks "Kodiak Supplements" and "Kodiak Sports Nutrition."  If any of these entities are limited liability companies, identify their individual members.

**RESPONSE TO INTERROGATORY NO. 7**:

Responding Party objects to this interrogatory as being vague and ambiguous because it uses the phrases "who have an interest in…" the marks.  In responding to this interrogatory, Responding Party will assume that the interrogatory seeks information about an ownership or financial "interest."

Responding Party believes that Muscle Sports Products, LLC sells products under the

2705/102038-0000
15792624.1 a12/14/20                                    -6-                    Case No. 2:20-cv-00581-DBB
                                                                    JRM's Response to First Set of Interrogatories

names "Kodiak Sports Nutrition" and under the brand or product line "Kodiak Nutrition" and therefore has an interest in those names and marks.  The sole member of Muscle Sports Products, LLC is Jason Mancuso.

Responding Party is the registrant for the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 and therefore has an interest in that mark.  Jason Mancuso is the sole member of Responding Party.

Responding Party has no information relating to the ownership interests of the company believed to be based in Atlanta, Georgia that sells products under the name "Kodiak Supplements" via the websites www.KodiakSupplements.com and www.Amazon.com.

**INTERROGATORY NO. 8**:

State the nature of Jason Mancuso's relationship with any and all parties who are authorized by license or otherwise to use the marks "Kodiak Supplements" and/or "Kodiak Sports Nutrition," and/or who own, control, or sell products through the website www.kodiaksupps.com.

//

//

//

//

//

//

//

//

**RESPONSE TO INTERROGATORY NO. 8**:

Responding Party has authorized Muscle Sports Products, LLC to sell products using the mark "KODIAK SPORTS NUTRITION."  The sole member of Muscle Sports Products, LLC is Jason Mancuso.

Responding Party is the registrant for the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 and therefore is authorized to use the mark.  Jason Mancuso is the sole member of Responding Party.

Dated: December 14, 2020

RUTAN & TUCKER, LLP

_____

Benjamin C. Deming

Michael Rossiter
Benjamin C. Deming
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612

*Attorneys for Defendant JRM NutraSciences, LLC*

## VERIFICATION

I have read the foregoing **DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** and I am familiar with the contents of that document.  I am a member of JRM Nutrasciences, LLC, a party to this action, and am authorized to make this verification for and on its behalf. The factual matters stated in the responses in the foregoing document are true according to the best of my knowledge, information, and belief.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and accurate.

Executed at _____ Ronkonkoma, NY  11779 _____

Dated: December __14__, 2020

_____

Jason Mancuso

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is one of the attorneys for Defendant JRM

Nutrasciences, LLC, in the above-captioned action proceeding and that on the date which

appears below, he caused a copy of the foregoing **DEFENDANT JRM**

**NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S FIRST SET OF**

**INTERROGATORIES** to be served on the following via email.

MANNING CURTIS BRADSHAW
& BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
abradshaw@mc2b.com
cderum@mc2b.com

Stephen H. Bean
Nicholas Wells
Legends Law Group, PLLC
330 N Main
Kaysville, UT 84037
steve@legendslaw.com
nwells@legendslaw.com

Dated: December 14, 2020    _____

Irvine, California                    Benjamin C. Deming

# EXHIBIT L

Dax D. Anderson (USB 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com


*Attorney for Defendants, JRM Nutrasciences, LLC,*
*Muscle Sports Products, LLC and Jason Mancuso*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company, | Case No.: 2:20-CV-0000581-DBB-JCB |
| Plaintiff, | Judge: David Barlow |
| vs. | Magistrate Judge Jared C. Bennett |
| JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual; | **DEFENDANT JASON MANCUSO RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS** |
| Defendants. | |

Defendant, Jason Mancuso ("Defendant" and/or "Mancuso" and/or "Responding Party"),

by and through his undersigned counsel, and pursuant to Rules 26 and 33, of the Federal Rules of

Civil Procedure, hereby responds to Kodiak Cakes, LLC's  ("Plaintiff") First Set of Discovery

Requests as follows:

4836-2732-7202

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are subject to all objections as to competence, relevance, materiality, propriety, and admissibility and any and all objections and grounds that would require the exclusion of any statement made herein if such statement were made by a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

No incidental or implied admission is intended by the responses herein. The fact that Responding Party responds or objects to any request for admission should not be taken as an admission that Responding Party accepts or admits the existence of any facts assumed by such request for admission.  The fact that Responding Party responds to part or all of any request is not intended and shall not be construed to be a waiver by Responding Party of any part of any objection to any request for admission.

Responding Party's responses herein are based on, and reflect, the current state of Responding Party's knowledge.  Responding Party expressly reserves the right to amend or supplement these responses at a later time should it deem such supplementation necessary or appropriate.

Responding Party's responses herein are made without waiving, and expressly reserving, Responding Party's right: (a) to object on any ground to the use of the information provided at any stage or proceeding in this action or any other action; and/or (b) to object on any ground to other discovery requests regarding the subject matter of any individual request for admission herein.

4836-2732-7202

All responses are made on an express reservation of objections as set forth above and in some instances below, and no response shall be deemed, and specifically is stated not to be, a waiver of such objection.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**Request No. 1.**    Admit that you are the owner and sole member of JRM NutraSciences, LLC.

**Answer:**  Mancuso admits Request No. 1.

**Request No. 2.**    Admit that you are the President of JRM NutraSciences, LLC.

**Answer:**  Mancuso admits Request No. 2.

**Request No. 3.**    Admit that you have the ability to direct, supervise, and control JRM's business activities.

**Answer:**  Mancuso admits Request no. 3.

**Request No. 4.**    Admit that you are the owner and sole member of Muscle Sports Products, LLC.

**Answer:** Mancuso admits Request no. 4.

**Request No. 5.**    Admit that you are the Chief Executive Officer of Muscle Sports Products.

**Answer:**        Mancuso admits Request no. 5.

**Request No. 6.**    Admit that you hold yourself out as "CEO" of both "Musclesport" and "Kodiak" on the Instagram page "thesuppchef," found at Instagram.com/thesuppchef.

**Answer:**        Mancuso admits Request no. 6.

**Request No. 7.**     Admit that you promote products displaying Defendants' Marks through one or more of your personal social media accounts.

**Answer:**     Mancuso admits Request no. 7.

**Request No. 8.**     Admit that you have the ability to direct, supervise, and control the business activities of Muscle Sports Products.

**Answer:**     Mancuso admits Request no. 8

**Request No. 9.**     Admit that Muscle Sports Products sells, markets, and distributes products that display Defendants' Marks.

**Answer:**     Mancuso admits Request no. 9.

**Request No. 10.**     Admit that you authorized Muscle Sports Products' adoption of Defendants' Marks.

**Answer:**     With regard to the allegation in Request for Admission No. 10, Mancuso asserts that the Licensing Agreement speaks for itself and therefore neither admits nor denies Request no. 10.

**Request No. 11.**     Admit that you have authorized and continue to authorize Muscle Sports Products' use of Defendants' Marks.

**Answer:**     Mancuso admits Request no. 11.

**Request No. 12.**     Admit that you authorized the licensing of the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 by JRM NutraSciences to Muscle Sports Products.

**Answer:**     Mancuso admits Request no. 12.

**Request No. 13.**     Admit that you own the website www.kodiaksupps.com.

**Answer:**        Mancuso admits Request no. 13.

**Request No. 14.**     Admit that Muscle Sports Products sells and markets products through the website www.kodiaksupps.com.

**Answer:**        Mancuso admits Request no.14.

**Request No. 15.**     Admit that you, either directly or in your capacity as Chief Executive Officer of Muscle Sports Products, have control over the textual and visual content displayed on www.kodiaksupps.com.

**Answer:**        Mancuso admits Request no. 15.

**Request No. 16.**     Admit that Defendants' Products have been sold in Utah.

**Answer:**        Mancuso admits Request no. 16.

**Request No. 17.**     Admit that you were aware of one or more of Plaintiff's Marks before the selection and adoption of Defendants' Marks.

**Answer:**        Mancuso denies Request no. 17.

**Request No. 18.**     Admit that the word "Kodiak" does not describe a characteristic, quality, or ingredient of the products sold under Plaintiff's Marks.

**Answer:**        Mancuso admits that the dictionary definition of the word "Kodiak" does not describe any ingredient of the products sold under Plaintiff's Marks.  As to the remaining allegations in Request for Admission No. 18, Mancuso asserts that the definition of "Kodiak" includes an Alaskan brown bear and implies the characteristics and qualities of said bear and therefore denies the remaining allegations in Request No. 18.

**Request No. 19.**     Admit that the word "Kodiak" does not suggest anything about the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**Answer:**     Mancuso denies the allegations in Request No. 19 and refers Plaintiff to his response to Request No. 18.

**Request No. 20.**     Admit that the word "Kodiak" bears no relationship to the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**Answer:**     Mancuso denies the allegations in Request No. 20 and refers Plaintiff to his response to Request No. 18

**Request No. 21.**     Admit that products sold in connection with Defendants' Marks also use a visual mark containing a roaring bear with a tilted head enclosed by a circle.

**Answer:**     Mancuso admits Request no. 21.

**Request No. 22.**     Admit that products sold in connection with Defendants' Marks include one or more protein supplements.

**Answer:**     Mancuso admits Request no. 22.

<u>**ANSWERS TO INTERROGATORIES**</u>

**Interrogatory No. 1.**     Describe with particularity your participation in the selection and adoption of Defendants' Marks by Muscle Sports Products.

**Answer:**     In response to Interrogatory No. 1 Mancuso states that he reviewed the license agreement and signed the same.

6

**Interrogatory No. 2.**      Describe with particularity your participation in the creation and design of Defendants' Marks.

**Answer:**      In response to Interrogatory No. 2, Mancuso states that he reviewed the mark when it was completed, admits that he liked the mark and moved forward with the adoption of the same.

**Interrogatory No. 3.**      Identify and describe the source materials (in any form) referenced or relied upon in the selection, adoption, creation, design, and decision to use Defendants' Marks.

**Answer:**      In response to Interrogatory No. 3, Mancuso was not involved in the creation or design of the mark.  Mancuso requested that the designer of the mark use a strong animal in the mark.  The decision to use the Kodiak brown bear was made by the designer of the mark. Mancuso has not knowledge, information or belief sufficient to form an opinion as to what source material was used in the rendering of the mark.

**Interrogatory No. 4.**      Describe with particularity your participation in the licensing of the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 by JRM NutraSciences to Muscle Sports Products.

**Answer:**      In response to Interrogatory No. 4, Mancuso states that he reviewed and signed the agreement.

**Interrogatory No. 5.**      Identify all entities that, to your knowledge, use, have used, or are licensed to use the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351.

**Answer:**      In response to Interrogatory No. 5, Mancuso states that to his knowledge, Musclesport Products LLC is the only user of the mark.

**Interrogatory No. 6.**     For each entity identified in Interrogatory No. 5, state your relationship to each entity, including whether you are an owner and/or member of said entity.

**Answer:**     In response to Interrogatory No. 6, Mancuso states that he is the CEO of Musclesport Products LLC.

**Interrogatory No. 7.**     Describe with particularity your participation in and/or authorization of the use of prurient content in connection with the advertising and sale of Defendants' Products.

**Answer:**     In response to Interrogatory No. 7, Mancuso states that his understanding of the word "prurient" is "having or encouraging an excessive interest in sexual matters."  Using that definition, Mancuso has neither participated in and/or authorized the use of any prurient content in connection with the advertising and sale of Defendants' Products and disputes any assertion that images used to promote the product are in any way prurient.

**Interrogatory No. 8.**     Describe with particularity your participation in and/or authorization of the use of prurient content on the website www.kodiaksupps.com.

**Answer:**     In response to Interrogatory No. 8, Mancuso states that his understanding of the word "prurient" is "having or encouraging an excessive interest in sexual matters."  Using that definition, Mancuso has neither participated in and/or authorized the use of any prurient content on the website and disputes any assertion that images or content used to promote the product are in any way prurient.

**Interrogatory No. 9.**     Identify all websites and social media accounts owned, operated, or controlled by you that promote or otherwise display Defendants' Marks and/or Defendants' Products.

4836-2732-7202

**Answer:**         In response to Interrogatory No. 9, Mancuso identified the following websites and

social media accounts:  1) kodiaksupps.com; 2) Instagram.com/kodiaksupps.

DATED this 9th day of April, 2021.

/s/ Jason Macuso
Jason Mancuso

DATED this 9th day of April 2021, as to objection.

KIRTON McCONKIE

By:   /s/Jeremy C. Sink
Dax D. Anderson
Jeremy Sink

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of April, 2021, a true and correct copy of the

foregoing DEFENDANT JASON MANCUSO RESPONSES TO PLAINTIFF'S FIRST SET OF

DISCOVERY REQUESTS were served on counsel by email addressed as follows:


Alan C. Bradshaw        *abradshaw@mc2b.com*
Chad R. Derum           *cderum@mc2b.com*
Michael Harmond         *mharmond@mc2b.com*
MANNING CURTIS BRADSHAW & BEDNAR
136 East South Temple, Suite 1300
Salt Lake City, UT 84111


Stephen H. Bean         *steve@legendslaw.com*
Nicholas Wells          *nwells@legendslaw.com*
LEGENDS LAW GROUP
330 N. Main
Kaysville, UT 84037

By:    */s/Margaret Carlson*

10

# EXHIBIT M



MSP 000974

**EXHIBIT**
**23**

# 02 - MASTER LOGO

Brand buidlines

# EXHIBIT N

Dax D. Anderson (USB 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com

*Attorney for Defendants, JRM Nutrasciences, LLC,*
*Muscle Sports Products, LLC and Jason Mancuso*

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual; <br><br> Defendants. | Case No.: 2:20-CV-0000581-DBB-JCB <br><br> Judge: David Barlow <br><br> Magistrate Judge Jared C. Bennett <br><br> **DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** |

Defendant JRM NutraSciences, LLC ("Responding Party") hereby responds to plaintiff

Kodiak Cakes, LLC's ("Propounding Party") Second Set of Interrogatories, as follows:

## PRELIMINARY STATEMENT

1.      The responses to these Interrogatories are provided for purpose of this litigation

only.  Each response is subject to all appropriate objections (including but not limited to objections

concerning competency, relevancy, materiality, propriety and admissibility) that would require the

exclusion of any requested information if the information were sought to be introduced into evidence at the time of trial.  All such objections and grounds are reserved and will be interposed at the time of trial or other appropriate proceedings.

2.      Responding Party has not yet completed its investigation of the facts relating to this action, its discovery, or its preparation for trial.  The following responses are given without prejudice to Responding Party 's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts and to introduce all information, whenever discovered, relating to the proof of subsequently discovered material facts.  Responding Party does not assume any duty to amend these responses.

3.      If any information within the scope of the attorney-client privilege or the attorney work-product doctrine is inadvertently disclosed in these responses, Responding Party has not done so intentionally and reserves its right to assert those privileges at any time in these proceedings and further reserves the right to seek the return of all privileged information— including any copies or abstracts of that information.

4.      This Preliminary Statement applies to each and every response or objection below and is incorporated in each as though set forth in full therein.  Unless otherwise noted, Responding Party is not withholding any information based on the objections set forth herein.

## INTERROGATORIES AND RESPONSES THERETO

**INTERROGATORY NO. 1**:

Identify all persons involved in your decision to license or otherwise authorize the use of the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351.

**RESPONSE TO INTERROGATORY NO. 1**:

Jason Mancuso.

**INTERROGATORY NO. 2**:

Identify the persons principally involved in the creation and design of all marketing, advertising, and promotional materials (whether print or digital) on which the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 has ever been displayed.

**RESPONSE TO INTERROGATORY NO. 2**:

Responding Party objects that the phrase "persons principally involved in the creation and design" renders the request vague and ambiguous.  The request is vague and ambiguous because Defendant cannot determine whether any given person's involvement is to be construed as "principally involved."  In responding to the request, Responding Party will assume that the phrase is intended to be construed as seeking the identity of the person in charge of Responding Party's marketing.

Subject to those objections, Responding Party responds as follows:

Creation of "marketing, advertising, and promotional materials" on which the KODIAK SPORTS NUTRITION was not done by Responding Party, Defendant JRM.  The materials were created by Muscle Sports Products under the supervision of Jason Mancuso.  Greg Helton assisted with graphic design.

**INTERROGATORY NO. 3**:

Identify each search conducted by you or on your behalf to determine whether the use of the mark KODIAK SPORTS NUTRITION would conflict with Plaintiff's or anyone else's intellectual property rights.

**RESPONSE TO INTERROGATORY NO. 3**:

Responding Party objects to this request to the extent it seeks an admission that the mark is or was ever considered to "conflict with [another's] intellectual property rights." This response should not be construed as an admission of any such concept. Responding Party further objects to the definition of "identify" to the extent it purports to require disclosure of information that is protected from disclosures by the attorney-client privilege or the attorney work product doctrine. In responding to this interrogatory, Responding Party will provide the date of any such search, and the identity of the person(s) conducting the search(es), but will not disclose the contents or results of any such searches.

Subject to those objections, Responding Party responds as follows:

A trademark clearance search was conducted by former trademark counsel Thomas Foster at TD Foster in or around late 2015 or early 2016.


**INTERROGATORY NO. 4**:

Identify the date in which the mark KODIAK SPORTS NUTRITION was first used in the United States in connection with the sale or advertising of Defendant's Products.

**RESPONSE TO INTERROGATORY NO. 4**:

Responding Party objects to the definition of "Defendant's Products" which is defined as: "any product marketed, advertised, promoted, developed, licensed, offered for sale, or sold in interstate commerce since 2010 under or in connection with the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 by you or any of your parent or sister companies, including Muscle Sports Products, LLC." Responding Party does not itself sell any such products.

Subject to the foregoing objections Responding Party responds that the products were first marketed and sold by a licensee in connection with Responding Party's KODIAK-formative marks on or around May 27, 2016.

**INTERROGATORY NO. 5**:

Identify each U.S. state in which any product bearing the mark KODIAK SPORTS NUTRITION has been sold, offered for sale, or intended to be sold.

**RESPONSE TO INTERROGATORY NO. 5**:

Responding Party objects to this request because it seeks information regarding the sale of products, which Responding Party does not do. All sales are made by licensees of Responding Party and not by Responding Party, to whom this interrogatory is directed. In responding to this interrogatory, Responding Party will provide information in its possession, custody, or control, about any sales made by licensees.

Subject to those objections, Responding Party responds as follows:

Responding Party believes that the products are offered for sale by others on the internet, and the products are therefore believed to be available for purchase in all 50 states. Responding Party believes that the product has actually been sold by a licensee to customers in all 50 states.

**INTERROGATORY NO. 6**:

Identify and describe all trade and/or distribution channels through which any product bearing the mark KODIAK SPORTS NUTRITION been sold or offered for sale.

**RESPONSE TO INTERROGATORY NO. 6**:

Responding Party objects to this request as vague and ambiguous to the extent it conflates

Case No. 2:20-cv-00581-DBB
JRM's Response to Second Set of Interrogatories

the various Kodiak-formative marks used by Responding Party in connection with its supplements.

Responding Party objects to this request because it seeks information regarding the sale of products, which Responding Party does not do.  All sales are made by licensees of Responding Party and not by Responding Party, to whom this interrogatory is directed.  In responding to this interrogatory, Responding Party will provide information in its possession, custody, or control, about the trade and distribution channels.

Subject to this objection, Responding Party responds as follows:

The products are advertised, offered, and sold by Responding Party's licensee via the website <https://kodiaksupps.com/>.   The products are also offered and sold by Responding Party's licensee to specialty nutritional supplement stores which then sells them to consumers.  Products are sold directly to end-users and consumers via the website.

**INTERROGATORY NO. 7**:

Identify each brick and mortar retail store in the U.S. in which any product bearing the mark KODIAK SPORTS NUTRITION has been sold, offered for sale, or intended to be sold.

**RESPONSE TO INTERROGATORY NO. 7**:

Responding Party objects to this request because it seeks information regarding the sale of products, which Responding Party does not do.  All sales are made by licensees of Responding Party and not by Responding Party, to whom this interrogatory is directed.  In responding to this interrogatory, Responding Party will provide information in its possession, custody, or control, about any sales made by licensees

Subject to those objections, Responding Party responds as follows:

Responding Party does not offer products for sale; however, Responding Party believes that products bearing the mark KODIAK SPORTS NUTRITION are sold by its licensees to at least the following brick-and-mortar retailers for resale to consumers.  Responding Party will produce documents under Rule 33(d) from which the information can be derived.

**INTERROGATORY NO. 8**:

Identify all methods and/or media through which the mark KODIAK SPORTS NUTRITION has been advertised or promoted.

**RESPONSE TO INTERROGATORY NO. 8**:

Responding Party objects to this request as vague and ambiguous to the extent it conflates the various Kodiak-formative marks used by Responding Party in connection with its supplements.  Responding Party objects that the phrase "methods and/or media" renders the request vague and ambiguous.  In responding to the request, Responding Party will assume that the phrase is intended to be construed as asking how Responding Party markets its supplements.

Subject to those objections, Responding Party responds as follows:

Responding Party does not advertise its products.  Rather, licensees of Responding Party conduct all advertising activities.  Responding Party understands that its licensee advertises products via the website www.kodiaksupps.com, and on social media, including Instagram (https://www.instagram.com/kodiaksupps/) and Facebook (https://www.facebook.com/kodiaksupps).  Responding Party believes that its licensees have also used in-store promotions and branded-products to advertise the products.

**INTERROGATORY NO. 9**:

Describe the target demographic market for Defendant's Products by age, gender, mean household income, and geographic location.

**RESPONSE TO INTERROGATORY NO. 9**:

Responding Party objects that the phrase "target demographic" renders the request vague and ambiguous.  In responding to the request, Responding Party will assume that the phrase is intended to be construed as the types of purchasers to whom licensees of Responding Party markets its supplements.

Subject to those objections, Responding Party responds as follows:

Responding Party does not market products; however, believes that products bearing the mark KODIAK SPORTS NUTRITION are marketed by its licensee to and for adults aged 18 to 35 across the U.S. with enough disposable income to spend on gym memberships, personal trainers and equipment, and high-end nutritional supplements.   More specifically, target consumers are consumers aged 18 to 35 obsessed with fitness and body building, who seek out specialty products intended to give them an edge on achieving specific physique-sculpting goals.

**INTERROGATORY NO. 10**:

Identify on an annual basis for each year since the date of first use of the mark KODIAK SPORTS NUTRITION the dollar amount of revenue derived from Defendant's Products.

**RESPONSE TO INTERROGATORY NO. 10**:

Responding Party objects to the definition of "Defendant's Products" which is defined as: "any product marketed, advertised, promoted, developed, licensed, offered for sale, or sold in interstate commerce since 2010 under or in connection with the mark KODIAK SPORTS

NUTRITION, U.S. Serial No. 86911351 by you or any of your parent or sister companies, including Muscle Sports Products, LLC." Responding Party does not itself sell any such products.

Responding Party objects to this request because it seeks information regarding the sale of products, which Responding Party does not do. All sales are made by licensees of Responding Party and not by Responding Party, to whom this interrogatory is directed.

Subject to the Standing Protective Order in this case, Responding Party responds that it will produce documents under Rule 33(d) from which the total revenue JRM has derived from licensing can be ascertained.

**INTERROGATORY NO. 11**:

Identify on an annual basis for each year since the date of first use of the mark KODIAK SPORTS NUTRITION the dollar amount of net profits derived from Defendant's Products and the details of the method used in calculating those profits.

**RESPONSE TO INTERROGATORY NO. 11**:

Responding Party objects to the definition of "Defendant's Products" which is defined as: "any product marketed, advertised, promoted, developed, licensed, offered for sale, or sold in interstate commerce since 2010 under or in connection with the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 by you or any of your parent or sister companies, including Muscle Sports Products, LLC." Responding Party does not itself sell any such products.

Responding Party objects to this request because it seeks information regarding the sale of products, which Responding Party does not do. All sales are made by licensees of

Responding Party and not by Responding Party, to whom this interrogatory is directed.  In

responding to this interrogatory, Responding Party will provide information in its possession,

custody, or control, relating to net profits resulting from the licensing agreement relating to the

products sold by others.

Subject to the Standing Protective Order in this case, Responding Party responds that it

will produce documents under Rule 33(d) from which the total net profit JRM has derived from

licensing can be ascertained.


**INTERROGATORY NO. 12**:

Identify all surveys, polls, or other studies of which you are aware concerning any mark

containing the term "Kodiak."

**RESPONSE TO INTERROGATORY NO. 12**:

Responding Party objects to this interrogatory to the extent that it calls for premature

disclosure of expert witness discovery.  Responding Party will disclose its testifying expert(s)

and any related survey(s) and expert opinion(s) per the timing set by the Federal Rules of Civil

Procedure and the applicable scheduling orders in this case.

Subject to those objections, Responding Party responds as follows:

Responding Party is not aware of any surveys, polls, or other studies concerning any mark

containing the term "Kodiak."


**INTERROGATORY NO. 13**:

Describe any instances, of which you (including any of your employees or agents) are

aware, when any third party has inquired about whether there is an association or other

connection between Defendant's Products and Plaintiff's Products.

**RESPONSE TO INTERROGATORY NO. 13**:

Responding Party objects to the definition of "Defendant's Products" which is defined as: "any product marketed, advertised, promoted, developed, licensed, offered for sale, or sold in interstate commerce since 2010 under or in connection with the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 by you or any of your parent or sister companies, including Muscle Sports Products, LLC." Responding Party does not itself sell any such products.

Subject to the foregoing objections, Responding Party responds as follows:

Responding Party is not aware of any instances of actual confusion concerning a relationship, association, or connection between Responding Party and Propounding Party, nor the products offered by licensees of Responding Party and those offered by Propounding Party.


**INTERROGATORY NO. 14**:

Identify the date when you first became aware of Plaintiff's use of the word mark "Kodiak" and the details and circumstances of such awareness.

**RESPONSE TO INTERROGATORY NO. 14**:

Responding Party objects that the phrase "details and circumstances of such awareness" renders the request vague and ambiguous. In responding to the request, Responding Party will assume that the phrase is intended to be construed as asking when and how Responding Party became aware of Propounding Party's products.

Subject to those objections, Responding Party responds as follows:

Responding Party does not recall the specifics of when it first became aware of Plaintiff's

mark, but generally recalls that Jason Mancuso saw Plaintiff's Products at a grocery store sometime in 2019.

**INTERROGATORY NO. 15:**

Describe with particularity the nature of your relationship with Muscle Sports Products, LLC.

**RESPONSE TO INTERROGATORY NO. 15:**

Muscle Sports Products, LLC has the same owner (Jason Mancuso) as Responding Party. Responding Party has authorized Muscle Sports Products, LLC to sell products using the mark "KODIAK SPORTS NUTRITION."

**INTERROGATORY NO. 16:**

Identify all owners (entity or person) and employees you have in common with Muscle Sports Products, LLC by name, title, and responsibilities at both entities.

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects that the information sought is not relevant to the claims or defenses in this action, and is thus beyond the scope of discovery under Fed. R. Civ. P. 26(b).  .

Subject to those objections, Responding Party responds as follows:

Muscle Sports Products, LLC has the same owner (Jason Mancuso) as Responding Party. JRM has no employees, therefore there are no employees in common between the companies.

**INTERROGATORY NO. 17**:

If your response to Request for Admission No. 5 is anything other than an unqualified admission, state in detail the factual and legal basis for your failure to admit the request, including an explanation of why you stated in your cease-and-desist response letter that JRM sells Defendant's Products, but in your Response to Plaintiff's First Set of Interrogatories, you stated that only Muscle Sports Products, LLC sells Defendant's Products.

**RESPONSE TO INTERROGATORY NO. 17**:

Responding Party that this interrogatory is ambiguous, incomplete, or incorrect recitation of facts that renders the interrogatory compound, vague and ambiguous because the latter portion of the interrogatory (i.e., after the words "including an explanation") is not necessarily encompassed by the former portion.

Subject to those objections, Responding Party responds as follows:

Responding Party does not sell or market products.  Rather, the products at issue are sold through Responding Party's licensee.  Any representation in correspondence prior to the institution of this lawsuit to the effect that JRM actually sells products to customers on its own is inaccurate.

Dated: March 19, 2021

KIRTON McCONKIE

By: ___ */s/Dax D. Anderson* _____
Dax D. Anderson
Jeremy Sink

Case No. 2:20-cv-00581-DBB
JRM's Response to Second Set of Interrogatories

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2021, a true and correct copy of the

foregoing DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S

SECOND SET OF INTERROGATORIES were served on counsel by email addressed as

follows:

 

      Alan C. Bradshaw     *abradshaw@mc2b.com*
      Chad R. Derum      *cderum@mc2b.com*
      MANNING CURTIS BRADSHAW & BEDNAR
      136 East South Temple, Suite 1300
      Salt Lake City, UT 84111

 

 

      Stephen H. Bean     *steve@legendslaw.com*
      Nicholas Wells      *nwells@legendslaw.com*
      LEGENDS LAW GROUP
      330 N. Main
      Kaysville, UT 84037

 

 

By:   */s/Margaret Carlson*

## VERIFICATION

I have read the foregoing **DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** and I am familiar with the contents of that document.  I am a member of JRM NutraSciences, LLC, a party to this action, and am authorized to make this verification for and on its behalf. The factual matters stated in the responses in the foregoing document are true according to the best of my knowledge, information, and belief.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and accurate.

Dated:  March 19, 2021

/s/ *Jason Mancuso*

Jason Mancuso

# EXHIBIT O

```
 1   IN THE UNITED STATES DISTRICT COURT

 2   FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

 3   - - - - - - - - - - - - - - - - - - - - - - - - - x

 4   KODIAK CAKES, LLC, a Utah limited liability
     corporation,
 5
                                    Plaintiff,
 6                            Civil No.
                              2:20-cv-00581-DBB-JCB
 7            -against-

 8   JRM NUTRASCIENCES, LLC, a New York limited
     liability corporation, MUSCLE SPORT PRODUCTS, LLC,
 9   a New York limited liability corporation, and
     JASON MANCUSO, an individual,
10
                                    Defendants.
11   - - - - - - - - - - - - - - - - - - - - - - - - - x

12                            Five North Avenue
                              Garden City, New York
13
                              September 23, 2021
14                            9:54 A.M.

15

16

17            DEPOSITION OF JASON MANCUSO, one of the

18   Defendants in the above-entitled action, taken by

19   the attorney for the Plaintiff, pursuant to Notice,

20   held before Andrea Bloecker, a Notary Public within

21   and for the State of New York, at the above time and

22   place.

23

24   Job Number. 791183

25
```

JASON MANCUSO - 09/23/2021

Page 62

1 remember?
2    A    U-r-i-d-e-l.
3    Q    U-r-i-d-e-l.
4         L-e-w-i-s?
5    A    No, it's Louis.
6    Q    Any others you remember?
7    A    No.
8         Matthew Acton, years ago.
9    Q    These influencers whom you had some kind
10 of formal contractual relationship with, what did
11 Muscle Sports provide to them, was it product or
12 discounts, things like that or something else?
13   A    Product, yes.  Discounts, yes.  Some of
14 them were paid.
15   Q    In your experience, did those turn out to
16 be worthwhile investments?
17   A    I would say yes.
18   Q    But it's not something you do today?
19   A    Today we just have a lot of low level
20 ambassadors, but we have a lot of them so I feel
21 like we get the same reach and we don't really have
22 to pay them anything, other than at this point we
23 give them product and discounts.
24   Q    A low level influencer would be somebody
25 with like how many followers?

Page 63

1    A    Typically less than 2500.
2    Q    To the extent you have ongoing
3 relationships with some of these low level
4 ambassadors and some of the influencers who you've
5 had contractual agreements with in the past, did
6 those relationships relate to particular Muscle
7 Sports products or did the influencer get to choose
8 which products they would be promoting?
9    A    They were just a representative of the
10 brand.  So they would have to promote the brand.  If
11 we felt -- for example, if it was a female and we
12 had a female focused product, we would have our
13 female athletes promote that, and that's kind of how
14 we delineated it.
15   Q    So, for example, if you look at
16 Exhibit 59 in the stack there in front of you, do
17 you recognize this, Exhibit 59?
18   A    No.
19   Q    This is an Instagram post from somebody
20 named Jessica Palmadessa, that's all one word, and
21 Palmadessa is P-a-l-m-a-d-e-s-s-a.  In this post,
22 she's wearing a Muscle Sport tank top and she has
23 posted, quote, big shout out to at Muscle Sports
24 U.S.A. and at Kodiak Supps for the hookup.
25        Does that refresh your recollection about

Page 64

1 whether she may be one of the influencers or brand
2 ambassadors that you've talked about?
3    A    I've never heard of her so I don't think
4 that she was anyone that we actually sponsored.
5    Q    But it sounds like she may have received
6 some products or something like that?
7    A    Yeah.
8    Q    This is Exhibit 81.  Exhibit 81 is an
9 Instagram post from Vida_DE_T.
10        Do you know who this poster is?
11   A    I don't, no.
12   Q    Here this person has posted some text
13 with a tagging of at Kodiak Supps.  Does that
14 refresh your recollection about whether she's
15 somebody that Kodiak has engaged as an influencer?
16   A    I don't know of her, but it appears that
17 she was an influencer, yes.
18   Q    With respect to the influencers and brand
19 ambassadors that Muscle Sports has engaged, is it
20 true that it's engaged in those relationships to
21 promote the Kodiak brands, historically?
22   A    Most of our influencers are to promote
23 the Muscle Sport brand, but we have had some for
24 Kodiak.
25   Q    Do you have any today, do you know?

Page 65

1    A    For Kodiak, I don't think we have any.
2    Q    When was the last time, if you recall,
3 that there were brand ambassadors or influencers
4 that were promoting the Kodiak products?
5    A    I don't know.
6    Q    This is exhibit 82.
7         Do you recognize this document?
8    A    Yes.
9    Q    What is this?
10   A    This looks like a renewal receipt for
11 GoDaddy.com.
12   Q    At the bottom right there are Bates
13 numbers JRM 1 and JRM 2.  Do you see that?
14   A    Yes.
15   Q    It looks like this includes the domain
16 renewals for several Kodiak related websites, is
17 that right?
18   A    Yes.
19   Q    Do you own those domain names personally?
20 It looks like they were billed to you personally.
21   A    They were billed to me personally, yes.
22   Q    Is it your understanding you had owned
23 them personally?
24   A    I'm not sure how that works, but I did
25 buy them, yeah.

JASON MANCUSO - 09/23/2021

Page 66

1    Q     Have you transferred, in other words,
2  ownership of those domain names into any of your
3  companies?
4    A     No.
5    Q     Is there a reason that the domain names
6  wouldn't be owned by Muscle Sports or JRM?
7    A     No.
8    Q     Just looking at the method of payment
9  used, does that help you know whether or not it's a
10  personal card or a work related company card?
11    A     It's a personal card, but it's used
12  mostly for work related purchases as Muscle Sport
13  Products is where we mostly use it or Custom
14  Nutraceuticals.
15    Q     Safe to say the card is in your name
16  personally, not the company name?
17    A     Yes.
18    Q     If you look at the Exhibit 22 in the
19  stack in front of you there.
20    A     Here?
21    Q     Yes.
22           Do you recognize Exhibit 22?  Do you know
23  what this is?
24    A     Yeah.  It looks like it's the -- I don't
25  know if I have ever seen this myself, but it looks

Page 67

1  like the trademark filing.
2    Q     Trademark application?
3    A     Yeah, the trademark application, right.
4    Q     For what mark?
5    A     Kodiak Sports Nutrition.
6    Q     This is the mark that for which JRM has
7  sought trademark registration, correct?
8    A     Correct.
9    Q     The date on this application appears to
10  be, at the very bottom, February -- bottom of the
11  second page, February 17, 2016.  Do you see that?
12    A     Yes.
13    Q     Is that consistent with your
14  understanding of the timeline of the filing of a
15  trademark application for that mark?
16    A     Yes.
17    Q     This mark uses the word Kodiak, right?
18    A     Correct.
19    Q     Look, if you would, at Exhibit 23 in the
20  exhibits.
21           Do you recognize this document?
22    A     Yes.
23    Q     What is it?
24    A     It's the Kodiak Sports Nutrition logo.
25    Q     In the bottom right it says master logo.

Page 68

1  Do you see that?
2    A     Yes.
3    Q     Is that your understanding that this is a
4  representation of the Kodiak Sports Nutrition master
5  logo?
6    A     Yes.
7    Q     This logo also uses the word Kodiak,
8  correct?
9    A     Yes.
10    Q     It has a picture of a roaring bear,
11  right?
12    A     Yes.
13    Q     Inside a circle, correct?
14    A     Yes.
15    Q     And the background of that circle is
16  red?
17    A     Yes.
18    Q     The bear's head appears to be tilted?
19    A     Yep.  Yes.
20    Q     If you look at the text where it says
21  Kodiak, there's an arc in the bottom of the K on the
22  left-hand side of the word Kodiak, do you see that,
23  so that that line extends below the rest of the text
24  in that word?
25    A     Yes.

Page 69

1    Q     That's also true on the K at the end of
2  that word, that K also extends below the text in
3  that line, as well, right?
4    A     Yes.
5    Q     In the upper right hand of the word
6  Kodiak is a trademark registration symbol.  Do you
7  see that?
8    A     Yes.
9    Q     Now, that is an R inside of a circle.
10  What does that represent to you?  What do you
11  understand that means?
12    A     That's a registered trademark.
13    Q     Is it your understanding that that is a
14  registered trademark?
15    A     No.  It's pending.
16    Q     That registration symbol that's applied
17  here, that's next to the word Kodiak, right?
18    A     Yes.
19    Q     Not after the words Sports Nutrition,
20  correct?
21    A     Correct.
22    Q     The mark for which JRM has sought
23  trademark registration is Kodiak Sports Nutrition,
24  correct?
25    A     Correct.

JASON MANCUSO - 09/23/2021

1    Q    Not just on the word Kodiak, right?
2    A    Correct.
3    Q    What's the reasoning behind putting that
4    registration symbol next to the word Kodiak?
5    A    I think it was just either an error or
6    not paying attention to the detail, but I don't
7    know.
8    Q    Look, if you would, at Exhibit 24 in the
9    stack of documents.
10        Do you recognize these documents or this
11   document?
12   A    I've never seen it before, but I
13   recognize what's in it.
14   Q    The title of the document is Kodiak
15   Sports Nutrition brand guide 2018, is that
16   correct?
17   A    Yes.
18   Q    You don't believe you've seen this
19   before?
20   A    Maybe I've seen this cover, but I feel
21   like in a different content, yeah.
22   Q    Who would have prepared this, to the best
23   of your knowledge?
24   A    Greg would have, Greg Hilton.
25   Q    Would Greg have prepared a similar brand

1    guide for each of the brands in the Muscle Sports
2    Products lineup?
3    A    Not every single one but for a few of
4    them, yes.
5    Q    Did Greg train as a graphic designer?
6    A    Yes.
7    Q    If we look at this document on page
8    MSP 975, I think that's the fourth page of the
9    exhibit, this shows variations of the Kodiak logo,
10   right?
11   A    Yes.
12   Q    The colors that are used are yellow, red,
13   black and white, correct?
14   A    Correct.
15   Q    Do you know why these colors were
16   chosen?
17   A    We felt like yellow and red was something
18   that was going to gain attention, and most of the
19   products were yellow and red.  So it was more for
20   attention.  We were talking about McDonald's and
21   Bank of America and big companies that use yellow
22   and red and sort of studying color psychology to
23   utilize the best colors, and then I'm sure just
24   white and black was just for the letters or
25   something like that, but I don't know exactly.

1    Q    Who was involved in the discussion about
2    the selection of those colors?
3    A    Greg, myself, Rob.  That I know for sure.
4    Other members of the team may have given input as
5    well.
6    Q    Do you remember when those discussions
7    occurred?
8    A    Late 2015.
9    Q    So this is the brand guide for 2018 but
10   by this time Kodiak was already selling products,
11   right?
12   A    Yes.
13   Q    Would there have been brand guides for
14   prior years or subsequent years other than 2018, to
15   your knowledge?
16   A    I believe he only did it one time.
17   Q    Who is the person who approved that color
18   scheme ultimately, was that you or was that Greg or
19   somebody else?
20   A    Probably -- Greg would present me with
21   the final label because it was more designing a
22   label is how we did it, and then I would approve.
23   Then once it was done then he would just create the
24   rest of the brand image and everything like that.
25   Q    I'm handing you what has been marked as

1    Exhibit 83.
2        Do you recognize this?
3    A    Yes.
4    Q    What is this?
5    A    It looks like the preliminary questions
6    for JRM Nutrasciences.
7    Q    So the title of the document, at least
8    the version I have, is Defendant Jason Mancuso
9    Responses to Plaintiff's First Set of Discovery
10   Requests.
11       Do you see that?
12   A    Yes, correct.
13   Q    Is that what you understand this to be?
14   A    Yes.
15   Q    Were you involved in the preparation of
16   these discovery responses?
17   A    Yes.
18   Q    Personally involved?
19   A    Yes.
20   Q    Turn, if you would, to page seven of
21   Exhibit 83.
22       Interrogatory number three asks that you,
23   Identify and describe the source of materials,
24   parenthesis, in any form, close parenthesis,
25   referenced or relied upon in the selection,

Page 102

1    Q    The colors that appear here, red, tan,
2  white, black, correct?
3    A    Yes.
4    Q    So both the Kodiak Sports Nutrition mark
5  and the Kodiak Cakes mark both use the word Kodiak,
6  right?
7    A    Yes.
8    Q    Are you aware of any other pronunciation
9  of the word Kodiak other than the way I've just
10 pronounced it?
11   A    No.
12   Q    The word is spelled the same in both
13 marks, correct?
14   A    Yes.
15   Q    Would you agree that Kodiak is the
16 dominant word that appears in the mark for both
17 Kodiak Sports Nutrition and the Kodiak mark that's
18 in Exhibit 31?
19   A    Yes.
20   Q    You've heard of Kodiak Cakes?
21   A    Yes.
22   Q    Do you think it's a good brand?
23   A    No.
24        I think it's a good brand.  I don't think
25 it's a good product.

Page 103

1    Q    You've tried the product?
2    A    I don't think I have.
3    Q    You have not?
4    A    No.
5    Q    Do you respect the brand?
6    A    Yeah.  Yes.
7    Q    Is it the kind of brand that you wouldn't
8  mind seeing in connection with your own brands?
9    A    (No response)
10   Q    Or alongside them.
11   A    I would rather not.
12   Q    This is Exhibit 85.
13        Do you recognize Exhibit 85 as Defendant
14 JRM Nutrasciences LLC's Response to Plaintiff's
15 Second Set of Interrogatories?
16   A    Yes.
17   Q    Did you review these to prepare for the
18 deposition today?
19   A    I do not think I reviewed these.
20        I didn't, actually.
21   Q    If you could look at page four of
22 Exhibit 85, at interrogatory four.
23        That asks about the date that Kodiak
24 Sports Nutrition was first used in the United States
25 in connection with the sale or advertising of

Page 104

1  defendant's products.
2        Do you see that?
3    A    Yes.
4    Q    The response is that Kodiak Sports
5  Nutrition products were, quote, First marketed and
6  sold by a licensee in connection with responding
7  parties Kodiak formative remarks on or around
8  May 27, 2016.  That's at the top of page five.
9        Do you see that?
10   A    Yes.
11   Q    Is that accurate, to the best of your
12 knowledge, that Muscle Sports Products first started
13 selling Kodiak Sports Nutrition products in May of
14 2016?
15   A    Yes.
16   Q    Look back, please, at Exhibit 83.
17   A    Is it one we looked at already?
18   Q    Yes, it is.
19        That's Jason Mancuso's Responses to
20 Plaintiff's First Set of Discovery Requests.
21        If you would, look at page five, request
22 for admission 17.
23   A    Page 17?
24   Q    I'm sorry.  Page five.
25   A    I'm there.

Page 105

1    Q    That asks you to admit that you were
2  aware of one or more of plaintiff's marks before the
3  selection and adoption of defendants' marks.
4        Do you see that?
5    A    Yes.
6    Q    You denied that request, right?
7    A    Yes.
8    Q    Were you aware of plaintiff's marks
9  before the first use in commerce of the Kodiak
10 Sports Nutrition mark in May 2017?
11   A    Was I aware?
12   Q    Yes.
13   A    No, I was not.
14   Q    I'm handing you what has been marked as
15 Exhibit 86.
16        Do you recognize this?
17   A    Yes.
18   Q    What is this?
19   A    This looks like an e-mail from myself --
20 or an e-mail back -- an e-mail between myself and
21 Foster, the attorney Foster, then I forwarded it to
22 Lindy Herman (phonetic spellings) at Rutan.
23        MR. DERUM:  JRM 46 through 52 is
24        represented in Exhibit 86, for the
25        record.

JASON MANCUSO - 09/23/2021

Page 106

1    Q      On that first page of Exhibit 86, the
2    attorney, Thomas Foster, writes to you on
3    December 10, 2018.
4           Do you see that?
5    A      What time?  'Cause there's a bunch.
6    Q      December 10, 2018.
7    A      What time though?  There's a few
8    different e-mails there.
9    Q      I'm referring to the Foster e-mail on the
10   bottom, from Foster on the first page.
11   A      Okay.
12   Q      I want to go to the Thomas Foster e-mail
13   on the following page, JRM 47.
14   A      Okay.
15   Q      This is the e-mail dated December 10,
16   2018, 5:35 P.M.
17   A      Yes.
18   Q      You see that?
19   A      Yes.
20   Q      Thomas Foster writes to you about the
21   fact that your application is still suspended
22   pending the disposition of two other applications?
23          Do you see that?
24   A      Yes.
25   Q      In response to that, you replied on

Page 107

1    December 10, 2018 at 3:02 P.M.
2           Do you see that?
3    A      Yes.
4    Q      You wrote to Mr. Foster, quote, Okay.  I
5    guess I will have to hold until April at this point.
6    Any other options?  There's a company called Kodiak
7    Cakes and they are pretty out there in terms of
8    exposure, end quote.
9           Do you see that?
10   A      Yes.
11   Q      So you were aware of Kodiak Cakes at
12   least as of December 10, 2018, right?
13   A      Yeah.
14   Q      Not only were you aware of them, you had
15   the perception that they were, quote, pretty out
16   there, close quote, in terms of exposure, right?
17   A      Yeah.
18   Q      Does this refresh your recollection about
19   your awareness at that time of the Kodiak Cakes mark
20   and how it was being used in commerce?
21   A      This is probably around the time -- I
22   mean it's the end of '18.  I believe I said '19.  So
23   this is pretty much when I became aware of them.
24   Q      Were you following Kodiak Cakes in the
25   marketplace?

Page 108

1    A      No.
2    Q      For example, had you visited a website?
3    A      I don't recall.  I have since.
4    Q      1Whey or the other, you had the
5    perception that they were pretty out there in terms
6    of exposure, correct?
7    A      Yes.  Yes.
8    Q      Go back to Exhibit 85, and take a look at
9    page 11, interrogatory 14.  This is A discovery
10   request to JRM.
11          Did you participate in the preparation of
12   JRM's responses to these interrogatories?
13   A      Yes.
14   Q      Was there anybody else other than you and
15   your counsel that was involved in preparing these
16   interrogatory responses for JRM?
17   A      No.
18   Q      Interrogatory 14 asks that you identify
19   the date when you first became aware of plaintiff's
20   use of the word mark, quote, Kodiak, close quote,
21   and the details and circumstances of such awareness.
22          Do you see that?
23   A      Yes.
24   Q      Following some objections, the response
25   says, quote, Responding party does not recall the

Page 109

1    specifics when he first became aware of plaintiff's
2    mark but generally recalls that Jason Mancuso saw
3    plaintiff's products at a grocery store sometime in
4    2019.
5           Do you see that?
6    A      Yes.
7    Q      We've established that you were aware of
8    that brand and its exposure at least by December of
9    2018, correct?
10   A      Yes.
11          MR. SINK:  Counsel, if you clarify,
12          your question about JRM's responses to
13          interrogatories, are you asking that as a
14          30(b)(6) witness or just him
15          individually?
16          MR. DERUM:  I think I established
17          that he was the person involved in
18          preparing those responses for JRM so I
19          think I got the testimony that I need.
20          THE WITNESS:  Can I run to the
21          bathroom while you're doing that?  Okay,
22          two minute break?
23          MR. DERUM:  Let me -- if you don't
24          mind, I would like to just finish this
25          line of questions.

JASON MANCUSO - 09/23/2021

Page 110

1    THE WITNESS:  Okay.
2    Q     I'm handing you what has been marked as
3 Exhibit 87.  This is MSP 327.
4          Do you see that?
5    A     Yes.
6    Q     You recognize these as Instagram posts
7 for the account the supp chef?
8    A     Yep.  Yes.
9    Q     That's you, right?  That's your Instagram
10 handle?
11   A     Yes.
12   Q     The top post is dated March 1, 2016.
13         Do you see that?
14   A     Yes.
15   Q     That refers to the Muscle Sport Product
16 Lean Whey, which we referred to earlier, right?
17   A     Yes.
18   Q     The post at the bottom, do you see the
19 date on that?
20   A     Yes.
21   Q     What's that date?
22   A     February 29, 2016.
23   Q     In that photo a picture of the Muscle
24 Sport Lean Whey product, right?
25   A     Yes.

Page 111

1    Q     And to the right of that is a picture of
2 the Kodiak Cakes Power Cake pancakes mix box,
3 right?
4    A     Yes.
5    Q     In front of that are some pancakes.  It
6 looks like there might be some bacon behind them,
7 pancake syrup and another protein mix on the bottom
8 left.
9    A     Yes.
10   Q     So you were aware of Kodiak Cakes on at
11 least February 29, 2016, right?
12   A     It looks like I shared this picture, but
13 I didn't recall, I mean, at all.  It's definitely
14 not my picture.
15   Q     It's not your picture?
16   A     I didn't take the picture.  This is not
17 me eating this.  I might have shared it though,
18 yeah.
19   Q     So you think this might have been
20 somebody else's photo that you shared?
21   A     I know for a fact, yeah.
22   Q     How do you know that?
23   A     Because I don't eat anything with wheat
24 in it and Kodiak Cakes has wheat.  So that's how I
25 know.

Page 112

1    Q     On February 29, 2016, you shared with the
2 world a photo of the Lean Whey product next to the
3 Kodiak Cakes product, right?
4    A     Yes.
5    Q     We established that your trademark
6 application for Kodiak Sports Nutrition was filed on
7 February 17, 2016, based on those trademark
8 application documents that we looked at, correct?
9    A     Yes.
10   Q     So you posted this picture 12 days after
11 filing the trademark application for Kodiak Sports
12 Nutrition, right?
13   A     It appears that way, yes.
14   Q     Is it your understanding that you were to
15 become aware of Kodiak Cakes sometime in that 12
16 days between February 17 and February 29?
17   A     I was probably aware of it on February 29
18 just by sharing it, but I don't think I was paying
19 much attention.  I was probably just sharing a
20 picture that someone tagged me in.
21   Q     Do you recognize the plate that is
22 here?
23   A     Yeah.  It's not my plate.
24   Q     It's not your plate?
25   A     I was at the gym.  See how it says Life

Page 113

1 Time Athletic.  That means I was at the gym when I
2 shared that.  So I probably just was sitting in the
3 sauna or working out and probably just sharing
4 content.
5    Q     At that time you thought enough of the
6 photo to share that on your personal Instagram feed,
7 correct?
8    A     Yes.
9    Q     Have you ever put protein powder in a
10 pancake mix?
11   A     Yes.
12   Q     What pancake mix did you use?
13   A     I'm not -- I don't recall, but just a
14 standard -- just some kind of standard pancake mix.
15 There was also another one called -- I don't know.
16 It had a flexing arm on it.  Man Stacks or
17 something.  It was years ago.  I don't really -- I
18 don't remember though.
19   Q     You mentioned that you worked for MET-Rx
20 for a time?
21   A     Yes.
22   Q     Are you aware that MET-Rx has a protein
23 pancake mix?
24   A     I'm not aware of what MET-Rx has anymore.
25 That was early 2000s.  I think they did have it then

Page 114

1  though.  They may have.
2      Q      Do you ever recall trying that MET-Rx
3  protein pancake next?
4      A      I don't recall, no.
5      Q      At least in February 2016 you were
6  content to see the Muscle Sport product next to the
7  Kodiak Cakes product in a photograph that you shared
8  on Instagram, fair?
9      A      Yes.
10     Q      Was one reason that this image appealed
11 to you was that as a business owner you were happy
12 to see your Lean Whey product being used in creative
13 ways or in additional ways beyond straight
14 consumption of the protein powder itself?
15             Do you understand my question?
16     A      Yeah.
17             I think I was just looking for content to
18 post.  I didn't post much at that point.  So I don't
19 think it was about creative ways.  I think it was
20 just looking for something to post.
21     Q      Where is the Custom Nutraceuticals
22 manufacturing operation located?
23     A      New York, Commack.
24     Q      Are they a warehoused where they are
25 manufactured or somewhere else?

Page 115

1      A      What is warehoused?
2      A      The Muscle Sport products that are
3  manufactured there.
4      A      They're warehoused in a different
5  warehouse.
6      Q      Today on hand how much Kodiak Sports
7  Nutrition inventory exists?
8      A      (No response)
9      Q      Maybe a better way to ask that is how
10 many months' worth of Kodiak Sports Nutrition
11 inventory exists today.
12     A      A few months' worth.
13     Q      Has the Kodiak Sports Nutrition brand
14 ever been sold on Amazon?
15     A      No.
16     Q      Have any of the Muscle Sport Products
17 brands been sold on Amazon?
18     A      Yes.
19     Q      Which ones, if you know?
20     A      Muscle Sport and Purge.
21     Q      Is that true today, are they available on
22 Amazon?
23     A      Muscle Sport is.  I'm not sure about
24 Purge.  Optitune may be.
25     Q      Does Amazon represent a meaningful sales

Page 116

1  channel for Muscle Sport Products, relative to your
2  other modes of distribution and sales?
3      A      It's minimal but it's meaningful because
4  we'd like to develop it, but it is -- it is, you
5  know, very minimal.
6      Q      Any plans currently to make the Kodiak
7  Sports Nutrition products available on Amazon?
8      A      No.
9      Q      Are there today any efforts to develop
10 new sales in distribution channels in the United
11 States for the Kodiak Sports Nutrition products that
12 don't already exist?
13     A      We haven't really done anything since
14 this case started with Kodiak.  We just kind of left
15 it hanging there.  So, no.
16     Q      Is that true internationally as well,
17 that you're sort of suspending the expansion of the
18 distribution channels internationally for Kodiak
19 Sports Nutrition products too or does that
20 continue?
21     A      That would continue, but the orders would
22 be built if we received it.  We manufacture it as
23 the order came in.  Simply because of a supply chain
24 issues.
25     Q      As long as the order was in sufficient

Page 117

1  volume to justify the production run, right?
2      A      Yes.
3      Q      Is there a particular threshold that
4  exists to make that kind of decision in terms of how
5  significant in volume an order needs to be to
6  justify building out the product?
7      A      We don't like to manufacture anything
8  less than 1000 bottles of a particular SKU.  So I
9  would say 1000.
10     Q      Does Kodiak Sports Nutrition have any
11 outstanding unfulfilled orders, either domestically
12 or internationally?
13     A      No.
14     Q      In Dominic Walsh's deposition yesterday,
15 he talked about seeking to expand the distribution
16 of the Kodiak brand in Iran.
17     A      Okay.
18     Q      Are you aware of that?
19     A      I know we're working with an Iran
20 customer, but I thought it was more for Muscle Sport
21 brand, but it could include Kodiak as well.  I
22 haven't dove into it.
23     Q      Referring back to your work with Thomas
24 Foster --
25     A      Yes.

JASON MANCUSO - 09/23/2021

Page 154

1  do you have any knowledge or information about
2  that?
3      A    They just appear to go after more of like
4  the wholesome family to get a little extra protein
5  into their diet, but they don't appear to go after
6  the fitness or body builders like we do.
7          Our products are high protein.  Their
8  products are just added protein.  It is, honestly,
9  two different products.  If their product was in our
10  industry, it would be considered a weight gainer
11  because it's double the carbs to the protein where
12  like our 1Whey is high protein and maybe one or two
13  carbs.  It's two different things.
14     Q    Take a look at Exhibit 58 in that stack,
15  if you would.
16     A    Sure.
17     Q    Exhibit 58 is an article from a website
18  called Refinery29, entitled Why Fitness Influencers
19  are Obsessed with These Pancakes.  It discusses the
20  fans that Kodiak Cakes has on fitness influencers?
21          Have you ever read this article?
22     A    No.
23     Q    Is that new information to you, that
24  fitness influencers are obsessed with these pancakes
25  or at least that there is media suggesting that

Page 155

1  fact?
2      A    This is an ad?  It's an ad?
3      Q    I don't know.
4      A    I don't.  I'm not aware of this.
5          It says advertisement right underneath
6  it.  It's an ad  It's something they paid for.
7          It's also not accurate.
8      Q    How's that?
9      A    Because it says that their product
10  contains 14 grams of whey protein isolate, but the
11  main protein in their product is a wheat isolate,
12  which is not even bio-available, and it causes a lot
13  of stomach distress because a lot of people have
14  issues with wheat, and it doesn't breakdown into a
15  full spectrum amino acid.
16          So that's sort of the problem with their
17  product which is why I said I don't like it but I
18  respect it.
19     Q    Take a look at Exhibit 47.  This is an
20  Instagram post by a user named Court the Fifth Mama.
21          Have you ever heard of that person?
22     A    I haven't, no.
23     Q    This person has a number of photos below
24  involving different kinds of fitness related
25  activity, it appears, but the post at the top of

Page 156

1  Exhibit 47 is four boxes of Kodiak Cakes.
2          Do you see that?
3      A    Yes.
4      Q    She's tagged Kodiak Cakes and Kodiak
5  Supps.
6          Do you see that?
7      A    I do.
8      Q    Do you know why a user would in a
9  photograph of Kodiak Cakes also be tagging Kodiak
10  Supps?
11          MR. SINK:  Objection.  Speculation,
12          foundation.
13     Q    If you know.
14     A    I don't know.
15     Q    Are you aware or have you ever been aware
16  of that kind of tagging, where somebody is tagging
17  Kodiak Cakes and also tagging Kodiak Supps for an
18  image that doesn't contain anything relating to
19  Kodiak Supps?
20     A    I've never seen it before, but I also,
21  like I said, don't manage or even review the Kodiak
22  Supps page at all.  I'm not privy to that
23  information, necessarily.
24     Q    That's not something anybody ever brought
25  to your attention?

Page 157

1      A    No.
2      Q    With respect to sales in the brick and
3  mortar retail establishments, are you able to track
4  the age of the purchasers of the Kodiak Sports
5  Nutrition products?
6      A    Can you just repeat that one more time.
7      Q    Sure.
8          With respect to sales of Kodiak Sports
9  Nutrition products in brick and mortar retailers,
10  are you able to track the age of those customers?
11     A    No.
12     Q    Are you able to track what created their
13  brand awareness?  That is what planted in that
14  customer's mind an awareness of the Kodiak Sports
15  Nutrition brand.
16     A    No.
17     Q    So you're not able to track whether it's
18  because somebody at the store said hey, this is a
19  great product, right?
20     A    Right.
21     Q    Or if they saw it online, right, or in an
22  influencer's post, right?
23     A    I'm not able to track it with any kind
24  of -- without just manually asking every single
25  owner how they sell the product, but no, there's no

JASON MANCUSO - 09/23/2021

Page 158

1  recording or anything like that.
2      Q      What supplements do you currently
3  personally use and does it include any Kodiak Sports
4  Nutrition products?
5      A      It's difficult to answer because I have
6  access to everything.  So do I use Kodiak Sports
7  Nutrition products, at times, yes.
8          My regular lineup would be a BCAA
9  product, like an amino drink.  I think the one by
10  Muscle Sport.  I currently use Lean Whey.  I do like
11  1Whey better than Lean Whey, but we've been out of
12  stock so I haven't used it.  Also the flavors under
13  Lean Whey are better.  I take a lot of just
14  vitamins.  More trying to stay young kind of stuff.
15      Q      Are any of those supplements made by any
16  of the Muscle Sports brand?
17      A      Yes, the BCAA drink and the Lean Whey.
18      Q      When you identified the vitamins that you
19  take --
20      A      Oh.  Oh.  Some, yes.
21      Q      Do you recall which ones?
22      A      I take our adrenal support products.
23  It's called Adrenal Revolution.
24      Q      I don't know what that does.  What does
25  that do?

Page 159

1      A      It just supports your adrenal gland.  It
2  helps reduce stress.  If you drink a lot of caffeine
3  it kind of resets your adrenal gland so you're not
4  like -- typically you drink a cup of coffee and then
5  the next day you need two, then you need three, then
6  you need four.  It brings back your tolerance so you
7  feel the same with one.  So that's a product I take.
8          The joint support, depending how old I'm
9  feeling that week.  I take a lot of Vitamin D and
10  Vit- -- like a lot of immune stuff right now just
11  because of COVID, Vitamin D, Vitamin C, Zinc.  We
12  have a product called immunity so I take that
13  sometimes.  That's about it.
14      Q      When you say you have access to
15  everything, do you mean access to anything in the
16  Muscle Sports lineup but you probably also have
17  enough contacts in the industry if there was
18  anything that you were curious about trying you
19  could probably have it at your doorstep the next
20  day?
21      A      I don't ask people for stuff.  If I want
22  to try something, I'll buy it.
23      Q      Okay.
24      A      But there's very few that I -- I believe
25  my stuff is the best.  I really do stick with my

Page 160

1  stuff.
2      Q      I think we established yesterday that the
3  most expensive of the Kodiak Sports Nutrition is the
4  1Whey.  Is that consistent with your under-
5  standing?
6      A      (No response)
7      Q      I think we can probably figure that out
8  specifically.
9      A      Yeah, it's probably up there.
10      Q      Why don't we take a look.
11      A      1Whey or Ketogen maybe.
12      Q      If you can look at Exhibit 21.  Look at
13  the fourth page which has the Kodiak lineup on it.
14  It looks like actually the Ammo performance
15  series --
16      A      I don't know if we have that stock
17  anymore though, but, yeah, that a large -- that's a
18  90 serving.
19      Q      Okay.
20      A      So that would be the most expensive,
21  obviously, but I don't know if we have much in stock
22  of that anymore.
23      Q      Today, which would be in terms of what
24  you have in stock, what would be the most
25  expensive?

Page 161

1      A      1Whey I think we have one or two flavors
2  in stock.  I don't think Torch or Ketogen are in
3  stock.  Anabolic Coma is probably in stock.  So
4  they're all at that 59.99 retail price.
5      Q      We looked yesterday at some ads that
6  promote discount codes and sales for some of the
7  Kodiak Sports Nutrition products, like black Friday,
8  Labor Day, Cyber Monday.
9      A      Okay.
10      Q      Is it your understanding that from time
11  to time Kodiak does put out discount codes or
12  promote sales of the products of up to 40 percent?
13      A      Yes.
14          I don't think we've done that since the
15  pandemic though because there might not be enough
16  room at that point.
17      Q      You say enough room?
18      A      Just margins because costs have gone
19  up.
20      Q      But in all events the hope would be that
21  consumers would be repeat customers for your
22  products, right, that they would continue to buy
23  those products?
24      A      Of course.  Yes.
25      Q      With respect to the word Kodiak that

Page 162

1  appears in both Kodiak Sports Nutrition and Kodiak
2  Cakes, would you agree that Kodiak is not generally
3  a word that describes pancakes or oatmeal or
4  waffles?
5      A    Yes, I would agree.
6      Q    And that Kodiak isn't a generic word that
7  means pancake or muffins or oatmeal?
8      A    I agree.
9      Q    Would you agree that the word Kodiak
10 doesn't describe the color of any of Kodiak Cakes'
11 products?
12     A    I agree.
13     Q    Or their odor or how they function?
14     A    I agree.
15     Q    Or the specific ingredients used?
16     A    Yeah, I agree.
17     Q    Or the size of the box or the dimensions
18 of the product when it's prepared?
19     A    I agree.
20     Q    Would you agree having said that Kodiak
21 Cakes is, quote, pretty out there in terms of
22 exposure, close quote, that it's a pretty well known
23 brand?
24     A    Yes.
25     Q    Do you have any reason to disagree that

Page 163

1  Kodiak Cakes began selling its products before
2  Kodiak Sports Nutrition began selling its products
3  in 2016?
4      A    Do I have any reason to disagree?
5      Q    Yes.
6      A    No, I don't.
7      Q    Can you understand from Kodiak Cakes
8  perspective its interest in monitoring the use of
9  the word Kodiak, given its presence in the market?
10     A    Yes.
11          MR. SINK:  I'm sorry, can you
12          repeat that question.  I didn't hear
13          that.
14          MR. DERUM:  The question has been
15          answered, but I asked him whether he
16          could understand Kodiak Cakes' interest
17          in monitoring the use of the word Kodiak
18          in the market.
19          MR. SINK:  Thank you.
20     Q    Is there another brand of protein
21 enhanced pancakes that you can think of other than
22 Kodiak Cakes?  That's better known than Kodiak
23 Cakes.
24     A    No.
25     Q    Does anybody that you know eat Kodiak

Page 164

1  Cakes products?
2      A    I don't know.
3      Q    No?
4      A    I don't know.
5      Q    You don't know?
6      A    I don't know.
7      Q    You don't know if they do or if they
8  don't?
9      A    I don't know if they do or if they don't.
10 It's pretty broad.
11          MR. DERUM:  All right.
12          I think I'm close to being done.  I
13          just want to take a couple of minutes and
14          review my notes and see how close we are.
15          THE WITNESS:  Sure.
16          MR. DERUM:  Okay.
17          THE WITNESS:  Yes, sir.
18          (Whereupon, there was a short break
19          in the proceeding from 4:19 P.M. to 4:24
20          P.M.)
21     Q    Have you ever reviewed any of the Google
22 analytics related to the Kodiak Sports Nutrition
23 digital market?
24     A    No, I haven't.
25     Q    Who would be the best person to answer

Page 165

1  questions about that?
2      A    Now?
3      Q    Yes.  Well, at least based on the
4  documents that have been produced to us in this
5  case.
6          So, for example, if we look at Exhibit
7  57, Exhibit 57 is entitled Facebook ad recommend-
8  ation.  This looks like it was prepared by REV7,
9  R-E-V, 7.
10         Have you ever seen this before?
11     A    No.
12     Q    This is dated 3/14/2019.  Who --
13     A    It would have been Greg who reviewed
14 this.
15     Q    It would have been Greg?
16     A    Yeah.
17     Q    Did he interface directly with REV7 in
18 connection with Kodiak Sports Nutrition?
19     A    Yes.
20     Q    Did anybody else have that job?
21     A    No.  We don't even use REV7 for Kodiak
22 anymore.
23     Q    You only used them for Kodiak?
24     A    No.  We only use them for Muscle Sport at
25 this time.  We stopped last year on Kodiak.

Page 166

1    Q    Is there any digital marketing agency
2  that you now use for Kodiak?
3    A    There's not.
4    Q    If you take a look at Exhibit 60.
5    A    Exhibit 60?
6    Q    Exhibit 60.
7         Do you recognize this document?
8    A    No.
9    Q    This was produced to us in this case by
10  your counsel.  This is titled Kodiaksupps.com
11  organic key words sub-domains US 20 November 2018.
12        You see that at the very bottom?
13   A    Yes.
14   Q    Do you know what organic key words
15  sub-domains means?
16   A    Not really, no.
17   Q    Based on the time frame of this document,
18  who would be able to testify about what this
19  represents?
20   A    Greg could probably give you the
21  information on this or REV7 possibly.
22   Q    Have you spoken to REV7 about this
23  case?
24   A    No.
25   Q    To your knowledge has anybody

Page 167

1  representing Muscle Sports or JRM spoken to REV7
2  about this case?
3    A    Say again.  Repeat the question.
4    Q    To your knowledge, has anybody on behalf
5  of Muscle Sports or JRM spoken to REV7 about this
6  case?
7    A    I do not believe anyone has.
8         MR. DERUM:  I don't have anymore
9    questions.
10        MR. SINK:  I have a couple of brief
11   questions.
12  EXAMINATION BY
13  JEREMY SINK, ESQ.:
14   Q    Jason, if you were here as the 30(b)(6)
15  representative of JRM Nutrasciences, LLC, would the
16  answers to any of the questions that you have given
17  today be different?
18   A    No, they wouldn't.
19        MR. SINK:  I don't have any further
20   questions.
21        MR. DERUM:  You're all done.
22        THE WITNESS:  Thank you, sir.
23        MR. DERUM:  Thank you.
24        (Whereupon, the within examination
25   was concluded at 4:30 P.M.)

Page 168

1              A C K N O W L E D G M E N T
2
3  STATE OF NEW YORK      )
4                         :     SS:
5  COUNTY OF              )
6
7         I, JASON MANCUSO, hereby certify that I
8  have read the transcript of my testimony taken under
9  oath in my deposition of September 23, 2021; that
10  the transcript is a true, complete and correct
11  record of what was asked, answered and said during
12  this deposition, and that the answers on the record
13  as given by me are true and correct.
14
15
16        _____
17                JASON MANCUSO
18
19  Subscribed and sworn to
20  before me this _____ day
21  of _____, 2021
22
23  _____
24              NOTARY PUBLIC
25

Page 169

1              I N D E X
2
3  WITNESS           EXAMINATION BY        PAGE
4  Jason Mancuso        Mr. Derum        3 - 167
5                       Mr. Sink            167
6
7            INFORMATION TO BE SUPPLIED
8  PAGE    LINE         DESCRIPTION
9  119      6         Copy of the trademark
              search that was run
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT P



**thesuppchef** • Follow
Limitless Fitness

**thesuppchef** #leanwhey #leancharms and #Rhinoblack are top notch and you need to try them ASAP. #trustme #Musclesport #musclesportmilitia #musclesportlifestyle #protein #ifbb #npc #wbff

268w

**miabreh23** @kianalynn__

262w

168 likes
MARCH 1, 2016

Comments on this post have been limited.



**thesuppchef** • Follow
Life Time Athletic - Garden City

**thesuppchef** Happy Monday!! Start your day right! #pancakes #Musclesport @musclesportkitchen #leanwhey @teammusclesport

268w

**theoneandonlyjrose** 😍😍

268w

158 likes
FEBRUARY 29, 2016

Comments on this post have been limited.

**EXHIBIT 87**

MSP 000327

# EXHIBIT Q

Dax Anderson (UBS 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com

*Attorneys for Defendants, JRM Nutrasciences, LLC*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company,<br><br>      Plaintiff,<br><br>vs.<br><br>JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation, ; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual;<br><br>      Defendant. | Case No.: 2:20-CV-0000581-DBB-JCB<br><br>Judge: David Barlow<br><br>Magistrate Judge Jared C. Bennett<br><br>**DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION** |

Defendant JRM NutraSciences, LLC ("Responding Party") hereby responds to plaintiff

Kodiak Cakes, LLC's ("Propounding Party") Second Set of Requests for Admission, as follows:

**PRELIMINARY STATEMENT**

1.    These responses are made solely for the purpose of this action and are subject to

all objections as to competence, relevance, materiality, propriety, and admissibility and any and

all objections and grounds that would require the exclusion of any statement made herein if such

statement were made by a witness present and testifying in court, all of which objections and

grounds are reserved and may be interposed at the time of trial.

2.      No incidental or implied admission is intended by the responses herein. The fact that Responding Party responds or objects to any request for admission should not be taken as an admission that Responding Party accepts or admits the existence of any facts assumed by such request for admission.  The fact that Responding Party responds to part or all of any request is not intended and shall not be construed to be a waiver by Responding Party of any part of any objection to any request for admission.

3.       Responding Party's responses herein are based on, and reflect, the current state of Responding Party's knowledge.  Responding Party expressly reserves the right to amend or supplement these responses at a later time should it deem such supplementation necessary or appropriate.

4.      Responding Party's responses herein are made without waiving, and expressly reserving, Responding Party's right: (a) to object on any ground to the use of the information provided at any stage or proceeding in this action or any other action; and/or (b) to object on any ground to other discovery requests regarding the subject matter of any individual request for admission herein.

5.      All responses are made on an express reservation of objections as set forth above and in some instances below, and no response shall be deemed, and specifically is stated not to be, a waiver of such objection.


**REQUESTS FOR ADMISSION AND RESPONSES THERETO**

**REQUEST NO. 1**:

Admit that in your cease-and-desist response letter you stated that JRM "started selling

nutritional supplements under the JRM marks in 2016."

**RESPONSE TO REQUEST NO. 1**:

Responding Party objects to this request as vague, ambiguous, and misleading because the truncated statement misleading characterizes Responding Party's five-page letter via a sentence excerpt without context.

Subject to these objections, admit that the cease-and-desist letter included the quoted excerpt, which was not the entirety of the sentence; deny that the statement is an accurate representation of JRM's role in the activity described in the letter.

**REQUEST NO. 2**:

Admit that in your cease-and-desist response letter you stated that "JRM's products are sold in specialty nutritional supplement stores."

**RESPONSE TO REQUEST NO. 2**:

Responding Party objects to this request as vague, ambiguous, and misleading because the truncated statement misleading characterizes Responding Party's five-page letter via a sentence excerpt without context.

Subject to these objections, admit that the cease-and-desist letter included the quoted excerpt, which was not the entirety of the sentence; deny that the statement is an accurate representation of JRM's role in the activity described in the letter.

**REQUEST NO. 3**:

Admit that in your cease-and-desist response letter you state that "Testimonials on its website emphasis[sic] the carnal nature of JRM's marketing."

**RESPONSE TO REQUEST NO. 3**:

Responding Party objects to this request as vague, ambiguous, and misleading to the extent it purports to capture Responding Party's five-page letter via a sentence excerpt. Responding Party further objects to this request to the extent it implies that any matters discussed in that letter have been conclusively established for purposes of this litigation.

Subject to these objections, admitted that the cease-and-desist letter included the quoted excerpt, which was not the entirety of the sentence.

**REQUEST NO. 4**:

Admit that in your cease-and-desist response letter you refer to a product displayed on the home page of the website www.kodiaksupps.com as a "JRM product."

**RESPONSE TO REQUEST NO. 4**:

Responding Party objects to this request as vague, ambiguous, and misleading to the extent it purports to capture Responding Party's five-page letter via a sentence excerpt. Responding Party further objects to this request to the extent it implies that any matters discussed in that letter have been conclusively established for purposes of this litigation.

Subject to these objections, admitted that the cease-and-desist letter used the term "JRM product" once; deny that the characterization as "JRM product" in the letter or on the website is an accurate representation of JRM's role in the activity described in the letter.

**REQUEST NO. 5**:

Admit that you sell and market products that display Defendant's Marks.

**RESPONSE TO REQUEST NO. 5**:

Responding Party objects to this request as compound in asking Responding Party to admit both that it (1) "sell[s]" and (2) "market[s]" products that display Defendant's Marks.  *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Subject to the foregoing objection, Responding Party responds:

Deny.

**REQUEST NO. 6**:

Admit that you did not take any of actions requested in Plaintiff's cease-and-desist letter.

**RESPONSE TO REQUEST NO. 6**:

Responding Party objects to this request as being vague, ambiguous, and compound because it uses the term "any of the actions requested."  The request does not "separately state" each matter to be admitted and therefore violates Rule 36 of the Federal Rules of Civil Procedure.

Deny.

**REQUEST NO. 7**:

Admit that you authorized and/or conducted a trademark search before adopting Defendant's Marks.

**RESPONSE TO REQUEST NO. 7**:

Responding Party objects to this request as compound in asking Responding Party to

admit both that it (1) "authorized" and (2) "conducted" a trademark search before adopting Defendant's Marks. *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Subject to the foregoing objection, Responding Party responds:

Admit.


**REQUEST NO. 8**:

Admit that you were aware of one or more of Plaintiff's Marks before the selection and adoption of Defendant's Marks.

**RESPONSE TO REQUEST NO. 8**:

Responding Party objects to this request as compound in asking Responding Party to admit that it was aware of (1) "one" or (2) "more" of Plaintiff's Marks before the (3) "selection" and the (4) "adoption" of Defendant's Marks. *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992). Plaintiff objects that the term "adoption" and "selection" are vague. Can't determine the difference between the two, nor when "adoption" or "selection" is determined to officially happen.

Subject to the foregoing objection, Responding Party responds:

Deny.

**REQUEST NO. 9**:

Admit that the word "Kodiak" does not describe a characteristic, quality, or ingredient of the products sold under Plaintiff's Marks.

**RESPONSE TO REQUEST NO. 9**:

Responding Party objects to this request as compound in asking Responding Party to admit that "Kodiak" does not describe a (1) "characteristic," (2) "quality," or (3) "ingredient" of the products sold under Plaintiff's Marks. *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Subject to the foregoing objection, Responding Party responds:

Admit.

**REQUEST NO. 10**:

Admit that the word "Kodiak" does not suggest anything about the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**RESPONSE TO REQUEST NO. 10**:

Responding Party objects to this request as compound in asking Responding Party to admit that "Kodiak" does not suggest anything about the (1) "characteristics," (2) "quality," or (3) "ingredients" of the products sold under Plaintiff's Marks. *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Subject to the foregoing objection, Responding Party responds:

Denied.


**REQUEST NO. 11**:

Admit that the word "Kodiak" bears no relationship to the characteristics, quality, or ingredients of the products sold under Plaintiff's Marks.

**RESPONSE TO REQUEST NO. 11**:

Responding Party objects to this request as compound in asking Responding Party to admit that "Kodiak" bears no relationship to the (1) "characteristics," (2) "quality," or (3) "ingredients" of the products sold under Plaintiff's Marks.  *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Subject to the foregoing objection, Responding Party responds:

Denied.


**REQUEST NO. 12**:

Admit that products sold in connection with the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 also use a visual mark containing a roaring bear with a tilted head enclosed by a circle.

**RESPONSE TO REQUEST NO. 12**:

Responding Party objects to this request as vague, ambiguous, and uncertain because it does not specify the "products" that are at issue in this request.  There are several products that

might fall into this definition, which are not all identical.  Accordingly, the request does not adequately describe the facts to be admitted, nor does it "separately state" the matter with respect to the undefined "products."  Responding Party further objects that the request is vague and unintelligible because it use the phrase "also use a visual mark" without providing a point of comparison.  Thus, it is impossible for Responding Party to understand the scope of the request sufficient to admit or deny the request.

Subject to these objections, Responding Party responds as follows:

Admit that it contains a visual mark containing a roaring bear with a tilted head enclosed by a circle, but deny that this describes the entirety of the visual mark.


**REQUEST NO. 13**:

Admit that products sold in connection with the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 include one or more protein supplements.

**RESPONSE TO REQUEST NO. 13**:

Responding Party objects to this request as compound in asking Responding Party to admit that products sold in connection with the mark KODIAK SPORTS NUTRITION include (1) "one" or (2) "more" protein supplements.  *See, e.g., U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("Requests for admissions may not contain compound, conjunctive, or disjunctive (e.g., 'and/or') statements."), citing *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992).

Responding Party objects to this request as vague, ambiguous, and uncertain because it does not specify the "products" that are at issue in this request.  There are several products that might fall into this definition, which are not all identical.  Accordingly, the request does not

adequately describe the facts to be admitted, nor does it "separately state" the matter with respect to the undefined "products."  Responding Party further objects that the request is vague and unintelligible because it use the phrase "protein supplements" without defining the term.  Thus, it is impossible for Responding Party to understand the scope of the request sufficient to admit or deny the request.

Subject to the foregoing objection, Responding Party responds:

Admit  that the mark KODIAK SPORTS NUTRITION, U.S. Serial No. 86911351 is licensed for use in connection with dietary supplements which may include protein supplements, however, JRM does not control the specific formulation used by its licensees. JRM believes the "One Whey" product sold by MuscleSports Products, LLC is a protein supplement and denied as to other products sold in connection with the mark KODIAK SPORTS NUTRITION.

DATED this 5th day of March, 2021.

KIRTON McCONKIE

By:   /s/Dax D. Anderson
        Dax D. Anderson
        Jeremy Sink

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of March, 20, a true and correct copy of the foregoing

DEFENDANT JRM NUTRASCIENCES, LLC'S RESPONSE TO PLAINTIFF'S SECOND

SET OF REQUESTS FOR ADMISSION were served on counsel by email addressed as follows:


       Alan C. Bradshaw     *abradshaw@mc2b.com*
       Chad R. Derum       *cderum@mc2b.com*
       MANNING CURTIS BRADSHAW & BEDNAR
       136 East South Temple, Suite 1300
       Salt Lake City, UT 84111


       Stephen H. Bean     *steve@legendslaw.com*
       Nicholas Wells      *nwells@legendslaw.com*
       LEGENDS LAW GROUP
       330 N. Main
       Kaysville, UT 84037


              By:    */s/Margaret Carlson*

11

# EXHIBIT R

Dax D. Anderson (USB 10168)
Jeremy Sink (USB 9916)
KIRTON McCONKIE
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile (801) 321-4893
Email: danderson@kmclaw.com
Email: jsink@kmclaw.com

*Attorney for Defendants, JRM Nutrasciences, LLC,*
*Muscle Sports Products, LLC and Jason Mancuso*

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah Limited Liability Company, | Case No.: 2:20-CV-0000581-DBB-JCB |
| Plaintiff, | Judge: David Barlow |
| | Magistrate Judge Jared C. Bennett |
| vs. | |
| JRM NUTRASCIENCES, LLC, a New York Limited Liability Corporation; MUSCLE SPORTS PRODUCTS, LLC, a New York Limited Liability Corporation; and JASON MANCUSO, an individual; | **DEFENDANT MUSCLE SPORTS PRODUCTS, LLC RESPONSES TO PLAINTIFF'S SECOND SET OF DISCOVERY REQUESTS** |
| Defendants. | |

Defendant, Muscle Sports Products, LLC, by and through their undersigned counsel, and pursuant to Rules 26 and 33, of the Federal Rules of Civil Procedure, hereby responds to LG Fitness Camp, LLC dba One Fitness Camp's ("Defendant") First Set of Discovery Requests as follows:

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action and are subject to all objections as to competence, relevance, materiality, propriety, and admissibility and any and all objections and grounds that would require the exclusion of any statement made herein if such

statement were made by a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

No incidental or implied admission is intended by the responses herein. The fact that Responding Party responds or objects to any request for admission should not be taken as an admission that Responding Party accepts or admits the existence of any facts assumed by such request for admission.  The fact that Responding Party responds to part or all of any request is not intended and shall not be construed to be a waiver by Responding Party of any part of any objection to any request for admission.

Responding Party's responses herein are based on, and reflect, the current state of Responding Party's knowledge.  Responding Party expressly reserves the right to amend or supplement these responses at a later time should it deem such supplementation necessary or appropriate.

Responding Party's responses herein are made without waiving, and expressly reserving, Responding Party's right: (a) to object on any ground to the use of the information provided at any stage or proceeding in this action or any other action; and/or (b) to object on any ground to other discovery requests regarding the subject matter of any individual request for admission herein.

All responses are made on an express reservation of objections as set forth above and in some instances below, and no response shall be deemed, and specifically is stated not to be, a waiver of such objection.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**Request No. 14.**     Admit that Defendants' Products are targeted to consumers interested in

products that promote nutrition, energy, and great taste.

**Answer:**     Admit

**Request No. 15.**     Admit that not all of Defendants' Products contain whey protein isolate.

**Answer:**     Admit

**Request No. 16.**     Admit that not all of Defendants' Products are lactose free.

**Answer:**     Deny

**Request No. 17.**     Admit that not all of Defendants' Products are fat free.

**Answer:**     Deny

**Request No. 18.**     Admit that not all of Defendants' Products are cholesterol free.

**Answer:**     Admit

**Request No. 19.**     Admit that Defendants would not exclude consumers who consider

themselves "rugged" from the target market for Defendants' Products.

**Answer**:  Defendants admit that they do not exclude from their target market potential

consumers who consider themselves rugged.

**Request No. 20.**     Admit that the word "Kodiak" used in connection Defendants' Products has

the same pronunciation as the word "Kodiak" used in connection with Plaintiff'sProducts.

**Answer:**     Admit

**Request No. 21.**     Admit that the word "Kodiak" used in connection Defendants' Products is

spelled the same as the word "Kodiak" used in connection with Plaintiff's Products.

**Answer:**      Admit

**Request No. 22.**      Admit that the word "Kodiak" that appears in both Defendants' Products and Plaintiff's Products appears alongside a visual mark depicting a roaring bear with a tilted head enclosed by a circle.

**Answer:**      Admit

**Request No. 23.**      Admit that you have sold products that include the word "Kodiak" appearing alongside a visual mark depicting a roaring bear with a tilted head enclosed by acircle.

**Answer:**      Admit

**Request No. 24.**      Admit that you have shipped the products identified in Request for Admission No. 23 for delivery in more than one state in the United States.

**Answer:**      Admit

**Request No. 25.**      Admit that you have advertised products bearing Defendants' marks in more than one state in the United States.

**Answer:**      Admit

**Request No. 26.**      Admit that you promote the use of protein supplements as an ingredient to be used in the preparation of other foods, including baked and/or cooked goods.

**Answer:**      Defendants admits that they have promoted certain protein supplements as an ingredient to be used in the preparation of other foods.

**Request No. 27.**      Admit that Defendants never have used or will use Defendants' Marks in connection with any product intended to be used as an ingredient in the preparation of other foods.

**Answer:**      Defendants are undecided as to future products that may be produced and marketing under their marks and therefore can neither admit nor deny request no. 27.

**Request No. 28.**    Admit that Defendants do not discourage consumers from using Defendants' Products as an ingredient in the preparation of other foods.

**Answer:**    Admit

**Request No. 29.**    Other than products intended for "fat burning", admit that all of Defendants' Products are sold in powder form.

**Answer:**      Currently that is correct, however we have in the recent past had other products in capsule form.

**Request No. 30.**    Admit that some of Defendants' Products are sold in powder form.

**Answer:**    Admit

**Request No. 31.**    Admit that all of Defendants' Products sold in powder form are intended to be mixed with one or more wet ingredients prior to consumption.

**Answer:**      Admit

**Request No. 32.**    Admit that Defendants' Products are not marketed exclusively to consumers who are between 18 and 35 years old and have a gym membership.

**Answer:**       Defendants admit that their marketing materials are likely seen by individuals outside of the target market.

**Request No. 33.**    Admit that Defendants' Products are not marketed exclusively to consumers who are between 18 and 35 years old and have a personal trainer.

**Answer:**    Admit

**Request No. 34.**     Admit that Defendants' do not track whether a consumer has purchased Defendants' Products on "impulse."

**Answer:**     Admit

**Request No. 35.**     Admit that Defendants' have no way of knowing whether a particular consumer has purchased Defendants' Products on "impulse."

**Answer:**     Admit

**Request No. 36.**     Admit that Defendants have no way of knowing whether a consumer has taken "care" when purchasing Defendants' Products.

**Answer:**     Defendants do not survey customers related to their purchasing habits and therefore have no data upon which to formulate an opinion related to Request for Admission No. 36 and therefore deny the same.

**Request No. 37.**     Admit that nothing in Defendants' marketing or promotion of Defendants' Products states that Defendants' Products and Plaintiff's Products are not affiliated.

**Answer:**     In response to Request for Admission No. 37 Defendants admit that their colors, branding, products, audience and distribution outlets related to their products are distinct and separate from Plaintiff's colors, branding, products audience and distribution outlets.  Defendants additionally admit that they do not indirectly or directly mention Plaintiff' or its products in any of their marketing or promotion efforts.

**Request No. 38.**     Admit that Defendants' Products are marketed to consumers interested in burning fat.

**Answer:**     Defendants admit that some (but not all) of their products are uniquely formatted and marketed to individuals interested in burning fat.

**Request No. 39.**    Admit that Defendants' Products are marketed to consumers interested in building muscle.

**Answer:**    Defendants admit that some (but not all) of their products are uniquely formatted and marketed to individuals interested in building muscle.

**Request No. 40**.  Admit that Defendants' Products are marketed to consumers interested in improving recovery from exercise.

**Answer:**    Defendants admit that some (but not all) of their products are uniquely formatted and marketed to individuals interested in recovery from workouts and/or exercise.

**Request No. 41**.  Admit that Defendants' Products are marketed to consumers interested in improving physical performance.

**Answer:**    Defendants admit that some of their target market may be interested in improving physical performance.

**Request No. 42**. Admit that Defendants Products are marketed to athletes.

**Answer:**    Admit

**Request No. 43**.  Admit that Defendants Products are sold online.

**Answer:**    Admit

**Request No. 44**.  Admit that Defendants promote the sale of their products online through search engine optimization techniques that use the word "Kodiak" to direct internet traffic to Defendants website(s).

**Answer:**    In the past Defendant has used paid search and organic SEO to promote its products.  Defendant is not employing these techniques at the current time.

**Request No. 45**.  Admit that the word "Kodiak" does not refer to a general class of goods of which Plaintiff's Products are a member.

**Answer:**      Admit

**Request No. 46**.  Admit that the word "Kodiak" does not identify the color of Plaintiff's Products.

**Answer:**      Admit

**Request No. 47**.  Admit that the word "Kodiak" does not identify the odor of Plaintiff's Products.

**Answer:**      Admit

**Request No. 48**.  Admit that the word "Kodiak" does not identify the dimensions of Plaintiff's Products.

**Answer:**      Admit

**Request No. 49**.  Admit that the word "Kodiak" does not identify the ingredients of Plaintiff's Products.

**Answer:**      Admit

**Request No. 50**.  Admit that the word "Kodiak" does not identify the function of Plaintiff's Products.

**Answer:**      Admit

## RESPONSE TO DOCUMENT REQUESTS

**Request No. 42.**   Produce all documents and electronically stored information concerning any digital marketing strategies or methods used in connection with Defendants' Marks or

8

Defendants' Products for the past five years. This request includes but is not limited to all documents concerning pay-per-click marketing, search engine optimization, search engine marketing, database marketing, email marketing, social media marketing, and any other form of marketing on the internet intended to generate sales of and/or interest in Defendants' Products.

**Response:**     The only documents in defendant's possession which are responsive to the above request are attached hereto as document MSP 1557- 1559.

**Request No. 43.**   Produce all documents and electronically stored information concerning any use of Google Ads in connection with Defendants' Marks or Defendants' Products for the past five years. This request encompasses but is not limited to all available analytics, including performance reports (such as predefined reports generated by Google Ads and any custom reports created by you using data from Google Ads), performance data, statistics, or other methods used to measure your digital marketing efforts or return-on- investment for digital marketing efforts.

**Response:**     The Defendant agreed upon a flat agency fee.  The Defendant is therefore unsure what COGs are, thus ROI numbers would be purely speculative.  After performing a WordPress-to-Shopify migration for the sales data after the site was up and running the following was generated:



There are no other documents in the defendant's possession responsive to the above

9

request.

**Request No. 44.**   Produce all documents and electronically stored information concerning any use of Google Analytics or Google Search Console to measure traffic to and sales from www.kodiaksupps.com for the past five years.  This request encompasses all availableanalytics, including those related to traffic, sales, impressions, conversions, clicks, Google Ads, or other datapoints used to measure your digital marketing efforts or return-on-investment.

**Response:**      The only documents in defendant's possession which are responsive to the above request are attached hereto as document MSP 1557- 1559 and 1564.

**Request No. 45.**   Produce all documents and electronically stored information concerning any use of Instagram, Instagram for Business, or Instagram Business Tools to advertise or promote Defendants' Marks or Defendants' Products within the past five years. This request encompasses all available analytics, including Instagram Insights, performance reports, performance data, statistics, or other methods used to measure your digital marketingefforts or return-on-investment.

**Response:**      Any and all documents in the defendant's possession have been provided.

**Request No. 46.**   If you contend that any of the information sought by Kodiak in Requests Nos. 42, 43, 44, and 45 is accessible only through specific accounts, such as yourGoogle Ads, Google Analytics, or Instagram account, or cannot otherwise be copied or reproduced, permit Kodiak, to inspect those accounts and obtain the requested information.

**Response:**      Any and all documents in the defendant's possession have been provided.

**Request No. 47.**   Produce all internal marketing and advertising documents concerning Defendants' Marks or Defendants' Products, including but not limited to marketresearch reports,

marketing strategy documents, marketing and/or advertising budgets, and communications with third-party marketing, advertising, and/or public relations firms or professionals.

**Response:**    Any documents related to marketing strategies or methods have already been produced.

**Request No. 48.**   To the extent they have not already been produced in response to Request for Production No. 18, produce all internal product surveys, demographic surveys, orother documents concerning or identifying the target audience and/or target demographic for Defendants' Products.

**Response:**    Defendants do not have any documents responsive to this request.

**Request No. 49.**   To the extent they have not already been produced in response to Request for Production No. 19, produce all internal product surveys, demographic surveys, orother documents concerning or identifying the actual audience and/or actual demographic for Defendants' Products.

**Response:**    Defendants do not have any documents responsive to this request.

**Request No. 50.**   To the extent they have not already been produced in response to Request for Production No. 27, produce all images or other social media content of any kindreferencing Defendants' Marks or Defendants' Products that have been posted on Instagram.com/kodiaksupps or any other social media account owned or controlled by you.

**Response:**    These documents have already been produced and/or are readily visible and available on the kodiaksupps Instagram page.

**Request No. 51.**   Produce all documents and communications demonstrating, showing, and/or evidencing that Defendants' Products are only targeted to adults ages 18 to 35who have a gym membership.

**Response:**     Defendants have provided all marketing information heretofore which may be responsive to this request.

**Request No. 52.**   Produce all documents and communications demonstrating, showing, and/or evidencing that Defendants' Products are only targeted to adults ages 18 to 35who have a personal trainer.

**Response:**     Defendants have provided all marketing information heretofore which may be responsive to this request.

**Request No. 53.**   Produce all documents and communications demonstrating, showing, and/or evidencing that Defendants' Products are only targeted to adults ages 18 to 35who can afford those of Defendants' Products that exceed $45 for a single product unit.

**Response:**     Defendants have provided all marketing information heretofore which may be responsive to this request.

**Request No. 54.**   Produce all documents and communications demonstrating, showing, and/or evidencing that consumers do not purchase Defendants' products on impulse.

**Response:**     None.

**Request No. 55.**   Produce all documents and communications demonstrating, showing, and/or evidencing that consumers who purchase Defendants' products so do with"care."

**Response:**     None.

**Request No. 56.**   Produce all documents and communications demonstrating, showing, and/or evidencing that consumers purchase Defendants' products in consultation with personal trainers, nutritionists, or others in the fitness industry.

**Response:**     Defendants do not have any documents responsive to this request.

**Request No. 57.**   Produce all documents and communications demonstrating, showing, and/or evidencing Defendants' plans for the creation and/or marketing of any future product in connection with Defendants' Marks.

**Response:**     Defendants do not have anything in production as of the date of this response.

**Request No. 58.**   Documents sufficient to identify all persons whom you have employed, contracted with, or otherwise engaged for purposes of promoting Defendants' Products.

**Response:**     Employment information identifying the sales/marketing team was provided in Defendant's prior responses.

DATED this 1st day of June, 2021.

KIRTON McCONKIE

By:   */s/Jeremy C. Sink*
         Dax D. Anderson
         Jeremy Sink

         Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2021, a true and correct copy of the foregoing DEFENDANT MUSCLE SPORTS PRODUCTS, LLC RESPONSES TO PLAINTIFF'S SECOND SET OF DISCOVERY REQUESTS were served on counsel by email addressed as follows:

Alan C. Bradshaw        *abradshaw@mc2b.com*
Chad R. Derum           *cderum@mc2b.com*
Michael Harmond         *mharmond@mc2b.com*
MANNING CURTIS BRADSHAW & BEDNAR
136 East South Temple, Suite 1300
Salt Lake City, UT 84111


Stephen H. Bean         *steve@legendslaw.com*
Nicholas Wells          *nwells@legendslaw.com*
LEGENDS LAW GROUP
330 N. Main
Kaysville, UT 84037


By:  __*/s/Margaret Carlson*__

# EXHIBIT S

**Generated on:** This page was generated by TSDR on 2022-07-29 12:41:25 EDT

**Mark:** KODIAK CAKES

| | |
|---|---|
| **US Serial Number:** 75031624 | **Application Filing Date:** Dec. 12, 1995 |
| **US Registration Number:** 2052194 | **Registration Date:** Apr. 15, 1997 |
| **Register:** Principal | |
| **Mark Type:** Trademark | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** The registration has been renewed.

**Status Date:** Jul. 08, 2016

**Publication Date:** Jan. 21, 1997

# Mark Information

**Mark Literal Elements:** KODIAK CAKES

**Standard Character Claim:** No

**Mark Drawing Type:** 1 - TYPESET WORD(S) /LETTER(S) /NUMBER(S)

**Disclaimer:** "CAKES"

# Related Properties Information

**Claimed Ownership of US Registrations:** 1992074

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** mixes for preparing bakery goods; chocolate topping, marshmallow topping and topping syrup for bakery goods

**International Class(es):** 030 - Primary Class          **U.S Class(es):** 046

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Nov. 27, 1995          **Use in Commerce:** Dec. 01, 1995

# Basis Information (Case Level)

**Filed Use:** Yes          **Currently Use:** Yes

| | | | |
|---|---|---|---|
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

# Current Owner(s) Information

**Owner Name:** KODIAK CAKES, LLC
**Owner Address:** 8163 Gorgoza Pines Rd.
Park City, UTAH UNITED STATES 84098
**Legal Entity Type:** LIMITED LIABILITY COMPANY      **State or Country Where Organized:** DELAWARE

# Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** Nicholas D. Wells      **Docket Number:** 4805.03
**Attorney Primary Email Address:** nwells@legendslaw.com      **Attorney Email Authorized:** Yes

**Correspondent**

**Correspondent Name/Address:** Nicholas D. Wells
Legends Law Group, PLLC
330 Main St.
Kaysville, UTAH UNITED STATES 84037
**Phone:** 8013374500
**Correspondent e-mail:** nwells@legendslaw.com
docket@legendslaw.com      **Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jul. 14, 2021 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Oct. 14, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Oct. 14, 2020 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Oct. 14, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 14, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 14, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Feb. 12, 2020 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Feb. 12, 2020 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Feb. 12, 2020 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Oct. 03, 2018 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Jun. 21, 2017 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Jul. 08, 2016 | NOTICE OF ACCEPTANCE OF SEC. 8 & 9 - E-MAILED | |
| Jul. 08, 2016 | REGISTERED AND RENEWED (SECOND RENEWAL - 10 YRS) | 75461 |
| Jul. 08, 2016 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | 75461 |
| Jul. 08, 2016 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 75461 |
| Apr. 26, 2016 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Apr. 26, 2016 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Apr. 18, 2016 | TEAS SECTION 8 & 9 RECEIVED | |
| Apr. 15, 2016 | COURTESY REMINDER - SEC. 8 (10-YR)/SEC. 9 E-MAILED | |
| Jan. 11, 2016 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Mar. 11, 2015 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | 88888 |
| Mar. 11, 2015 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |

| Mar. 11, 2015 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Mar. 11, 2015 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Feb. 05, 2009 | WITHDRAWAL OF ATTORNEY GRANTED | |
| Feb. 05, 2009 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED | |
| Apr. 06, 2007 | REGISTERED AND RENEWED (FIRST RENEWAL - 10 YRS) | 61619 |
| Apr. 06, 2007 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | |
| Jan. 29, 2007 | REGISTERED - COMBINED SECTION 8 (10-YR) & SEC. 9 FILED | |
| Jan. 29, 2007 | TEAS SECTION 8 & 9 RECEIVED | |
| Dec. 18, 2006 | CASE FILE IN TICRS | |
| Aug. 02, 2006 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Sep. 17, 2002 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Aug. 07, 2002 | REGISTERED - SEC. 8 (6-YR) & SEC. 15 FILED | |
| Aug. 07, 2002 | PAPER RECEIVED | |
| Apr. 15, 1997 | REGISTERED-PRINCIPAL REGISTER | |
| Jan. 21, 1997 | PUBLISHED FOR OPPOSITION | |
| Dec. 20, 1996 | NOTICE OF PUBLICATION | |
| Sep. 26, 1996 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Sep. 20, 1996 | EXAMINER'S AMENDMENT MAILED | |
| Sep. 03, 1996 | ASSIGNED TO EXAMINER | 69923 |
| Aug. 01, 1996 | ASSIGNED TO EXAMINER | 69222 |

## TM Staff and Location Information

| TM Staff Information - None | |
| File Location | |
| **Current Location:** GENERIC WEB UPDATE | **Date in Location:** Jul. 08, 2016 |

## Assignment Abstract Of Title Information

| Summary | |
| **Total Assignments:** 5 | **Registrant:** CLARK, JONATHAN |

### Assignment 1 of 5

| **Conveyance:** | ASSIGNS THE ENTIRE INTEREST | |
| **Reel/Frame:** | 3357/0920 | **Pages:** 4 |
| **Date Recorded:** | Jul. 31, 2006 | |
| **Supporting Documents:** | assignment-tm-3357-0920.pdf | |

| Assignor | |
| **Name:** JON CLARK | **Execution Date:** Jul. 26, 2006 |
| **Legal Entity Type:** INDIVIDUAL | **Citizenship:** UNITED STATES |

| Assignee | |
| **Name:** BAKER MILLS, INC. | |
| **Legal Entity Type:** CORPORATION | **State or Country Where Organized:** UTAH |
| **Address:** P.O. BOX 521938 4104 S POWERS CIR SALT LAKE CITY, UTAH 84124 | |

| Correspondent | |
| **Correspondent Name:** | RANDALL B. BATEMAN |
| **Correspondent Address:** | P.O. BOX 1319 8 EAST BROADWAY, SUITE 550 SALT LAKE CITY, UT 84110 |

| Domestic Representative - Not Found |

### Assignment 2 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | ASSIGNS THE ENTIRE INTEREST | | |
| **Reel/Frame:** | 6076/0196 | **Pages:** | 4 |
| **Date Recorded:** | Jun. 02, 2017 | | |
| **Supporting Documents:** | assignment-tm-6076-0196.pdf | | |

| Assignor | | | |
|---|---|---|---|
| **Name:** | BAKER MILLS, INC. | **Execution Date:** | May 25, 2017 |
| **Legal Entity Type:** | CORPORATION | **State or Country Where Organized:** | UTAH |

| Assignee | | | |
|---|---|---|---|
| **Name:** | KODIAK CAKES, LLC | | |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** | DELAWARE |
| **Address:** | 3247 SANTA FE ROAD PARK CITY, UTAH 84098 | | |

| Correspondent | | | |
|---|---|---|---|
| **Correspondent Name:** | NICHOLAS D WELLS | | |
| **Correspondent Address:** | 330 N. MAIN ST. KAYSVILLE, UT 84037 | | |

**Domestic Representative - Not Found**

### Assignment 3 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | SECURITY AGREEMENT | | |
| **Reel/Frame:** | 6445/0638 | **Pages:** | 11 |
| **Date Recorded:** | Sep. 27, 2018 | | |
| **Supporting Documents:** | assignment-tm-6445-0638.pdf | | |

| Assignor | | | |
|---|---|---|---|
| **Name:** | KODIAK CAKES, LLC | **Execution Date:** | Sep. 27, 2018 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** | DELAWARE |

| Assignee | | | |
|---|---|---|---|
| **Name:** | ACF FINCO I LP | | |
| **Legal Entity Type:** | LIMITED PARTNERSHIP | **State or Country Where Organized:** | DELAWARE |
| **Address:** | 560 WHITE PLAINS ROAD, SUITE 400 TARRYTOWN, NEW YORK 10591 | | |

| Correspondent | | | |
|---|---|---|---|
| **Correspondent Name:** | JAMES MURRAY | | |
| **Correspondent Address:** | 4400 EASTON COMMONS WAY, SUITE 125 COLUMBUS, OH 43219 | | |

**Domestic Representative - Not Found**

### Assignment 4 of 5

| | | | |
|---|---|---|---|
| **Conveyance:** | SECURITY INTEREST | | |
| **Reel/Frame:** | 7344/0934 | **Pages:** | 10 |
| **Date Recorded:** | Jul. 02, 2021 | | |
| **Supporting Documents:** | assignment-tm-7344-0934.pdf | | |

| Assignor | | | |
|---|---|---|---|
| **Name:** | KODIAK CAKES, LLC | **Execution Date:** | Jun. 30, 2021 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** | DELAWARE |

| Assignee | | | |
|---|---|---|---|

| | |
|---|---|
| **Name:** | GOLUB CAPITAL LLC, AS COLLATERAL AGENT |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY |
| **State or Country Where Organized:** | DELAWARE |
| **Address:** | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166 |

### Correspondent

| | |
|---|---|
| **Correspondent Name:** | LATHAM & WATKINS LLP C/O ANGELA M. AMARU |
| **Correspondent Address:** | 1271 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020 |

### Domestic Representative - Not Found

### Assignment 5 of 5

| | |
|---|---|
| **Conveyance:** | RELEASE OF SECURITY INTEREST RECORDED AT REEL FRAME 6445/0638 |
| **Reel/Frame:** | 7347/0668 |
| **Pages:** | 7 |
| **Date Recorded:** | Jul. 07, 2021 |
| **Supporting Documents:** | assignment-tm-7347-0668.pdf |

### Assignor

| | |
|---|---|
| **Name:** | ACF FINCO I LP |
| **Execution Date:** | Jun. 30, 2021 |
| **Legal Entity Type:** | LIMITED PARTNERSHIP |
| **State or Country Where Organized:** | DELAWARE |

### Assignee

| | |
|---|---|
| **Name:** | KODIAK CAKES, LLC |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY |
| **State or Country Where Organized:** | DELAWARE |
| **Address:** | PO BOX 980992<br>PARK CITY, UTAH 84098 |

### Correspondent

| | |
|---|---|
| **Correspondent Name:** | ROB SONESON |
| **Correspondent Address:** | 300 N LASALLE<br>KIRKLAND & ELLIS LLP<br>CHICAGO, IL 60654 |

### Domestic Representative - Not Found

# Proceedings

### Summary

| | |
|---|---|
| **Number of Proceedings:** | 1 |

### Type of Proceeding: Opposition

| | | | |
|---|---|---|---|
| **Proceeding Number:** | 91264186 | **Filing Date:** | Aug 12, 2020 |
| **Status:** | Suspended | **Status Date:** | Jul 13, 2021 |
| **Interlocutory Attorney:** | MARY B MYLES | | |

### Defendant

| | |
|---|---|
| **Name:** | JRM NutraSciences, LLC |
| **Correspondent Address:** | HANI SAYED<br>RUTAN & TUCKER LLP<br>611 ANTON BLVD, SUITE 1400<br>COSTA MESA CA UNITED STATES , 92626 |
| **Correspondent e-mail:** | trademarks@rutan.com , lherman@rutan.com , lweiland@rutan.com |

### Associated marks

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|

| KODIAK SPORTS NUTRITION | Abandoned - After Inter-Partes Decision | 86911351 |
|---|---|---|

**Plaintiff(s)**

**Name:** Kodiak Cakes, LLC

**Correspondent** NICHOLAS D WELLS
**Address:** LEGENDS LAW GROUP PLLC
330 MAIN ST
KAYSVILLE UT UNITED STATES , 84037

**Correspondent e-mail:** nwells@legendslaw.com

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| KODIAK CAKES | REGISTERED AND RENEWED | 75031624 | 2052194 |
| KODIAK | Notice of Allowance - Issued | 88407044 | |
| 100% WHOLE GRAINS KODIAK CAKES PARK CITY | Registered | 87461577 | 5471172 |
| KODIAK SYRUP | Section 8 and 15 - Accepted and Acknowledged | 85965209 | 4509684 |
| KODIAK PARK CITY | Registered | 88404012 | 6639628 |
| SUPER FRUIT SYRUP PARK KODIAK CAKES CITY | Registered | 87606972 | 5458224 |
| BAKER MILLS KODIAK CAKES 100% WHOLE GRAINS | REGISTERED AND RENEWED | 74608371 | 1992074 |
| 100% WHOLE GRAINS KODIAK PARK CITY | Registered | 88404043 | 6639629 |
| KODIAK CAKES | Notice of Allowance - Issued | 88406991 | |
| KODIAK | Registered | 88403983 | 6441657 |

**Prosecution History**

| Entry Number | History Text | Date | Due Date |
|---|---|---|---|
| 8 | RESPONSE DUE 30 DAYS (DUE DATE) | Jul 13, 2022 | Aug 12, 2022 |
| 7 | SUSP PEND DISP OF CIVIL ACTION | Jul 13, 2021 | |
| 6 | D OPP/RESP TO MOTION | Jun 07, 2021 | |
| 5 | P MOT TO SUSP PEND DISP CIV ACTION | May 18, 2021 | |
| 4 | ANSWER | Sep 21, 2020 | |
| 3 | INSTITUTED | Aug 12, 2020 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | Aug 12, 2020 | Sep 21, 2020 |
| 1 | FILED AND FEE | Aug 12, 2020 | |