THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| KODIAK CAKES, LLC, a Utah limited liability corporation;<br><br>Plaintiff,<br><br>v.<br><br>JRM NUTRASCIENCES, LLC, a New York limited liability corporation, MUSCLE SPORTS PRODUCTS, LLC, a New York limited liability corporation, and JASON MANCUSO, an individual;<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [93] DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID FRANKLYN**<br><br>Case No. 2:20-cv-00581-DBB-JCB<br><br>District Judge David Barlow<br><br>Magistrate Judge Jared C. Bennett |

Before the court is Defendants JRM Nutrasciences, LLC, Muscle Sports Products, LLC, and Jason Mancuso's (collectively, "Defendants") Motion to Exclude the Expert Testimony of David Franklyn.[1] Defendants seek to exclude Plaintiff Kodiak Cakes, LLC's expert David Franklyn's testimony and report, arguing that this evidence is barred under Federal Rules of Evidence 104, 403, and 702. For the reasons that follow, the court denies Defendants' Motion to Exclude.

## BACKGROUND

Kodiak Cakes, LLC, is a Park City, Utah company that sells "health-focused, high-protein, nutritious food products."[2] Kodiak Cakes was founded in 1994 and began selling pancake, muffin, and baking mixes in November 1995.[3]

---

[1] ECF No. 93, filed July 19, 2022.
[2] First Am. Compl. ¶¶ 1, 10, ECF No. 28, filed January 28, 2021.
[3] Dec. Joel Clark ¶ 8, Ex. D, ECF No. 97-1.

By 2014, national retailers such as Target, Costco, Kroger, Sam's Club, and UNFI were selling Kodiak Cakes' products.[4] That year, Kodiak Cakes launched its "Protein Power Cakes" products: pancake and waffle baking mixes with added protein.[5] The Power Cakes were a "runaway success with consumers" and quickly became the top-selling pancake mix at Target.[6]

Today, Kodiak Cakes sells a variety of grain-based breakfast and baking mixes, snacks, and frozen, ready-to-eat breakfast items, including pancakes, waffles, muffins, oatmeal, granola bars, baking mixes, and more.[7] Most of its products contain added protein.[8] Kodiak Cakes' protein-containing products have developed a following among health, fitness, and exercise conscious consumers, and Kodiak Cakes has several successful partnerships with professional athletes who use its products.[9]

Kodiak Cakes' products are now sold in many national retailers, including Costco, Kroger, and Walmart, as well as many regional retail and grocery chains in all regions of the United States and Canada.[10] It is currently the second bestselling pancake mix brand in the United States by dollar sales.[11]

In August 2020, Kodiak Cakes initiated this lawsuit against JRM Nutrasciences, LLC, Muscle Sports Products, LLC, and Jason Mancuso, alleging trademark infringement and unfair competition.[12] Mr. Mancuso is the owner and sole member of both Muscle Sports Products, LLC ("Muscle Sports"), and JRM Nutrasciences, LLC ("JRM").[13] Muscle Sports markets and sells

---

[4] *Id.* at ¶ 23.
[5] *Id.* at ¶ 18.
[6] *Id.* at ¶ 22.
[7] *Id.* at ¶ 4.
[8] *Id.*
[9] *Id.* at ¶ 30.
[10] *Id.* at ¶ 23.
[11] *Id.* at ¶ 27.
[12] Compl., ECF No. 2, filed Aug. 12, 2020.
[13] Mancuso Resp. to Pl.'s First Set of Disc. Req. 3, Ex. L, ECF No. 97-1.

products under the mark KODIAK SPORTS NUTRITION.[14] These products include nutritional supplements such as protein power.[15] JRM owns the trademark application and other intellectual property for KODIAK SPORTS NUTRITION.[16] Defendants have been selling their KODIAK-branded products since May 27, 2016,[17] and JRM applied for the KODIAK SPORTS NUTRITION trademark on February 17, 2016.[18]

As part of its litigation strategy, Kodiak Cakes hired David Joel Franklyn to "assess, using standard and generally accepted statistical and consumer market survey methods, the level of confusion, if any, stemming from the usage of the KODIAK mark by" Defendants. [19] Mr. Franklyn is a professor of intellectual property law at Arizona State University's Sandra Day O'Connor College of Law and the executive director of the McCarthy Institute,[20] a center that "sits at the intersection of trademark law, marketing, technology, and consumer behavior."[21] He was formerly a professor of business, marketing, and advertising at Golden Gate University and a director of the Center for Empirical Study of Consumer Perceptions between July 2018 and June 2021.[22] From 2000 to 2018, he was a professor of intellectual property law, a director for the Thomas McCarthy Institute for IP & Technology Law, and a director of the Center for Empirical Study of Trademark Law at the University of San Francisco School of Law.[23] He has a juris doctorate from the University of Michigan Law School and is admitted to practice in

---

[14] Muscle Sports' Resp. to Pl.'s First Set of Disc. Req. 4, Ex. H, ECF No. 93-5.
[15] Muscle Sports' Dep. 35:25–36:6, Ex. I, ECF No. 97-1; Muscle Sports' Product List 4, Ex. J, ECF No. 97-1.
[16] JRM's Resp. to Pl.'s First Set of Interrogs. 5, 8, Ex. K, ECF No. 97-1.
[17] JRM's Resp. to Pl.'s Second Set of Interrogs. 4–5, Ex. N, ECF No. 97-1.
[18] Jason Mancuso Dep. 66:18–67:16, Ex. O, ECF No. 97-1.
[19] Expert Report of David Franklyn Regarding Level of Confusion Between Kodiak Sports Nutrition and Kodiak Cakes 5, Ex. 1, ECF No. 93-1 [hereinafter Expert Report].
[20] David J. Franklyn Curriculum Vitae 1, Ex. 2, ECF No. 93-2 [hereinafter Franklyn C.V.].
[21] *The McCarthy Institute*, ASU: Sandra Day O'Conner College of Law, https://law.asu.edu/centers/mccarthy-institute (last visited November 30, 2022).
[22] Franklyn C.V. 1.
[23] *Id.*

California and Illinois.[24] He has published numerous articles on trademarks in law reviews and other academic journals since 1998, and he has organized and presented at trademark-related conferences since 1999.[25] Mr. Franklyn also works as a consultant, serving as a trademark and empirical survey expert.[26] He has done this since 2000,[27] conducting over 100 surveys.[28] He designed his first survey in 2002 based on his experience in trademark litigation and his study of accepted methodologies in trademark law.[29] He describes himself as "largely self-taught," but he "collaborated academically and professionally with other people who had done survey work along the way."[30] He is not aware of any type of license or certification for an individual to be a survey designer.[31]

Mr. Franklyn conducted four surveys for Kodiak Cakes: two *Squirt*/Modified Lineup surveys, an *Evereadv* survey, and a brand recognition survey.[32] The surveys were designed to capture "the level of confusion, if any, from the usage of the KODIAK mark by JRM Nutrasciences and/or its licenses including Muscle Sports."[33] He ran all four surveys twice: once in July 2021 and again in September 2021.[34]

Mr. Franklyn used Lucid to procure the consumers who participated in the surveys.[35] Lucid "offers the world's largest pool of global consumers and is highly regarded as a reputable source of consumers for online surveys within the field of market research."[36]

---

[24] *Id.*
[25] *Id.* at 2–3.
[26] *Id.* at 3.
[27] *Id.*
[28] Franklyn Dep. 14:7–14:11, ECF No. 93-3.
[29] Franklyn Dep. 20:10–20:20.
[30] Franklyn Dep. 20:23–21:5.
[31] Franklyn Dep. 21:12–21:15.
[32] Franklyn Dep. 34:19–36:2.
[33] Expert Report 5.
[34] Franklyn Dep. 58:7–59:2.
[35] Expert Report 27.
[36] *Id.*

The survey implemented double-blind conditions, so consumers were not informed as to the purpose or sponsorship of the study, and no person administering the survey could influence the results.[37]

Mr. Franklyn directed Halsted Strategy Group, "a leading market research company with expertise in online survey design, programming, and data collection and processing" on the construction of the online surveys' questionnaires.[38] Halsted Strategy Group staff and Mr. Franklyn tested the programmed surveys prior to inviting potential consumers to participate.[39]

The surveys employed several quality control metrics including CAPTCHA and a quality assurance question.[40] Survey takers who failed either were immediately terminated from the survey or removed prior to analysis.[41] Survey takers were then given detailed instructions and asked to indicate whether they understood the instructions.[42] Participants were prevented from taking the survey on a mobile device to ensure they had a clear view of the stimuli.[43] Prior to analysis, any survey takers who entered gibberish into the open-ended responses were removed, as were any survey takers who took any survey in less than half the median survey completion time or longer than four times the median survey completion time.[44]

The survey also narrowed the universe of interest at the outset. Mr. Franklyn defined the interested universe broadly as "past or future purchasers of protein products."[45] The survey's design provided more insight into that interested universe. First, it asked survey takers for their

---

[37] *Id.*
[38] *Id.* at 28.
[39] *Id.*
[40] *Id.* at 29.
[41] *Id.* at 29–30.
[42] *Id.* at 31.
[43] *Id.*
[44] *Id.* at 31, 50, 71, 84.
[45] *Id.* at 22.

age and terminated survey takers who selected "Under 18" or "Prefer not to answer."[46] Next, it terminated survey takers who selected "I do not live in the United States" when asked in which state they currently reside.[47] Then it asked if the survey taker was in a "sensitive industry," terminating those who personally—or who lived in a household with someone—worked in market research or in advertising.[48] The remaining survey takers were then asked about their purchasing of a variety of nutritional products.[49] The options included multi-vitamins, protein powder, meal replacement alternatives, milk alternatives (nut milk, oat milk, soy milk), foods with added protein, pre- or post-workout supplements, plant-based meat alternatives, or none of the above.[50] The options were randomized.[51] If a participant indicated that they had purchased any of those products, they were asked about where they bought those products: in a physical store, from an online retailer, other, or none of the above.[52] Survey takers were then asked about their intended purchasing of the same list of products: "Within the next 12 months, are you likely to purchase any of the following types of nutritional products?"[53] They were then asked where they were likely to purchase those products.[54] Participants were only permitted to advance to the actual survey if they selected that they had purchased protein powder or foods with added protein in the past 12 months or were likely to purchase protein powder or foods with added protein in the next 12 months.[55]

---

[46] *Id.* at 23.
[47] *Id.* at 24.
[48] *Id.*
[49] *Id.*
[50] *Id.* at 25.
[51] *Id.* at 24.
[52] *Id.* at 25.
[53] *Id.* at 25–26.
[54] *Id.* at 26.
[55] *Id.*; Appendix B to Expert Report at 2, ECF No. 100-3.

At this point, survey takers were limited to persons who resided in the United States who were over 18 years old who had purchased protein powder or foods with added protein in the past 12 months or were likely to in the next 12 months. They were then randomly assigned to participate in Survey 1 (in either a test or control cell), Survey 2 (in either a test or control cell), Survey 3 (in either a test or control cell), or Survey 4.[56]

In Survey 1, Mr. Franklyn "utilized a Modified Lineup survey format."[57] After passing the screening criteria (described above), the survey takers were first asked to review six images of products with added protein presented in random order.[58] Products were placed on an image carousel and survey takers could click the arrows to toggle between products.[59] The products include Oikos Triple Zero Yogurt, Kodiak Cakes Power Cakes, Protein Pretzel Sticks, Kodiak 1Whey, Quest Peanut Butter Cups, and Modern Table Mac & Cheese.[60] The images of the products were displayed on a white background.[61]

The survey displayed an image of Kodiak 1Whey as a black (presumably plastic) canister with yellow labeling wrapped around it.[62] The "1Whey" name is large and easy to read, printed in red and white in the upper center of the yellow labeling.[63] The next largest text on the product states "MILK Chocolate" in brown and white, off to the right hand side.[64] The canister is displayed with a shrink band, a plastic casing that wraps around the cap to deter product tampering.[65] The shrink band is black, matching the canister, and it has a pattern printed on it.[66]

---

[56] Appendix B to Expert Report at 3.
[57] Expert Report 9.
[58] *Id.* at 12.
[59] *Id.*
[60] *Id.* at 17.
[61] *Id.*
[62] *Id.* at 14.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*

The pattern repeats the word "KODIAK" in yellow with a red circle and image.[67] It is difficult to discern, at least in the quality used in Mr. Franklyn's report, that the red circle and image is a bear—even when zooming in.[68] The word "KODIAK" on the shrink band is much smaller than the "1WHEY" letters, small enough to fully repeat seven times across three rows on the shrink band.[69] In the test "cell," or randomly assigned group, survey takers saw this unaltered Kodiak Sports Nutrition product, 1Whey, with the single word KODIAK mark and a bear logo on the shrink band near the top of the canister.[70] In the control cell, respondents saw an altered product with the single word KODIAK mark and bear logo removed from the shrink band on top of the canister.[71] The shrink band was instead displayed as all black, matching the canister.[72] All other stimuli were identical across the test and control cell.[73]

| Survey 1 Test Cell | Survey 1 Control Cell |
|---|---|
|  |  |

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.* at 13.
[71] *Id.* at 14.
[72] *Id.* at 15.
[73] *Id.*

Survey takers were asked to state whether they could see the images, and those who indicated that they could not were terminated from the survey.[74] To ensure the participants reviewed the images, a 30-second wait time was required before respondents could proceed with the survey.[75] The survey takers were then shown all six products and asked whether they thought that "each of these products is from a separate company" or "two or more are from the same company or are affiliated or connected in some way."[76] If the respondent indicated that they believed that two or more products were from the same company or affiliated or connected in some way, they were asked which products.[77] Specifically, the survey asked "Which products do you believe are from the same company or are affiliated or connected," while displaying images of all six products and directing the participant to select two images.[78]

---

[74] *Id.*
[75] *Id.* at 16.
[76] *Id.*
[77] *Id.*
[78] *Id.* at 17.

Survey 1

"Which products do you believe are from the same company or are affiliated or connected? Please select only two images."



The respondent was then asked "Why do you say that?"[79] The survey taker would type their rationale into a blank text box.[80] Respondents were then asked if they thought any additional products shown in the images were from the same company or were affiliated or connected in any way.[81] If they indicated yes, they were again shown the six images, asked to select the two, and then provide a rationale.[82] This process could repeat three times in addition to the first time they saw it, allowing them to indicate four relationships among the products.[83]

Survey 2 was a second Modified Lineup survey. In Survey 2, after passing the screening criteria and qualifying into the survey, respondents were asked to review six images of websites offering products with added protein.[84] As with Survey 1, the website images were placed on an image carousel and survey takers could click the arrows to toggle between products.[85] The products included Kay's Protein Pretzel Sticks, Quest Peanut Butter Cups, Kodiak Nutrition 1Whey, Kodiak Cakes Power Cakes, Modern Table Three Cheese Marconi and Cheese, and Oikos Triple Zero Nonfat Yogurt.[86] The images were screenshots of the desktop view of the websites for the products, featuring one image of the product listed and a description of the product.[87]

As with Survey 1, the survey utilized a test and control design. In the test cell, the stimuli shown for the KODIAK SPORTS NUTRITION product was an unaltered image of the website.[88] In the control cell, respondents saw an altered image of the website with the "Kodiak"

---

[79] *Id.* at 18.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* at 32.
[85] *Id.*
[86] *Id.* at 36.
[87] *Id.*
[88] *Id.* at 32–33.

mark and bear logo removed from the shrink band on the canister, the page banner, and the URL.[89] All other stimuli were identical across the test and control cell.[90] Aside from the stimuli displayed to survey participants, Survey 2 functioned in the same manner and delivered the same questions as Survey 1.[91]



| Survey 2 Test Cell |
| --- |

| Survey 2 Control Cell |
| --- |

---

[89] *Id.* at 33–34.
[90] *Id.* at 15.
[91] *Id.* at 34–50.

Survey 2

"Which products do you believe are from the same company or are affiliated or connected?
Please select only two images."

Survey 3 was an *Eveready* survey. In Survey 3, after passing the screening criteria and qualifying into the survey, respondents were asked to review an image of KODIAK SPORTS NUTRITION 1Whey protein powder.[92] Again, the survey used a test and control design.[93] In the test cell, survey participants saw the unaltered 1Whey product with the "Kodiak" mark and bear logo on the shrink band displayed on a white background.[94] In the control cell, participants saw an altered product with the "Kodiak" mark and bear logo removed from the shrink band.[95] This was the only difference between the test and control cells.[96]

| Survey 3 Test Cell | Survey 3 Control Cell |
|---|---|
|  | |

Upon being shown the 1Whey product, participants were asked whether they could see the image.[97] Those who indicated they could not were terminated from the survey immediately.[98] Those who answered that they could see the image were then shown the same image again and

---

[92] *Id.* at 51.
[93] *Id.*
[94] *Id.* at 52.
[95] *Id.* at 52–53.
[96] *Id.* at 51.
[97] *Id.* at 53.
[98] *Id.*

14

asked "What company makes or puts out this product?"[99] The participants typed their answers into a blank text box.[100] They were then asked, "Why do you say that?"[101] Again, the participants typed their answers into a blank text box.[102] Next, they were shown the same image again and asked whether they believed the product is sponsored or approved by another company, is not sponsored or approved by another company, or "I don't know or have no opinion."[103] Respondents could select one response.[104]

Respondents who indicated that they believe the product is sponsored or approved by another company were asked, "What other company do you believe sponsored or approved this product?"[105] The participants typed their answers into a blank text box.[106] They were then asked, "Why do you say that?"[107] Next, the same image would appear again.[108] All respondents were asked, "Do you believe whoever makes this product: Does not have a business affiliation or connection with another company; Has a business affiliation or connection with another company;" or "I don't know or have no opinion."[109] Participants who selected the first option, that they believed the company has a business affiliation or connection with another company, were then asked "What other company do you believe has a business affiliation or connection with whoever makes this product?"[110] The participants typed their answers into a blank text box.[111] Next, they were asked, "Why do you say that?"[112] Again, participants typed their answers

---

99 *Id.* at 54.
100 *Id.*
101 *Id.*
102 *Id.* at 54.
103 *Id.* at 55.
104 *Id.*
105 *Id.* at 55–56.
106 *Id.* at 56.
107 *Id.*
108 *Id.*
109 *Id.* at 57.
110 *Id.* at 58.
111 *Id.*
112 *Id.*

into a blank text box.[113] All participants were then shown the same image again and directed to "name any other products made by the company shown in this image."[114]

Survey 4 was a brand recognition survey. In Survey 4, after passing the screening criteria and qualifying into the survey, participants were randomly assigned one of two questions.[115] Half were asked, "When you hear the name 'Kodiak', what does it mean to you?"[116] Participants typed their answers into a blank text box.[117] The other half of participants were asked, "Do you associate the name "Kodiak" with the protein-enhanced products of one, or more than one, company?"[118] They could respond by selecting "One company"; "More than one company"; or "I do not know or have no opinion."[119] Respondents who selected either "One company" or "More than one company" were asked "Why do you say that?"[120] Participants typed their answers into a blank text box.[121] These participants were then asked, "What protein-enhanced products do you associate with the name "Kodiak"?"[122] Participants typed their answers into a blank text box.[123] Finally, all participants were asked about their awareness and relationship with a variety of brands offering protein-enhanced products.[124] The question asked, "Which of the following best describes your relationship with the following brands of protein-enhanced products?"[125] The brands listed included Modern Table, PB2, Kodiak Cakes, Oikos, Quest, and Soyrifood.[126] Respondents could select "I have never heard of this brand"; "I have heard of this

---

[113] *Id.*
[114] *Id.* at 59.
[115] *Id.* at 72.
[116] *Id.*
[117] *Id.*
[118] *Id.* at 73.
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.* at 74.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*

brand, but I'm not very familiar with them"; "I am familiar with this brand, but never considered purchasing products from them"; "I have considered purchasing products from this brand in the past"; or "I have purchased products from this brand in the past."[127]

After each survey (Survey 1, 2, 3, 4, both test and control cells), respondents were asked if they were aware of Kodiak Cakes prior to taking the survey.[128] They were then asked if they were aware of Kodiak Nutrition prior to taking the survey.[129] If they answered yes, they were asked what products Kodiak Nutrition makes or sells with an open-ended text box into which to type their answer.[130] Next, they were asked if prior to taking the survey they were aware of KODIAK SPORTS NUTRITION.[131] If they answered yes, they were asked what products KODIAK SPORTS NUTRITION makes or sells with an open-ended text box into which to type their answer.[132]

In Mr. Franklyn's discussion of survey results, he described Survey 1 as showing "a significant percentage of consumers are confused as to the relationship between the brands."[133] Survey 1 was the *Squirt*/Modified Lineup survey involving images of six products with added protein. Five hundred thirty-two people who qualified for the survey participated in Survey 1.[134] Two hundred sixty-eight were in the test cell, and 264 were in the control cell.[135] Mr. Franklyn pointed to the 12% difference between the test and control cell for the question "Do you think that each of these products is from a separate company, or do you think that two or more are

---

[127] *Id.*
[128] *Id.* at 20, 59–60.
[129] *Id.* at 21, 60.
[130] *Id.* at 21, 60–61.
[131] *Id.* at 21, 61.
[132] *Id.* at 22, 61–62.
[133] *Id.* at 85.
[134] *Id.* at 87.
[135] *Id.*

from the same company or are affiliated or connected in any way?"[136] In the test cell—the one in which participants were shown the authentic images of 1Whey—34% of participants indicated two or more products were from the same (or affiliated or connected) company.[137] In the control cell—the one in which participants were shown the altered images of 1Whey that removed the "Kodiak" mark and bear logo—22% of participants indicated two or more products were from the same (or affiliated or connected) company.[138] This represents a 12% difference. For the participants who indicated that two or more products were from the same (or affiliated or connected) company—34% in the test cell and 22% in the control cell—they were then asked to select which products they believed were from the same company or affiliated or connected.[139] In the test cell, 19% of its participants selected the Kodiak Cakes product and the KODIAK SPORTS NUTRITION product.[140] In the control cell, only 2.3% did the same.[141] After controlling for noise, Mr. Franklyn determined there was a 17.5% level of confusion.[142] Mr. Franklyn then reviewed the text responses to the question asking the participants to provide a rationale for why they thought two products were related.[143] In the test cell, where 19% indicated a relationship between Kodiak Cakes and KODIAK SPORTS NUTRITION's products, 52 out of 53 respondents explained that they thought the two products were related because of the presence of the word "Kodiak" on both products.[144] In the control cell, no respondent explicitly said "Kodiak" as a reason for believing there was a relationship between the products.[145] Mr.

---

[136] *Id.* at 86.
[137] *Id.*
[138] *Id.*
[139] *Id.* at 87.
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.* at 88–90.
[144] *Id.* at 90.
[145] *Id.*

Franklyn interpreted this as proving that "nearly all of the confusion between the products is directly linked to the single-word KODIAK mark on the KODIAK SPORTS NUTRITION product packaging."[146]

For Survey 2, Mr. Franklyn again found that "a significant percentage of consumers are confused as to the relationship between the KODIAK brands of these two companies."[147] Survey 2 was the second *Squirt*/Modified Lineup survey involving six images of website screenshots featuring the products with added protein. Five hundred thirty-eight people who qualified for the survey participated in Survey 2.[148] Two hundred seventy-four were in the test cell and 264 were in the control cell.[149] When asked "Do you think that each of these products is from a separate company, or do you think that two or more are from the same company or are affiliated or connected in any way," 37% of test cell participants and 16% of control cell participants responded "I believe that two or more products are from the same company or are affiliated/connected."[150] Mr. Franklyn described this discrepancy between cells—21%—as "significant."[151] Again, participants were then asked to select which products they thought were related.[152] In the test cell, 19.7% of all test cell participants selected Kodiak Cakes and KODIAK SPORTS NUTRITION.[153] In the control cell, 0% did.[154] Mr. Franklyn found a 19.7% level of confusion, which again he described as "significant."[155] Reviewing the participants' rationales behind their selection, Mr. Franklyn found that 48 of the 54 participants who indicated a

---

[146] *Id.* at 91.
[147] *Id.*
[148] *Id.* at 92.
[149] *Id.*
[150] *Id.*
[151] *Id.* at 93.
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.* at 94.

relationship between Kodiak Cakes and KODIAK SPORTS NUTRITION did so because of the
Kodiak name or mark.[156] In conclusion, he found that the survey proved "that nearly all of the
confusion between the product websites is directly linked to the inclusion of the single-word
KODIAK mark and bear logo on the KODIAK SPORTS NUTRITION protein product
packaging, the stylized KODIAK mark, and the presence of 'Kodiak' in the website URL."[157]

　　　For Survey 3, Mr. Franklyn found that "a significant percentage of consumers
definitively link the product with products commonly sold by Kodiak Cakes, LLC."[158] Survey 3
was the *Eveready* survey. Five hundred thirty-one people who qualified for the survey
participated in Survey 3.[159] Two hundred sixty-eight of them were assigned to a test cell and 263
were assigned to a control cell.[160] When asked, "What company makes or puts out this product,"
77% of respondents in the test cell—shown the unaltered image of KODIAK SPORTS
NUTRITION's 1Whey product—responded "Kodiak."[161] Only 1% of respondents in the control
cell—shown the altered image without the Kodiak mark on the shrink band—did the same.[162]
When asked what other products were made by the company shown in the image, 38 directly
referenced products by Kodiak Cakes, LLC,[163] representing 14.2% of total test cell
participants.[164]

　　　For Survey 4, Mr. Franklyn found that "Kodiak Cakes has created a strong connection
between the single-word KODIAK brand and protein products in the minds of consumers."[165]

---

[156] *Id.* at 97–98.
[157] *Id.* at 98.
[158] *Id.*
[159] *Id.* at 99.
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] *Id.* at 100.
[164] *Id.* at 102.
[165] *Id.* at 103.

Ten percent of respondents said that Kodiak meant "protein/pancakes" to them.[166] For the other half of participants who were asked "Do you associate the name 'Kodiak' with the protein-enhanced products of one, or more than one, company," 44% responded "One company" and 53% responded "I do not know or have no opinion."[167] For the 47% of participants who did not select "I do not know or have no opinion," 40 respondents referenced products made by "Kodiak" or "Kodiak Cakes" when asked "What protein-enhanced products do you associate with the name 'Kodiak?'"[168] This represented 31% of the total survey takers in this half of Survey 4. One respondent, representing 0.8% of the total survey takers, indicated that "Kodiak" was related to a single company connected to the 1Whey product.[169]

In conclusion, Mr. Franklyn found that "it is clear that the combination of JRM Nutrasciences, LLC's use of the single-word KODIAK mark and bear logo on its KODIAK SPORT NUTRITION protein product has created a significant level of consumer confusion within the interested universe."[170]

Mr. Franklyn's report is dated November 1, 2021.[171] For his report, he considered Kodiak Cake's complaint, reviewed Kodiak Cake's website and KODIAK SPORTS NUTRITION's websites,[172] and talked to his son and his son's friends who "lift weights and buy protein enhanced pancake mix and protein enhanced supplements."[173] He also talked to Kodiak Cakes' counsel, who informed him that Kodiak Cakes are typically consumed by younger adult males between the ages of 18 and 35.[174] In April 2021, Muscle Sports had returned its responses to

---

[166] *Id.* at 104–105.
[167] *Id.* at 105.
[168] *Id.* at 106.
[169] *Id.* at 108.
[170] *Id.*
[171] *Id.* at 1.
[172] Appendix E to Expert Report, ECF No. 93-1.
[173] Franklyn Dep. 72:17–72:21.
[174] *Id.* at 74:24–76:2.

Plaintiff's first set of discovery requests.[175] It informed Plaintiff that its target demographic market "is 18-35 year old males and females located anywhere on the third rock from the sun."[176] Later that year, on September 23, 2021, Plaintiff's counsel deposed Mr. Mancuso.[177] In response to a question about Kodiak Cakes' target market demographics, Mr. Mancuso said, "they don't appear to go after the fitness or body builders like we do."[178]

On July 19, 2022, Defendants filed this Motion to Exclude the Expert Testimony of David Franklyn.[179] They argue that "Franklyn's opinions are based almost entirely upon speculation, the methodology is flawed, he ignores significant data, and he misinterprets the data. In addition, Franklyn fails to properly narrow the survey participants."[180] Specifically, they contend that Mr. Franklyn is "not qualified" because he has "no formal training in designing and conducting trademark surveys."[181] They also argue that Mr. Franklyn's opinions are "speculation" because he did not define the interested universe with "sources that characterize 'the methods and procedures of science,'" he had "no idea how to calculate the rate of error," "did not define terms like 'marks,' 'trademarks,' 'logos' or 'brands,'" and surveyed an overbroad universe.[182] Because of these purported flaws, Defendants seek the exclusion of the report and Mr. Franklyn's testimony under Federal Rules of Evidence 104, 403, and 702.[183]

### STANDARD

Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

---

[175] Muscle Sports Resp. to Pl.'s First Set of Disc. Req., Ex. H. to Pl.'s Mot. for Summ. J., ECF No. 97.
[176] *Id.* at 6.
[177] Mancuso Dep., Ex. 6.
[178] *Id.* at 154:5–154:6.
[179] Mot. to Exclude, ECF No. 93.
[180] *Id.* at 2.
[181] *Id.* at 5.
[182] *Id.* at 7–9.
[183] *Id.* at 2.

opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[184]

"The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence."[185]

Rule 702 "imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."[186] While the district court has "wide latitude . . . in exercising its discretion to admit or exclude expert testimony,"[187] it "must, on the record make some kind of reliability determination."[188] "By conducting a preliminary inquiry into the expert's qualifications and the admissibility of proffered evidence, a district court fulfills its initial obligation under Federal Rule of Evidence 104(a)."[189]

## DISCUSSION

I.     **Mr. Franklyn Is Qualified to Testify as an Expert on Consumer Surveys Because He Has Over Twenty Years of Skill and Experience Performing Consumer Surveys and Possesses Ample Knowledge in the Field of Consumer Surveys.**

"[A]n expert is qualified when he possesses 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and

---

[184] Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) ("Faced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").
[185] *Sinclair Wyoming Ref. Co. v. A&B Builders, Ltd.*, 2018 WL 4698781, at *2 (D. Wyo. Sept. 11, 2018) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, (1999)).
[186] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).
[187] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005).
[188] *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000).
[189] *Bitler*, 400 F.3d at 1233.

would tend to aid the trier of fact in his search for the truth.'"[190] In making this determination, courts consider the expert's occupation, the expert's education, the expert's experience in performing the services at issue, whether the expert has been published in the field, whether the expert has ever taught a course or lectured on the subject, and whether the expert has testified as an expert in similar cases.[191]

Defendants draw the court's attention to two cases for the proposition that an individual's credentials are insufficient to qualify a witness as an expert.[192] In *Ralston v. Smith & Nephew Richards, Inc.*, a product liability case, the district court precluded a witness from testifying as an expert because, although she was a board certified orthopedic surgeon, she admitted she was not an expert on the medical technique at issue (a nail implant), that she "knew little—if anything— about the subject," had "done no research" on the subject, had never been published in any matter, and had never drafted a surgical technique or warning of a product of any kind.[193] In *Broadcort Cap. Corp. v. Summa Med. Corp.*, a case involving securities, the district court refused to permit an attorney to testify as an expert when "[a]lthough [he] had some education and training in the field, he admitted that he had no experience whatsoever in representing large brokerage houses, clearing corporations, or transfer agents."[194] The attorney's "general experience and education did not qualify [him] as an expert in the securities area."[195]

Defendants also point to a district court case from Virginia, *Valador, Inc. v. HTC Corporation*, in which the court excluded a witness from testifying as an expert when he had

---

[190] *Dillon Companies, Inc. v. Hussmann Corp.*, 163 F. App'x 749, 756 (10th Cir. 2006) (quoting *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)).

[191] *See Dillon Companies, Inc.*, 163 F. App'x at 756; *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 458 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

[192] Mot. to Exclude 5.

[193] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

[194] *Broadcort Cap. Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992).

[195] *Id.*

four decades of experience as a market research consultant but had "no prior experience conducting surveys regarding likelihood of confusion involving claims of trademark infringement."[196] The court considered that the expert "admitted that he does 'not have any specific knowledge or specialty in trademark cases,'" that he did not "review any likelihood of confusion surveys from previous trademark infringement cases before conducting his own survey in this matter," had "never testified as an expert or performed work for anyone testifying as an expert in a trademark dispute or Lanham Act case," and had "never published on the topic of trademark surveys or likelihood of trademark confusion."[197] "Put simply," the court found that the proffered expert "lack[ed] the necessary experience with trademark infringement claims to pass muster under Rule 702"[198] because the plaintiff had "not demonstrated that [the witness] understands the intricacies of surveys prepared for trademark litigation or surveys testing the particular issue[ ] of ... likelihood of consumer confusion."[199]

Here, unlike in *Ralston* and *Broadcort*, Plaintiff does not rely solely on Mr. Franklyn's occupation as a law professor or his law license. And, unlike in *Valador*, Mr. Franklyn has specific expertise and knowledge in trademark cases and consumer confusion surveys. Mr. Franklyn has twenty years of experience designing consumer surveys.[200] He has conducted over 100 consumer surveys to date.[201] He has taught graduate-level courses on marketing and advertising, including a course on survey design.[202] He has an extensive record of publications and presentations on trademark law.[203] He has served as an independent consultant and expert

---

[196] *Valador, Inc.*, 242 F. Supp. 3d at 458.
[197] *Id.*
[198] *Id.* at 459.
[199] *Id.* (quoting *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 675 (E.D. Va. 2013)).
[200] Franklyn Dep. 20:10–20:11.
[201] *Id.* at 14:7–14:10.
[202] Franklyn C.V. 1; Franklyn Dep. 21:6–21:7.
[203] Franklyn C.V. 2–13.

witness in IP cases on behalf of corporations including Apple, Amazon, Crocs, Spotify,

Facebook, Raytheon, Microsoft, and Nike.[204] He believes no court has ever ruled that he is not

qualified to be an expert under Rule 702,[205] and Defendants have not identified any such case.

Given this extensive record establishing Mr. Franklyn's significant relevant experience,

knowledge, and skill in consumer surveys, the court finds Mr. Franklyn easily satisfies Rule

702's requirement that he be "qualified."

## II.   Rule 702 Does Not Require the Exclusion of Mr. Franklyn's Report or Testimony Because They Are the Product of Reliable Principles, Reliably Applied.

A qualified expert may testify about his opinions if "the testimony is based on sufficient

facts or data; the testimony is the product of reliable principles and methods; and the expert has

reliably applied the principles and methods to the facts of the case."[206] In other words, the expert

testimony must be the product of sufficient facts and reliable principles that are reliably applied

to the facts.

### A.  Consumer Confusion Surveys Use Reliable Methodology.

"To determine whether expert testimony is admissible requires a trial court to examine

'whether the reasoning or methodology underlying the testimony is scientifically valid.'"[207]

> The plaintiff need not prove that the expert is undisputably correct
> or that the expert's theory is 'generally accepted' in the scientific
> community. Instead, the plaintiff must show that the method
> employed by the expert in reaching the conclusion is scientifically
> sound and that the opinion is based on facts which sufficiently
> satisfy Rule 702's reliability requirements.[208]

---

[204] *Id.* at 4–7.
[205] Franklyn Dep. 26:18–27:1.
[206] Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 592–93.
[207] *Bitler*, 400 F.3d at 1233 (quoting *Daubert,* 509 U.S. at 592–93).
[208] *Id.* (quoting *Mitchell v. Gencorp Inc*., 165 F.3d 778, 781 (10th Cir. 1999)).

The Supreme Court, in *Daubert*, provided a list of factors for courts to consider in making this determination, including "(1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has 'general acceptance.'"[209] The Supreme Court "has made clear, however, that this list is neither definitive nor exhaustive and that a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability."[210]

"The first *Daubert* question is whether the technique can be and has been tested."[211] "Testing" is not limited to the scientific ideal, but includes testing through "court proceedings[] and other practical applications."[212] There is a long history in this circuit of courts admitting consumer confusion surveys.[213] For at least 60 years, consumer confusion surveys have been tested through the adversarial process,[214] as well as by businesses that use the surveys "in making decisions of considerable consequence."[215] This factor weighs in favor of admissibility.

"The second Daubert factor is whether the theory or process has been subject to peer review and publication."[216] Plaintiff has provided evidence that the theory and process of consumer confusion surveys is subject to extensive publication and discussion.[217] This factor weighs in favor of admissibility.

---

[209] *Id.* (citing *Daubert*, 509 U.S. at 593–94).
[210] *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 150, 152–53).
[211] *United States v. Baines*, 573 F.3d 979, 990 (10th Cir. 2009).
[212] *Id.* ("And unquestionably the technique has been subject to testing, albeit less rigorous than a scientific ideal, in the world of criminal investigation, court proceedings, and other practical applications, such as identification of victims of disasters.").
[213] *See Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 75 (10th Cir. 1958).
[214] *See id.*
[215] National Research Council, *Reference Manual on Scientific Evidence* 366 (3d ed. 2011).
[216] *Baines*, 573 F.3d at 990.
[217] *See* Franklyn C.V.

"The third Daubert factor is the known or potential error rate of the procedure."[218] Concerning surveys, "[t]he familiar 'sampling error' or 'margin of error' computation is appropriate only for a probability sample."[219] "A probability survey involves the mathematically random selection of persons from the defined universe such that each person has a known mathematical probability of being selected for questioning."[220] "This permits a statistical projection of the results to the universe as a whole, with a known degree of error."[221] Here, the consumer surveys did not permit or result in an error rate computation. This weighs against admissibility.

However, "[a] majority of the consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples"[222] because "probability sampling for trademark surveys is, generally speaking, an unrealizable ideal."[223] These nonprobability convenience samples "are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that 'results of these studies are used by major American companies in making decisions of considerable consequence.'"[224] The fact that companies widely rely on these studies weighs in favor of admissibility.

"The fourth Daubert factor is the existence and maintenance of standards controlling the technique's operation."[225] "In 1960, a judges' study group issued recommendations as to the basic criteria to be met by a consumer survey in order to be admitted and given significant

---

[218] *Baines*, 573 F.3d at 990.
[219] 6 McCarthy on Trademarks and Unfair Competition § 32:164 (5th ed.).
[220] *Id.*
[221] *Id.*
[222] National Research Council, *supra*, at 366.
[223] McCarthy, *supra*, § 32:165 (quoting Jacoby, Trademark Surveys § 6.70 (ABA 2014)).
[224] National Research Council, *supra*, at 366. It would appear that Defendants' argument that Mr. Franklyn "has no idea how to calculate the rate of error," in addition to being a misrepresentation of Mr. Franklyn's testimony, is a red herring.
[225] *Baines*, 573 F.3d at 991.

weight as evidence."[226] "These criteria, which have been widely adopted by the courts in trademark cases, may be summarized as follows: (1) the 'universe,' or total pool from which survey respondents are selected, must be found to be the appropriate target group for the purposes of the particular survey in question; (2) the representative sample drawn from the universe must be statistically valid and appropriate under the circumstances; (3) the questions to be asked of interviewees must be framed in a clear, precise, and nonleading manner; (4) sound interview procedures must be followed by competent interviewers who have no knowledge of the litigation or the purpose for which the survey is conducted; (5) the data gathered must be accurately reported; (6) the data must be analyzed in accordance with accepted statistical principles; and (7) the objectivity of the entire process must be assured."[227] Because there are established criteria, this factor weighs in favor of admissibility.

"The fifth Daubert factor is whether the technique has attained general acceptance in the relevant scientific or expert community."[228] The National Research Council has observed that "[a] routine use of surveys in federal courts occurs in Lanham Act cases, when the plaintiff alleges trademark infringement or claims that false advertising has confused or deceived consumers."[229] It notes that "[t]he pivotal legal question in such cases *virtually demands* survey research because it centers on consumer perception and memory (i.e., is the consumer likely to be confused about the source of a product . . . ?)."[230] This factor weighs in favor of admissibility. Therefore, four of the five original *Daubert* factors point clearly to the reliability and therefore admissibility of consumer confusion surveys.

---

[226] *Admissibility and weight of consumer survey in litigation under trademark opposition, trademark infringement, and false designation of origin provisions of Lanham Act*, 98 A.L.R. Fed. 20 (1990).
[227] *Id.*
[228] *Baines*, 573 F.3d at 991.
[229] National Research Council, *supra*, at 366.
[230] *Id.* (emphasis added).

29

**B. Mr. Franklyn Reliably Applied the Consumer Confusion Survey Methodology.**

Rule 702 requires the trial court to determine whether, by a preponderance of the evidence, "the expert has reliably applied the principles and methods to the facts of the case."[231]

"When determining reliability and trustworthiness of a survey, the court considers a variety of factors, including the following:"[232]

> 1. The universe was properly chosen and defined;
> 2. The sample chosen was representative of that universe;
> 3. The questions asked of the interviewees were framed in a clear, precise and nonleading manner;
> 4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted;
> 5. The data gathered were accurately reported;
> 6. The data were analyzed in accordance with accepted statistical principles; and
> 7. Objectivity of the entire process was assured.[233]

"Although methodological flaws in a confusion survey will typically affect only the survey's weight and not its admissibility, these flaws may justify exclusion under Rule 702 if they are serious and pervasive enough."[234]

*1. The universe was properly chosen and defined.*

"The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in this case."[235] Whether the surveyor desires to test forward (direct) or

---

[231] Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 592–93.

[232] *Hodgdon Powder Co. v. Alliant Techsystems, Inc*., 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (citing *Citizen Fin. Group, Inc. v. Citizens Nat'l Bank*, 2003 WL 24010950, at *1 (W.D.Pa. 2003)).

[233] 6 McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2003); 98 A.L.R. Fed. 20 (1990); *see generally* Judicial Conference Study Group on Procedure in Protracted Litigation, *Handbook of Recommended Procedures for the Trial of Protracted Cases* (1960).

[234] *1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1246 (10th Cir. 2013) (citing *Brunswick Corp. v. Spinit Reel Co*., 832 F.2d 513, 523 (10th Cir. 1987); *see id*. ("Surveys can be used as evidence of actual confusion, but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." (quoting *Universal Money Centers, Inc. v. Am. Tel. & Tel. Co*., 22 F.3d 1527, 1534 n.3 (10th Cir. 1994)); *Vail Assocs., Inc. v. Vend-Tel-Co*., 516 F.3d 853, 864 n.8 (10th Cir. 2008)).

[235] McCarthy, *supra*, § 32:159; *see Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) ("That is, the respondents to a survey 'must adequately represent the opinions which are

reverse confusion determines the universe they choose. Here, Mr. Franklyn tested forward (direct) confusion.[236]

"The classic case of direct confusion occurs when '[c]ustomers want to buy the [plaintiff's] product and because of the similarity of the marks, mistakenly buy the [defendant's] product instead.'"[237] To test forward (direct) confusion, "the proper universe to survey is composed of the potential buyers of the junior user's goods or services."[238] "A survey that provides information about a wholly irrelevant population is itself irrelevant."[239] "In most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its inadmissibility."[240]

Therefore, the proper universe to survey was potential buyers of KODIAK SPORTS NUTRITION's goods. By the date that Mr. Franklyn first administered his survey—July 2021— Defendants had informed Plaintiff that its *target* demographic market "is 18-35 year old males and females located anywhere on the third rock from the sun."[241] Defendants have never provided Plaintiff with any demographic information about its customers. Mr. Franklyn, therefore, determined the universe of potential buyers of Defendants' goods by considering

---

relevant to the litigation." (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996))).

[236] Franklyn Dep. 88:17–89:6 ("But that the case law and literature teaches that when one is doing a forward confusion survey as opposed to a reverse confusion survey, the typical target interested universe is people who have bought or are likely to buy the type of product that the defendant sells. And so I needed to collect information based on Internet research, based on conversations with counsel, and what other -- and ideally based on document productions that had been requested, to my knowledge not satisfactorily provided by your client or answered by your client, to determine to the best extent practicable under the circumstances the demographics on the types of people who buy your client's products.").

[237] *1-800 Contacts, Inc.*, 722 F.3d at 1238–39 (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:10 at 23–70 (4th ed. 2013)) (alterations in original). By contrast, "[r]everse confusion typically occurs 'when the [defendant's] advertising and promotion so swamps the [plaintiff's] reputation in the market' that 'customers purchase the [plaintiff's] goods under the mistaken impression that they are getting the goods of the [defendant].'" *Id.* at 1239 (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:10 at 23–71) (alterations in original).

[238] McCarthy, *supra*, § 32:159.

[239] National Research Council, *supra*, at 377.

[240] McCarthy, *supra*, § 32:162.

[241] Muscle Sports Resp. to Pl.'s First Set of Disc. Req. 6.

Kodiak Cake's complaint, reviewing Kodiak Cake's and Kodiak Sports Nutrition websites,[242] and talking to his college-age son and his son's friends who "lift weights and buy protein enhanced pancake mix and protein enhanced supplements."[243] Mr. Franklyn then defined the survey universe as individuals over 18 years of age who had either purchased protein powder or foods with added protein in the past 12 months or were likely to in the next 12 months.[244] Defendant criticize this universe as inappropriately overbroad, because their products are protein supplements, not "foods with added protein,"[245] and their target market is 18–35-year-olds.[246] Plaintiff argues in response that Defendants promote protein powder as an ingredient in cooked food and that a "target" market is not the same as a potential audience, for which Defendants admit persons up to 50 years old are included.[247]

Defendant's criticism seems logical: the entire survey could have consisted solely of participants who had bought or planned to buy foods with added protein—not protein supplements. These appear to be separate food product categories. KODIAK SPORTS NUTRITION protein supplements come in powder form[248] and their containers recommend mixing the dry powder with a liquid, such as water or milk.[249] The supplements are not "added protein product[s]," they are high protein products that can be added to other foods.[250] While Defendants have promoted their protein supplements as an ingredient in recipes, this does not make the goods they sell—high protein, powder supplements—"foods with added protein."

---

[242] Appendix E to Report.
[243] Franklyn Dep. 72:17–72:21.
[244] Expert Report 26; Appendix B to Report at 2.
[245] Reply 9.
[246] Mot. to Exclude 9.
[247] Opp'n 8, ECF No. 100 (citing Helton Dep. 125:9–126:17 (discussing social media promotions involving recipes "using the Kodiak protein as an ingredient to help make in this case a dessert")); *id.* at 8 (citing Walsh Dep. 176:22–177:18).
[248] Mancuso Dep. 148:23–148:25.
[249] *Id.* at 149:1–149:4, 151:9–151:11.
[250] Walsh Dep. 154:19–154:25, Ex. I, ECF No. 97-1.; Mancuso Dep. 154:7–154:13.

Therefore, "foods with added protein" does not accurately describe KODIAK SPORTS

NUTRITION goods. But for Defendants' argument to be successful in proving Mr. Franklyn's

survey is unreliable, it must go a step further. Whether the screening question accurately

describes the Defendants' product is not the issue. The issue is whether the "survey is composed

of the *potential buyers* of the junior user's goods or services."[251] Therefore, Mr. Franklyn's

survey is only surveying the improper universe if consumers of foods with added protein are not

potential buyers of Defendants' goods.

Here, it is useful to consider the similarities of the products, especially the market they

target. Both Plaintiff's and Defendants' products are products intended for consumption, have

protein as an ingredient, focus their promotional efforts on that ingredient, and are sold in

powder form. Notably, had the survey screened for whether the potential participant had or

intended to purchase *protein products*, rather than specifying "foods with added protein" and

"protein supplements," the screened participants would have remained consistent—but the hook

for Defendants' argument would have disappeared. Therefore, the propriety of this survey

universe turns on whether potential buyers of Defendants' goods should be defined as granularly

as Defendant proposes. Accordingly, the court considers the five district court cases Defendants

cite to support their argument.[252]

In *Weight Watchers*, the surveys' universe "was defined as women between the ages of

18 and 55 who have purchased frozen food entrees in the past six months and who have tried to

lose weight through diet and/or exercise in the past year."[253] The court found that the universe

was too broad because it was not limited "to consumers who had purchased a diet frozen entree,

---

[251] McCarthy, *supra*, § 32:159.

[252] Mot. to Exclude 9–10; Reply 9–10, ECF No. 101.

[253] *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990).

or who had tried to lose weight through diet as opposed to exercise; therefore, some of the respondents may not have been in the market for diet food of any kind, and the study universe therefore was too broad."[254] Because of the survey's overinclusive universe and other "flaws" in the survey, the court accorded very light weight to the results.[255]

In *Weight Watchers*, the universe was broad enough to include respondents who were not in the market for diet food products of any kind. A similarly overbroad universe here would have included respondents who were not in the market for protein food products of any kind (for example, people interested in building muscle mass through exercise alone and not diet). Instead, all of Mr. Franklyn's survey participants were in the market for protein.[256] Therefore, the universe Mr. Franklyn surveyed was not problematic in the way the surveyed universe was in *Weight Watchers*.

In *Hutchinson v. Essence Communications*, the surveyed universe was African American consumers of both a specific magazine and rap music.[257] But the junior good was rap music—not the magazine[258]—meaning the proper universe was people who listen to or buy rap music.[259] The court considered whether the surveyed universe, while underinclusive because it only included rap music consumers who also bought the magazine, was nonetheless adequate.[260] However, the survey had excluded all potential white participants, meaning the universe was not reflective of

---

[254] *Id.*

[255] *Id.* at 1274.

[256] The court conceives of the possibility that not all participants were driven to consume "foods with added protein" *because* of the protein—in other words, that some participants bought "foods with added protein" but the added protein was incidental to their decision to purchase such a product and therefore those participants would *not* be potential buyers of protein powder. Still, this case is distinguishable from *Weight Watchers* because all participants had purchased or planned to purchase protein products, whereas not all the participants in *Weight Watchers* had or planned to purchase diet frozen entrees.

[257] *Hutchinson v. Essence Commc'ns, Inc.*, 769 F. Supp. 541, 559 (S.D.N.Y. 1991).

[258] *Id.*

[259] *Id.* at 560.

[260] *Id.*

consumers of the junior good—as trial testimony showed, white people also bought and listened to rap. Because the people selected for interview did not adequately represent the universe, this factor, among other flaws, led the court to conclude that "[t]he survey, while evidence of some actual confusion, is not entitled to significant weight."[261] Here, Defendants do not contend that the surveys were underinclusive or the surveyed population did not adequately reflect the defined universe. Therefore, *Hutchinson* is inapposite.

In *Paco Sport, Ltd. v. Paco Rabanne Parfums*, the court found that the survey's results were "weaken[ed]" by the survey's flawed universe.[262] There, a perfume company attempted to show consumer confusion among consumers of its product—perfume—and a junior user's product—jeans—through a survey of persons who had purchased fragrances in the past twelve months.[263] Because it excluded prospective buyers and because it improperly focused on the fragrance market rather than on the jeans or casual clothing market, the survey was entitled to less weight.[264]

Here, Mr. Franklyn's survey did not screen participants to be only those that bought Plaintiff's product. Further, unlike with fragrances and jeans, the protein supplement and the pancakes with added protein share many similarities: both are products intended for consumption, both have protein as an ingredient, both focus their promotional efforts on that ingredient, and both are in powder form. *Paco Sport* is distinguishable because it relied on a clear difference between the parties' products—jeans and fragrances—and therefore, intuitively, their potential customers, that is not present in this case.

---

[261] *Id.* at 565.
[262] *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 323 (S.D.N.Y. 2000), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000).
[263] *Id.* at 322.
[264] *Id.* at 323.

In *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc*., a clothing and consumer product company alleged that a motorcycle company was causing consumer confusion when both used the name "Big Dog" on their products.[265] In order to prove confusion, the clothing company surveyed "prospective purchasers of t-shirts and caps" at malls, half of which had a Big Dog clothing company store.[266] But because the motorcycle company was the junior user, the proper universe should have been consumers who patronize motorcycle dealerships.[267] As the survey "did not attempt to limit the survey universe to include buyers who would be likely to purchase t-shirts and hats at motorcycle dealerships," the court found that the survey's results "ha[d] essentially no probative value."[268] Similarly, in *Limited v. Macy's Merchandising Group Inc.*, the court discounted the survey when, among other flaws, the universe was not limited to consumers of the junior user's products.[269] The survey's universe was women between the ages of 16 and 35 who had shopped for clothing online or in a department store within the past year[270] even when the junior user's merchandise was sold primarily at Macy's.[271] Because it failed to limit the participants to Macy's customers, the survey's universe was overly broad.[272]

*Big Dogs* and *Limited* both featured surveys that were so overinclusive as to drown out any probative value: there was a probability that *none* of the participants were potential consumers of the junior user's products. Here, even if the survey includes only past and potential purchasers of "foods with added protein"—the senior user's goods—there is a significant likelihood that that same market will be interested in the junior user's goods: also protein-

---

[265] *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc*., 402 F. Supp. 2d 1312, 1316 (D. Kan. 2005).
[266] *Id*. at 1322.
[267] *Id*. at 1334.
[268] *Id*. at 1334.
[269] *Ltd. v. Macy's Merch. Grp. Inc*, 2016 WL 4094913, at *10 (S.D.N.Y. Aug. 2, 2016), *aff'd sub nom. Joules Ltd. v. Macy's Merch. Grp., Inc*., 695 F. App'x 633 (2d Cir. 2017).
[270] *Id*. at *5.
[271] *Id*. at *10.
[272] *Id*.

focused. The same overlap is not present in *Big Dogs* or *Limited*; at that level of generality (purchasers of t-shirts or department store shoppers), a similarly overbroad universe would be purchasers of food.

In conclusion, it is theoretically *possible* the surveyed universe did not include any current or potential purchasers of protein powder by surveying consumers of "foods with added protein." But, at a less granular level, the surveyed universe consisted solely of past or potential purchasers of protein products. Defendants' KODIAK SPORTS NUTRITION protein powder supplements are undoubtedly "protein products." Mr. Franklyn's survey universe was not improper.

2. *The sample chosen was representative of that universe.*

"[W]hen the sample is clearly not representative of the universe it is intended to reflect," the court should exclude the evidence as irrelevant.[273]

There is no suggestion that the sample Mr. Franklyn chose was not representative of the universe as he defined it. Indeed, assuming participants were truthful in their responses to the screening questions, he chose participants who were over 18, lived in the United States, and had purchased or planned to purchase protein products. This was consistent with the universe as he described it: "past or future purchasers of protein products."

3. *The questions asked of the interviewees were framed in a clear, precise, and nonleading manner.*

The survey at issue here had clear, precise, and nonleading questions. While in the deposition Mr. Franklyn was asked about his decision to ask participants about their knowledge of Kodiak Cakes and KODIAK SPORTS NUTRITION prior to the survey, all of these questions were asked at the tail end of the survey. Therefore, there was no ability for them to influence the

---

[273] *Harolds Stores, Inc.*, 82 F.3d at 1546.

participant's previous answers. Further, in response to Defendants' argument that Mr. Franklyn failed to define the terms "'marks,' 'trademarks,' 'logos' or 'brands,'" Mr. Franklyn did not use these terms in the survey, only in his report. Therefore, the lack of definition does not impact the application of the consumer confusion survey methodology.

4.   *Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted.*

Mr. Franklyn testified that he used two companies, Lucid and Halsted Strategy Group, to find participants and to create and host the survey. He noted in his report that the survey was "double-blind," meaning that the participants and software administering the survey did not have knowledge of the purpose for which the survey was conducted.

5.   *The data gathered were accurately reported.*

While the court does not have the raw data from the surveys, Plaintiffs provided Defendants with the data from the surveys and Defendants make no argument that the data is inaccurate.

6.   *The data were analyzed in accordance with accepted statistical principles.*

Mr. Franklyn's analysis utilized mainly basic functions, such as calculating percentages.

7.   *Objectivity of the entire process was assured.*

Mr. Franklyn's surveys were objective. Participants were curated by Lucid, a third party. No sponsorship information was shared with the participants. The surveys utilized widely accepted formats—Squirt, Eveready, brand recognition—and implemented test and control designs. When shown product line-ups, the survey displayed six products that shared a common attribute (here, added protein) in a randomized order. The two products at issue in this litigation

were never shown together in the absence of other products. Survey administrators could not "do anything to influence the results."[274]

In summary, all seven of these factors are present in the instant case. These surveys are admissible: Mr. Franklyn's survey applied reliable surveying methods reliably. There is no reason to limit the weight assigned to the survey or to exclude it under Rule 702.

### III.   Defendants Waived Their Rule 403 Argument Because They Did Not Adequately Brief It.

Defendants devote three sentences to their argument that Federal Rule of Evidence 403 requires Mr. Franklyn's testimony and report to be excluded as "needlessly cumulative evidence and wasteful," "irrelevant," "unfairly prejudicial," and "unhelpful."[275]

Because "[w]hen issues are not adequately briefed, they are deemed waived,"[276] the court need not consider whether Mr. Franklyn's testimony would implicate Rule 403. Defendants have not offered any real basis for this argument, and the court sees none.

### ORDER

IT IS HEREBY ORDERED that Defendants' Motion to Exclude is DENIED.

Signed November 30, 2022.

BY THE COURT

_____
David Barlow
United States District Judge

---

[274] Expert Report 47.
[275] Mot. to Exclude 10.
[276] *Petrella v. Brownback*, 787 F.3d 1242, 1260 (10th Cir. 2015).